1

1    <u>TRANSCRIBED FROM DIGITAL RECORDING</u>

2            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                     EASTERN DIVISION

4    ZHU ZHAI HOLDINGS LIMITED and        )
     PETER PUI TAK LEE,                    )
5                                          )  Case No. 20 CV 04985
                         Plaintiffs,       )
6    -vs-                                  )  Chicago, Illinois
                                           )  March 22, 2021
7    STEVEN IVANKOVICH,                    )  9:29 a.m.
                                           )
8                          Defendant.      )

9                   TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE SUSAN E. COX, MAGISTRATE JUDGE
10
     TELEPHONIC APPEARANCES:
11
     For the Plaintiffs:      MR. WILL SEARS
12                            Quinn Emanuel Urquhart & Sullivan LLP
                              865 South Figueroa Street
13                            10th Floor
                              Los Angeles, CA 90017
14                            (213) 443-3000
                              E-mail: Willsears@quinnemanuel.com
15
     For the Defendant:       MR. DARYL M. SCHUMACHER
16                            Kopecky Schumacher Rosenburg PC
                              120 N. LaSalle Street, Suite 2000
17                            Chicago, IL  60602
                              (312) 380-6556
18                            E-mail: Dschumacher@ksrp.com

19        **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
             NOTE:  USE OF A SPEAKERPHONE MAY MAKE PORTIONS
20                  UNINTELLIGIBLE AND INAUDIBLE

21   Transcriber:
                  KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
22                     Official Court Reporter
                     United States District Court
23              219 South Dearborn Street, Suite 1426
                       Chicago, Illinois  60604
24                 Telephone:  (312) 435-5569
                  Kathleen_Fennell@ilnd.uscourts.gov

25

1    (Proceedings heard in open court:)

2         THE COURTROOM DEPUTY:  Case No. 20 CV 4985, Zhu

3    versus Ivankovich.

4         THE COURT:  Good morning.  Could you please --

5         MR. SEARS:  Good morning, your Honor.

6         THE COURT:  Could you please state your names and who

7    you represent, starting with the plaintiff.

8         MR. SEARS:  Yes.  Good morning, your Honor.  This is

9    Will Sears, Quinn Emanuel, for the plaintiffs.

10        THE COURT:  Thank you.

11        MR. SCHUMACHER:  Good morning, your Honor.  Daryl

12   Schumacher on behalf of defendant Ivankovich.

13        THE COURT:  Good morning to you.

14        Okay.  I guess the state of play is the plaintiff

15   filed a motion, and then the defendant filed a response, which

16   I would strike because you're not allowed to file a response

17   until the motion is heard, but then I saw that you filed the

18   motion to withdraw that, but attached your response, and then

19   the plaintiff replied to that.

20        Do I have that straight?

21        MR. SEARS:  That's correct, your Honor.

22        MR. SCHUMACHER:  Your Honor --

23        THE COURT:  Okay.

24        Well, the whole point of hearing a motion is to kind

25   of maybe cut through some of the necessity for briefing

1    everything, so I -- I would like, if you wouldn't mind, first

2    with the plaintiff it seems to me that the major dispute

3    between the parties, and, again, I should say, I -- I really

4    didn't study the defendant's response carefully because it

5    came over the weekend, but it seemed to me from reading the

6    plaintiffs' motion that the heart of this dispute is discovery

7    of other entities besides the one that made the -- the one

8    that the plaintiff made the loan to.

9                Is that accurate?

10               MR. SEARS:  Your Honor, this is Will Sears, Quinn

11   Emanuel.

12               I think --

13               THE COURT:  Yeah.

14               MR. SEARS:  -- that is accurate.  I think there's --

15   I think that's a big part of the dispute.  I think there are

16   two other issues that are somewhat --

17               THE COURT:  Okay.

18               MR. SEARS:  -- related but a little bit distinct.

19   And those actually --

20               THE COURT:  Okay.

21               MR. SEARS:  -- if it's okay with the Court, I'd like

22   to start with those other two because I think they're actually

23   fairly straightforward --

24               THE COURT:  Sure, why don't you go ahead.

25               MR. SEARS:  Thank you.

1        So the other two issues other than the Atlas

2   organization, one is about discovery into the collateral

3   securing these loans --

4        THE COURT:  Mm-hmm.

5        MR. SEARS:  -- and the other one is about litigation

6   involving the defendant and his assets, and I'll take those in

7   turn if that's okay.

8        THE COURT:  Okay.  Sure.

9        MR. SEARS:  So regarding the collateral, and in terms

10  of the specific request, it's really Request 7 and Request 8.

11  Quite simply, these are secured loans.  A big issue in the

12  case --

13        THE COURT:  Yeah.

14        MR. SEARS:  -- is what the security was and what the

15  economic value that our clients received for what the loans

16  were.

17        It's come out over the past few months and even in

18  defendant's response at Page 5 is that they think the

19  collateral is basically worthless.  The collateral is largely

20  distributions from this entity called Overlook that the

21  defendant controls.  He's now taken the position that Overlook

22  is not making any distributions.  In other words, there's no

23  money coming out of it so the collateral, to his view, isn't

24  worth anything.

25        We think that's a huge (inaudible) the case.  If

1   that's correct, the economic bargain that our client struck

2   was much different from what they realized, and we're just

3   trying to get some basic discovery into how it came to be that

4   what was pledged as collateral really has no value now that

5   the loans are in default.

6         THE COURT:  How -- sorry -- hold on for a second.

7      (Dog barking in background.)

8         THE COURT:  Okay.  Sorry about that.

9         So what -- how long a time was it between the loan

10  being made and this acknowledgment that the collateral or your

11  discovery of the collateral that secured that loan was

12  basically worthless?  What's the timeframe we're talking

13  about?

14        MR. SEARS:  So there's two loans here, very similar

15  structures for both.  One from plaintiff ZZH, Zhu Zhai

16  Holding, one from plaintiff Lee.  The loans were made

17  respectively in late 2018, early 2019.  I don't have the

18  exact --

19     (Cross-talking.)

20        THE COURT:  That's okay.  That gives me enough.

21        Okay.  Go ahead.

22        MR. SEARS:  When we found out that the collateral was

23  nothing was really after the loans defaulted, which was this

24  summer.  Again, slightly different maturity dates, but the ZZH

25  loan matured June 15, 2020.  The Lee loan matured July 31st,

1    2020.

2           It was after that when our client sought to enforce

3    their rights that we started hearing that, well, there's been

4    no distributions from this entity.  And one of the things we

5    pleaded in our complaint is that we think that there may have

6    been things that were effectively distributions but were

7    perhaps called something else, and that those were

8    misappropriated, which would be a breach of the limited

9    guaranty agreement, but to figure out what exactly happened

10   and to what extent those were breached and if there were any

11   distributions by a different name and they were -- something

12   else was done with them, we'd really need some basic discovery

13   into the collateral.

14          THE COURT:  Okay.

15          So basically you're -- with respect to this argument,

16   you're arguing and you're contending basically that Overlook,

17   which is now essentially bust -- might be bust because of

18   misappropriations of the funds (inaudible).

19          MR. SEARS:  Kind of, although I think it's a little

20   more subtle.  It's not clear to us really whether it's bust or

21   what the deal is.

22          One thing that we learned, again, just after we filed

23   the lawsuit and was in defendant's response at Page 5, is this

24   Overlook entity apparently doesn't even have a bank account,

25   which is very concerning to us.

1          As the defendant notes, he's produced a balance sheet

2    for Overlook.  It's hard for us to understand how it has a

3    balance sheet but no bank account and how its distributions

4    were pledged as collateral if it has no account from which it

5    can make those.

6          THE COURT:  Okay.  And so what exactly are you

7    looking for?

8          MR. SEARS:  I think this would be Request 7.  We've

9    asked for --

10         THE COURT:  Uh-huh.

11         MR. SEARS:  -- all documents regarding the

12   collateral, and we give some specific examples.

13         I think on this, and really all of these requests,

14   your Honor, we're willing to be reasonable here.  We don't

15   think --

16         THE COURT:  Yeah.

17         MR. SEARS:  -- this is a million-document case.  We

18   don't want discovery to go on for years and years.

19         THE COURT:  Right.

20         MR. SEARS:  This is something where we could take --

21   we could take documents sufficient to show or we could come up

22   with a narrow set of search terms.

23         What we're concerned about is the scenario that we're

24   in now, where the defendant is selectively disclosing bits and

25   pieces of information but without a full picture.  So we see a

1    balance sheet, but we don't understand what that means because
2    there's no bank account to go with it.
3            THE COURT:  Uh-huh, uh-huh.
4            Okay.  Defendant, why don't you tell me what's wrong
5    with that idea?
6            MR. SCHUMACHER:  Thank you, your Honor.
7            THE COURT:  I think -- you challenged relevance
8    primarily as I recall, correct?
9            MR. SCHUMACHER:  That's correct, your Honor.
10           THE COURT:  Okay.
11           Why isn't this relevant?
12           MR. SCHUMACHER:  So I guess the first thing I would
13   disagree with is the conclusion that counsel made that their
14   collateral is worthless.  This portfolio has an entity called
15   Overlook Managing Member at sort of the top of the
16   organization.
17           Below Overlook are five operating entities referred
18   to as the program entities.
19           THE COURT:  Uh-huh.
20           MR. SCHUMACHER:  That's -- and then there are
21   entities below that as well.  Their collateral are
22   distribution rights from Overlook.  Simply because Overlook
23   isn't distributing assets doesn't mean the collateral is
24   worthless.  I think that's a false --
25           THE COURT:  But aren't -- okay.  But aren't you sort

1  of proving their point a little bit when you say that?  I
2  mean --

3          MR. SCHUMACHER:  Well, your Honor --

4          THE COURT:  -- you're contending one thing about
5  Outlook, and the plaintiff is contending an entirely different
6  thing, and it seems to me the only way to get to the bottom of
7  whether this -- you know, what the evidence is on these
8  allegations is to give them this information.

9          MR. SCHUMACHER:  Judge, what we've given them already
10  are bank accounts for all of the Pilgrim entities, as well as
11  the balance sheet for Overlook, which is at the top.

12          You know, I think the dispute is some of the things
13  they're looking for are deep, deep into this portfolio
14  beyond -- again, keeping in mind their collateral are just the
15  distribution rights.  They want documents about refinancing
16  and very extensive --

17          THE COURT:  Yeah, but -- but essentially they want to
18  test what you're saying --

19          MR. SCHUMACHER:  Understood.

20          THE COURT:  -- right?

21          MR. SCHUMACHER:  And I think they want to test what
22  we're saying --

23          THE COURT:  What's the problem?

24          MR. SCHUMACHER:  -- give them --

25          THE COURT:  I mean, take your word for it on that

1    particular point, it seems to me given the allegations in the

2    case, so --

3            MR. SCHUMACHER:  Judge --

4            THE COURT:  -- go ahead.  Go ahead.

5            MR. SCHUMACHER:  I'm not asking them to take my word

6    for it.  We've given them all the bank accounts and the

7    operating -- I'm sorry, and the balance sheet for the

8    top-level entity.

9            And I'm not suggesting that, you know, maybe there's

10   some additional documents they'd be entitled to, but they seem

11   to want everything for the entire portfolio and relative to

12   the -- you know, the distribution rights from the top-level

13   entity that they're entitled to, I just think it's -- it's way

14   beyond the realm of anything that could be relevant.  The

15   burden is --

16          THE COURT:  Well, that's -- I mean, I heard the

17   plaintiffs say that they were willing try to come up with some

18   way to limit this discovery to test exactly what you're

19   saying, and it seems to me from even your -- I mean, I read it

20   briefly, but even your position is that -- well, you're

21   basically sort of closing the door on that --

22          MR. SCHUMACHER:  I just think that there's --

23          THE COURT:  -- as automatically -- it's automatically

24   not relevant, and I don't agree with that premise.

25          So it seems -- really, it doesn't make sense to me.

1   But I do understand that this is -- this is a, you know, a
2   complicated series of companies, but I don't agree that it
3   should be just not negotiable in terms of relevance.  So I
4   think the best thing to do here is to have you guys talking
5   this through.

6          I don't think just saying stop is sufficient, and I
7   don't think if the balance sheet for Outlook is basically not
8   backed up by even a bank account, that suggests to me that
9   something more complicated is going on with respect to these
10  entities.

11         And I thought I read that the plaintiffs -- I guess
12  plaintiff pointed out that there was testimony, you know,
13  money kind of moved around in and among these entities, which
14  makes it more likely that there's something there.

15         I agree with you, and I think the plaintiff agrees
16  with you, that there should be limitations on this discovery,
17  and they've offered to try to negotiate that, but essentially
18  you put up a stop sign.

19         MR. SCHUMACHER:  Your Honor, my only point is I don't
20  think they get unfettered access to the entirety of this
21  portfolio --

22         THE COURT:  I don't think they're asking -- I don't
23  think they're asking for unfettered access.  I think they're
24  asking -- you know, what I'm saying is you just said no.

25         Now, you're only giving -- you're only giving

1  information concerning this particular transaction and what
2  backs it up, but that doesn't -- I mean, I think that the
3  allegations kind of go beyond that.
4          MR. SCHUMACHER:  Okay.  And just for the record,
5  there is no allegation that there was misappropriation that
6  caused Outlook to be --
7          THE COURT:  No, there was allegations that there was
8  fraud and intentional misrepresentation about --
9          MR. SCHUMACHER:  The portfolio, the inducement to the
10  loan is what they're arguing.  This is just the collateral to
11  the loan.  The fraud that counsel has alleged is fraudulent
12  inducement to a loan.
13          THE COURT:  Yeah, and what exactly would that be?
14          MR. SCHUMACHER:  I guess my point, your Honor, is
15  they're not alleging misappropriate or fraud within this
16  portfolio of companies.  They're alleging that a separate
17  loan, which is the subject of the lawsuit, they were
18  fraudulently induced into, indeed distribution rights served
19  as collateral.  That's all.
20          THE COURT:  Okay.  But --
21          MR. SCHUMACHER:  I understand your ruling though, I
22  understand --
23          THE COURT:  Well, let me ask the plaintiff, what
24  about that?  What about what he just said?
25          MR. SEARS:  Yes, your Honor.  I think we don't agree

1  with that characterization of our complaint.  I've got it open

2  in front of me, and there are --

3           THE COURT:  Yeah.

4           MR. SEARS:  -- numerous places where we've alleged

5  that he misappropriated distributions.  We say it in

6  Paragraph 6 in the preliminary statement of the complaint.

7           THE COURT:  Yeah.

8           MR. SEARS:  We say it in Paragraph (inaudible).  It's

9  repeated throughout.  In fact, one of our (inaudible) is of

10 the limited guaranties that we plead is that he

11 misappropriated distributions because under the guaranties,

12 that is one of the triggers that renders defendant liable.

13          THE COURT:  Yeah.

14          MR. SEARS:  He misappropriated distributions.  So

15 it's within the four corners of the complaint, and he didn't

16 move to dismiss it.

17          THE COURT:  All right.

18          Well, that was my sense, too, so I'm just not

19 understanding why this should be, you know, a forbidden topic.

20 I think -- you know what my feelings are, and I think you guys

21 need to, as the plaintiff actually suggested, get together and

22 figure out how to streamline this so that you're getting at

23 exactly what it is, what is relevant to these allegations

24 because I don't think they want every document from every

25 entity, every -- that's not what I -- that's not how I read

1  what they're saying.

2  But I also think that you've stymied that by just

3  sort of taking these issues, which seem very germane to what

4  the complaint says, just off the table, and you're not going

5  to do that.  That's not going to fly I guess is what I'm

6  saying.  I don't agree with that basic premise.

7  I do agree that there could be overbreadth issues and

8  they should be negotiated, and I'm going to order you to do

9  that with respect to these particular documents because I

10  don't think that negotiation has taken place.

11  Am I correct?

12  MR. SCHUMACHER:  Your Honor, we've had a telephonic

13  meet-and-confer.  The big issue was we're going to negotiate

14  search terms.  It's going to be an electronic type of review,

15  but obviously we have some significant scope issues, one of

16  which you've just resolved.

17  But once we get past, in my view, the two big issues,

18  I know counsel has identified it as three, I think we can

19  negotiate search terms if you so order.

20  THE COURT:  Okay.

21  So when you do do that, you're going to do it face to

22  face.  And what I mean by that is you're going to either have

23  a Zoom or Teams or other video platform meeting so that you

24  can talk directly to each other and get to the bottom.

25  It seems to me that's more effective than chatting on

1   the telephone and sending emails back and forth.  And,

2   frankly, my standing order requires it.  Now we can't do it

3   actually in person.  We can certainly do it via these

4   platforms.

5          Okay.  So let's get to the litigation involving

6   defendants.  What's the relevance of that, plaintiffs?

7          MR. SEARS:  Thank you, your Honor.

8          And I'm sorry, I don't mean to belabor the point, but

9   I just had one clarification on the collateral.

10         THE COURT:  Uh-huh.

11         MR. SEARS:  So Request 8 is related to the

12  collateral.  The collateral securing the Lee loan includes

13  proceeds from refinancing another loan from a third party

14  called Walker Dunlop.  I just want to confirm that the Court's

15  order applies to that, and it's subject --

16         THE COURT:  Agree.

17         MR. SEARS:  -- to a face to face -- thank you.

18         THE COURT:  Yeah, agree.

19         Really, what I want you to focus on, and I'm

20  stressing this to you, that just because I ruled it relevant

21  doesn't mean that you get everything you want.  You need to

22  get really in good faith negotiate a scope of this particular

23  material.

24         Okay.  So let's get to the litigation.

25         MR. SEARS:  Thank you.

1       So, your Honor, I think the litigation issue is as

2   follows:  Under Section 9 of both guaranty agreements, the

3   defendant made express representations that there were no

4   pending or threatened legal proceedings against him personally

5   or any of the defendant's assets that would have a material

6   adverse impact on him if adversely determined.

7       So it's an express representation.  The breach of it

8   would trigger the limited guaranties, and we know, your Honor,

9   that that representation was not true because when he signed

10  at least one of the loans -- the guaranty agreements, there

11  was already a lawsuit on file against them, which has since

12  been resolved against the defendant and he's now currently

13  facing a judgment in that case.

14      So these litigation requests really all go to that

15  issue.  We think they're clearly relevant to whether he

16  breached that express representation in the guaranty, and for

17  this one, we don't see any plausible burden objection because

18  it's essentially just a list of lawsuits involving the

19  defendant or his assets.  We'll be reasonable on the timeframe

20  we're looking for.  I don't think it can just be as of the

21  date that he signed the guaranties because the guaranties are

22  broader than that.

23      They speak in terms of threatened litigation.  They

24  could also contemplate cases in which maybe the defendant or

25  one of his entities is a plaintiff but sort of sued first for

1    some tactical reason.

2              THE COURT:  Yeah, yeah.

3              MR. SEARS:  So we're happy to work that out similar

4    to the guidance the Court provided, but we don't think a

5    categorical relevance objection or even really significant

6    narrowing of these requests is appropriate, given that it's

7    within the four corners of the guaranty.

8              THE COURT:  Remind me what your time frame was?

9              MR. SEARS:  When we asked for this, I think we asked

10   for documents and a list of the lawsuits from 2017 to the

11   present.  We'd be willing to narrow that.  Our

12   understanding --

13             THE COURT:  Yeah, I do think -- yeah, I do think you

14   do need to narrow that.

15             I understand why you can't just say, you know, on the

16   day of the -- of the closing because, you know, threatened

17   litigation is actually something that needs to be covered, and

18   you can't really do that by, you know, essentially limiting

19   the request (inaudible).

20             But I do think the timeframe is pretty narrow.  I

21   don't think 2017 to the present by any means, so I'd like you

22   to negotiate that.

23             What does the defendant think an appropriate

24   timeframe for this would be?

25             MR. SCHUMACHER:  Judge, if we're trying to capture

1   threatened and pending at the time he signed these documents,

2   which I agree is appropriate, six months before and six months

3   after would be fine.

4           Your Honor, my issue is not with what we've just

5   discussed.  I have two issues with this.  One, the guaranty,

6   where he makes the representations are with respect to himself

7   and the language "his assets" is in there.  I think what --

8   what plaintiffs have requested is a problem in two respects:

9   One, they're requesting litigation for any of the 50-plus

10  Atlas entities; and, two, they're not just requesting the

11  listing of it.  They're asking for all documents involved in

12  any case, and that --

13          THE COURT:  Well, I -- I don't mean to cut you off,

14  but that's an overbreadth issue, which should be, as I said,

15  negotiated in good faith by the parties, and that needs to

16  take place.

17          I read assets pretty broadly though.  Why wouldn't

18  the defendant's personal assets -- rather entity assets count?

19          MR. SCHUMACHER:  Well, those are -- those are

20  entities in which he has a membership interest, but --

21          THE COURT:  Well, that's an asset, is it not, by any

22  definition?  I mean, it just is.

23          Like, again, this is -- to me, this is more a scope

24  issue than a relevance.  I mean, I think -- you know, I'm not

25  faulting you.  I don't think, you know, you've -- there's been

1  a lot of discovery in this case, you know, things have been
2  turned over and so on and so forth.

3          But just basically not really negotiating this, just
4  saying it's off the table doesn't make sense to it.  Atlas is
5  a broad term, and I think it encompasses membership interests
6  in other assets or other entities, which it does.

7          Plaintiff, what do you think about the timeframe?
8          MR. SEARS:  Thank you, your Honor.

9          THE COURT:  Six months before and six after?

10          MR. SEARS:  I think that's close.  If it's okay with
11  the Court, I think what we'd like to do is think about it and
12  talk it over with Mr. Schumacher.  The six months before
13  sounds about right.

14          I guess our concern with six months after is that
15  we're already aware of lawsuits that were hitting the docket
16  and potentially even proceedings involving some of the
17  defendants' personal assets that may have come about more than
18  six months after, but for some of them and one of them we
19  identify in our Requests for Production is a lawsuit the
20  defendant initiated over a foreclosure sale of one of his
21  portfolios of properties.  Those things don't just come out of
22  the blue.  There are usually pre-default notices and
23  discussions.  I think we would --

24          THE COURT:  Yeah.

25          MR. SEARS:  -- want to make sure that whatever

1  timeframe we agree on, we're not losing emails that say we are

2  concerned you're going to default and we're going to sue you

3  for a lot of money just because it happens to be on month

4  seven.

5        THE COURT:  Mm-hmm.  Again, also, okay, that topic

6  should also be negotiated between the parties.  I can see

7  going a little beyond six months, maybe nine months.  I just

8  don't think the timeframe of 2017 to present is really -- is

9  really appropriate.

10        So, again, you can add this to your list of things to

11  do in your conference.

12        So what's the third issue?

13        MR. SEARS:  Judge, before we move on, could I get one

14  point of clarification?

15        THE COURT:  Sure.

16        MR. SCHUMACHER:  I think some guidance would be

17  helpful on, you know, identifying litigation is one thing, but

18  one piece of litigation involves, as your Honor's aware, many,

19  many, many documents.  I don't think they're necessary.  Maybe

20  the complaint is necessary, but if you can just give us some

21  guidance because I know we're going to be negotiating that.

22        THE COURT:  Well, I actually think, I actually think

23  this is more -- I mean, this is your case.  You both know more

24  about it than I do.  I don't -- I'm not going to tell you with

25  respect to, you know, all litigation, you know, what exactly

1   should be produced because it depends, and I think you guys

2   are a better -- in a better place than I am to draw those

3   kinds of distinctions.

4           And I think what happened in this case, which is

5   unfortunate, is those negotiations really didn't happen

6   because you sort of took this off the table with respect to

7   other -- you know, other entities, and now you're going to

8   have to, like, understanding that I don't think that bars this

9   discovery, you're going to have to negotiate about it.

10          And this is why I have my rule because it seems to

11  me, you know, briefing those isn't great, but you get more to

12  the bottom of this by talking, and what I think was really

13  important for me to say is that I think these relevance

14  objections are not appropriate.  What is appropriate is

15  overbreadth with respect to some of the requests.  I totally

16  see that.

17          But how that gets -- how that gets, you know,

18  resolved is really going to depend on your negotiations.

19          If at the end of your -- of your discussions you've

20  made a lot of progress but there are a few things that you

21  just need a ruling on, I'll do that.

22          But I'm not going to do it now because you haven't

23  done, in my mind, the hard work that is required to actually

24  bring this -- you know, bring this to the Court for an actual

25  ruling by sort of taking it off the table, and now you know

1   you can't do that.  So it seems to me -- and now the plaintiff

2   knows that they need to narrow, but I think the plaintiff has

3   sort of always been willing to do that, but you can't get

4   there if you just, like I say, put a stop sign on it.

5   　　　　　So what's the third issue?  I've got to move on.

6   I've got other people.

7   　　　　　MR. SEARS:  Understood, your Honor.  I'll try to be

8   brief.

9   　　　　　The third issue is the Atlas organization.  That one

10  I think is the one that's been briefed the most heavily, and I

11  think your Honor actually identified the key allegations here.

12  　　　　　We allege in Paragraph 56 of our complaint that the

13  defendant testified under oath that he's moved money between

14  his entities and has the ability to do so, and we also alleged

15  and the defendant has admitted in his answer that one of the

16  things that was shown to our client during the preloan

17  discussions was projections and decks showing asset values for

18  different entities and portfolios of properties owned by

19  different Atlas entities, and the defendants can make

20  arguments at summary judgment as to why those are or aren't

21  actionable, but because they were some of the materials given

22  to our clients and we concluded they were some of the

23  inducements for this loan, we think that discovery into the

24  financial condition of the Atlas organization generally is

25  relevant.

1      This isn't a business that observes hard-and-fast

2  corporate distinctions.  It's just not.  The whole point of

3  the transaction and the materials that were shown to our

4  clients was that there were other entities that owned other

5  assets that produced income, and that was always on the table

6  as part of the deal.

7      THE COURT:  Uh-huh.  What do you say to that,

8  defendant?

9      MR. SCHUMACHER:  Your Honor, I think there are two

10  Atlas entities involved here, which, by the way, they're not

11  suing.  They're suing the guarantor.  There are over 50 Atlas

12  entities that all are involved in real estate operations.

13      I made a proportionality argument.  I think also many

14  of the other Atlas entities that weren't a borrower, weren't a

15  guarantor, and quite frankly had no relevance to this

16  transaction are -- you know, discovery as to those entities,

17  which would be extremely burdensome, the relevance is

18  disproportionate to the value in this case.

19      THE COURT:  Well, normally I would agree with you,

20  but what your client said under oath gives me pause.

21      What do you have to say about that?

22      MR. SCHUMACHER:  I think it's taken out of context.

23  It wasn't relating to any of these entities, and what he was

24  saying was he's the managing member of many of the LLCs,

25  but --

1            THE COURT:  How was it taken out of context exactly?

2            MR. SCHUMACHER:  Because it was with respect to -- it

3  was in one case in New York with respect to one particular

4  issue.

5            THE COURT:  Plaintiff, what's your answer?

6            MR. SEARS:  Your Honor, I think that we don't agree

7  that it was taken out of context.  I'm sure that won't

8  surprise the Court.  I think --

9            THE COURT:  No, it does not.

10           MR. SEARS:  -- going back and forth -- I think going

11  back and forth over how to interpret something that the

12  defendant said under oath in another lawsuit is a summary

13  judgment Rule 56 argument, not a Rule 26 argument.

14        We've pleaded that he doesn't observe corporate

15  formalities.  We've pleaded that to induce our clients to make

16  the loans, he gave them projections about asset values for

17  properties owned by other Atlas entities and that those were

18  material and something they relied on as part of the deal.

19        He can make arguments at summary judgment as to why

20  that doesn't give rise to the claim.  For now, we think it's

21  fair game for discovery.

22        I hear the Court and defense counsel on the burden

23  issues.  Frankly, we don't want millions of documents from 50

24  different companies --

25           THE COURT:  No, I don't expect -- I'm sorry, I

1 interrupted.  I don't expect you do.  I don't know why you
2 would want them.

3       MR. SEARS:  Exactly.  I think what we want, though,
4 is in an organization where literally every entity is called
5 Atlas blank LLC, we don't want documents about the defendant's
6 financial condition or the financial condition of his
7 organization generally to get left on the cutting room floor
8 because they just say Atlas or they say --

9       THE COURT:  Right.

10       MR. SEARS:  -- your financial troubles and they
11 reference an LLC that maybe wasn't the borrower in this case;
12 but as your Honor has noted, I really think that's a search
13 term and custodians issue.  It's not a relevance issue.

14       THE COURT:  Yeah, I don't think it's a relevance
15 issue either, but I never thought of the proportionality of
16 the discovery.  And, again, that's something you have a better
17 idea about in terms of solving that problem than do I at this
18 point.

19       So, again, I need you to discuss it.  So what I would
20 like you to do is take, you know, I don't know how long you
21 need, maybe a week, maybe two weeks, to have this discussion
22 and try to resolve sort of the burden issues that are part
23 of -- and timeframe with respect to litigation that are part
24 of each of these separate issues, and what you can't agree on,
25 and I really hope it ends up being nothing, but if you can't

1   agree on it, you'll -- I would -- what I typically do
2   (inaudible) but I order the conference and then order at the
3   end of the conference you file a joint submission as to what
4   remains for the Court to resolve, and it should be fairly
5   narrow with respect to each of these.
6          So that's what I'm going to do with this.  So how
7   long do you think it will take you to have the
8   meet-and-confer?
9          MR. SCHUMACHER:  Your Honor, this is Daryl
10  Schumacher.
11         I have an appellate argument later this week, so if
12  we could make two weeks part of the suggestion.
13         THE COURT:  Yeah, okay.  That's fine.
14         So you have 14 days to have your meet-and-confer by
15  video, and then you can file (inaudible) let's say seven days,
16  and it's a joint submission, specifically defining what you
17  were not able to agree on, and -- and as I said, I would hope
18  in a good-faith negotiation, now that you've gotten something
19  from the Court, you would be able to resolve many of these
20  issues.
21         So that will be the Court's order today.  Like I
22  said, the submission should be joint, and if you want to, you
23  can say a little bit about what your position is each, but,
24  again, I hope that those will be relatively -- you won't have
25  a lot of those.

1       And if we do, then you're just going to have me make

2   a call, and that, really, I always tell people, cases like

3   that, you know the landscape a lot better than I will ever do,

4   but to some extent when you present me with, you know, these

5   kinds of issues, it's really going to be, you know, I don't

6   want to say arbitrary, but I'm just going to take my best

7   whack at it, and you're going to have to live with the

8   results.

9       So I often think what the parties can negotiate

10  themselves is more valuable.  But, again, that's the order for

11  today.  Okay, is everybody clear?  I have to move on to the

12  next case.

13      MR. SCHUMACHER:  Yes, your Honor.

14      MR. SEARS:  Yes, your Honor.  Thank you.

15      THE COURT:  All right.  Thank you very much.

16  Bye-bye.

17      (Which were all the proceedings heard.)

18                          CERTIFICATE

19      I certify that the foregoing is a correct transcript from

20  the digital recording of proceedings in the above-entitled

21  matter to the best of my ability, given the limitations of

22  using a digital-recording system.

23  */s/Kathleen M. Fennell*              *March 22, 2021*

24  Kathleen M. Fennell                    Date
    Official Court Reporter

25