IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ZHU ZHAI HOLDINGS LIMITED and | ) | |
| PETER PUI TAK LEE, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 20-cv-4985 |
| | ) | |
| STEVEN IVANKOVICH, | ) | |
| Defendant. | ) | |

## MOTION FOR TURNOVER OF FUNDS HELD BY DEBTOR IVANKOVICH, P2 PORTFOLIO MANAGEMENT, LLC, IVANKOVICH FAMILY, LLC OR, ALTERANATIVELY AN ORDER PROHIBITING TRANSFER OF FUNDS

Comes now, Zhu Zhai Holdings Limited and Peter Pui Tak Lee ("Plaintiffs"), and seeks a turnover order of funds identified as Ivankovich's, and in support, states as follows:

## INTRODUCTION

On May 31, 2022, this Court denied Steven Ivankovich ("Ivankovich"), P2 Portfolio Management LLC ('P2 LLC') and the Ivankovich Family LLC's motion to quash and dismiss citations issued to them. It also granted Plaintiffs' rule to show cause and ordered the citations be responded to by June 24, 2022. (DOC #197). In addition, this Court unfroze the accounts held at Stifel for the LLCs after finding that Plaintiffs failed to establish that those funds were Ivankovich's. In response to this Court's May 31, 2022 Order, Plaintiffs now set forth evidence that (1) Ivankovich himself has assets sufficient to satisfy the judgment and (2) the funds in the P2 and Ivankovich Family accounts are Ivankovich's funds. Ivankovich has already begun moving funds out of Stifel in an apparent attempt to prevent Plaintiffs from collecting on their judgment.[1]

---

[1] This motion is set for initial hearing on June 27, 2022. Given the relief requested, Plaintiffs submit that Ivankovich, P2 and Ivankovich Family should not be transferring any funds or assets.

Ivankovich's sworn personal financial statement shows he has a net worth well in excess of that necessary to pay the judgment. (Ex. 1, Ivankovich Personal Financial Statement).[2] These Financial Statements were produced in this case and sworn to by Ivankovich. As the Court will see, there is enough money to pay the judgment many times over. Ivankovich either made a false statement in this document or has the funds to immediately pay the judgment. These funds should be turned over to the Plaintiffs or Ivankovich should be held in contempt.

Further, in a proceeding in the Supreme Court of New York Captioned *Atlas v. Macquarie Texas Loan Holder, et.al.,* Index 651657/2017 (the "New York Case"), Ivankovich gave sworn testimony that establishes he was in ownership and control of the funds in the LLCs at issue.[3] As outlined below, he testified that cash flowed freely to and from the LLC's, the chain of ownership had plenty of assets, and that he could populate an entity with "signing of a pen and phone call in a matter of minutes." (Ex. 2, pg. 278, ln.13 – pg. 304).

At minimum, Ivankovich's testimony and the discovery evidence should allow this Court to maintain the status quo and not allow funds to be disbursed from Ivankovich, P2 LLC or the Ivankovich Family LLC until further discovery is completed.

**ARGUMENT**

**I.      Ivankovich has sufficient assets to pay the judgment and should turnover the funds or be held in contempt.**

In discovery, Ivankovich produced a personal financial statement, which he signed under oath, and which plainly shows that he has funds to satisfy the judgment. (Ex. 1). At the time Ivankovich's financials were produced he was entrenched in this litigation and should *not* have

---

[2] This exhibit is submitted *in camera* as it has been designated confidential.
[3] Notably, the issue in the New York Case was whether Ivankovich had sufficient funds to acquire property in an auction that was previously owned by his entities and foreclosed on. Ivankovich went to great lengths to show the LLCs at issue here had funds that could be transferred at a

been transferring assets. As such, the mere fact that the financial statement is from August 26, 2020 should be of no consequence—those funds should still be within Ivankovich's control, and if they are not, that strongly suggests he transferred them in an attempt to make himself judgment proof. This Court should Order the turnover of the judgment amount or hold Ivankovich in contempt of Court.

It should also be noted that within days (maybe hours) of this Court lifting the freeze on the Stifel accounts, Ivankovich's lawyers ordered the money to be transferred out. It is not yet know where the request to transfer the funds was made to. However, this is certainly further evidence that Ivankovich owns and controls the LLCs' funds. (Ex. 3, 6/9/22 Wandner Email Re: Transfer). Concerningly, it also shows that Ivankovich may be taking steps to avoid paying the judgment, which is all the more reason to grant the present motion.

## II. An Order of turnover is now warranted given there is sufficient evidence that P2 and Ivankovich Family holds funds of Ivankovich's.

In denying Plaintiff's prior motion for turnover (DOC#186), this Court found Plaintiff had not yet "sufficiently established" that the assets held were assets of judgement debtor Ivankovich. It cited *R & J Construction Supply Co. v. Adamusik*, 2017 IL App (1st) 160778, which found that there cannot be a basis for a judgment to stand against a third-party when it had no assets of the debtor and no relationship with the debtor. (*Id*. at ¶ 21). It further noted that there must be a reasonable basis or some evidence that the third party had assets of the judgment debtor. (*Id*. at ¶ 14).

Plaintiffs now have such evidence. P2 LLC and Ivankovich Family have $10,991.073 and $19,042.437.51 in assets respectively. (Ex. 2, Stifel Amended Citation Response). And there is a reasonable basis to find that P2 LLC and Ivankovich Family LLC hold assets that belong to Ivankovich. (Ex. 2, pg. 278 -304).

3

In the New York Case, Ivankovich testified that LLCs that held accounts at Stifel (which include P2 LLC and Ivankovich Family LLC) were accounts he could draw checks on and that that the Ivankovich family was 100% owners of those LLCs. (Ex. 1, pg. 137, ln. 2-10). Ivankovich testified:

Q. And what did you end up doing?

A. We started wiring the -- this was my call, what I thought would be the most efficient way to do it -- **we started wiring money to Chase where we had accounts in.** It was near the auction. Being a big money sender bank that, you know, issues cashier's checks and stuff quickly, **I had calls into the bank at Stifel telling them, look, we need to be prepared to wire money into a Chase account first thing in the morning** when you get there because we need to generate this cashier's check and went to the bank directly with our head of asset management Ravi Malli who flew in that morning early and we immediately went to the bank … But plan B would have been Stifel immediately delivering us a cashier's check.

(Ex. 2, pg. 132-133;134).

Q. Now, in terms of the Stifel accounts, some of those accounts -- whose names are those accounts in?

A. **Various sundry from family LLC to trust accounts to individual family members, my father, my mother.**

Q. **Was some of them in the names of your father?**

A. **Yes.**

Q. **And you?**

A. **Not the statements that were produced for -- during the process of this litigation but there are trust accounts that I have.**

Q. **And would those accounts had been available for Stifel could draw a check on?**

A. **Absolutely, yes.**

(Ex. 2, pg. 136-137).

…

**Q.** **Have you ever asked for funds from your father before?**

**A.** **For transactions, all the time.**

**Q.** **Has he ever turned you down?**

**A.** **Never.** Just to clarify that, even though it's a family situation, we try and run it like a company. Nobody could draw that kind of money without, you know, one or two signatures so that's just the way we set things up to go.

(Ex. 2, pg. 137).

…

**Q.** **So when you signed that certificate and said in the present tense that that company has the funds, you were relying on funds elsewhere, true?**

**A.** **We were relying on the funds in the chain of ownership of those companies.**

**Q.** **You were relying on funds that were held by the Ivankovich family, true?**

**A.** **Correct. Who are the 100 percent owners of those companies. I will remind you, counselor, those are pass-through entities so...**

(Ex. 2, pg. 278).

…

**Q.** **Is it your understanding that cash can flow freely between those entities?**

**A.** **Sure.**

**Q.** **And the control of all those entities is ultimately held by who?**

**A.** **By 80 percent myself and -- 20 percent myself and 80 percent Anthony Ivankovich.**

**Q.** **80 percent you?**

**A.** **20 percent me and 80 percent Anthony Ivankovich with me being the sole managing member.**

(Ex. 2, pg. 279).

…

**Q.** **Okay. Now, can you explain to me, sir, how it is that on October 30th, 2017 and this is about five months after -- more than five months after the closing of my client's purchase of the equity interest in the properties, how you could represent to the Court that that entity was in a strong financial condition?**

A. I take that to mean that the overall Atlas entity, which includes the Atlas principles. **We could capitalize that entity in five minutes.**

(Ex. 2, pg. 303).

…

**Q.** **How is it that your counsel could represent to this Court yesterday that that entity has no assets?**

**A.** **The specific entity doesn't, but the chain of ownership, as I said, has plenty of assets. We could populate that entity with the signing of a pen and a phone call in a matter of minutes.**

**Q.** **Is it your testimony, sir, in this Court under oath that you have the authority to move money as you see fit to that entity or away from that entity?**

**A.** **I don't have the authority, but I have the ability.**

(Ex. 2, pg. 304).

…

**Q.** **So am I right on the 27th you made an effort to make a series of transfers from those properties, LLCs into that Atlas account, JP Morgan Chase, right?**

**A.** **Those and other accounts, correct.**

(Ex. 2, pg. 308).

Ivankovich testified he had the ability to move money in and out of the LLCs accounts freely, including for his own purpose. He testified that the Ivankovich family owned 100% of the funds. (Ex. 1, pg. 278, ln. 18-20). Ivankovich went so far as to say he could populate an entity with the *signing of a pen and a phone call within a matter of minutes.* (Ex. 1, pg. 304, ln. 11-13). This was sworn testimony that he gave under oath in a case where he sought tens of

6

millions of dollars in damages. Nonetheless, now he wants this Court to believe the exact opposite of what he previously said – that the funds held in P2 LLC and Ivankovich Family LLC are not his. They were his when it was convenient for him in the New York Case – they are not his in this matter when he seeks to avoid his financial obligations.

III. **If this Court is not Inclined to Order the Turnover of Funds held in the P2 LLC and Ivankovich Family LLC accounts, then they should not be allowed to transfer funds to any other accounts from any of its accounts**

There is now sufficient evidence before this Court that the LLCs assets are those of Ivankovich. Based on Ivankovich's history of ignoring his obligations to his investors and this Court, it is likely that he will soon be transferring money that could be used to pay this judgment out of the LLCs and to any unknow account. In order to maintain the status quo, Plaintiffs request that if a turnover is not ordered that P2 LLC and the Ivankovich Family LLC be Ordered not to transfer any of the approximately $29,000,000 between the two accounts out of the LLCS. Plaintiffs further request that this Court consider setting this matter for an evidentiary hearing after the citations are answered and Ivankovich be Ordered to appear.

## CONCLUSION

WHEREFORE, Plaintiffs seek a turnover Order from this Court in an amount that will fully satisfy the judgment amount, interest and attorneys' fees, or alternatively, Order all accounts remain frozen until further discovery is completed.

Dated: June 16, 2022.                    Respectfully submitted,

                                         /s/ Amir Tahmassebi
                                         Amir Tahmassebi, Bar #6287787
                                         Konicek & Dillon, P.C.
                                         70 W. Madison, Suite 2060
                                         Chicago, IL 60602
                                         (312) 328-9166 (Direct)
                                         (630) 262-9659 (Fax)
                                         amir@konicekdillonlaw.com

Steven Lammers, Bar #6294413
Mandel Rauch & Lammers, P.C.
704 Adams Street, Suite F
Carmel, IN 46032
(317) 581-7440 (Direct)
(317) 848-6197 (Fax)
slammers@mhmrlaw.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing was filed with the Court on June 16, 2022 causing all counsel of record to be served via the Court's CM/ECF filing system.

/s/ Amir R. Tahmassebi
Amir R. Tahmassebi

# In The Matter Of:

*Atlas v.*
*Macquarie et al (FINAL)*

---

*January 13, 2020*

---

**EXHIBIT
2**

Page 129

S. Ivankovich - by Plaintiff - Direct (Meister)

1           S. Ivankovich - by Plaintiff - Direct (Meister)
2     Q. And regarding Atlas assets or Atlas principal assets,
3  you gave a series of Stifel accounts?
4     A. We initially just gave a letter from Stifel stating
5  that we had cash or American securities on hand in excess of
6  $71 million.
7     Q. What happened -- who on behalf of Stifel signed that
8  letter; if you remember?
9     A. Our banker there.
10    Q. What was his name?
11    A. David Morris.
12    Q. David Morris. And what happened? Did they accept
13 that?
14    A. It doesn't seem like it did initially, no.
15    Q. So what did you do then?
16    A. I complained to our attorneys and asked what is it. I
17 mean, I don't understand what else I could do, what else do we
18 need to do to get --
19    Q. Did you ever give bank statements from Stifel to
20 Macquarie?
21    A. We did eventually during discovery of this lawsuit, but
22 we were never asked for bank statements prior to that. If
23 somebody asked for bank statements, we would have given it to
24 them.
25    Q. Right. And how much did you have in those accounts at
26 that time at Stifel, you and your father?

Page 130

S. Ivankovich - by Plaintiff - Direct (Meister)

1           S. Ivankovich - by Plaintiff - Direct (Meister)
2     A. Well, so Stifel was our family asset manager. They
3  didn't manage stuff at Stifel but at different institutions. So
4  of the collective monies that Stifel managed for us at the time,
5  it was well over 71 million.
6     Q. Okay.
7     A. This was a family Atlas assets. This was nothing new.
8  I mean, Macquarie had underwritten us for this loan. They were
9  aware of our capability and our family collective assets prior
10 to making this loan, so it shouldn't have been a surprise to
11 them that we had the money.
12    Q. You had mentioned in your, one of your previous answers
13 that -- I think you said that there was a time when you did get
14 approved to bid finally by Macquarie; is that right?
15    A. Yes.
16    Q. And when did that happen to the best of your
17 recollection?
18    A. Late afternoon on a Sunday before the auction.
19    Q. Could you turn to 71G, please?
20    A. I'm here.
21    Q. That's an e-mail from Mr. Mennitt to Miss Rothell
22 February 26, 2017, at 4:04 p.m.?
23    A. Yes.
24    Q. That's the Sunday before the Monday auction?
25    A. Yes.
26    Q. And in the third paragraph, could you read the third

Page 131

S. Ivankovich - by Plaintiff - Direct (Meister)

1           S. Ivankovich - by Plaintiff - Direct (Meister)
2  paragraph, nonetheless?
3     A. Nonetheless the borrower is welcomed to attend the
4  auction and submit bids. Be aware that the acceptance of any
5  and all bids is conditioned upon and will be assessed in light
6  of the bidder's demonstrated ability to close at the amount
7  bid.
8     Q. Okay.
9     A. And this is February 26, 4:04 p.m.
10    Q. So this is after they had gotten the Walker and Dunlop
11 term sheet, right after Macquarie gotten the Walker and Dunlop
12 term sheet?
13    A. Yeah, after all the documentation we supplied to them.
14    Q. And after the check that -- you had given them a check
15 with expense deposit, correct?
16    A. Yes.
17    Q. After you had given them the letter from Stifel about
18 your cash assets?
19    A. Correct, and there was a letter from IIB as well
20 regarding --
21    Q. A letter from IIB and after the conversation between --
22 what was the gentleman's name?
23    A. Geoff Smith.
24    Q. Geoff Smith and was it Hayden Jones?
25    A. The only way I know who was on the other call was
26 described to me so Mr. Smith told me it was Mr. Jones and

Page 132

S. Ivankovich - by Plaintiff - Direct (Meister)

1           S. Ivankovich - by Plaintiff - Direct (Meister)
2  Mrs. Hamilton.
3     Q. Okay. There was someone from Macquarie?
4     A. Yes.
5     Q. Okay. So let's go to the next day which is the day of
6  the auction. Where are you that day? Actually, where are you
7  the evening, Sunday evening the 26th?
8     A. I was in New York that weekend. I'd stayed.
9     Q. Okay. So when did you learn about the 4:04 p.m. e-mail
10 and Macquarie's statement that Atlas was welcomed to bid?
11    A. I'm sure counsel forwarded it to me because I'm not
12 copied on it. So I'm sure it was forwarded to me very soon
13 after they received it. It would have been 5, 6 o'clock that
14 day. It wouldn't have been much later than that.
15    Q. So what did you do at that point, if anything, given
16 that you were now told that you could bid?
17    A. I started scrambling and making phone calls immediately
18 to our banks and to our treasurer and asset managers to figure
19 out to get a cashier's check to New York in the morning. I had
20 calls into all our banks to figure out what's the best and most
21 efficient way to do it.
22    Q. And what did you end up doing?
23    A. We started wiring the -- this was my call, what I
24 thought would be the most efficient way to do it -- we started
25 wiring money to Chase where we had accounts in. It was near the
26 auction. Being a big money sender bank that, you know, issues

Atlas v.
Macquarie et al (FINAL)

January 13, 2020

Page 133

S. Ivankovich - by Plaintiff - Direct (Meister)

1 cashier's checks and stuff quickly, I had calls into the bank at
2 Stifel telling them, look, we need to be prepared to wire money
3 into a Chase account first thing in the morning when you get
4 there because we need to generate this cashier's check and went
5 to the bank directly with our head of asset management Ravi
6 Malli who flew in that morning early and we immediately went to
7 the bank.
8 Q. To JP Morgan Chase?
9 A. To Chase to say, hey, we got these funds coming in. We
10 are going to need a cashier's check issued immediately.
11 Q. Okay. And what happened with that?
12 A. There was a little bit of confusion, but at some point
13 within, you know, before ten, around 10 a.m., the relationship
14 banker who was helping us said, look, I just found out we can't
15 issue cash which cashier's check on the same day when funds
16 arrive. We have to let them season for 24-hours before we can
17 do another transfer over these funds.
18        So I immediately stopped any other transfers coming in
19 there and started looking into, okay, how do we get a cashier's
20 check immediately, you know, from the Stifel accounts into
21 New York. I got to know if this is divine intervention but it
22 just turns out that the Stifel head office is in Dechert's
23 building so, you know, we were exploring. That obviously would
24 have been the easy one. I didn't do that initially because
25 Stifel is an investment bank. It'll take a little longer and, you

Page 134

S. Ivankovich - by Plaintiff - Direct (Meister)

1 know, Chase was the logical one. But plan B would have been
2 Stifel immediately delivering us a cashier's check.
3 Q. If you had been awarded the bid, I know you were the
4 high bidder, if you were awarded the bid, would you been
5 available to produce a check that day?
6 A. Absolutely, yes.
7 Q. Through Stifel.
8 A. Through Stifel.
9 Q. And then if you would close the bid through Walker and
10 Dunlop, you would have gotten your money back, in essence?
11 A. Yeah or it would have stayed as equity in the deal or
12 whatever.
13 Q. Besides Walker Dunlop, did you ever have any
14 conversations with a lender or investor called Riverbanc?
15 A. Yes.
16 Q. Who are they and what happened there?
17 A. Riverbanc is a subsidiary of New York Life, I believe,
18 that does a lot of lending above HUD. They had turned the
19 property -- two of the properties underwritten them, you know,
20 wanted to do the deal. It's just for us the Walker Dunlop
21 transaction seemed to make more sense. They were an incumbent
22 lender with the senior mortgage. They had just underwritten us
23 and approved a deal already. They were eager to do more HUD
24 business as well as preserve their existing loans so we went
25 Walker Dunlop route. I think the options were opened to

Page 135

S. Ivankovich - by Plaintiff - Direct (Meister)

1 I-Star and Riverbanc.
2 Q. What about Black Rock, were they involved?
3 A. Initially, but we didn't. They kind of didn't make the
4 final cut both Black Stone and Black Rock had issues of
5 indication in terms of e-mail.
6 Q. What -- how did you -- you weren't at the auction
7 because you testified that you were at the JP Morgan Chase
8 branch initially trying to arrange the check through JP Morgan
9 Chase?
10 A. Yes.
11 Q. That was the morning of Monday the 27th?
12 A. Correct.
13 Q. How did you know what was happening at the auction that
14 day?
15 A. I nominated Gary Romaniello and Bonnie to go there and
16 sort of bid on our behalf, really Gary, and Bonnie would sort
17 of be counsel to make sure there were no shenanigans. And I was
18 getting text updates from Bonnie.
19 Q. Did there come a time which you knew that KKR had been
20 awarded the winning bid even though they didn't have the high
21 bid?
22 A. Yeah.
23 Q. How did you find that out?
24 A. Text from Bonnie.
25 Q. And what did you do at that point in terms of this

Page 136

S. Ivankovich - by Plaintiff - Direct (Meister)

1 check process?
2 A. I stopped it and, you know, kind of having -- sensing
3 this was going to litigation, I asked the relationship manager
4 at Chase to write a letter for us just to have something to
5 because, you know, make sure we had evidence that we were there
6 trying to get the check, that even if funds came at Chase, it
7 would take a day to get it. It was a knee-jerk reaction at this
8 point. It probably wasn't necessary, but we did it and we got
9 the letter and then met --
10 Q. That was a letter from?
11 A. From the nice young man that was helping there.
12 Q. At JP Morgan?
13 A. JP Morgan Chase.
14 Q. Saying they couldn't write a cashier's check?
15 A. On the same day when funds arrive.
16 Q. But, again, what were your options with respect to
17 Stifel?
18 A. We absolutely could have gotten a check from Stifel
19 that day but we hadn't won the auction so I stopped the process.
20 It didn't seem relevant at the time. And we met with counsel
21 and figured out --
22 Q. Now, in terms of the Stifel accounts, some of those
23 accounts -- whose names are those accounts in?
24 A. Various sundry from family LLC to trust accounts to
25 individual family members, my father, my mother.

Atlas v.
Macquarie et al (FINAL)

January 13, 2020

Page 137

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2 Q. Was some of them in the names of your father?
3 A. Yes.
4 Q. And you?
5 A. Not the statements that were produced for -- during the
6 process of this litigation but there are trust accounts that I
7 have.
8 Q. And would those accounts had been available for Stifel
9 could draw a check on?
10 A. Absolutely, yes.
11 Q. And would your father have consented to that?
12 MR. GONZALEZ: Objection, Your Honor. Hearsay.
13 THE COURT: Sustained.
14 Q. Have you ever asked for funds from your father before?
15 A. For transactions, all the time.
16 Q. Has he ever turned you down?
17 A. Never. Just to clarify that, even though it's a family
18 situation, we try and run it like a company. Nobody could draw
19 that kind of money without, you know, one or two signatures so
20 that's just the way we set things up to go.
21 Q. Let's talk for a minute about this redemption right
22 that's been the subject of some debates. Do you know when I say
23 redemption right I know this is a legal term, do you have an
24 understanding what I mean?
25 A. Yeah.
26 Q. What?

Page 138

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2 A. That we have the right to pay off the loan.
3 Q. Okay. So what was your understanding, if you had one,
4 you obviously were counseled by a number of different firms, as
5 to your redemption right?
6 A. That after the auction it goes away.
7 Q. And so what -- but you had it through the auction,
8 correct?
9 A. Yes.
10 Q. What was the point of bidding at the auction as opposed
11 to just exercising redemption right at the auction?
12 A. Well, we -- the process that we had just gone through
13 is incredibly disruptive and we needed to be consulting with
14 HUD. This is a complicated transaction. It needed time. So,
15 it stands out during the TRO process, I mean, the judge kind of
16 told us. He goes go bid at the auction if you need more time.
17 So, essentially, because we knew the deal would close. We had
18 the funds. This is a complicated structure with a government
19 agency involved. We bid to preserve our rights and get
20 ourselves the time to close because I still don't understand why
21 the lender was kind of playing shenanigans and not letting us
22 have an orderly transaction. I mean, they were treating us like
23 this was a distressed deal and it wasn't.
24 Q. And after the auction, which I know you weren't at but
25 you, obviously, got word that your high bid was rejected in
26 favor of KKR lower bid, did you continue to try to finance the

Page 139

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2 transaction and pay off the loan?
3 A. Oh, yes.
4 Q. Why did you do that if you understood that your
5 redemption right was over?
6 A. I had hoped and it would make sense if you show up with
7 a check for 71 or whatever million dollars to your lender,
8 whether you have the right to redeem or not, you know a bird in
9 the hand is worth two in the bush, I would have hoped that I
10 showed up with a check they would have accepted it. And then I
11 was convinced -- that was one of the big issues with Walker
12 Dunlop, do you have the right to redeem. I had hoped and it's
13 unclear that we were -- I had asked for a legal opinion because
14 they wanted one. I couldn't get one.
15 Q. Who wanted a legal opinion?
16 A. Walker Dunlop.
17 Q. That what?
18 A. That if we do this and approve the loan and we block 70
19 whatever million dollars and show up to the table, it's not
20 discretionary you have the absolute right to redeem.
21 Q. They asked you for a legal opinion to that effect?
22 A. Yes.
23 Q. Did you ask your lawyers to do it?
24 A. I asked three or four law firms.
25 Q. And did you get one?
26 A. No. Nobody could issue one.

Page 140

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2 Q. Who did you ask?
3 A. I asked Morris Manning.
4 Q. That's the HUD lawyer?
5 A. I asked the HUD lawyers.
6 Q. Did you ask Robert?
7 A. We asked DLA.
8 Q. What did DLA say?
9 MR. ROSSMAN: Objection, Your Honor. If we are
10 going to get this testimony, then he has opened the door to
11 all of those privileged communication. We intend to explore
12 this.
13 MR. MEISTER: This is directly relevant to --
14 THE COURT: He is not saying its irrelevant.
15 A. These were phones calls. They weren't letters or
16 e-mails.
17 MR. MEISTER: We are not waiving privilege, but we
18 are asking for his testimony about whether these law firms
19 would give this opinion.
20 MR. ROSSMAN: It is a classic sword and a shield.
21 You can't elicit the testimony about what he got from the
22 lawyers in terms of one piece of advice without allowing us
23 to explore the totality of that communication.
24 MR. MEISTER: I'll move on, Your Honor.
25 THE COURT: Okay.
26 Q. Okay. Let me ask this question --

Page 141

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2     THE COURT: You know, people can raise this issue
3   later whether you want to or not but go ahead.
4   Q.   Okay.   Did you get a copy of the purchase and sale
5   agreement that was eventually signed between Macquarie?
6   A.   Go ahead.
7   Q.   And KKR?
8   A.   Eventually, yeah.
9   Q.   When did you get that document?
10  A.   I think during discovery in this case.
11  Q.   So did you get it before or after the May 3rd closing
12  between Macquarie and KKR?
13  A.   My recollection says after.
14  Q.   Did you know before May 3rd that there was a provision
15  in that agreement that entitled you to pay off to redeem?
16  A.   No.
17      MR. MEISTER: Could we have a few minute break,
18  Your Honor?
19      THE COURT: Sure.
20      (Whereupon, the witness was excused from the
21  stand.)
22      (Whereupon, a recess was taken.)
23      (Whereupon, the witness resumes the witness stand.)
24      THE COURT: Back on the record.
25  CONT'D DIRECT EXAMINATION
26  BY MR. MEISTER:

Page 142

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2   Q.   Thank you, Your Honor.
3       Mr. Ivankovich, could you turn to Exhibit 238 in the
4   binder, please.
5   A.   I'm here.
6   Q.   This is an e-mail.   So this is an e-mail -- it's 238,
7   Mr. Ivankovich -- from Geoff Smith of Walker and Dunlop to you
8   dated February 24, 2017?
9   A.   Yes.
10  Q.   And attached to the e-mail is another document.   Could
11  you tell me if you recognize that other document?
12  A.   It is the loan application with Walker Dunlop.
13  Q.   And how much is the amount of the loan in this loan
14  application?
15  A.   75 million.
16  Q.   And if you look at page 4 of 18, there's a couple of
17  signatures.   Is the lower left-hand signature your signature?
18  A.   Yes.
19  Q.   And do you recognize the other signature?
20  A.   That's Geoff Smith signature, yeah.
21  Q.   He is with Walker and Dunlop?
22  A.   Yes.
23  Q.   This is Walker and Dunlop term sheet that you were
24  discussing earlier before the break?
25  A.   Yes.
26  Q.   If you look at Exhibit 70G, this is an e-mail chain

Page 143

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2   between counsel in the February 25, 2017; do you see that?
3   A.   Yes.
4   Q.   And if you look at the last page of the exhibit,
5   there's a letter from Stifel; do you see that?
6   A.   Yes.
7   Q.   What's the date of that letter?
8   A.   February 25, 2017.
9   Q.   And who's is it signed by on behalf of Stifel?
10  A.   David Morris.
11  Q.   And what's the substance of the letter beginning this
12  letter if you can read it?
13  A.   To whom it may concern, this letter is to confirm that
14  the date of this letter, the principal of Atlas MF Mezzanine
15  Borrower LLC has in excess of 71 million in cash and marketable
16  securities managed by myself, David J. Morris as their private
17  wealth manager.   If you have any questions, please feel free to
18  contact me at your convenience.
19  Q.   And that letter was transmitted to Macquarie's counsel?
20  A.   It looks like it, yeah, from our counsel, from our HUD
21  counsel.
22  Q.   If you flip back to Exhibit 69G, there is an e-mail
23  chain from Bonnie Rothell to Mr. Ginsburg.   And if you look at
24  the last page of that and tell me what you see, the last page of
25  69?
26  A.   It's a $600,000 check dated February 23, 2017, to

Page 144

S. Ivankovich - by Plaintiff - Direct (Meister)
1
2   Walker Dunlop commercial property fund.
3   Q.   And whose account is it written on?
4   A.   Atlas Apartments Homes LLC.
5   Q.   Is that one of your companies?
6   A.   Yes, that's the management company.
7   Q.   And do you recognize the signatory on that check?
8   A.   Yeah, I think it is Jennifer Trainer who's our
9   treasurer -- one of our treasurers at the time.
10  Q.   And is that the deposit check on the Walker and Dunlop
11  term sheet or application?
12  A.   Yes.
13  Q.   Okay.   All right.   If you could turn to 145, please.
14  Tell me what you see?
15      MR. GONZALEZ: Your Honor, we have an objection to
16  this.   On several grounds, they are hearsay, authenticity,
17  also there has been zero foundation ever said on whether
18  this was ever sent to Macquarie but the primary, Your Honor,
19  is the hearsay objection.
20      THE COURT: Hayden Jones and Macquarie.
21      MR. MENNITT: Yes.
22      THE COURT: The initial one is sent from him.   I
23  assume that came from Macquarie's files.
24      MR. GONZALEZ: 145, Your Honor.
25      MR. MENNITT: PX.
26      THE COURT: 145.



---

Page 145

Ivankovich - Plaintiff - Direct (Mr. Meister)

1   S. Ivankovich - by Plaintiff - Direct (Meister)
2          MR. GONZALEZ: Yes, Your Honor.
3          MR. MEISTER: I am happy to ask Mr. Ivankovich if
4   he has knowledge whether it was sent.
5          MR. GONZALEZ: It is still hearsay, Your Honor.
6          THE COURT: Why don't you ask the question.
7   (Continued on next page)

---

Page 147

Ivankovich - Plaintiff - Direct (Mr. Meister)

1   but the content of the letter is also hearsay because it's
2   coming in for the truth that they had somehow this 71
3   million dollars. If it was sent to Macquarie related to
4   demonstrating ability to close, then it's certainly coming
5   in for the truth.
6          THE COURT: This is IIB.
7          MR. GONZALEZ: Exactly, your Honor.
8          THE COURT: So don't we have anyone from --
9          MR. MEISTER: I don't think it's being offered for
10  the truth. It's being offered -- this is a trial about
11  commercial reasonableness. If they received it and they
12  received -- I mean, it's cumulative that's for sure because
13  they've also received evidence that there's 700 thousand
14  dollars in assets from Ivankovich at Stifel, there's a
15  Walker Dunlop commitment conversation with Walker Dunlop, so
16  it's cumulative, but I don't see why it can't go to the
17  weight.
18         THE COURT: Well, for the truth of the matter that
19  that entity had that cash, that's hearsay.
20         MR. MEISTER: What about for the truth of whether
21  the letter was sent?
22         THE COURT: I was going to get to that.
23         MR. MEISTER: Sorry.
24         THE COURT: That part is based on, I assume, what
25  his lawyer told him, which his lawyer being an agent, I

---

Page 146

Ivankovich - Plaintiff - Direct (Mr. Meister)

1   DIRECT EXAMINATION CONTINUED
2   BY MR. MEISTER:
3      Q  Do you have any knowledge, Mr. Ivankovich, about
4   whether this letter was transmitted to Macquarie, 145?
5      A  I do. About the same time I remember receiving this
6   letter, sending it to Morris Manning and then Morris Manning
7   transmitting it to Macquarie.
8          MR. ROSSMAN: Objection, your Honor. The letter
9   wasn't previously discovered. The letter, as far as I
10  understand, wasn't produced in discovery, I'm sorry, with
11  any correspondence showing that it went to Macquarie from
12  anyone, Morris Manning or anyone.
13         THE COURT: This document was produced.
14         MR. ROSSMAN: All we have is this. We did receive
15  the transmittal showing that it went in.
16         MR. MEISTER: That goes to the evidence not
17  admissibility.
18         THE COURT: Well, the last piece was I think you
19  were saying that your counsel sent it, but that's based on
20  what they told you they did, correct?
21         MR. MEISTER: Isn't it based on what he told them?
22         THE COURT: Well, then I think what the objection
23  is then whether they respond yes, I sent it, that's the part
24  is hearsay.
25         MR. GONZALEZ: Well, that's hearsay, your Honor,

---

Page 148

Ivankovich - Plaintiff - Direct (Mr. Meister)

1   suppose.
2          MR. MEISTER: What he told his lawyer.
3          THE COURT: I think what it's being offered is that
4   it was transmitted to the defendants, which would have been
5   by the lawyer, yes?
6          MR. MEISTER: Right, based on instructions he gave
7   to his lawyer, not his lawyer's ascent to those
8   instructions.
9          THE COURT: So I suppose it's all you can -- what
10  he testified to is I gave instructions to the lawyer and the
11  lawyer sent it. The last part of his testimony was and the
12  lawyer did it. That part you have to get from the lawyer, I
13  suppose. Again, just to further that point, presumably, if
14  the lawyer had evidence of the transmittal it would be
15  called for in discovery.
16         MR. MEISTER: There were a lot of documents
17  produced, your Honor.
18         THE COURT: I hear you.
19         MR. MEISTER: Thousands and thousands of pages.
20         THE COURT: It would have been also something that
21  the defendants would have to produce if they had it.
22  Anyway, I take the point, this is the letter, I
23  assume this letter is in your client's files.
24         MR. MEISTER: Yeah. It was produced. It as an
25  Atlas Bate's number on it. So I assume it was produced by

---

Atlas v.
Macquarie et al (FINAL)                                                          **January 13, 2020**

| Ivankovich - Plaintiff - Direct (Mr. Meister)          Page 149 |
| --- |

1    my client to us in the course of our production of discovery
2    responses.
3        THE COURT: Okay. I think you got it in for the
4    idea that this is in your business records and/or this was
5    kept in your files at least, and he told his lawyer to send
6    it. I understand the point.
7        MR. MEISTER: Thank you, Judge.
8    Q    Mr. Ivankovich, there was discussion about a so-called
9    bidding to infinity strategy. What was your -- strike that.
10       Were you planning on bidding to infinity?
11   A    No. We would probably still be there.
12   Q    Okay. What were you planning?
13   A    It was tongue in cheek. We were going to bid to the
14   level where our appraisals and value said they were, which was
15   relative to where the bidding stopped. Feels like --
16   Q    So in other words at -- what did you see the value as?
17   I don't want to put words in your mouth.
18   A    Definitely in excess of 250 million dollars.
19   Q    And so if the HUD loans were 140 and the debt was 71
20   that's 211, so that's roughly 40 and 70, 110 or 111 million
21   dollars?
22   A    Sound about right, yeah.
23   Q    And you've also heard that there was -- that the
24   bidding was driven up that KKR's bid went from like I think 73
25   and a half, maybe 73 and three quarters to -- I got it wrong.

| Ivankovich - Plaintiff - Direct (Mr. Meister)          Page 150 |
| --- |

1    It went up three million dollars, okay. So whatever three
2    million by 73 and three quarter million to 76 and three quarter
3    million, did you or did Atlas or any Atlas entity ever receive
4    any of those funds?
5    A    No.
6    Q    Did you or any Atlas entity ever receive a demand from
7    Macquarie that there was a deficiency in legal fees or other
8    costs?
9    A    No.
10   Q    So did you receive the benefit from the extra three
11   million dollars?
12   A    No.
13   Q    When you said before that your plan was to bid to the
14   value of the property, why were you doing that? What was your
15   point in bidding up to the value of the property or your opinion
16   of the value of the property?
17   A    Look, there was value in the properties. We had lots
18   of money invested in the deals, as did our partner. There was
19   value. We wanted to protect our equity.
20       MR. MEISTER: I have no further questions.
21       THE COURT: Thank you.
22   CROSS EXAMINATION
23   BY MR. GONZALEZ:
24   Q    Good afternoon, Mr. Ivankovich. I don't think we have
25   ever met. My name is Hector Gonzalez. I'm one of the lawyers

| Ivankovich - Plaintiff - Cross (Mr. Gonzalez)          Page 151 |
| --- |

1    representing Macquarie.
2    A    Pleased to meet you. I see we go to the same barber.
3    Q    I rarely go to the barber.
4        Now, do you recall testifying during your direct that
5    Timbercreek was irate with you, do you recall that testimony?
6    A    Yes.
7    Q    And that was in connection to the -- that was in
8    connection to the Notice of Default, correct?
9    A    No, not the Notice of Default. I believe they received
10   some sort of notice or email blast of the UCC sale, foreclosure
11   sale.
12   Q    So it would have been sometime after January 11, right,
13   because the email blast went out either January 11 or 12th,
14   correct?
15   A    Makes sense.
16   Q    So you were aware prior to January 11 that Macquarie
17   had noticed the default, correct?
18   A    I can't tell you the exact date. I know that the
19   letter was dated -- there were two letters, one the 3rd and the
20   4th. It was -- the hard copy was sent to the wrong address and
21   I was out of the country, so it would have gone to our lawyers
22   first. They probably sent it to me at some point therein, but
23   in or around that time I would have gotten the letter from our
24   lawyer.
25   Q    But it would have been before January 12th when the

| Ivankovich - Plaintiff - Cross (Mr. Gonzalez)          Page 152 |
| --- |

1    teaser went out, correct?
2    A    Probably.
3    Q    At the time that you became aware of the Notice of
4    Default you didn't let Timbercreek know about that, right?
5    A    No.
6    Q    You were in the midst of working out a potential
7    refinancing with them, correct?
8    A    Yes.
9    Q    You had signed the loan application with them, correct?
10   A    Correct.
11   Q    And you had given them, I believe, the deposit was 250
12   thousand; is that correct?
13   A    In that range.
14   Q    And -- now, isn't it a fact that Timbercreek pulled out
15   of that transaction because Atlas didn't meet the net operating
16   income requirement that was required in the loan application
17   with Timbercreek?
18   A    That's not what they told us. That's not what they
19   told me.
20   Q    Do you recall that there was an NOI requirement in the
21   Timbercreek loan application?
22   A    Yeah, to achieve 75 million dollar loan, but it was a
23   sliding scale, so they could have easily have loaned less.
24   Q    But the -- the term that was set forth in the
25   application was an NOI of 14 million dollars, correct?

1    A    An underwritten NOI of 15 million, yeah.  To my
2  understanding we met that standard on an underwritten basis.
3  There was never a question of the NOI to issue the term sheet.
4  No lender will ever issue a term sheet like that and accept a
5  deposit.  They have been underwriting portfolios for months.
6  They were satisfied and I know this from conversations in tours,
7  in deep dive.  This wasn't idly prickly.  They had seen the
8  financials.  They had never questioned the NOI.  They accepted
9  that the NOI was 14 million dollars.
10   Q    So they never questioned the NOI?
11   A    Not up to that point.  Not until the defaults and the UCC
12  sale.
13   Q    But at some point they did say that the reason they
14  were holding your deposit was because you weren't meeting the
15  NOI, correct?
16   A    It was a technical, legal way to hold the NOI because
17  they were so angry with us.  They thought that we were lying to
18  them about our relationship in the nature of the loan with
19  Macquarie that they were just being -- it may be readily so,
20  they were being vindictive.
21   Q    Did they ever tell you that when they were sticking to
22  the term of the NOI that was 14 million dollars that that was
23  only because they were upset with you about the -- the default?
24   A    They intimated, they told Brookfield who told us and in
25  subsequent conversation with Mr. Trotter, he basically said that

1  they're not going to stick to the deal and they thought we were
2  lying.
3    Q    Did they ever -- did Timbercreek ever indicate to you
4  that notwithstanding the Notice of Default that they would be
5  willing to continue to negotiate with you?
6    A    Yes.  They said they would consider a lower amount for
7  the loan.
8    Q    But you didn't do that, correct?
9    A    We kept going forward with them, and frankly, at some
10  point they actually said that it was just too much.  I think the
11  term was there was too much water under the bridge and there was
12  too much noise around it with the UCC, that we decided to change
13  horses.
14        MR. GONZALEZ: Your Honor, if I can approach the
15  witness?
16        THE COURT: Okay.
17    Q    I put in front of you what has been marked as
18  Defendant's Exhibit 44.  Do you see that?
19    A    Yes.
20    Q    This is an email string between you and a Bradley
21  Trotter at Timbercreek, correct?
22    A    Yes.
23    Q    And I'll look at the second in time email, the one from
24  Mr. Trotter to you at 9:55 A.M. on January 30th.  Do you see
25  that?

1    A    Yes.
2    Q    In that email he writes, as I discussed with
3  Brookfield, I believe my comments were passed onto you, the
4  conditions of the term sheet were not met, specifically, the
5  minimum NOI of 14 million and failure to notify us of the
6  default notice.  Do you see that?
7    A    Yes.
8    Q    It's your testimony that that was pretextual on their
9  part, that they didn't mean that?
10   A    No.  I believe, and this is when you look outside the
11  corners of the document, if I'm a lender who has just spent
12  three months in allocating capital and bringing in a third-party
13  investor to do a deal and they felt wronged, they felt that we
14  were not -- when I told them we never missed an interest payment
15  to Macquarie, we had an amicable relationship that it was going
16  to be good, they were probably unjustifiably so angry.  So they
17  were latching on and manufacturing things that were permitted in
18  the term sheet as a punitive basis to, you know, like a woman
19  scorned, to keep the money.
20        Now, ultimately they did return, I went back and
21  checked, looking at this case, they did return a portion of that
22  money to us.
23   Q    So maybe it was my use of the word pretextual.  You
24  just used the word manufactured.  So is it your testimony that
25  stating to you, that you hadn't met the NOI of 14 million

1  dollars was a manufactured reason, and you will have plenty of
2  opportunity with your lawyer.
3    A    Yes.  The answer is yes.  There is no way that a
4  serious lender like Timbercreek or anybody would ever issue a
5  term sheet and accept a deposit without, number 1, underwriting
6  the buildings extensively, which Timbercreek did, put in the
7  specific 14 million dollars number, which they did because they
8  arrived to it through analysis.  It just -- it was -- it was
9  them being upset, and frankly, wanting to keep --
10        MR. GONZALEZ: Your Honor, move to strike
11  everything after yes.
12        THE COURT: Sustained.
13   Q    Now, I just want to go back over your background a
14  little bit.  I think you testified earlier that you've been
15  involved in the real estate business your entire adult life; is
16  that correct?
17   A    Yes.
18   Q    During that time look at the -- you maintain an Atlas
19  residential website, correct?
20   A    Yes.
21   Q    I took a look at that website.  It says you've been
22  involved in over seven billion dollars worth of property
23  transactions?  I'm not going to hold you to seven billion, but
24  directionally is that a correct number?
25   A    Correct.

1    Q    You have experience in all phases of property
2    acquisition, correct?
3    A    Correct.
4    Q    Including the financing of property acquisitions?
5    A    Yes.
6    Q    So that means you have experience in how to raise funds
7    for property acquisitions?
8    A    Correct.
9    Q    And you have experience with real estate related loans,
10   right, that predate your experience with Macquarie, correct?
11   A    Correct.
12   Q    So Macquarie is not the first real estate related loan
13   that you worked on, correct?
14   A    No.
15   Q    No, it was not the first?
16   A    It was not the first.
17   Q    Now, you attended, just going to check your educational
18   background, you attended both Brown and the University of
19   Chicago?
20   A    Correct.
21   Q    You graduated from the University of Chicago?
22   A    Correct.
23   Q    I believe according to your website it says you
24   graduated with honors, correct?
25   A    Yes.

1    Q    Now, it also says on your web bio that you have been a
2    guest lecturer at the University of Chicago, right?
3    A    Yes.
4    Q    And that that has been on the topic of real estate
5    finance, correct?
6    A    Correct.
7    Q    When was the last time that you were a guest lecturer
8    at UC?
9    A    2010, 2012.
10   Q    What school at UC is that?
11   A    Business school.
12   Q    So it's fair to say that prior to your dealings with
13   the Mezzanine Loan you had experience with loan documents,
14   correct?
15   A    Yes.
16   Q    And you had been involved in loan transactions and
17   negotiated loan transactions, correct?
18   A    Yes.
19   Q    You had counsel on this transaction, Macquarie
20   transaction, you had counsel who assisted you with that
21   transaction, correct?
22   A    Yes.
23   Q    And that was Mr. Broderick?
24   A    Yes.
25   Q    And I believe we saw in an email that he was at DLA,

1    but I think at the time of this loan he was at Latham, correct?
2    A    And Watkins.
3    Q    And when you ventured into loan transactions, it's your
4    practice to read the loan documents, correct?
5    A    Yes.
6    Q    And there are provisions of the loan document that you
7    don't understand, you try to get clarification on those
8    provisions before you sign the loan document, correct?
9    A    Typically.
10   Q    Is there ever a time where you would sign the loan
11   documents with provisions that you didn't understand that you
12   would go ahead and sign it anyway?
13   A    Not knowingly.
14   Q    Excuse me?
15   A    Not knowingly.
16   Q    Now, with respect to the Macquarie loan documents, I
17   think the operative documents that you discussed earlier was the
18   Mezzanine Loan Agreement, correct?
19   A    Correct.
20   Q    And there's a Promissory Note, correct?
21   A    Yes.
22   Q    And there's also a Pledge and Security Agreement,
23   correct?
24   A    I'm assuming there is.  It's standard.
25   Q    You don't recall?

1    A    No.
2    Q    Now, at the time you signed the documents, let me back
3    up.  You were the individual at Atlas who signed the documents
4    related to the Mezzanine Loan, correct?
5    A    Correct.
6    Q    At the time you signed those documents you read those
7    documents before you signed them, correct?
8    A    Probably the drafts that led to the finals, yes.
9    Q    So the drafts and the finals?
10   A    Yes.
11   Q    It's fair to say that you understood the terms of the
12   loan, correct?
13   A    Yes.
14   Q    Now, the Maturity Date for this loan, was that January
15   2nd, 2017, correct?
16   A    Correct.
17   Q    And since January 2nd was a bank holiday, the loan was
18   actually due on the preceding business day, correct?
19   A    I don't have a calendar in front of me, but I will take
20   your word for it.
21   Q    I will represent to you that January 2nd was a bank
22   holiday.  So all I want to understand is, we hear January 2nd as
23   the Maturity Date, but the loan itself was actually due on
24   December 30th, correct?
25   A    I would have to go back and look for the statements and

Atlas v.
Macquarie et al (FINAL)

January 13, 2020

1   the loan documents. Like I said, I'll take your word for it.
2      Q   It's fair to say that whether it was December 30th or
3   January 2nd, whatever date the loan was due, Atlas did not repay
4   it, correct?
5      A   No.
6      Q   I'm not correct or I am correct that it wasn't paid?
7      A   We did not pay the principal due.
8      Q   Now, throughout the fall of 2016, I think you testified
9   you had regular discussions with Miss Hamilton, correct?
10     A   Not just Miss Hamilton, Mr. Jones. There was other
11  people in Macquarie. There's a gentleman that worked there Min
12  Wang. There was other people we had spoke with, but primarily
13  our contact was with Hayden Jones, Jackie Hamilton and Min Wan.
14     Q   And if you had to sought of put them in a hierarchy,
15  it's fair to say that the person you had the most direct contact
16  with was Miss Hamilton, correct?
17     A   In terms of frequency, yes.
18     Q   Now, throughout the fall of 2016, you had regular
19  discussions with Miss Hamilton regarding the Loan Maturity Date,
20  correct?
21     A   Yes.
22     Q   And Miss Hamilton at Macquarie, in fact, in November of
23  2016 had warned you about the loans upcoming maturity, correct?
24     A   I think you're alluding to sort of a form email she
25  sent me, yes.

1      Q   And in that email she also was urging you that you
2   needed to act fast to refinance the loan, correct?
3      A   Correct, which we were doing.
4      Q   I think this is actually in your binder there, PX216,
5   is that the -- is that the email you're referring to?
6      A   No, not specifically. Email that I'm thinking about,
7   sticks out in my head was one that was written by their lawyers.
8   It was a legal written email. It seemed like a form lawyer's
9   email, not this one specifically.
10     Q   I'll try to look for that email. I'm sure we will talk
11  about it. Let's stay with this one, Plaintiff's 216. So this
12  is an email exchange between you and Miss Hamilton, correct?
13     A   Yes.
14     Q   And the subject of the email -- and the first in time
15  email is from Miss Hamilton, correct? If you flip the page.
16     A   Yes.
17     Q   And it's dated November 2nd at 1:29 P.M., correct?
18     A   Correct.
19     Q   She says, hi, Steve. Go Cubs?
20     A   She did.
21     Q   You said you were a Cubs fan?
22     A   I am. Yes.
23     Q   And actually that wasn't the year they lost to the Mets
24  that was actually the World Series year. That was Game 7, I
25  believe. Do you recall that?

1      A   Was that '16 or was that the following year?
2      Q   It was that year, against Cleveland at Cleveland?
3      A   I should remember, but it was all a daze.
4      Q   So in that first email she says to you, I'm going to be
5   in the area tomorrow during our standing call and wanted to check
6   in, do you see that?
7      A   Yes.
8      Q   You can't see it on that page, but if you go to the
9   first page, the subject line of the email is update question
10  mark, correct, at the very top?
11     A   Yes. Yep.
12     Q   She references a standing call, do you see that?
13     A   Yes.
14     Q   Now, during the fall of 2016, you had a weekly call
15  schedule with Macquarie, correct, where you would update them on
16  your refinancing efforts?
17     A   I think it goes further back than that. We had at
18  least a monthly call, if not meetings going back to February,
19  March of that year.
20     Q   And on those calls you would update them about your
21  refinancing efforts, correct?
22     A   Not just refinancing efforts, in terms of overall
23  strategy, paydown. There was a lot of back and forth in the
24  conversations early on. Did they want a paydown through the
25  extension of stand a loan, to what level of paydown. So I would

1   categorize that the early conversations with more discussion of
2   extension levels and paydown levels and then somewhere around
3   June of that year it moved to a definite pay off and updates on
4   new lenders.
5      Q   So at least as of June the focus of those update calls
6   became the refinancing efforts; is that fair to say?
7      A   Yes, that's fair to say.
8      Q   Now, Miss Hamilton goes on to say, what is the latest?
9   Have you signed the Timbercreek term sheet or received one from
10  Riverbanc? Do you see that? On the second page, in her first
11  email.
12     A   Yes.
13     Q   Now, those were Timbercreek we have heard about, right?
14     A   Yes.
15     Q   And Riverbanc, that's another financial institution?
16     A   Yes.
17     Q   And those were both at the time financial institutions
18  that Atlas was working with in an effort to refinance the loan,
19  correct?
20     A   Correct.
21     Q   Let's turn to your response email, the one on the first
22  page at the very bottom at 118. Do you see that?
23     A   Yes.
24     Q   You say, "we have had multiple follow up calls with
25  Timbercreek, Riverbanc, Another Tomorrow, and Blackrock." Do you

Atlas v.
Macquarie et al (FINAL)                                                                January 13, 2020

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 165

1   see that?
2      A   Yes.
3      Q   So Blackrock was an additional financial institution
4   that you remember having financial discussions with?
5      A   Correct.
6      Q   And the follow up calls were calls concerning the
7   refinancing, correct?
8      A   Correct.
9      Q   You then write, Timbercreek is reviewing submission
10  forms, do you see that?
11     A   Yes.
12     Q   And you go on to say that you were expecting final
13  terms from RB tomorrow, correct?
14     A   Yes.
15     Q   That's Riverbanc, correct?
16     A   Correct.
17     Q   You also discuss that you were providing tours to these
18  institutions?
19     A   Yes.
20     Q   Miss Hamilton writes you back.  Do you see that, at
21  4:02, the next email?
22     A   Yep.
23     Q   She writes, "only comment is that you are running out
24  of time."  Do you see that?
25     A   Correct.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 166

1      Q   You understood running out of time to mean that the
2   Maturity Date was approaching, correct?
3      A   That's correct, but that's not all she says,
4   counsellor.  Go ahead.  I'm sorry.
5      Q   I think the way this works I get to ask you questions.
6   If you don't understand the question let me know.
7      A   I understand that, but... there's more to it.
8      Q   You understood running out of time to mean that the
9   Maturity Date was approaching, correct?
10     A   Not necessarily because as you know, because I'm sure
11  you read the documents as well, that we have the right to extend
12  the loan with a paydown.  And Miss Hamilton writes, because she
13  knew the loan documents as well, that and I can't see us giving
14  you an extension without some sort of meaningful paydown.
15     Q   So your answer to my question is no, correct, you
16  didn't understand that to mean that she was referring to the
17  Maturity Date, correct?
18     A   Well, the Maturity Date is fluid.  We could have paid
19  down the loan to an agreed number, which we were discussing all
20  the time with Miss Hamilton.
21     Q   You said the Maturity Date was fluid?
22     A   Yes.  We could extend.  We could extend unequivocally
23  if we agreed to a debt yield number and pay it down, which we
24  had the means to do.
25         Now, I remember this conversation specifically when she

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 167

1   got out of the air and I asked her, Jackie, for a contingency, what
2   is the number?  What do you consider to be a meaningful paydown
3   to get this done?  And her reply was don't worry about that.
4   Let's get the loan paid off.  So they never -- so the -- just to
5   make it clear to the Court, we had the absolute right to extend
6   the loan.  It wasn't the drop dead date as you characterized
7   with a paydown to meet the debt yield requirement.  We had the
8   absolute unequivocal right to contractually to extend the loan
9   with a paydown.  Those conversations were stopped because
10  Macquarie wanted a paydown.
11     Q   Now, you say you had the absolute right to --
12     A   Pay off.  I'm sorry.
13     Q   To extend the loan, correct?
14     A   Correct.
15     Q   That required you to demonstrate a debt yield of 8
16  percent or higher, correct?
17     A   Yes.
18     Q   That's a yes or no answer?
19     A   Yes, but no defaulting.
20         THE COURT: He can ask yes or no questions.  If you
21  want to elaborate.
22     A   The answer is yes.  Sorry, counsel.
23     Q   So that right to extend was contractual and you had a
24  right to it, but only if Atlas met an 8 percent or higher debt
25  yield, correct?

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 168

1         MR. MEISTER: Objection.  That's a
2   mischaracterization of the document.  That's not what the
3   document says.
4         THE COURT: Overruled.  You can answer.
5      A   Yes.
6      Q   Now, she goes on in her email to say, lenders won't be
7   able to close this (and get the type of HUD recognition they're
8   asking for) in approximately 45 days especially with major
9   holidays thrown in, correct?  She says that?
10     A   She does say that.
11     Q   And then she goes on to state, "can't see you -- can't
12  see us giving you an extension without some sort of meaningful
13  paydown," correct?
14     A   She did say that.  I will also comment that I don't
15  think she knew the kind of discussions we were having with our
16  lenders and what sort of recognition they needed, but she did
17  write that statement.  I don't think she was correct and I agree
18  with you, she did say, and I can't see us giving you an
19  extension without some sort of meaningful paydown.
20     Q   So you're saying that Miss Hamilton did not have an
21  understanding of what was required under the loan documents to
22  give an extension?
23     A   No.  No.  What she says here, what I'm addressing and
24  get the type of HUD recognition they're asking for.  She didn't
25  know what type of recognition Timbercreek was asking for.

Atlas v.
**Macquarie et al (FINAL)**                                    **January 13, 2020**

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)               Page 169

1    Q   I don't think you heard my question, so let me go back
2  to my question.  She goes on to say that "can't see us giving
3  you an extension without some sort of meaningful paydown."  Do
4  you that?
5    A   Yes, I do.
6    Q   So you're not suggesting that when Miss Hamilton wrote
7  that that she did not understand her own loan documents about
8  what was required for an extension?
9    A   That's not what I'm saying at all.
10    Q   That's what I understood, but that's what I want a
11  clarification on.
12    A   To clarify what I did say is, when I asked her numerous
13  times, what do you consider meaningful paydown, she doesn't say
14  a paydown to get in debt yield compliance, a meaningful, which
15  is an arbitrary nebulous clause.  I asked her what is a
16  meaningful paydown?  What do you consider a meaningful paydown?
17  $10?  She didn't give it to me.
18    Q   So you say she never gave you any indication of what a
19  meaningful paydown would be to qualify for the -- for the
20  contractual extension?
21    A   Not after this email.  There were discussions prior to this
22  email.
23        THE COURT: Counsel, you have a few more minutes
24  until we have to break.
25        MR. GONZALEZ: I will try to wrap up with this

Page 170

1    document then, your Honor.
2    Q   And you understand a debt yield to be net operating
3  income divided by the total debt amount on that property,
4  correct?
5    A   I would have to go back and read the specific
6  definition, but in a general sense of it that's about right.  If
7  there's qualifying language in the definition, like underwritten
8  and NOI, that may make a difference.  So the answer is I don't
9  know.  I would like to go back and read the definition.
10        (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

S. Ivankovich - by Plaintiff - Cross (Gonzalez)               Page 171

1        S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2  CROSS-EXAMINATION
3  BY MR. GONZALEZ:
4    Q   But it is your understanding that the debt yield that
5  was being discussed in the Mezzanine Loan document -- agreement
6  was the total debt, the mezzanine debt plus the underlining HUD
7  debt, correct?
8    A   You know, if you could please -- I don't want to
9  misspeak.  I am under oath.  If I can get the definition of it
10  so I can verify that definition in the loan document, I would
11  appreciate it.
12    Q   As you sit here right now, you don't recall?
13    A   Not specifically because it is very technical and
14  specific.
15        MR. GONZALEZ: Your Honor, I think we can break at
16  this point.
17        THE COURT: Thank you.
18        MR. GONZALEZ: Your Honor, I would just like an
19  instruction that since the witness is on cross he is no
20  longer available to plaintiff for prep.
21        THE COURT: You're in the midst of testimony and
22  you will be under oath tomorrow.  You shouldn't discuss your
23  testimony with your counsel.
24        Okay.  So we will reconvene at 9:30.  Anything else
25  before we break.  Okay.  See you then.
26        (Whereupon, the witness was excused from the

S. Ivankovich - by Plaintiff - Cross (Gonzalez)               Page 172

1        S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2  stand.)
3        (Whereupon, the trial is adjourned until Tuesday,
4  January 14, 2020, at 9:30 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Page 173

```
1
2   SUPREME COURT OF THE STATE OF NEW YORK
3   COUNTY OF NEW YORK : CIVIL TERM : PART 45/3
4   ------------------------------------x
5   ATLAS MF MEZZANINE BORROWER, LLC, a      : Index:
    Delaware limited liability company,        651657/2017
6                          Plaintiff(s).  :
7         - against -                       :
8   MACQUARIE TEXAS LOAN HOLDER LLC, a       :
    Delaware limited liability company, KKR
9   REPA AIV-2, L.P., a Delaware limited      :
    Partnership, and KRE LRP OSPREY VENTURE
10  LLC, a Delaware limited liability company :
11                        Defendant(s).   :
12  ------------------------------------x
13  KKR REPA AIV-2 L.P., a Delaware limited   :
    Partnership; KRE LRP OSPREY VENTURE LLC, a
14  Delaware limited liability company,       :
15                   Counterclaim-Plaintiff(s). :
16        - against -                        :
17  ATLAS MF MEZZANINE BORROWER, LLC, a       :
    Delaware limited liability company,
18                   Counterclaim-Defendant(s).:
19  ------------------------------------x
20            60 Centre Street
              New York, N.Y. 10013
21            January 14, 2020
22  B E F O R E :
23        HONORABLE JOEL M. COHEN,
              J U S T I C E
24
          (Appearances cont'd on next page)
25
26
```

Page 174

```
1
2   A P P E A R A N C E S :
3
4       MEISTER SEELIG & FEIN LLP
        Attorneys for the Plaintiff
5       125 Park Avenue - 7th Floor
        New York, New York 10017
6       BY:  STEPHEN B. MEISTER, ESQ.,
             BENJAMIN BIANCO, ESQ. &
7            CHRISTINA VERNASCHI, ESQ.
    CAITLIN TROW, ESQ.
8
9       DECHERT LLP
        Attorneys for the Defendant
10      Macquarie Texas Loan Holder LLC
        Three Bryant Park
11      1095 Avenue of the Americas
        New York, New York 10036-6797
12      BY:  PAT ANDRIOLA, ESQ.,
             HECTOR GONZALEZ, ESQ. &
13           GARY J. MENNITT, ESQ.
14
15      QUINN EMANUEL
        Attorneys for the Defendant KKR REPA AIV-2
16      51 Madison Avenue - 22nd Floor
        New York, New York 10010
17      BY:  TYLER G. WHITMER, ESQ.,
             WILL SEARS, ESQ &
18           ANDREW J. ROSSMAN, ESQ.
19
20              SHAMEEKA HARRIS, CSR, RMR, CLR
                    LYNNETTE CRUZ, CRR
21                  Senior Court Reporters
22
23
24
25
26
```

Page 175

1    S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2         THE COURT: Good morning. I know I made a big
3    thing about making you upload trial documents to NYSCEF. If
4    this is something like a witness list that I need, just also
5    send it by e-mail because I probably would have missed it.
6    It is not criticizing. We get a few number of NYSCEF cases
7    every day.
8         MR. MENNITT: Your Honor, just to clarify on that,
9    I think there has been five filed. Do you have the five?
10   Not recently. There was one filed last night.
11        THE COURT: I have two expert ones. Are there two
12   more?
13        MR. WHITMER: Your Honor, there were two fact
14   witnesses that we filed Friday evening as well.
15        MR. MENNITT: Brudney and Morales are the two that
16   they filed.
17        MR. WHITMER: We can send them by today if that's
18   useful.
19        THE COURT: Do you have a hard copy?
20        MR. WHITMER: I don't know if we do, but I'll
21   check. Your Honor, one more housekeeping. I know -- I
22   think plaintiffs are intending to call David Morris as a
23   witness today. I think I understood yesterday the
24   instructions were the fact witnesses were not to sit in the
25   courtroom if it is fact witness testimony. I just wanted to
26   confirm that.

Page 176

1    S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2         THE COURT: That's typically the rule unless people
3    want to waive it. If people know they have a fact witness,
4    I would prefer, as an objection, for them to wait outside.
5         MR. MEISTER: Your Honor, that is the plan. If he
6    walks in and I don't see him, we should just be sensitive to
7    that because my back would be to the door.
8         THE COURT: No automatic default. There is
9    typically an exception for principals of a party generally
10   has a right to be there. So there is that.
11        Any other preliminaries before we get started?
12   Okay, can we have Mr. Ivankovich back on the stand.
13   S T E V E N        I V A N K O V I C H, a witness called by
14   and on behalf of the Plaintiff, upon being previously duly
15   sworn, was examined and testified as follows:
16        THE COURT: Good morning. Okay, well, Mr.
17   Ivankovich, you are still under oath.
18        THE WITNESS: Yes.
19   CROSS-EXAMINATION
20   BY MR. GONZALEZ:
21   A.  Good morning, Counselor.
22   Q.  Good morning, Mr. Ivankovich.
23        Your Honor, I just have a binder of exhibits for the
24   cross-examination.
25        THE COURT: Are they all on the memory stick?
26        MR. GONZALEZ: They are but in --

Atlas v.
Macquarie et al (FINAL)

January 13, 2020

Page 177

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1      S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2          THE COURT: Going forward, could we just save some
3      trees.
4      Q.   Mr. Ivankovich, yesterday we left off we were talking
5      about Defendant's Exhibit 19 and I'll ask, in the small binder,
6      if you could turn to tab 19, please.
7          THE COURT: Counselor, are these defendants'
8      exhibits or plaintiffs'?
9          MR. GONZALEZ: In this binder are mostly
10     defendants' exhibits.
11         THE COURT: Thank you.
12     A.   I am there.
13     Q.   And this was the e-mail we were talking about yesterday
14     the update e-mail from Miss Hamilton to you, correct?
15     A.   Yes, correct.
16     Q.   And if you could turn to the e-mail that's around the
17     middle of the first page with the stamp -- time stamp of 5:08;
18     do you see that?
19     A.   Yes.
20     Q.   And in it you write, quote, everyone's still shooting
21     for year-end close. I would imagine not giving someone
22     exclusive until committed probably wise so we don't get jammed;
23     do you see that?
24     A.   Yes.
25     Q.   By exclusive you meant working with just one financial
26     institution to get the refinancing, correct?

Page 179

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1      S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2      Q.   And how long has she been with Atlas?
3      A.   She first started with me -- we had a name change when
4      we went global from Alliance to Atlas. I think she first
5      started with the company in 2002, left to go work for another
6      company, then came back in, I want to say, 2012.
7      Q.   And yesterday remember we -- I made some reference to
8      your firm's website; do you recall that?
9      A.   Yes.
10     Q.   And she's actually one of four individuals including
11     yourself that's listed as part of the executive team on your
12     company's website, correct?
13     A.   Correct.
14     Q.   Now, she's someone you trust, correct?
15     A.   Yes.
16     Q.   And she's someone as to whose honesty or integrity you
17     have no question, correct?
18     A.   I have no reason to.
19     Q.   Now, in September 2016, Miss Andren told you not to let
20     the loan go past maturity, correct?
21     A.   Are you referring to a specific e-mail or a
22     conversation.
23     Q.   I am just asking you if you recall that?
24     A.   I don't.
25     Q.   And do you have any recollection that around
26     September 2016 Miss Andren warned that Miss Hamilton had told

Page 178

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1      S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2      A.   Correct.
3      Q.   Then the next in time e-mail Miss Hamilton says to you,
4      quote, yes, as long as working with more than one group doesn't
5      slow either down, correct?
6      A.   Correct.
7      Q.   And you understood that what she was saying was that
8      dealing with multiple lenders could slow down individual
9      negotiations, correct?
10     A.   No. As a matter of fact, I think she didn't -- I think
11     what she is referring here is the lenders themselves aren't
12     tripping people up. It is a small community. People talk so
13     that's what I infer from this. You may infer something
14     different.
15     Q.   And your response to her is, quote, it's motivating,
16     correct?
17     A.   Yes.
18     Q.   And she writes back to you, quote, I fear you are going
19     to need more than motivation to get this closed by 1/2/17,
20     correct?
21     A.   She does.
22     Q.   And 1/2/17 was the maturity date, correct?
23     A.   Yeah, I think that's right.
24     Q.   And I am going to switch topics for a second. Who's at
25     your firm Leslie Andren?
26     A.   She is our chief investment officer.

Page 180

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1      S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2      Miss Andren that Macquarie would foreclose if Atlas let the loan
3      go past maturity?
4      A.   I have no recollection and having known Leslie for as
5      long as I have, I would find that a very unusual comment from
6      her.
7      Q.   So you don't recall in September of 2016 Miss Andren
8      strongly encouraging you to ask for an extension because that
9      was what Miss Hamilton had recommended to her?
10     A.   No, not specifically. If you have an e-mail to refresh
11     my memory.
12     Q.   If you could go to tab 33, Defendant's 33, please. Do
13     you see the e-mail, Defendant's 33?
14     A.   Um, hum.
15     Q.   And who's Mr. Malli who's also on this e-mail?
16     A.   Director of asset management.
17     Q.   And he is also a senior executive of the company,
18     correct?
19     A.   Correct.
20     Q.   Now, this e-mail was sent -- the original e-mail was
21     sent from Mr. Malli -- actually from Miss Andren to Mr. Malli on
22     January 13th, correct?
23         MR. MEISTER: Objection. Hearsay, relevance.
24     These people are not here.
25         THE COURT: Are they parties?
26         MR. GONZALEZ: They are, Your Honor.

Page 181

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

2 THE COURT: Okay, overruled.

3 Q. Now, that January 13th is ten days after Macquarie
4 noticed a default on the loan, correct?

5 A. Yeah, it looks like that.

6 Q. And in the top e-mail, Miss Andren says to Mr. Malli,
7 quote, I told Steve in September not to let Macquarie's interest
8 go past maturity because Jackie told me they would have to
9 foreclose; do you see that?

10 A. I do.

11 Q. So according to Miss Andren in this e-mail she warned
12 in September '16 that Macquarie would foreclose, correct?

13 A. According to this e-mail, but I don't recollect that
14 conversation at all.

15 Q. And she goes on to say that, quote, she strongly
16 encouraged him, referring to you, to ask for an extension
17 as that was what Jackie recommended. She told me if he waits
18 and does not request an extension, then she'd have to declare a
19 default and then foreclose. Obviously, he did not take that
20 seriously. Do you see that statement written there?

21 A. I do.

22 Q. And it's fair to say you didn't follow Miss Andren's
23 advice to ask for an extension, correct?

24 A. Well, you're jumping to conclusion that she actually
25 made that advice to me.

26 Q. So it's your testimony that she never said that to you?

Page 182

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

2 A. Not that I recall. And I will say that we clearly were
3 taking this seriously. We had many discussions with Macquarie
4 about extension pay down during this time, the evidence
5 certainly shows that, and the course was always, you know, we
6 would like to get this loan paid off. So we were going to that
7 direction and clearly we did ask for an extension in December.
8 So whether I followed her advice or not, I don't recall her
9 giving me this advice. We asked for an extension.

10 MR. GONZALEZ: Your Honor, I move to strike after
11 the initial answer of I don't recall.

12 THE COURT: Sustained. Please answer the question
13 yes or no. It will go quicker. But if you have to explain,
14 you can explain but your lawyer will have a chance to give
15 you an opportunity to elaborate.

16 THE WITNESS: Understood. Thank you.

17 Q. Now, during November and December of 2016, you were
18 working with an advisor Brookfield, correct?

19 A. Correct.

20 Q. And Brookfield was trying to help Atlas with its
21 efforts to refinance the mezzanine loan with a different lender,
22 correct?

23 A. We engaged them to be a, what I would categorize, as a
24 mortgage broker.

25 Q. To help you refinance?

26 A. Yes, and also not just for this transaction but for

Page 183

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

2 other transactions as well.

3 Q. Now, in November of 2016, IIB, the Bahrain Bank told
4 you that they were appointing their own brokerage firm called
5 JLL to help market the 11 multifamily residential properties for a
6 possible sale, correct?

7 A. They did.

8 Q. Let me ask you to turn to exhibit -- Defendant's 20 in
9 the binder, please. This is a series of e-mails between you and
10 primarily Marcus Scott. Do you see that?

11 A. I do.

12 Q. And Mr. Scott was the chief investment officer at IIB,
13 correct?

14 A. Correct.

15 Q. At the bottom e-mail on November 13, 2016, which is on
16 page two of the exhibit, so the first in time e-mail, Mr. Scott
17 tells you -- and this is on November 13th of 2016, correct?

18 A. Correct.

19 Q. He tells you that IIB has, quote, been in discussion
20 with several real estate broker firms regarding a sale of Prop
21 Tex and have decided to appoint JLL; do you see that?

22 A. Correct.

23 Q. And the sale of Prop Tex, in effect, what he was
24 talking about selling the 11 underlying properties, correct?

25 A. No, not correct. They didn't have the authority to do
26 that. They were talking about selling their interest only.

Page 184

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

2 Q. And their interest was, in effect, a 95 percent
3 indirect ownership of those properties, correct?

4 A. Correct.

5 Q. He then says, quote, reviewing their engagement letter
6 now and once signed will give them access to the data room so
7 they can start preparing their marketing materials, correct?

8 A. Correct.

9 Q. So in this e-mail, he was making you aware that they
10 were going to engage JLL, correct?

11 A. Yes.

12 Q. And that JLL would begin a marketing effort, correct?

13 A. Correct.

14 Q. In your response, the e-mail above which is on the
15 first page, you write, that is fine but JLL is the worst
16 possible firm for the job; do you see that?

17 A. I do.

18 Q. And you said that because you didn't think that JLL had
19 a good enough reputation for these kind of transactions,
20 correct?

21 A. Correct.

22 Q. You then listed a number of what you call, quote,
23 proper, close quote, brokerage firms, correct?

24 A. I do.

25 Q. And you list Cushman, right?

26 A. Yes.

Page 185

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
1
2 Q. You list CBRE?
3 A. Correct.
4 Q. ARA?
5 A. Correct.
6 Q. As firms that you'd recommend, correct?
7 A. Yes.
8 Q. So you thought CBRE was a proper brokerage firm as you
9 state here, correct?
10 A. Yes, they clearly are.
11 Q. You go on to say, quote, but we are okay with this if
12 that is what you want to do; do you see that?
13 A. Sure.
14 Q. And the it that you're referring to is IIB's decision
15 to market its interest in Prop Tex, correct?
16 A. We couldn't stop them from doing that, no.
17 Q. You go on to say, quote, it will be a fool's errand
18 unless IIB wants to take a loss on their equity. Then you list
19 some factors to consider, correct?
20 A. I do.
21 Q. And then above in the top e-mail you recommend someone
22 at JLL that you know a fellow by the name of Chip Nash; do you
23 see that?
24 A. No, that is an incorrect statement. I say, by the way,
25 Chip Nash has just moved from Berkadia at JLL. He is friend, a
26 good guy but Houston is specific. Not necessarily recommending

Page 186

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
1
2 him but just saying maybe you want to give him a call.
3 Q. Were you suggesting to them that if they were going to
4 use JLL they might have well try to use Chip Nash who was an
5 individual that you knew?
6 A. I said give him a call to get his advice. That's what
7 I am inferring from them.
8 Q. And then soon after this, JLL began marketing Prop Tex
9 by circulating a deal book, correct?
10 A. That's what I was told. I never received a copy of the
11 deal book. It wasn't mine to look at. I had requested it, but
12 I think the reason I didn't get one because they stopped the
13 marketing process immediately when I told them, you know, when I
14 gave them my advice. But I never received a copy of the book.
15 Q. But it is fair to say that the deal book and the
16 marketing process that it went out to the market, correct?
17 A. I don't have any firsthand recollection of that.
18 Q. And you did become aware that individual institutions
19 became aware of the marketing effort, correct?
20 A. Yeah. Jackie called me and told me that they were
21 aware of it. That's how I became aware of it.
22 Q. And you also heard from other financial institutions
23 besides Macquarie, correct?
24 A. It's possible. I don't recall specifically. It's
25 possible I might have heard from Brookfield.
26 Q. Now, isn't it a fact that the JLL marketing effort was

Page 187

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
1
2 not well received by the lenders you were trying to get
3 refinancing from?
4 A. I can't comment either way. I don't have knowledge of
5 that.
6 Q. You don't recall them in effect telling you that that
7 marketing effort was not well received by them?
8 A. It's possible I would have gotten a phone call. It
9 makes sense. And then when I explained to them, you know, look,
10 this is our partner marketing their equity interest, it has
11 nothing to do with the property or portfolio, we are still
12 pursuing the refinance, they obviously were fine with it because
13 they continued to go and refinance.
14 Q. Now, isn't it true that as a result of JLL marketing
15 effort a number of lenders that you had been talking to
16 questioned Atlas' commitment to refinancing?
17 A. They did, correct. And, again, I clarified it and said
18 we are not selling the buildings. IIB is selling their interest
19 and then they didn't question the commitment.
20 Q. So your answer was correct to my question?
21 A. No, the answer is it's -- your question isn't correct.
22 The lenders weren't questioning our commitment until I explained
23 to them that we weren't selling the properties.
24 Q. So then your answer to my question was just I'm not
25 correct?
26 A. Yes, you're not correct.

Page 188

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
1
2 Q. I ask you to turn to Defendants' Exhibit 8 in the
3 binder, please. This is an e-mail string, correct?
4 A. Yes.
5 Q. And it's dated December 10th, correct?
6 A. Correct.
7 Q. It's about a month after you got the November 13th
8 e-mail to Defendants' Exhibit 20 from Mr. Scott telling you
9 about JLL, correct?
10 A. Correct.
11 Q. And the subject line of the e-mail is JLL, correct?
12 A. Yes.
13 Q. Now, in this e-mail, there's an individual who's got an
14 IIB e-mail address by the name of Subhi Benkadra; do you see
15 that?
16 A. That was the correct pronunciation. You got it right.
17 Yes.
18 Q. And Mr. Benkadra is the chief executive officer of IIB,
19 correct?
20 A. At the time he was, yes.
21 Q. He still is, correct?
22 A. Not to my knowledge, no. As a matter of fact, I know
23 with certainty he isn't.
24 Q. But he was at the time of this e-mail?
25 A. He was at the time, yes.
26 Q. Now, going to the first in time e-mail at the bottom of

Page 189

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1 the first page, the one that appears to be a 25 minutes after
2 midnight; do you see that?
3 A. Yes.
4 Q. You write that, quote, got a huge earful today from
5 Timbercreek about a JLL call they got on the portfolio; do you
6 see that?
7 A. I do.
8 Q. And that's referring to JLL's effort to market Prop
9 Tex, correct?
10 A. Correct.
11 Q. And in the e-mail --
12 A. Sorry, incorrect. To market their interest in Prop
13 Tex.
14 Q. In the e-mail above that at 10:50 p.m., Mr. Scott
15 replies to you, quote, tell them that the owner is exploring all
16 options because as of today there is no mezz deal in place and
17 in two and a half weeks Macquarie would be in a position legally
18 to take possession of the asset and sell it for whatever price
19 they can get without regard to the equity holders; do you see
20 that?
21 A. Correct.
22 Q. So IIB, your equity partner, was telling you that
23 without a refinancing deal Macquarie had the right to foreclose
24 on the collateral, correct?
25 A. Correct.

Page 190

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1 Q. And you knew that already, correct?
2 A. I did.
3 Q. And in the next paragraph, he goes on to say, quote, so
4 far as I'm aware, Timbercreek haven't asked for a period of
5 exclusivity so they have no justification for giving anyone an
6 earful. Do they expect us to sit on our asses and do nothing
7 while we wait for the deal to come through; do you see that?
8 A. I do.
9 Q. Now, to the top e-mail on the page, which is your reply
10 to Mr. Scott, let me direct your attention to the second
11 paragraph beginning if you recall. Do you see that?
12 A. Correct.
13 Q. You write, if you recall, we sat on my hands for months
14 when we could have been running a sale or re-fi process and now
15 we are running a fire drill for re-fi with stuff going on in the
16 background that isn't making it easier; do you see that?
17 A. I do.
18 Q. By stuff in the background, you meant JLL marketing
19 effort, correct?
20 A. I did.
21 Q. And when you wrote this statement, that was a true
22 statement when you wrote it, correct?
23 A. Could you please clarify?
24 Q. The statement I just read to you, that was a true
25 statement when you wrote it, right?

Page 191

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1 A. Yes.
2 Q. That's what you believed at the time, correct?
3 A. Correct.
4 Q. Now, as a result of the JLL marketing effort, your
5 broker Brookfield told you to prepare for Macquarie to foreclose
6 on the properties on January 2nd, correct?
7 A. If you have a specific e-mail or a conversation, I
8 don't recall that conversation but it's possible it happened.
9 Q. Let me ask you to turn to Defendants' 21, please. Now,
10 defendants' 21 is an e-mail dated December 13, 2016, correct?
11 A. Correct.
12 Q. And it's an e-mail from you to Mr. Scott, correct?
13 A. Yes.
14 Q. And it's -- the subject line is for your perusal,
15 correct?
16 A. Correct.
17 Q. And you attached three separate e-mails to this e-mail,
18 correct?
19 A. I do.
20 Q. And your transmittal e-mail to Mr. Scott states, quote,
21 today was not a good day. See attached, correct?
22 A. Correct.
23 Q. Let's go to the last attachment which is page four of
24 the exhibit. Do you see that page four?
25 A. Yes.

Page 192

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1 Q. And that is an e-mail from Joe Kunzon to you on
2 December 12, 2016, correct?
3 A. Correct.
4 Q. And the subject line of that e-mail is TX portfolio; do
5 you see that?
6 A. Yes.
7 Q. Now, Mr. Kunzon was the representative from Riverbanc,
8 correct?
9 A. Correct.
10 Q. And Riverbanc was a potential lender with whom Atlas
11 was in negotiations regarding the refinancing, correct?
12 A. Yes.
13 Q. And he says to you that, quote, given that we just
14 received a deal book from third-party for sale or smaller pref
15 raise -- I assume that means a preferred raise?
16 A. It could.
17 Q. -- I think it will be difficult to move this through or
18 a group at a higher level; do you see that?
19 A. Yes.
20 Q. And the deal book he was referring to was the JLL deal
21 book, correct?
22 A. Can you please tell me -- that was my assumption, but I
23 don't know. It doesn't say that in this e-mail.
24 Q. But given what was going on during the time, is it fair
25 to say that that's what you assumed he was talking about?

Page 193

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1    A. It's possible. It's very difficult to draw that
2 conclusion from this e-mail but it is possible.
3    Q. So it wasn't your understanding, as you sit here today,
4 that when you received this e-mail he was telling you that
5 because of that deal book the refinancing won't be getting
6 approved by them?
7    A. Sitting here today no.
8    Q. And you never entered into a refinancing deal with
9 Riverbanc, correct?
10   A. No, we chose Timbercreek over the Riverbanc
11 transaction.
12   Q. So the answer is no?
13   A. The answer is no.
14   Q. Let's look at the second attached e-mail which is page
15 three of the exhibit. Now, this e-mail is from an individual
16 named Anthony Alicea?
17   A. Yes.
18   Q. And he is at Pensam Funding, correct?
19   A. Correct.
20   Q. And he sends you this e-mail on December 12, 2016,
21 correct?
22   A. Correct.
23   Q. With the subject of Prop Tex, correct?
24   A. Correct.
25   Q. Now, Pensam is a boutique financing company in Miami

Page 194

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1    that you also had had conversations with about refinancing,
2 correct?
3    A. I wouldn't categorize it that way, but if you choose to
4 that's your categorization. They are a lender. They are debt
5 funds.
6    Q. And you had been looking to Pensam -- you had been
7 having discussions with Pensam about a possible refinancing,
8 correct?
9    A. For Prop Tex and several other deals, yes.
10   Q. Including the refinancing of the Macquarie mezzanine
11 loan, correct?
12   A. For Prop Tex, yes.
13   Q. And you never entered into a refinancing deal regarding
14 the mezzanine loan with Pensam, correct?
15   A. We did not.
16   Q. Now, if you could turn to the third attachment which is
17 on page two; do you see that?
18   A. Yes.
19   Q. Now, this is an e-mail from Dan McNulty at Brookfield
20 to you on December 13th, correct?
21   A. Correct.
22   Q. And like you said Brookfield was working for Atlas
23 helping with the process regarding getting refinancing for the
24 Macquarie loan, correct?
25   A. Correct.

Page 195

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1    Q. And Mr. McNulty is an experienced investment banker in
2 the commercial real estate space, correct?
3    A. My relationship is really with Josephine Shum. I
4 think Mr. McNulty was her boss. So I don't know his resumé, but
5 I imagine if he was Josephine's boss he probably knew what he
6 was doing.
7    Q. And Atlas had hired Brookfield to help it secure
8 refinancing, correct?
9    A. Yes.
10   Q. Now, the subject of the e-mail from Mr. McNulty is in
11 all caps seriously; do you see that?
12   A. I do.
13   Q. And Mr. McNulty says in the first paragraph that
14 Brookfield had, quote, just heard from multiple mezzanine
15 investors that Prop Tex is being marketed for sale by JLL. I am
16 beyond confused by this course of action at this very sensitive
17 stage unless, of course, you are determined to shoot yourself in
18 the foot; do you see that?
19   A. I do.
20   Q. And do you recall receiving this e-mail from Mr.
21 McNulty?
22   A. I must have. I don't specifically but, yes. It's sent
23 to me. I have no reason to believe this isn't an authentic
24 e-mail.
25   Q. As you sit here today, do you recall it?

Page 196

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1    A. Not specifically, no.
2    Q. In the next paragraph he says that the deal book,
3 quote, blind sided, close quote, Brookfield, and sends, quote, a
4 clear message to the market that we are not privy to your real
5 intentions and our client is more than happy to waste everyone's
6 time; do you see that?
7    A. Correct.
8    Q. Do you recall receiving, not the specific e-mail, do
9 you recall receiving any communication of that sort from
10 Mr. McNulty or anyone else at Brookfield?
11   A. I recall conversations with both McNulty and Shum
12 after -- around the time of learning of the JLL book. And as
13 they say in these e-mails, telling people what the situation
14 was, what the explanation was. By the way, and as the same
15 where they were blind sided, as the other evidence shows, we
16 were as well.
17   Q. But do you recall -- you said you don't recall this
18 e-mail specifically?
19   A. Not specifically, correct.
20   Q. Do you recall any conversation with Brookfield that
21 captured the spirit of what I just read?
22   A. No, the conversation that I recall is saying, look,
23 this isn't our book. This is a book from our equity partner
24 selling their interest. Whichever lender is having an issue
25 with it, let's get on the phone with them.

Page 197

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1    S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2   Q. The answer to my question was no?
3   A. The answer was no.
4   Q. And in the next paragraph it says that you -- that
5 you're sending the message that, quote, you have no long-term
6 ownership interest in the assets and are choosing to sell
7 because you do not believe in your ability to extract future
8 revenue potential. And it goes on that that, quote, signals
9 that the ownership group may also have internal operational
10 disagreements which would be problematic to lend to a group
11 going through a divorce; do you see that?
12   A. I do.
13   Q. And that's what your investment banker Mr. McNulty
14 wrote to you; do you see that?
15   A. I do.
16   Q. Again, do you recall, since you don't recall the
17 specific e-mail, do you recall any conversation with Mr. McNulty
18 or anyone else at Brookfield that captured the spirit or the
19 essence of what I just read to you?
20   A. No.
21   Q. And in the next paragraph he says that the JLL book
22 sent a message to Macquarie that, quote, either you have no
23 intention to re-fi and they should prepare to foreclose and
24 notify you that you're in default on January 2nd, new sentence,
25 or you simply nobody -- it must be a word missing -- or you
26 simply nobody is communicating with each other and it looks like

Page 198

S. Ivvankovich - by Plaintiff - Cross (Gonzalez)

1    S. Ivvankovich - by Plaintiff - Cross (Gonzalez)
2 you don't know what you're doing. Presumably neither is a
3 desired outcome; do you see that?
4   A. I do.
5    (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Page 199

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)

1   CROSS EXAMINATION CONTINUED
2   BY MR. GONZALEZ:
3   Q. Do you recall any conversation with Mr. McNulty --
4   First of all, you don't recall that email, right, so
5 you don't recall that writing, correct?
6   A. Correct.
7   Q. Do you recall any conversation with Mr. McNulty or
8 anyone at Brookfield that in essence gave you that message that
9 I just read?
10   A. Not this message, no.
11   Q. Now, while you don't recall the email, is it fair to
12 say that if you had received an email from Mr. McNulty that you
13 have read it, correct?
14   A. I'm sure I would have read it, yes.
15   Q. And in the final paragraph you write "choosing to
16 poison your own well doesn't seem to be a good long-term or
17 prudent strategy to me. If you have any intent to re-fi this
18 Mezzanine Loan you need to slam the brakes, and then in all
19 caps, YESTERDAY on this sales process and get on a call to
20 reassure the Mezzanine lender you actually have a plan and
21 intend to move forward with an LOI do you see that?
22   A. I do.
23   Q. LOI is Letter of Intent, correct?
24   A. Yeah.
25   Q. Now, Brookfield never arranged a refinancing loan for

Page 200

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)

1 Atlas regarding the Mezzanine Loan, correct?
2   A. I think that's incorrect. I mean Timbercreek term
3 sheet, that was Brookfield's client that we signed and put a
4 deposit on, served due diligence was evidence of that
5 arrangement. Now it didn't conclude, but that event happened
6 after that fact. Your answer is incorrect.
7   Q. So maybe I should have been clearer. By arrange I mean
8 that they helped you consummate to completion a refinancing loan
9 for -- to refinance the Mezzanine Loan?
10   A. That wasn't their job. Their job was to make the
11 introduction, not to help consummate.
12   Q. And it's fair to say that none of the introductions
13 that they made resulted in a closed deal to refinance the
14 Mezzanine Loan, correct?
15   A. Correct.
16   Q. Now, is it fair to say that when you read this email
17 you took what Mr. McNulty said seriously, correct?
18   A. No. That is incorrect.
19   Q. In fact, well, you thought this email and the other two
20 that you attach in this exhibit were important enough that you
21 forwarded them to IIB, correct?
22   A. Yes.
23   Q. When you forwarded these emails to Mr. Scott, which is
24 the first page of the exhibit, you say, today was not a good
25 day, see attached, correct?

Atlas v.
Macquarie et al (FINAL)                                          January 13, 2020

1    A    Correct.
2    Q    And it wasn't "a good day" because potential
3  refinancing sources were backing out because of the JLL
4  marketing effort, correct?
5    A    No.
6    Q    That's not what you meant by it's not a good day?
7    A    That's not what I meant.
8    Q    Now, let me take you to Defendant's Exhibit 24.
9         MR. GONZALEZ: If I may, your Honor?  I just need
10   to grab that.
11   Q    It wasn't in my binder, but is it in yours,
12  Mr. Ivankovich?
13   A    24, yes.  Yeah.  I'm at 24.
14   Q    Now, this is another email chain, this one is dated
15  December 29, 2016, correct?
16   A    Correct.
17   Q    And that was one day before payment on the loan was
18  due, correct?
19   A    Correct.
20   Q    And it's and email chain among Atlas individuals
21  including yourself, correct?
22   A    Correct.
23   Q    And individuals at IIB, correct?
24   A    Correct.
25   Q    Now, there's an individual there in the email string

1  Hemant Bhadara, do you see that?
2    A    I do.
3    Q    At the time he was IIB's CFO, correct?
4    A    I actually don't recall what his title was.  It's
5  possible.  Is there a -- is there a byline anywhere you see in
6  this email to save time?
7    Q    I'm just asking you is it your recollection that he was
8  the Chief Financial Officer for IIB?
9    A    I don't think I have any word what his position was.
10  Actually, it's not true.  It says Head of Direct Investment on
11  the email, so I'm going to assume that he was Head of Direct
12  Investment.
13   Q    Do you know whether he had a function akin to that of a
14  CFO?
15   A    I don't.
16   Q    He copies other individuals from IIB, do you see that?
17   A    Yes.
18   Q    He copies Mr. Scott, do you see that?
19   A    Yes.
20   Q    And we've already talked about Mr. Benkhadra, correct?
21   A    Yes.
22   Q    And who is Dr. Khalid Naji El-Ali?
23   A    I don't know.  I actually have never met that person.
24  I don't think I've ever had a conversation with him.  I don't
25  know.

1    Q    The subject line of this original email from Mr. Bhadra
2  is Timbercreek, correct?
3    A    Correct.
4    Q    Now, in the first in time email, Mr. Bhadra writes that
5  IIB has been -- has begun funding "our share, 95 percent of the
6  US dollar 250 thousand good faith deposit against Timbercreek's
7  fees and expenses, correct?
8    A    Correct.
9    Q    So this was an email regarding putting in the loan
10  application with Timbercreek, correct?
11   A    Correct.
12   Q    He then writes, in the interim please ask Timbercreek
13  to change the following terms in the term sheet and then he sets
14  forth a number of items and bullet points, correct?
15   A    Correct.
16   Q    So Mr. Bhadra was proposing changes to the term sheet
17  that Timbercreek had put forward, correct?
18   A    He did.
19   Q    The next email in the chain is from Malli, correct?
20   A    Yes.
21   Q    That's at 3:46 P.M. on December 29th?
22   A    Correct.
23   Q    He writes, that Steven, that's a reference to you, I
24  assume, correct?
25   A    Yes.

1    Q    Steven and I spoke with Timbercreek and Brookfield
2  yesterday.  As mentioned during our conversation yesterday
3  afternoon, Timbercreek is unwilling to further spend time on the
4  term sheet or other aspects of the transaction until they see
5  commitment from IIB/Atlas namely in the form of a deposit.
6         Do you see that?
7    A    Yes.
8    Q    And what Mr. Malli wrote in his email was an accurate
9  summary of what Timbercreek had told the of two you, correct?
10   A    I have no reason to believe it isn't accurate.
11   Q    That it is not accurate?
12   A    That it is inaccurate, but I wasn't part of that
13  conversation, so -- but let's say yes.
14   Q    So when he wrote, Steven and I spoke with Timbercreek
15  and Brookfield, it's your testimony you weren't part of the
16  conversation that he's referring to?
17   A    I don't recall the conversation he's referring to.
18  It's possible.  There were numerous conversations.
19   Q    Do you have any reason to doubt what Mr. Malli wrote in
20  his email?
21   A    I do not.
22   Q    So according to Mr. Malli, Timbercreek had told you and
23  Mr. Malli that coming forward with a deposit was a way for Atlas
24  to demonstrate it's commitment to obtaining the refinancing,
25  correct?

Atlas v.
Macquarie et al (FINAL)                                                     January 13, 2020

 1     A    Yes.
 2     Q    And the deposit that Timbercreek needed was 250
 3   thousand dollars, right?
 4     A    Yes.
 5     Q    Malli goes on "as also discussed yesterday they have had
 6   multiple starts and stops during this process and with the JLL
 7   book they are unsure if we are serious in our commitment. I'm
 8   sure you can appreciate this as you even stated that if you were
 9   in their shoes you would take a similar approach." Do you see
10   that?
11     A    I do.
12     Q    And you understood Mr. Malli to say that Atlas can't go
13   back and give new terms to Timbercreek without first putting up
14   the deposit, correct?
15     A    Correct.
16     Q    And you agreed with that comment at the time, correct?
17     A    I did.
18     Q    Now, Mr. Bhadra responds, if you turn to the first
19   page, and it's the email stamped 9:04 A.M., do you see that?
20     A    I do.
21     Q    He responds, while I understand Timbercreek's hesitancy
22   to do additional work but at the same time I am not sure what
23   incentive they will have to revise the terms (which you yourself
24   confirmed during our telephone conversation yesterday) have room
25   to be improved in our favor once we have made the deposit, do

 1   you see that?
 2     A    Yes.
 3     Q    So you understood Mr. Bhadra to be saying that after
 4   giving the deposits Atlas would no longer have leverage to
 5   negotiate those terms, correct?
 6     A    Yes.
 7     Q    Now, the last email in this chain is from you, correct?
 8     A    Yes.
 9     Q    And you replied to Mr. Bhadra in the first paragraph
10   that "your comments below are a day late and a dollar short.
11   There is no incentive for Timbercreek to do anything and this is
12   our last option." Do you see that?
13     A    I do.
14     Q    And when you wrote that on December 29, it's what you
15   believed at the time, correct?
16     A    Yes.
17     Q    And then the next paragraph you say, there is no more
18   negotiating and IIB has undermined our efforts to get the best
19   deal possible by putting out the ill-advised JLL book without
20   informing us or involving us in the process. The result of that
21   action was taking at least two viable financing options out of
22   the running and almost blowing the Timbercreek deal, do you see
23   that?
24     A    Yes.
25     Q    When you wrote that it's what you believed at the time,

 1   correct?
 2     A    Correct.
 3     Q    And the two viable financing options that you reference
 4   who were "taken out of the running as a result of the
 5   ill-advised JLL book," were Riverbanc and pin sum?
 6     A    I don't recall which two I'm referring to.
 7     Q    Now, you wrote in that section I just read, putting out
 8   the ill-advised JLL book without informing us or involving us in
 9   the process. Do you see that?
10     A    I do.
11     Q    Now, you first heard from IIB that JLL would be
12   marketing the properties in mid November, correct?
13     A    That is an incorrect statement.
14     Q    Incorrect?
15     A    Yes.
16     Q    Why don't we go back to Defendant's Exhibit 20, which
17   was the email from November 13th?
18     A    You said marketing properties. That is incorrect.
19   Marketing their interest.
20     Q    Let's go back to the email, please.
21     A    Sure.
22     Q    Defendant's Exhibit 20. If you go to page 2 of that
23   exhibit, which is the original email from Mr. Scott to you. Do
24   you see his last sentence there, I'm referring their Engagement
25   Letter now and once signed we will give them access to the data

 1   room so that they can start preparing their marketing material,
 2   correct?
 3     A    Correct.
 4     Q    Fair to say that you understood that sentence to mean
 5   that once the Engagement Letter was signed they would begin
 6   preparing and distributing marketing materials, correct?
 7     A    Marketing materials for their interest not the
 8   properties. That was the issue I had with your previous
 9   statement. It was incorrect. It's not the properties, it was
10   IIB's interest.
11     Q    So the marketing materials that IIB was sending out was
12   for the PropTex interest, correct?
13     A    For the IIB PropTex interest, correct.
14     Q    That interest was an indirect ownership of the
15   properties, correct?
16     A    No. It was an indirect -- well, going back to the
17   chart, I want to make sure the answer is right, it's an indirect
18   ownership by contract of shares in the Mezzanine Borrower that
19   owned the rest.
20     Q    Let me make it simple. There's no other asset in the
21   enterprise but the 11 properties, correct?
22     A    Correct.
23     Q    So if you have an indirect ownership somewhere along
24   that structure, if you have an ownership interest somewhere in
25   that structure, that ownership interest evolves at the bottom

1  through a new ownership interest, whether indirect or direct in
2  the 11 properties, correct?
3      A  But the answer is no.  I mean, maybe I'm thick here,
4  but selling properties and selling an ownership interest or
5  partial ownership interest in properties is not the same thing.
6      Q  I'm not suggesting they are the same thing.  All I'm
7  asking you is, did IIB have an indirect ownership interest in
8  the 11 properties?
9      A  Yes.
10     Q  So that by selling it's stake in PropTex it was
11  likewise selling it's indirect ownership interest in the 11
12  properties, correct?
13     A  That is correct.
14     Q  Now, let's go back, let's go back to the email at
15  Exhibit 24, Defendant's 24.
16        In the final sentence of that paragraph that I have
17  been looking at before, you say that Timbercreek came back to
18  the table with materially worse terms, correct?
19     A  Correct.
20     Q  And that was a true statement when you wrote it,
21  correct?
22     A  Probably, yes.
23     Q  You wouldn't have written it if it wasn't true,
24  correct?
25     A  I would hope not.

1      Q  And in the third paragraph you say that you are
2  "furious that we are left working on our side.  This during the
3  holiday period when we were ready to begin the process last
4  January for simultaneous sale or refinance, but were told to
5  stand down while IIB was looking for an alternative with a
6  Government loan only to have the option taken away in August by
7  your board.  We have been left -- we have been left us
8  scrambling to get something done by year end, which again was
9  almost killed.  Do you see that?
10     A  I do.
11     Q  And as you write here, Atlas had been ready almost a
12  year earlier to begin the process of either selling the
13  properties or refinancing the Mezzanine Loan, correct?
14     A  Correct.
15     Q  But that process did not give underway because as you
16  put it IIB told Atlas to "stand down," correct?
17     A  Correct.
18     Q  It's true as you wrote that you, meaning Atlas, were
19  "scrambling to get something done by year end," correct?
20     A  Correct.
21     Q  And year end was significant because that was the date
22  of maturity of the loan, correct?
23     A  Year end was significant because it was year end.
24     Q  And the loan was coming due on December 30th, correct?
25     A  Yes.  Correct.

1      Q  And that's year end, correct?
2      A  Well, January 2nd, beginning of the new year, but let's
3  not quibble.
4      Q  You still don't recall whether the loan was due?
5      A  Yeah.  January 2nd, 2017.
6      Q  That was the Maturity Date?
7      A  Correct.
8      Q  You don't recall that it was due on December 30th?
9      A  I don't sitting here.  I need my memory refreshed,
10  please.
11     Q  I'm going to refer you, I'm going to read it to, you
12  are aware that Atlas has filed in this case with the other
13  parties what's known as a Joint Statement of Stipulated Facts?
14     A  I probably should be aware, but I specifically don't
15  recall that document.  If we have, we have.
16     Q  I represent to you that a Joint Statement of Stipulated
17  Facts is those facts as to which the parties in the case
18  actually agree to.
19     A  If we did, we did.
20     Q  And in paragraph 20 of that joint statement that
21  paragraph reads, final payment was due on December 30, 2016.
22  "The immediately preceding business day" before the Maturity
23  Date.
24     A  Okay.
25     Q  So Atlas in this case has agreed that the loan was due

1  on December 30th, okay.
2      A  Is that what that means?
3      Q  Well, do you want me to read it back to you?
4      A  Yeah, please.
5      Q  Final payment, this is referring to the Mezzanine Loan
6  obviously.  Final payment was due on December 30, 2016.  The
7  immediately preceding business day before the Maturity Date.
8      A  Okay.
9      Q  So that means that the Maturity Date you recall was
10  January 2nd?
11     A  Yes.
12     Q  And that statement that Atlas has agreed to is saying
13  that even though it was January 2nd, because that was not a
14  business day, the immediately preceding business day was
15  December 30th, when the loan was due.
16     A  Okay.
17     Q  Does that ring a bell from your review of the loan
18  documents in this case?
19     A  It doesn't ring a bell, but if that's the case, I'll
20  agree that you're right.
21     Q  I don't want you to agree that I'm right.  I'm asking
22  you whether you recall that the loan was due at year end
23  December 30th?
24     A  Look, what I -- it's a technical question.  What I do
25  know for sure the Maturity Date was January 2nd.  Whether that

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 213

1  means that the payment was due on the 30th, it's possible. I
2  have to go back and read the loan documents, but what I can
3  testify to is that the Maturity Date I know for a fact, because
4  I -- I read the document again last night and the Maturity Date
5  was January 2nd, but I have to go back and read the document
6  again to deal with what seems to be a technical issue or
7  technical question. I'm sorry if I'm not being helpful. I'm
8  just trying to answer truthfully.
9      Q   It is a technical issue when a loan is due, right?
10     A   Yes.
11     Q   Probably some would argue the most important date in a
12  Loan Agreement?
13     A   Some might. I wouldn't, but some might.
14     Q   You wouldn't -- you wouldn't agree that the payment
15  date is the most important date in a Loan Agreement?
16     A   Having been a lender, I think interest payments are
17  also very, very important, it's not the most important. I think
18  the collateral is the most important. Making sure there's value
19  there. I think there's a lot of things that are very important
20  to a loan. To categorize the payment date as the most
21  important, I think is a self-serving comment.
22     Q   Well, then you'll agree with me that in the hierarchy
23  of important terms in a Loan Agreement the payment date is one
24  of those important terms, correct?
25     A   Yes. It's one of the important terms. Absolutely.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 214

1      Q   Now, in the final paragraph of this email, Defendant's
2  Exhibit 24, you write, it will be a miracle now if Macquarie
3  actually gives us an extension (they received the JLL book too,
4  as has everyone on the planet) to close the Timbercreek deal and
5  knowing the situation we are in. If Timbercreek makes the terms
6  worse as we go through the closing process. Do you see that?
7      A   I do.
8      Q   What you wrote in this email is what you believed at
9  the time, correct?
10     A   Yes.
11     Q   You -- I think you testified earlier that Atlas had
12  first engaged Brookfield in early January of 2016 to assist in
13  with obtaining refinancing to pay off the Macquarie loan,
14  correct?
15     A   I believe that's correct. I would have to go back and
16  look at the Engagement Letter. That sounds right, but we had
17  several engagements with Brookfield, so if you -- if you have a
18  copy of the engagement I would like to read it to confirm that
19  statement since I'm under oath.
20     Q   But directionally it would have been early in the year
21  of 2016 that Brookfield was engaged, correct?
22     A   I really would -- if you can -- if somebody can give me
23  the engagement that would help refresh my memory.
24     Q   Maybe I have something else. Why don't you take a look
25  at Defendant's Exhibit 11, please.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 215

1          (Witness complies.)
2      Q   This again is an email string and this is an email
3  string that the first in time email is from December 15, 2016,
4  correct? If you look on Page 3.
5      A   Yes.
6      Q   And the individual there, Josephine Shum, that is the
7  individual at Brookfield that you mentioned earlier when you
8  were discussing Mr. McNulty, correct?
9      A   Correct.
10     Q   She copies Mr. McNulty on that email, correct?
11     A   Correct.
12     Q   In the email she attaches a draft Letter of Intent
13  between Timbercreek and Atlas concerning PropTex, correct?
14     A   Is that -- there's a reference to it but no actual
15  attachment. Do you have that?
16     Q   Yes. As it was produced, it was produced like this,
17  but it appears that there was a -- if you look --
18     A   Yeah. I see the Timbercreek LOI Atlas project. If
19  that matches the other exhibit then that would be correct.
20     Q   Now, in your next email you forward this email from
21  Brookfield to IIB, correct?
22     A   Yes.
23     Q   So if you look at the very bottom of Page 2 at 2:13
24  A.M., you forwarded -- it's hard to tell, but if you look at the
25  first email it looks like this email string then begins a

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 216

1  forwarding with IIB individuals, correct?
2      A   Yes. It looks like it is a little tough to read.
3  You're right. On December 16th at 2:13 A.M. I don't know what
4  I was doing up at 2:13 A.M., but I may have been overseas. It
5  says, gentlemen, hot off the press, I have not reviewed yet but
6  forwarding, so we can simultaneously discuss and review in the
7  morning. The feedback after my discussion, post our discussion is
8  they are keen to do the deal. They want to be sure of our
9  commitment as well. I have yet to speak with Jackie, but have a
10  call arranged in the morning to discuss minimum pay down
11  concept. Regards Steve Ivankovich. That part is the email from
12  me. Correct.
13     Q   The Letter of Intent to Timbercreek, this email --
14     A   I'm sorry, counsel. Not just to quibble. Is there a
15  -- it looks like I did send this to IIB. Is there a header?
16     Q   This is the way it was produced to us. It doesn't
17  appear to then show how you forward it until you look at the
18  very first email on Page 1, that shows all the recipients?
19     A   Yes. It is how the string goes. You're right. Sorry
20  just trying to be as accurate as possible.
21     Q   The Letter of Intent that's referenced here, that's the
22  term sheet that in the earlier email we were discussing with
23  respect to IIB wanting to make changes to the Letter of Intent,
24  correct?
25     A   It is probably some version of the term sheet. It

Atlas v.
Macquarie et al (FINAL)

January 13, 2020

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                                    Page 217

1  looks like this is a final version. So it is -- I would say
2  it's probably some form of the term sheet, may not be the exact
3  term sheet.
4      Q    But the email that we looked at before discussing IIB
5  wanting changes to the term sheet, if you recall, that was dated
6  December 29th, correct?
7      A    What exhibit is that?
8      Q    That was Exhibit Defendant's 24.
9      A    Let me just confirm that. Yes.
10     Q    I'm just going back in time a little bit, correct?
11     A    Yes, you are. Again, it's hard to say. There was
12  probably a few machinations. The final version in the December
13  29th email may not have been -- was probably a version of this,
14  may not have been the exact version, but it's part of the
15  progression. I would say this is probably a closer version.
16  It's hard to tell without seeing the attachment.
17     Q    Now, you already, I believe read into the record your
18  email, so I want to take you to the next in time email which is
19  from Mr. Benkhadra at 2 A.M. do you see that?
20     A    Yes.
21     Q    He writes, "Steve, most importantly we will have to
22  move forward with this as our board and the market have left us
23  no other alternative to avoid a foreclosure event by MB." Do
24  you see that?
25     A    I do.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                                    Page 218

1      Q    You understood MB to be Macquarie, correct?
2      A    I have to assume yes. I mean it's certainly not
3  Manufacturers Bank.
4      Q    You actually get Mets tickets at Manufacturers Bank?
5      A    I know, and Cubs.
6      Q    You understood him to be saying that Atlas has to
7  refinance with Timbercreek because if it doesn't Macquarie would
8  foreclose, correct?
9      A    Correct.
10     Q    In the final paragraph he writes, my intensely
11  disappointed thoughts, more for the record than anything else,
12  as I reiterate, I don't see we have any other realistic
13  alternatives and we should move forward ASAP to avoid an even
14  bigger catastrophe." Do you see that?
15     A    I do.
16     Q    When he says, "an even bigger catastrophe," you
17  understood him to mean that Macquarie would foreclose and sell
18  the collateral, correct?
19     A    I don't think he was talking about climate change, so
20  yes, probably.
21     Q    You reply, I understand your desire to vent frustration
22  and I respectfully will indulge myself to do the same because
23  the last three months --
24     A    I'm sorry, counsel. Where are you reading from?
25     Q    I'm reading your reply.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                                    Page 219

1      A    From that other page?
2      Q    Yeah.
3      A    There we go.
4      Q    Page 1. Sorry. You see at the top of Page 1, a third
5  down Page 1 you reply, at 9:21 A.M. you write Subhi, and you
6  begin, I understand, do you see that?
7      A    Oh, yeah. It's after, as a follow up. Yep.
8      Q    You write, "I understand your desire to vent
9  frustration and I respectfully will indulge myself to do the
10  same because the last three months of running this hasty process
11  to get to this point has taken a toll on me and the Atlas team."
12  Do you see that?
13     A    Yes.
14     Q    Now, at the time you wrote that that was an accurate
15  expression of what you believed, correct?
16     A    Yeah. I mean, I think I had a full head of hair when I
17  wrote this. You see me now. So it's possibly right, yes. That
18  was the toll. It was a joke, counsellor. I'm sorry.
19     Q    I'm not taking it personally, your jokes about being
20  follicly challenged.
21     A    You and me both, brother.
22     Q    That was an accurate expression of what you believed at
23  the time, right?
24     A    Definitely, yes.
25     Q    You go on, "I echo your thoughts of disappointment and

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                                    Page 220

1  will add my disappointment in IIB's board waffling and then
2  complete about-face from August with regard to long stated
3  strategy for the portfolio." Do you see that?
4      A    I do.
5      Q    What you wrote was an accurate statement about what
6  IIB's actions had been, correct?
7      A    Correct.
8      Q    You then say, "had we been given adequate time to
9  market the portfolio as well as time to replace the MBL
10  Mezzanine, we could have done significantly better. I hate to
11  belabor the point, but we had signed the engagement with
12  Brookfield in January 2016, but were told to stand down by you
13  in all sale or refinance activity which, of course, we respected
14  and complied." Do you see that?
15     A    I do.
16     Q    And now, the reference to Brookfield in January 2016,
17  does that refresh your recollection that you had engaged
18  Brookfield to assist you with a refinancing effort at the
19  beginning of 2016?
20     A    I wasn't questioning my recollection. I knew we had
21  signed the engagement. Again, since I'm under oath, it would be
22  great to see the engagement, but the fact that I'm referencing
23  it here means I probably looked at it. So that's what I wrote
24  in the email. I don't have a belief that it's untrue, but to
25  absolutely confirm that statement, if I can get a copy of the

Case: 1:20-cv-04985 Document #: 202 Filed: 06/16/22 Page 33 of 63 PageID #:1620
Atlas v.
Macquarie et al (FINAL)                                                          January 13, 2020

Page 221

1  engagement, I would appreciate it.
2  Q   Now, what you wrote in this paragraph, namely, that
3  Atlas "could have done significantly better," with either a sale
4  or refinance of the properties if IIB had given Atlas "adequate
5  time." That's what you believed at the time, correct, when you
6  wrote it?
7  A   Yes.
8  Q   And the reason you didn't have adequate time was
9  because IIB had instructed Atlas to "stand down" and Atlas
10  complied with that instruction, correct?
11  A   Correct.
12        (Continued on next page.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 222

1        S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2  CONT'D CROSS-EXAMINATION
3  BY MR. GONZALEZ:
4  Q   You go on in the next paragraph, moreover, the decision
5  to unilaterally engage JLL without involving us in the process
6  further undermined our efforts, as previously indicated, and
7  removed two serious parties of interest for the financing who
8  could have offered better terms elsewhere or given the
9  opportunity to negotiate better terms with Timbercreek; do you
10  see that?
11  A   I do.
12  Q   And that is an accurate statement of what you believed
13  at the time, correct?
14  A   Correct.
15  Q   You go on then, quote, Pensam's proposal, by example,
16  was an $87 million offer 90 percent LTV. In fact, I had
17  negotiated better terms with Timbercreek and yesterday's term
18  sheet pricing increase and larger than normal dispense deposit
19  reflects mistrust of source that we will not transact; do you
20  see that?
21  A   I do.
22  Q   And what you wrote there was an accurate statement at
23  the time, correct?
24  A   I probably believed it to be, yes.
25  Q   So what you're telling IIB is that Timbercreek's terms
26  worsened after they received the JLL book because Timbercreek

Page 223

1        S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2  doubted Atlas' commitment to signing a deal, correct?
3  A   That is correct.
4  Q   You then say, quote, as far as NOI goes, we believe we
5  have reached a nadir due to the collapse in the oil market which
6  has affected long view and Odessa markets the most
7  and to a lesser extent Houston; do you see that?
8  A   Correct.
9  Q   And likewise that is an accurate statement of what you
10  believed regarding net operating income or NOI at the time,
11  correct?
12  A   Most likely, yes.
13  Q   Well, you wouldn't have written it if you didn't
14  believe it to be accurate, correct?
15  A   I would hope so.
16  Q   Now, let's skip to page two of this exhibit. And at
17  the bottom still that same e-mail from you, the second to last
18  paragraph you write, we will also continue to try to better the
19  terms with Timbercreek?
20  A   I'm sorry. This is the same.
21  Q   Yes. Sorry. So you were reading from page one.
22  A   You're on page two.
23  Q   We're still in your 9:21 a.m. e-mail and now we're
24  about a third of the page down on page two the paragraph
25  beginning we will. Do you see that?
26  A   Yes.

Page 224

1        S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2  Q   We will also continue to try to better the terms with
3  Timbercreek and will still make the proposal we discussed
4  yesterday to MBL; do you see that?
5  A   Yes.
6  Q   And MBL there is Macquarie?
7  A   That is Macquarie, yes.
8  Q   And the proposal to Macquarie that you reference there
9  is to make a pay down correct?
10  A   Yes.
11  Q   You then end the e-mail by saying, quote, I will report
12  back today after the call with MBL, correct?
13  A   Yes.
14  Q   Now, let's go back to page one of this exhibit, please.
15  This is still the same e-mail but this is another e-mail,
16  same string but another e-mail from you. This one at 12:24 in
17  the afternoon; do you see that?
18  A   Yes.
19  Q   It is about three hours after your prior e-mail?
20  A   Yes.
21  Q   Where you ended by saying, you would report back on the
22  call with Macquarie, correct?
23  A   Yes.
24  Q   You say, quote, as a follow-up, I spoke to Jackie who
25  said that she cannot guess what number they would take as a pay
26  down but that if you would like to propose something that has

Page 225

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1 certainty of execution please make the proposal immediately. I
2 am not sure if it is realistic to get anything cleared by your
3 board, but we would need to make that proposal by Monday; do you
4 see that?
5    A.  I do.
6    Q.  Now, prior to this e-mail, Defendants' Exhibit 11 in
7 November of 2016 -- well, first of all, do you recall the
8 conversation that you referenced there with Miss Hamilton?
9    A.  During that time, I was having numerous, probably daily
10 conversations with Jackie.  So I don't remember this specific
11 conversation.  I do remember conversations about a pay down
12 proposal, and, but I don't know if it was this specific
13 conversation.
14   Q.  Well, regardless of which conversation it was, is it
15 fair to say that if you wrote this summary of a conversation
16 that you had with Miss Hamilton that you would have accurately
17 recorded or summarized that conversation for IIB as you do in
18 this e-mail?
19   A.  Yeah, definitely.  We were in constant conversations
20 with everybody at the time.
21   Q.  Now, this e-mail, Defendants' Exhibit 11 is
22 December 16, 2016, correct, this string?
23   A.  Yes.
24   Q.  Now, prior to this e-mail, about a month before in
25 November of 2016, do you recall that Miss Hamilton provided you

Page 226

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1 and Atlas' director of asset management, Mr. Malli, with a table
2 for calculating the pay down amount that would qualify Atlas for
3 the extension per the terms the loan agreement?
4    A.  No, not specifically.  Is there an e-mail you're
5 referencing?
6    Q.  Why don't we turn to Defendants' Exhibit 17, please.
7 Do you see Defendants' Exhibit 17?
8    A.  Yes.
9    Q.  Now, the subject line of the e-mail is and it's -- the
10 initial e-mail is an e-mail sent from Miss Hamilton to you and
11 others, correct?
12   A.  Yes.
13   Q.  And it's an e-mail sent at 1:59 p.m., correct?
14   A.  Correct.
15   Q.  And the subject line of Miss Hamilton's e-mail is Atlas
16 calc, C-A-L-C, hyphen to qualify for an extension, correct?
17   A.  Correct.
18   Q.  And in that first in time e-mail, Miss Hamilton states,
19 quote, see below for pay down calc to qualify for the mezz
20 extension per the definitions in the loan; do you see that?
21   A.  Correct.
22   Q.  And if you flip the page, there's a spreadsheet table
23 that she includes, correct?
24   A.  Yes.  Are you referring to the one that says extension
25 debt yield.

Page 227

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1    Q.  On page two of the exhibit; do you see that?
2    A.  I do.
3    Q.  That's when she sent in her e-mail to you and
4 Mr. Malli, correct?
5    A.  Correct.
6    Q.  And you see the line minimum debt yield in that table,
7 correct?
8    A.  I do.
9    Q.  And the entry is eight percent, correct?
10   A.  Correct.
11   Q.  And eight percent debt yield was what the contract
12 required for the first contractual extension, correct?
13   A.  Correct.
14   Q.  So in order to get that first contractual extension,
15 you had to meet that eight percent yield, correct?
16   A.  Correct.
17   Q.  The last entry is CAF mezz pay down for 8.0 DY, right?
18   A.  Yes.
19   Q.  And you understood that to mean eight percent DY debt
20 yield, correct?
21   A.  Correct.
22   Q.  And the result for that line is 54920; do you see that?
23   A.  That's what it says, yes.
24   Q.  You understood that to mean $54.9 million, correct?
25   A.  Yes, probably.

Page 228

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1    Q.  That's in millions, right?  The zeros are missing?
2    A.  That's what it looks like, yes.
3    Q.  Because if you look above that it's got a reference to
4 the unpaid balance of the HUD loans, right, do you see that?
5    A.  Correct.
6    Q.  That's 136939, right?
7    A.  Correct.
8    Q.  So there's no zeros there but you know that that loan
9 was 136 million, correct?
10   A.  Correct.
11   Q.  And then underneath that its got 71,000 for the
12 mezzanine loan, correct?
13   A.  Correct.
14   Q.  You knew that that loan was $71 million, correct, the
15 principal?
16   A.  Yep.
17   Q.  So this table shows, at least according to Macquarie's
18 calculations, that in order for Atlas to qualify for the
19 contractual extension it would require a pay down of
20 $54.9 million, right?
21   A.  That's what this table shows, but I don't believe it's
22 a correct number.
23   Q.  But it's what the table shows, correct?
24   A.  It's what the table shows with the incorrect inputs.
25   Q.  But Macquarie sent you their estimation of what pay

Page 229

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2   down amount was required to qualify for the extension, correct?
3     A.  Initially, yes.
4     Q.  And the next e-mail in this string you drop off Miss
5   Hamilton.
6         THE COURT: Can I ask while I am here, your
7     understanding, the number there in that last line is that
8     the number -- the total payment you understood or would it
9     be to bring the 71 million down to that number?
10        THE WITNESS: I think they're suggesting a
11    $55 million pay down.
12        THE COURT: So to bring it down to 16 million?
13        THE WITNESS: That's what they're suggesting.
14    Q.  And you understood that debt yield figure to be a
15  reduction of debt by, we'll call it, $55 million that could be
16  either the HUD debt, the mezzanine loan or some combination of
17  the two, correct?  It was the total debt?
18    A.  I don't think so.  I think it was just the mezz.
19    Q.  You don't recall that it was a combination of
20  outstanding debt period?
21    A.  Well, it may have been the definition, but I don't
22  think there was a mechanism to contemplate it to be able to pay
23  down the senior loan.
24    Q.  Whether there was a mechanism or not, it was your
25  understanding that the debt yield calculation, however, took
26  into account the total outstanding debt of the enterprise,

Page 230

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2   correct?
3     A.  I need to go back and read the specific definition to
4   be absolutely certain as you reference it.  If you have it, I'd
5   be happy to read it right now.
6     Q.  Now, in the next e-mail, you forward the e-mail back to
7   Mr. Malli saying, quote, call me about this please; do you see
8   that?
9     A.  Correct.
10    Q.  And then you say we should be getting them to use our
11  numbers, right?
12    A.  Correct.
13    Q.  And Mr. Malli in turn forwards the e-mail to
14  Miss Willis and she is an analyst at Atlas, correct?
15    A.  Correct.
16    Q.  And Mr. Malli asked her to redo the table sent by Miss
17  Hamilton, quote, using our, in quotation marks, re-classed
18  numbers; do you see that?
19    A.  I do.
20    Q.  And Atlas eventually gets back to Miss Hamilton with
21  its own calculation of the pay down amount; do you recall that?
22    A.  Do you have that e-mail?  I recall conversations about
23  the calculations, but I don't recall a -- specifically
24  getting -- I am sure there was an e-mail somewhere.
25    Q.  But you recall having conversations internally at Atlas
26  about how to redo the pay down number using this table?

Page 231

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2     A.  Both internally and with Macquarie, correct.
3     Q.  Now, let me show you then Defendants' Exhibit 114, the
4   back of that binder.  So do you have Defendants' Exhibit 114?
5     A.  I do.
6     Q.  Now, do you see that it's an e-mail -- the first or the
7   top e-mail is dated December 13, 2016, do you see that?
8     A.  Correct.
9     Q.  And it is an e-mail from Mr. Malli reapplying to
10  Miss Hamilton's e-mail, the one we were just looking at in
11  DE-17; do you recall that -- do you see that?
12    A.  Correct.
13    Q.  So Miss Hamilton's e-mails where she first sends the
14  table is November 22nd, correct?
15    A.  Correct.
16    Q.  And then about three weeks later Atlas replies to that
17  e-mail, correct?
18    A.  Yes.
19    Q.  And in his e-mail, he attaches Atlas', quote,
20  calculation for the debt yield; do you see that in the top
21  sentence to her?
22    A.  Yes.
23    Q.  And he then lists from one to five some, what he calls,
24  corrections or questions; do you see that?
25    A.  I do.
26    Q.  And in the last sentence of the e-mail he writes,

Page 232

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2   quote, based on this calculation, coming up with a pay down of
3   35 million?
4     A.  Correct.
5     Q.  So $35 million was Atlas' own calculation as compared
6   to Macquarie's figure of $54.9 million of the pay down amount
7   needed to qualify for the extension, right?
8     A.  Correct.
9     Q.  Now, you also knew by mid-December that Macquarie,
10  specifically Miss Hamilton and her colleague Hayden Jones, had
11  received the JLL deal book, correct?
12    A.  Correct.
13    Q.  And after Macquarie became aware of the JLL deal book,
14  you tried to reassure Macquarie that you were still working on
15  getting the refinancing in place, correct?
16    A.  Correct.
17    Q.  Let's go to exhibit Defendants' 22, please.  This is an
18  e-mail from Miss Hamilton to you on December 20, 2016, do you
19  see that?
20    A.  Yes.
21    Q.  And do you recall receiving this e-mail?
22    A.  Yes.
23    Q.  In this e-mail she writes, quote, Steve, as you are
24  aware, the mezzanine loan in the original principal amount of
25  $71 million to Atlas MF Mezzanine Borrower is scheduled to
26  mature on January 2, 2017, with payment in full due on

Page 233

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1    December 30, 2016, as January 2, 2017, is not a business day; do
2    you see that?
3    A. I do.
4    Q. And you were already aware of the maturity date at the
5    time you received this, correct?
6    A. Correct.
7    Q. She goes on and writes, quote, in the event the
8    borrower fails to pay all amounts due as and when required by the
9    loan documents, Macquarie may exercise all rights and remedies
10   available to it under the loan documents and applicable law; do
11   you see that?
12   A. I do.
13   Q. And you knew that among the, quote, rights and remedies
14   available to Macquarie if Atlas did not pay off the loan at
15   maturity was to declare a default and commence a foreclosure
16   sale, correct?
17   A. Correct.
18   Q. In the next paragraph she writes, quote, as we
19   discussed yesterday, you and your equity partner may desire that
20   Macquarie consider a short-term forbearance from exercising
21   rights and remedies with respect to the mezzanine loan as you
22   pursue a refinance of the mezzanine loan; do you see that?
23   A. I do.
24   Q. And when she says this, we discussed yesterday, do you
25   recall having a discussion with her the day before having

Page 234

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1    received this e-mail?
2    A. I don't specifically. But as I had said, we were
3    having numerous discussions during that period of time.
4    Q. Her e-mail goes on, quote, while I do not know if
5    Macquarie would consider a forbearance and with the
6    understanding that it has no obligation to do so, in order for
7    any discussions regarding a forbearance to commence, borrower
8    must make any such request to Macquarie in writing; do you see
9    that?
10   A. I do.
11   Q. So Miss Hamilton made it clear to you that she did not
12   know whether Macquarie would enter into a forbearance agreement,
13   correct?
14   A. Correct.
15   Q. And as she states in the e-mail, you knew that
16   Macquarie was under no obligation to enter into a forbearance
17   agreement with Atlas, correct?
18   A. Correct.
19   Q. The last sentence of her e-mail reads, quote, the above
20   is subject in all respects to the prenegotiation letter dated
21   August 5, 2015, between Macquarie, and then it gives a full
22   entity name, and Atlas as reaffirmed on February 15, 2016, do
23   you see that?
24   A. I do.
25   Q. And you're familiar with the prenegotiation letter she

Page 235

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1    references, correct?
2    A. I remember we did sign one.
3    Q. And you would have been the person who signed on behalf
4    of Atlas, correct?
5    A. Probably. If you have a copy of the letter, I can
6    confirm that.
7    Q. And you knew from Miss Hamilton's e-mail that any
8    negotiations regarding a forbearance agreement would be subject
9    to the prenegotiation letter, correct?
10   A. That's what it says here. Whether it is accurate or
11   not, you have to ask Mr. Ginsburg who probably wrote this.
12   Q. So you understood from her e-mail that she was telling
13   you that any discussion --
14   A. Yeah, this is a reservation of rights letter. I
15   understand what that means.
16   Q. Does the fact that its a reservation of rights letter
17   make it any less significant in terms of what is being conveyed?
18   A. No.
19   Q. Now, two days later on December 22, 2016, you sent
20   Miss Hamilton an e-mail request that Macquarie consider entering
21   into a forbearance agreement; do you recall that?
22   A. What was the date?
23   Q. Two days later December 22nd?
24   A. Yeah, I think we looked at that e-mail yesterday in one
25   of the exhibits. Which one is it?

Page 236

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1    Q. I'm not sure we have, but we'll get to it in a second.
2    And in that request, you told Miss Hamilton that you needed the
3    forbearance because Atlas had been delayed in starting the
4    refinancing process, correct?
5    A. Let me read the e-mail, and I'll verify that statement,
6    please.
7    Q. Let's go to Defendants' Exhibit 108, please. Do you
8    have 108 in front of you, defendant's?
9    MR. MEISTER: We're missing 108 from our book.
10   Q. This is an e-mail that you sent Miss Hamilton, correct?
11   A. Yes, correct.
12   Q. On December 22, 2016, at 3:14 eastern p.m., correct?
13   A. Correct.
14   Q. And the subject of the e-mail that you wrote is, quote,
15   nonbinding forbearance request, correct?
16   A. Correct.
17   Q. And in the e-mail you write, quote, as you know, Atlas
18   has been working diligently toward this end from our meeting
19   this summer -- when you say this end, you mean getting
20   refinancing, correct?
21   A. Correct.
22   Q. -- but got a less than ideal start date due to our
23   limited partner's unexpected change of business plan this past
24   August which caused a delay and subsequent request; do you see
25   that?

Page 237

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
1
2    A.  I do.
3    Q.  And that's a reference to the earlier e-mails we were
4    looking at when you were telling IIB about them causing you to
5    sit on your hands, correct?
6    A.  Yes.
7    Q.  And what you wrote in this e-mail to Miss Hamilton was
8    an accurate statement, correct?
9    A.  Correct.
10   Q.  Now, if you turn the document, the page, the
11   attachment, there's an attachment to the e-mail, correct?
12   A.  Yes.
13   Q.  And the e-mail attaches a document titled, quote,
14   nonbinding forbearance agreement request subject to the
15   prenegotiation letter between Macquarie and Atlas dated
16   August 5, 2015, and reaffirmed on February 15, 2016, correct?
17   A.  Correct.
18   Q.  So as Miss Hamilton had indicated in her December 20th
19   e-mail, you were confirming to her that these negotiations would
20   be subject to that prenegotiation letter, correct?
21   A.  Yes.
22   Q.  And then your document proposes the terms of the
23   forbearance that Atlas was seeking from Macquarie, correct?
24   A.  Correct.
25   Q.  Now, the parties never agreed on the final terms of the
26   forbearance agreement, correct?

Page 238

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
1
2    A.  No.
3    Q.  And Atlas now claims that those forbearance
4    negotiations on the part of Macquarie were a sham, correct?
5    A.  We do.
6    Q.  You claim that Macquarie never intended to enter into a
7    forbearance agreement with Atlas, correct?
8    A.  That's not what we claim.  That's not what I claim.
9    Q.  Well, according to you, Macquarie was using the
10   forbearance negotiations as a way of lulling Atlas into
11   defaulting on the loan, correct?
12   A.  Yeah, I think a statement would be that they intended
13   on entering to do a forbearance that we could not sign.  I think
14   that would probably be an accurate statement.
15   Q.  But you always understood that Macquarie was under no
16   obligation to enter into a forbearance agreement with Atlas,
17   correct?
18   A.  Correct.
19   Q.  Let me show you Defendants' Exhibit 45.  Do you
20   recognize Defendants' Exhibit 45?
21   A.  Yeah, it appears to be the prenegotiation agreement and
22   the affirmation you referenced earlier.
23   Q.  And that prenegotiation agreement you see is dated
24   August 5, 2015, correct?
25   A.  I do.
26   Q.  And the re-affirmance of that agreement by Atlas is

Page 239

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
1
2    dated February 15, 2016, correct?
3    A.  Correct.
4    Q.  And those are the exact dates that you referenced in
5    the attached forbearance term sheet that you sent in
6    Exhibit 108, correct?
7    A.  Correct.
8    Q.  And in this document, your signature appears -- in
9    Exhibit 45, your signature appears on multiple pages, correct?
10   A.  Correct, on page ten of the original agreement and on
11   page 4, 5, and 2 of the affirmation it looks like.
12   Q.  And you understood that the -- you understood that the
13   reaffirmation, which is page one of this exhibit, was Atlas
14   confirming that the terms of the prenegotiation letter were
15   still in effect, correct?
16   A.  Correct.
17   Q.  Now, you know that Defendants' Exhibit 45, the
18   prenegotiation letter, precludes Atlas from using any evidence
19   concerning whatever happened in the forbearance negotiations for
20   any purpose in any proceeding; do you understood that?
21   A.  Can you show me that specific paragraph?
22   Q.  Sure.  If you go to paragraph six on page seven of the
23   exhibit.
24   A.  Yes.
25   Q.  I will give you a chance to read that to yourself and
26   let me know when you've read it.

Page 240

S. Ivankovich - by Plaintiff - Cross (Gonzalez)
1
2    A.  I'm ready.
3    Q.  When you signed the prenegotiation letter and the
4    reaffirmation, you read the prenegotiation letter, correct?
5    A.  I did.
6    Q.  And you read paragraph six, correct?
7    A.  Correct.
8    Q.  And you understood that paragraph six precluded Atlas
9    from using any evidence concerning whatever happened in the
10   forbearance negotiations for any purpose in any proceeding,
11   correct?
12   A.  I could have at the time.  I would have to refresh my
13   memory on what Rule 48 is of the federal rules of evidence under
14   New York law.  But if that's what the rules are, then I'll have
15   to accept that.
16   Q.  And that's what Atlas is doing in this litigation now,
17   right, using what occurred during the negotiations over the
18   forbearance agreement, you're using that in this litigation,
19   correct?
20   A.  Can you please be more specific?  I am not following
21   your logic.
22   Q.  Sure.  You made allegations that during those
23   forbearance negotiations, which were covered by paragraph six of
24   the prenegotiation letter, correct?
25   A.  Yes.
26   Q.  That during those negotiations that those negotiations

Page 241

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1 were used to lull Atlas, correct?
2
3    A.   It's possible, but I don't think that goes to the heart
4 of the case.  I don't think that's the issue we're adjudicating
5 here.
6    Q.   Why don't we -- I am going to -- if we could go to the
7 binder that you had yesterday.  And if you could turn to
8 Plaintiffs' Exhibit 31 in the larger binder, please?
9    A.   I'm here.
10    Q.   Okay.  Do you recall Mr. Meister showing you this
11 exhibit yesterday?
12    A.   I do.
13    Q.   Now, this is an e-mail string, correct?
14    A.   Yes.
15    Q.   And in this e-mail string, Atlas' lawyer, Mr. Broderick
16 sent an additional round of edits regarding the draft
17 forbearance agreement to Macquarie's lawyers, correct?
18    A.   Correct.
19    Q.   And that round of additional edits is sent on
20 January 2, 2017, correct?
21    A.   Correct.
22    Q.   That's on page one of the exhibit, correct?
23    A.   Yes.
24    Q.   And Mr. Broderick writes, as we discussed on the phone,
25 attached please find comments to the revised nonbinding
26 forbearance agreement proposal.  And then he goes on in that

Page 243

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1
2 Broderick replied with comments and it seems that they had a
3 conversation so I think my answer is no.
4    Q.   But the e-mail states that the version sent on
5 December 30th was Macquarie's final offer, correct?
6    A.   That's what it states.
7        MR. GONZALEZ:  Your Honor, I'm not sure if you want
8 to take a morning break.
9        THE COURT:  We will take five.  Usually, it is for
10 the court reporters.  Yeah, five would be good for a stretch
11 break.
12        (Whereupon, the witness was excused from the
13 stand.)
14        (Whereupon, a recess was taken.)
15        (Continued on next page)
16
17
18
19
20
21
22
23
24
25
26

Page 242

S. Ivankovich - by Plaintiff - Cross (Gonzalez)

1
2 sentence, correct?
3    A.   Correct.
4    Q.   And that e-mail is dated January 2, 2017, correct?
5    A.   Correct.
6    Q.   Now, if you turn the page, the previous in time e-mail
7 is dated Friday, December 30th; do you see that?
8    A.   I do.
9    Q.   And that was from Macquarie's lawyers to Mr. Broderick,
10 correct?
11    A.   Yes, from Dechert.
12    Q.   So that was -- Mr. Broderick e-mail of January 2nd was
13 three days after receiving the December 30th e-mail from
14 Mr. Gilbert, correct?
15    A.   Correct.
16    Q.   Now, do you see in his e-mail Mr. Gilbert states,
17 David, that's a reference to Mr. Broderick, correct?
18    A.   Yes.
19    Q.   David, we have reviewed your comments.  Please find
20 attached a revised version of the agreement which reflect
21 lender's final offer on which it is willing to forebear; do you
22 see that?
23    A.   I do.
24    Q.   So Atlas was aware that the draft Macquarie counsel
25 sent on December 30th was Macquarie's final offer, correct?
26    A.   Clearly, we didn't understand that because David

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)

Page 244

1        (Witness resumes the stand.)
2        THE COURT:  Before we continue, I just want to -- I
3 think all counsel have been very efficient and there's been
4 a minimum of objections and I have no complaints about how
5 it's going, but I would just observe that we're about a
6 quarter of the way through our week and we are in the middle
7 of the first witness.  So, you know, do the math.  If we're
8 going to try to be done by the end of Friday, we're going to
9 have to accelerate.
10        Again, I don't eliminate the possibility that we
11 may need more time for this.  Estimates are always a little
12 tricky.  But if you do want to finish this week and get this
13 thing to a resolution more quickly because I can't pick up
14 on Monday, let's put it that way, we will have to just move
15 a little more quickly, but again there are times in these
16 trials where I look at the lawyers and say, why are you
17 wasting your time?  I don't see that here.  Everybody is
18 doing a pretty good job, so...
19        MR. MEISTER:  Your Honor, I would just add that
20 there have been many times I have contemplated objections
21 and not made them in part because I'm trying not to slow
22 down the proceedings.
23        THE COURT:  I overruled those in my head, so...
24        MR. MEISTER:  Okay.  I think we are all working
25 toward that goal, but it is a possibility, at least in my

Case: 1:20-cv-04985 Document #: 202 Filed: 06/16/22 Page 39 of 63 PageID #:1626
Atlas v.
Macquarie et al (FINAL)                                                    January 13, 2020

**Ivankovich - Plaintiff - Cross (Mr. Gonzalez)**                                       Page 245

1  opinion, that despite the best efforts we won't be done on
2  Friday.  You have told us all you have a very hectic
3  calendar, but it's a possible reality.  That's all I'm
4  saying.
5          THE COURT: It's an important case.  I want to make
6  sure that people have a fair opportunity to present their
7  case.  At the same time I have a right to expect, I think,
8  you know, that we not do duplication.  There hasn't been any
9  duplication in this witness, but as we look forward, I'm
10 going to assume that people don't duplicate.  I did have a
11 trial cancel on me a little bit further off and closer than
12 I would have thought, but I'm not going to dangle that to
13 you yet.  You may continue.
14 CROSS EXAMINATION CONTINUED
15 BY MR. GONZALEZ:
16 Q   Now, if you look in the larger book, do you recall your
17 lawyer yesterday showing you Plaintiff's Exhibit 120?
18 A   Yes.
19 Q   That was the Notice of Default?
20 A   Yes.
21 Q   At least the version of that exhibit, a four page
22 document, correct?
23 A   Correct.
24 Q   And as you indicated yesterday, the address for MF
25 Mezzaine Borrower on the first page of the document, it was your

**Ivankovich - Plaintiff - Cross (Mr. Gonzalez)**                                       Page 246

1  testimony that that wasn't the correct address for MF Mezzaine
2  Borrower, correct?
3  A   Not at the time.
4  Q   As of that date, that the correct address was actually
5  55 East Monroe, correct?
6  A   Correct.
7  Q   I would like you now to look at Defendant's Exhibit
8  116, please.
9  A   In the same book?
10 Q   No.  In the smaller book.
11 A   I'm sorry 16 or 116?
12 Q   116.  Towards the back.  Do you see that?
13 A   Yes.
14 Q   You see that Defendant's Exhibit 116 is the same Notice
15 of Default as you were looking at in Plaintiff's Exhibit 120,
16 correct?
17 A   Yes.  That's correct.
18 Q   The only difference is that Defendant's Exhibit 116 is
19 a complete copy of that document that includes pages 5 and 6,
20 correct?
21 A   Correct.
22 Q   You see that on page 5 the continuation of that
23 document is a list of entities or individuals who were carbon
24 copied, correct?
25 A   Correct.

**Ivankovich - Plaintiff - Cross (Mr. Gonzalez)**                                       Page 247

1  Q   You see that in the middle of that there is a carbon
2  copy that was sent to Atlas MF Mezzaine Borrower, correct?
3  A   Correct.
4  Q   That's the same entity that's listed on the first page
5  of the document, correct?
6  A   Correct.
7  Q   And the address that's listed as a carbon copy
8  recipient is the 55 East Monroe Street, address, correct?
9  A   Correct.
10 Q   And that was the correct address at the time for Atlas
11 MF Mezzaine Borrower, correct?
12 A   Correct.
13 Q   There's also a carbon copy that was sent to you at 55
14 East Monroe, do you see that at the bottom?
15 A   Correct.
16 Q   And that would have been -- was that your office or is
17 that a home address?
18 A   That's the office address.
19 Q   Now, were you at the office on or about January 3rd or
20 4th, 2017?
21 A   No, I was not.
22 Q   Where were you during that time?
23 A   I was on vacation, out of the country.
24 Q   How long were you on vacation, from when to when?
25 A   I couldn't give you the exact dates.  Generally from

**Ivankovich - Plaintiff - Cross (Mr. Gonzalez)**                                       Page 248

1  before Christmas, probably the week before Christmas to the end
2  of the week after New Years, depending on where Christmas and
3  New Year land.
4  Q   So you were on vacation during the time that the loan
5  matured, correct?
6  A   Correct.  Also I recall I was out of the country when
7  we were negotiating the forbearance and the Letter of Credit
8  extension as well.  So, yes.
9  Q   But at the time of the maturity and the time that you
10 got the Notice of Default you were out of the country on
11 vacation, correct?
12 A   Correct.
13 Q   Now, if you will turn back to Defendant's Exhibit 116,
14 please, in the small binder.  If you go to page 2 of that
15 exhibit.
16       (Witness complies.)
17 Q   Around the middle of that page, do you see the
18 paragraph beginning, certain amounts due under the loan
19 documents?
20 A   Yes.
21 Q   It says, certain amounts due as of January 4, 2017,
22 correct?
23 A   Correct.
24 Q   It lists the principal amount of the loan which was 71
25 million dollars, correct?

Atlas v.
Macquarie et al (FINAL)                                                                January 13, 2020

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 249

1   A   Correct.
2   Q   You were aware of that figure always, right, 71
3   million?
4   A   Yes.
5   Q   Sorry.  I think I interrupted you.
6   A   Yes.
7   Q   And then it says third-party fees and it lists an
8   amount of 69 thousand odd, correct?
9   A   Yes.
10  Q   And then it says legal fees and it lists an amount 260
11  thousand, do you see that?
12  A   I do.
13  Q   Then it has a total amount, correct?
14  A   Correct.
15  Q   And then it goes on to say that in addition to the
16  foregoing interest the default rate continues to accrue in the
17  amount of $25,205 for each day after December 30, 2016, do you
18  see that?
19  A   Yes.
20  Q   So this portion of the notice gave Atlas the
21  information it needed to calculate its pay-off amount, correct?
22  A   I would say incorrect.
23  Q   Well, did it give you enough information to know what
24  to pay in principal and interest, correct?
25  A   In principal and interest, yes.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 250

1   Q   Now, a little further down on that page, the notice
2   provides the paragraph beginning, please be advised, do you see
3   that?
4   A   Yes.
5   Q   And that paragraph says that the lender at any time can
6   exercise any and all of its rights and remedies under the loan
7   documents, do you see that?
8   A   I do.
9   Q   And then it says, including without limitation, do you
10  see that?
11  A   I do.
12  Q   Then it sets out a number of things that the lender did
13  do, correct?
14  A   Correct.
15  Q   And including, "foreclosing on any or all of the
16  collateral and/or seeking recovery pursuant to the provisions of
17  the loan documents," do you see that?
18  A   I do.
19  Q   So this Notice of Default explicitly stated to Atlas
20  that Macquarie could foreclose on the collateral, correct?
21  A   Correct.
22  Q   Now, if you turn in that same binder to Defendant's
23  Exhibit 115, please.
24      (Witness complies.)
25  Q   Defendant's Exhibit 115.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 251

1   A   Yes.
2   Q   Do you recall receiving this from Macquarie?
3   A   Yes.
4   Q   And this is an accounting dated as of February 17,
5   2017, correct?
6   A   That's correct.
7   Q   And it was addressed to your attention at the 55 East
8   Monroe address, correct?
9   A   Correct.
10  Q   And this indicates the amount that would be owing to
11  pay off the loan as of that date, correct?
12  A   It indicates the purported amount, correct.
13  Q   Now, Atlas received the Notice of Disposition of
14  Collateral and the Terms of Public Sale on this matter on or
15  about January 11, 2017, correct?
16  A   I don't specifically recall.  If that document is an
17  exhibit it might refresh my memory.
18  Q   Now, do you recall being asked this question -- you
19  were deposed in this matter, correct?
20  A   Yes.
21  Q   And I'm just going to ask you if you recall being asked
22  a question and giving the answer.
23  A   I do not sitting here today.
24  Q   You don't recall all of it.  Right.  I'm going to read
25  one to you.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 252

1   A   Oh, please.
2   Q   "QUESTION:  All right.  Now I'm going to show you
3       the Notice of Disposition of Collateral and the
4       attached Terms of Public Sale which have previously
5       been marked in evidence as exhibit 7.  Do you recall
6       having received these documents in or about January 11
7       of 2017?
8       "ANSWER:  Yes."
9       Do you recall being asked that question during the
10  deposition?
11  A   I don't, but if it's there in the deposition it must be
12  so.
13  Q   So on or about January 11, you received the Notice of
14  Disposition, correct?
15  A   I said it back then.  Back then it was correct.  Yes.
16  Probably.  I would still like to see the notice to refresh my
17  memory sitting here today, but at that time it was correct.
18  Q   I think that's in your binder at Defendant's Exhibit
19  30.
20  A   Great.  Thank you.
21      MR. MEISTER:  Your Honor, if it's possible, without
22  interrupting the flow, for counsel to give cites to the
23  transcript, what he's citing to.
24      MR. GONZALEZ:  If I didn't, my apologies.
25      MR. MEISTER:  We're passed it.  I would just like

Case: 1:20-cv-04985 Document #: 202 Filed: 06/16/22 Page 41 of 63 PageID #:1628
Atlas v.
Macquarie et al (FINAL)                                    January 13, 2020

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)          Page 253

1    to read along in the future.
2         MR. GONZALEZ: That was my oversight. Just so the
3    record has it, I read from deposition transcript Page 100,
4    Lines 13 to 20.
5    A    I do recall having received this by email.
6    Q    At the time you received this you read it, correct?
7    A    Yes.
8    Q    And do you recall that one of the provisions in the
9    Notice of Disposition and Terms of Sale was a notice that CBRE
10   would set up a virtual data room regarding the properties?
11   A    I don't recall specifically, but let me read that here.
12   If you can point me to that paragraph.
13   Q    If you go to Page 10 of 16 of the exhibit.
14   A    Great.
15   Q    You see there's a numbered paragraph 2, and about
16   halfway down numbered paragraph 2, the line beginning applicable
17   operating agreements, and then it goes on, the Secured Party
18   will provide.
19   A    Yes, I see that. Yep.
20   Q    It reads, "Secured Party will provide to prospective
21   bidders upon the execution of a confidentiality agreement
22   available from CBRE Capital Advisors, Inc. Then it says, see
23   Section 4 below for contact information. Access to an on-line
24   data site. Do you see that?
25   A    Correct.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)          Page 254

1    Q    So at the time that you read this you were aware that
2    there would be an on-line data site being set up, correct?
3    A    Yes.
4    Q    And that was sometime around January 11 or 12 that you
5    read this for the first time?
6    A    Yeah. Makes sense that I would have.
7    Q    Now, Atlas did not seek access to that data room until
8    February 23rd or about four days after the auction, correct?
9    A    I'm not sure that's a correct statement. I'm not sure
10   we were permitted access to that data room when we sought it. I
11   don't remember specifically, but I would have absolutely
12   directed someone from the organization to get access to the data
13   room. I'm not sure that we were permitted access to the data
14   room until February.
15   Q    So it's your testimony that prior to February you or
16   someone at Atlas had sought permission to enter the data room
17   and that permission was denied?
18   A    Whether they did or didn't, I remember specifically
19   directing my people to get access to the data room and then I
20   remember there being issues. I would have to go back
21   specifically through emails and discussions, but that's my vague
22   recollection today.
23   Q    But is it your recollection that someone at either CBRE
24   or Macquarie prohibited Atlas from gaining access to the data
25   room?

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)          Page 255

1    A    I don't remember what the reason was, if it was a
2    technical issue with the data room, but I recall that we were
3    struggling to get access to the data room.
4    Q    Well, let me take you to Defendant's Exhibit 56 in that
5    binder. If you can take a look it. Actually, I might have
6    misspoken. 56. Are you at Exhibit 56?
7    A    Correct.
8    Q    Defendant's 56. You see that the subject line for this
9    email is Atlas/Macquarie bidding certificate? Do you see that?
10   A    Correct.
11   Q    And if you go to the first in time email, which is on
12   Page 2 of the Exhibit, do you see that?
13   A    Yes.
14   Q    And this is an email from you on Thursday, February
15   23rd, at 2:21. Do you see that?
16   A    I do.
17   Q    It's addressed to Mr. Guberer. Do you see that?
18   A    I do.
19   Q    Someone at CBRE, correct?
20   A    Yes.
21   Q    You write, "PropTex Holdings, LLC, has registered to
22   bid at the UCC sales scheduled to be conducted on February 27,
23   2017, at 11 A.M. on behalf of Macquarie Texas Loan Holder, LLC
24   and involving Atlas MF Holdco, LLC. As set forth in Section 2
25   of the Terms of Public Sale. Please send me a copy of the

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)          Page 256

1    confidentiality agreement that must be executed in order to get
2    access to the on-line date site for the sale." Do you see that?
3    A    I do.
4    Q    Is it your testimony that this was not the first time
5    that Atlas requested access to the data room?
6    A    Yeah. My recollection says that I think we tried to
7    access it prior to that, but, again, it was a while ago, during
8    that time, but I do remember instructing our people to access
9    the data room.
10   Q    Now, is it just as likely that this email of February
11   23rd is the first time that Atlas sought access to the data
12   room?
13   A    It's entirely possible.
14   Q    Now, when you say that PropTex Holdings, LLC has
15   registered to bid, you're referring to a bidding certificate
16   that PropTex had sent to CBRE on February 17, correct?
17   A    Do you have that email so I can cite that?
18   Q    Sure. Look in that same small binder, the last
19   exhibit, PX129.
20   A    Sorry. Are you saying when I write to Mr. Guberer that
21   we registered a bid blah, blah, blah... that that's referencing
22   that the bidding certificate is registration?
23   Q    Yes. When you say that you registered to bid, are you
24   referring to the fact that on February 17 you sent to CBRE what
25   purports to be a bidding certificate?

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 257

1    A   I'm going to read it so. PropTex Holdings --
2    Q   Are you going to read it to yourself or you're going --
3  you can read it to yourself and then you can answer my question.
4    A   Sorry. It says we registered a bid. If issuing a
5  certificate is registering a bid, then that's what it means, but
6  it is unclear from this email that the bidding certificate is a
7  register to bid, but again I'm just trying to be succinct to
8  answer the question.
9    Q   But Plaintiff's Exhibit 129 you recall sending that
10 document on February 17 to CBRE, correct?
11   A   Yeah. And it says registration to bid and bidding
12 certificate for UCC sale, so I would imagine this would be the
13 registration.
14   Q   That was dated February 17, correct?
15   A   Correct.
16   Q   So at the time that you sent Plaintiff's Exhibit 129
17 Atlas had not yet gained access to the data room, correct?
18   A   Correct.
19   Q   Let's go back to Defendant's Exhibit 56. The first in
20 time, you know, this is your request for the Confidentiality
21 Agreement, correct?
22   A   Correct.
23   Q   The confidentiality agreement, as we looked at before
24 in the Terms of Sale, was one of the documents, the document
25 that needed to be signed before gaining access to the data room,

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 258

1  correct?
2    A   Correct.
3    Q   Atlas was given access to the data room on February
4  23rd, the same day it first requested access, correct?
5    A   Well, it infers that, but I don't think there's a
6  specific verification of that access here. It says you should
7  be receiving an email shortly to enter the virtual data room.
8    Q   As you sit here today you don't recall that?
9    A   I don't.
10   Q   Let me refer you and see if this refreshes your
11 recollection, to the Parties' Joint Statement of Stipulated
12 Facts, Paragraph 68 which reads:
13       "Atlas received access to the data room on February
14 23rd, 2017, five days before the auction."
15       Does that refresh your recollection that on the same
16 day that you sent the email that Atlas received access to the
17 data room?
18   A   It doesn't, but if it's stipulated there then we must
19 have.
20   Q   Now, as Plaintiff's Exhibit 129, the PropTex bidding
21 certificate that we looked at a minute ago. As that document
22 shows, Atlas was aware that each prospective bidder had to
23 submit a bidding certificate as part of registering to bid,
24 correct?
25   A   Correct.

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 259

1    Q   And in the data room there was a form bidding
2  certificate, correct?
3    A   I don't recall.
4    Q   Well, let's look at Exhibit D59, please. If you look
5  at the first page of this Exhibit, the cover sheet. If you go
6  -- the cover sheet that shows DE59. I'll just represent to you
7  that DE59 is a compilation of a lengthy exhibit with all the
8  documents in the data room; and for our purposes, I'm just
9  taking you to that portion of those documents which is the form
10 bidding certificate on the next page. Do you see that?
11   A   Yes.
12   Q   Do you recall seeing the form bidding certificate in
13 the data room?
14   A   I do not.
15   Q   Now, if you look at Plaintiff's Exhibit 29 and keep a
16 finger on Plaintiff's Exhibit 59, the form bidding certificate.
17 Plaintiff's Exhibit 129, the document you originally submitted
18 as the PropTex bidding certificate did not make all the
19 representations as required by the form bidding certificate,
20 correct?
21   A   I'm sorry. 29?
22   Q   No Plaintiff's Exhibit 129, which is the last document
23 in your binder.
24   A   Correct.
25   Q   Do you have that in front of you?

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 260

1    A   I do.
2    Q   You're holding Plaintiff's Exhibit -- I mean
3  Defendant's Exhibit 59, which is the form bidding certificate in
4  the data room?
5    A   Correct.
6    Q   And my question to you, is that Plaintiff's Exhibit
7  129, the document that Atlas originally submitted as the PropTex
8  bidding certificate did not make all the representations
9  required by the form bidding certificate, Defendant's Exhibit
10 59, correct?
11   A   It appears so.
12   Q   So, for example, the form bidding certificate required
13 a certification that "by signing below, the company, and that
14 would be the potential bidder, hereby certifies that the company
15 (A) is able to meet the requirements detailed in the Terms of
16 Public Sale; (B), agrees to be bound by the terms of the bidding
17 procedures detailed in the Terms of Public Sale; and (C), has
18 sufficient ready funds to consummate the sale of the collateral.
19 Did I read that correctly?
20   A   Correct.
21   Q   And Plaintiff's 129, the February 17 bidding
22 certificate does not contain that language, correct?
23   A   Correct.
24   Q   Atlas eventually submitted a revised bidding
25 certificate, correct?

Atlas v.
Macquarie et al (FINAL)                                              January 13, 2020

| Ivankovich - Plaintiff - Cross (Mr. Gonzalez) | Page 261 |
| --- | --- |

1    A    Correct.
2    Q    And it changed the bidder from PropTex to Atlas
3  Mezzanine, correct?
4    A    Correct.
5    Q    So if you will go to Defendant's Exhibit 70, please.
6    A    I'm here.
7    Q    Do you see Defendant's Exhibit 70?
8    A    Correct.
9    Q    This is Atlas's revised bidding certificate, correct?
10   A    Yes.
11   Q    And Atlas submitted this bidding certificate after
12  gaining access to the data room on February 23rd, 2017, correct?
13   A    Correct.
14   Q    When you sent Defendant's 56, which was the request to
15  CBRE for access to the data room, do you recall that email,
16  Defendant's 56?
17   A    Yes.
18   Q    The subject line was bidding certificate, correct?
19   A    Correct.
20   Q    So you were seeking access to the data room in order to
21  find the form bidding certificate, correct?
22   A    Correct.
23   Q    Now, Defendant's Exhibit 70, the Atlas bidding
24  certificate follows the language of the form bidding
25  certificate, correct?

| Ivankovich - Plaintiff - Cross (Mr. Gonzalez) | Page 262 |
| --- | --- |

1    A    It appears to, yes.
2    Q    I'm going to change topic, Mr. Ivankovich.
3         In mid-January 2017, when you received the Notice of
4  Auction you knew that a 4.125 million dollars certified or bank
5  check was needed for the auction, correct?
6    A    Correct.
7    Q    Now, on February 27, the date of the auction, I think
8  you testified you were not physically present at the auction,
9  correct?
10   A    Correct.
11   Q    And that's because you were trying to get the bank
12  check that morning, correct?
13   A    Correct.
14   Q    And you sent Bonnie Rothell, I believe you said, and
15  Gary Romaniello to the auction?
16   A    Correct.
17   Q    And Miss Rothell was Atlas's outside counsel, correct?
18   A    She was our counsel, yes.
19   Q    She didn't work -- she was an outside lawyer?
20   A    Yes.  Yes.
21   Q    And Mr. Romaniello was a business associate of yours,
22  correct?
23   A    Yes.
24   Q    And he was not an employee of Atlas, correct?
25   A    No, he was a -- an investor and partner in another

| Ivankovich - Plaintiff - Cross (Mr. Gonzalez) | Page 263 |
| --- | --- |

1  deal.
2    Q    So there were no Atlas employees at the auction,
3  correct?
4    A    Which specific Atlas company do you mean?
5    Q    Well, any Atlas, the bidder, Atlas Mezzanine.  There
6  was no employee from Atlas Mezzanine at the auction, correct?
7    A    Because Atlas Mezzanine has and never had employees,
8  yes.
9    Q    So the answer is correct?
10   A    The answer is correct.
11   Q    Now -- well, in addition to Miss Rothell and
12  Mr. Romaniello, there was no one else who had any connection to
13  any Atlas entity present at the auction, correct?
14   A    Correct.
15   Q    Now, five days before the auction on Wednesday,
16  February 22nd -- so the auction was on a Monday, correct?
17   A    It was.
18   Q    And on Wednesday, February 22nd, you attended a hearing
19  related to this case just across the street in the Southern
20  District courthouse in front of Judge Stanton, correct?
21   A    I believe that's correct, yes.
22   Q    Do you recall if it was a Wednesday?
23   A    I don't, but I remember the hearing.
24   Q    And it was a few days before the auction, correct?
25   A    I think it was a week before, yes.

| Ivankovich - Plaintiff - Cross (Mr. Gonzalez) | Page 264 |
| --- | --- |

1    Q    There was an intervening weekend between the hearing
2  and the auction, correct?
3    A    Correct.
4    Q    And do you recall that the hearing ended mid-afternoon
5  on the day of the hearing, whatever date that was?
6    A    It ended, yes.  I don't know what the time was.  At
7  some point.
8    Q    Do you recall that Atlas was there trying to get a
9  preliminary injunction, correct?
10   A    Correct.
11   Q    And that injunction was to enjoin the auction from
12  going forward on February 27, correct?
13   A    Correct.
14   Q    And Judge Stanton denied that application, correct?
15   A    Correct.
16   Q    So you were aware that the auction would in fact go
17  forward on February 27, correct?
18   A    Correct.
19   Q    So you were aware of that, at least as of February
20  22nd, when Judge Stanton denied Atlas's application, correct?
21   A    Correct.
22   Q    Now, on Thursday, February 23rd, Atlas had not obtained
23  a bank check in the amount of 4.125 million dollars, correct?
24   A    Correct.
25   Q    Likewise on Friday, February 24th, Atlas had not

Case: 1:20-cv-04985 Document #: 202 Filed: 06/16/22 Page 44 of 63 PageID #:1631
Atlas v.
Macquarie et al (FINAL)

January 13, 2020

Ivankovich - Plaintiff - Cross (Mr. Gonzalez)                    Page 265

1  obtained a bank check in the amount of 4.125 million dollars,
2  correct?
3     A   That is correct.
4     Q   It wasn't until the morning of the auction, February
5  27th, the Monday, that you went to the Chase Branch to try and
6  get a bank check in the amount of 4.125 million, right?
7     A   That's correct.
8     Q   Where was that Chase Branch?
9     A   It was here in New York. I think we picked that branch
10 because it was a few blocks away from the actual auction.
11    Q   So it was somewhere in the Times Square area?
12    A   Yeah, in Times Square.
13    Q   Prior to going to that branch you hadn't called anyone
14 at that branch in advance, correct?
15    A   Correct.
16    Q   So when you showed up at the branch you didn't have a
17 scheduled appointment, correct?
18    A   Correct.
19    Q   You simply walked in, first you spoke to a teller,
20 correct?
21    A   Probably, yeah.
22    Q   And then eventually the bank branch provided you with a
23 letter, correct?
24    A   Yes.
25    Q   And that letter stated that the funds you were seeking

Page 267

1     S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2  CONT'D CROSS-EXAMINATION
3  BY MR. GONZALEZ:
4     Q   And you didn't provide this letter to Macquarie on the
5  day of the auction, correct?
6     A   We did not.
7     Q   In fact, this letter was not provided to Macquarie
8  until months later during the discovery in the litigation,
9  correct?
10    A   I believe that is correct.
11    Q   Now, while you were at the bank, Miss Rothell texted
12 you and said KKR has been declared the winning bidder based on
13 their demonstrated ability to close, correct?
14    A   If that's what the text said. Do you have a copy? I
15 remember she texted me something to the effect the auction is
16 over. They gave the bid to KKR, but I don't know if it was
17 exactly as you read unless you have a copy of that text.
18    Q   I do have a copy of the text. You were in text
19 communication with her during the morning of the auction,
20 correct?
21    A   Correct.
22    Q   And on the morning of the 27th, you never received a
23 check for $4.125 million, correct?
24    A   Correct.
25    Q   And that day, the 27th, you never had in hand a check
26 for $4.125 million, correct?

Page 266

1  to draw on for the bank check would not be available for
2  withdrawal that day, correct?
3     A   Correct.
4     Q   Let me show you Defendant's Exhibit 67, please.
5  Defendant's Exhibit 67 is the letter that was provided to you by
6  the Chase Branch, correct?
7     A   Correct.
8     Q   You see that it looks like their address was 3 Times
9  Square, do you see that?
10    A   Yes.
11    Q   The letter states, "we are in receipt of wires into the
12 Atlas Apartment Homes, LLC account this morning and your request
13 to issue a cash -- let me start that again -- and your request
14 to issue a cashier's check. However, wires received on 2/27/17
15 cannot be approved 2/27/17 for withdrawal. Funds received needs
16 to be held in account for one to two business days before they
17 can be withdrawn for cash." Did I read that correctly?
18    A   You did.
19    Q   Now, the letter accurately reflects what you were told
20 at the Chase Branch on the morning of February 27, correct?
21    A   Correct.
22    Q   And the letter does not reference any dollar amounts,
23 correct?
24    A   It does not.
25           (Continued on next page.)

Page 268

1     S. Ivankovich - by Plaintiff - Cross (Gonzalez)
2     A   Correct.
3     Q   So you left the bank that day without a bank check of
4  $4.125 million, correct?
5     A   Correct.
6     Q   At no time during your back and forth texting with
7  Miss Rothell during the auction did you ever mention to her the
8  possibility of getting a check from Stifel, correct?
9     A   I didn't mention a lot of things to her but
10 specifically that, yes.
11    Q   You did not mention Stifel to her, correct?
12    A   Nope.
13    Q   No, you did not mention?
14    A   I did not mention Stifel nor did I mention the Cubs.
15    Q   On the day of the auction, Atlas never informed
16 Macquarie that it could get a check from Stifel, correct?
17    A   No.
18    Q   Now, do you recall during your direct testimony you
19 said that Atlas had never been, I think the words you used were,
20 a minute late with Macquarie, right?
21    A   Referring to interest payments, correct.
22    Q   And I believe what you said is that you paid like clock
23 work, right?
24    A   Correct.
25    Q   But the one payment you did not make like clock work,
26 correct, was the loan maturity payment, correct?

Case: 1:20-cv-04985 Document #: 202 Filed: 06/16/22 Page 45 of 63 PageID #:1632
Atlas v.
Macquarie et al (FINAL)

January 13, 2020

Page 269

Proceedings

1
2 A. Correct.
3    MR. GONZALEZ: I have nothing further, Your Honor.
4    MR. MEISTER: Could we take a break?
5    THE COURT: Before we take a break, let me just
6 make sure we are all level set on timing. Maybe, over lunch
7 people can think about how long they think this is going to
8 take and how many witnesses you have. And as you think
9 about that, we had agreed five days. Since that time, if
10 anything, the case has gotten slimmer in that there is no
11 jury trial and one of the counterclaims was dismissed. So,
12 again, I'm not blaming anyone. But if I have more days than
13 five, it's only going to be by one or two, okay. And I'm
14 not willing to just let this go on and on.
15    So I think people need to start making their plans
16 with the assumption that if it goes beyond this week it is
17 not by much. I started to keep track of how much time each
18 side has been taking, and I don't say that in a threatening
19 way. But I also don't want one side to run out the clock on
20 the others. So I think you should start working back from
21 the end of that period and just ensure that you -- either if
22 you need to trim things like cross and redirect or which
23 witnesses you call, I don't want people to show up at the
24 end and be surprised that we're running out of time.
25    So I'd like you, you know, we'll come back in five
26 minutes. I don't expect you to have new estimates at that

Page 270

Proceedings

1
2 time, but I would like to talk to people at 2:15 when we
3 come back because I need to have the schedule very clear in
4 everybody's mind so I don't hear later we were deprived of
5 process because we didn't know you were going to end at a
6 certain point. So, again, without casting any aspersions, I
7 think there are some times when you can get right to the
8 point of things and I think we're probably going to need
9 that point. So you want to take five.
10    MR. MEISTER: I did. There is one item that came
11 up that could bear on timing, so I'd like to raise it with
12 you now rather than surprise you with it later.
13    THE COURT: That's a troubling thing.
14    MR. MEISTER: So we want to put on the witness
15 stand Mr. Jones, Hayden Jones. He's a very essential
16 player. You've seen some of the e-mails that he's written.
17 I think I also referenced in my opening statement that he's
18 terminated or no longer with Macquarie and that that
19 happened, you know, during the preparation for this trial.
20    So, plaintiff Macquarie -- sorry, defendant
21 Macquarie has taken the position he's the third-party
22 witness. We have been trying to serve him. Unsuccessfully
23 until earlier this morning, we received an e-mail, Ben
24 did -- Mr. Bianco from our process server. My understanding
25 is that he was served in New York State, I think New York
26 City, that there's a video of it, he threw down the process.

Page 271

Proceedings

1
2 And we had a conversation with counsel Macquarie to inform
3 them of this within the last hour on the last break and what
4 we're told they have nothing to do with Mr. Jones. So I
5 don't know what to do other than ask the Court for a bench
6 warrant. He's a very important witness. This is an
7 important matter. I don't want to slow anything down. I
8 don't think the examination of him will take a long time. I
9 can't examine him if he doesn't honor the process
10 voluntarily. I just wanted -- this only maybe an hour
11 old -- to inform the Court of this since we're discussing
12 the conclusion of the trial.
13    THE COURT: Okay. Well, why don't we discuss this
14 as part of the longer conversation and, you know, hopefully,
15 the issue goes away because we'll have his testimony either
16 by the end of the week or if there is a day or two after
17 that. But, obviously, I'd like to get an update on where
18 things stand. Take five.
19    COURT OFFICER: The part is down for five minutes.
20 The witness may step down.
21    (Whereupon, the witness was excused from the
22 stand.)
23    (Whereupon, a recess was taken.)
24    COURT OFFICER: All rise. Come to order.
25    (Whereupon, the witness resumes the witness stand.)
26    MR. ROSSMAN: May I inquire, Your Honor?

Page 272

1 S. Ivankovich - by Plaintiff - Cross (Rossman)
2    THE COURT: Not yet.
3    MR. WHITMER: Your Honor, before we get started, I
4 believe Mr. Morris is in the courtroom. I would ask that he
5 step outside.
6    MR. BIANCO: Just so the Court is aware, I asked
7 him to be here after lunch. He is represented by counsel
8 and I told him --
9    THE COURT: I would ask maybe somebody from each
10 team keep track of the time of how long people are taking.
11 And I just mean not individual people but required for
12 expert time for the plaintiff for one period of time, KKR
13 for one period of time. I have a pretty good sense after
14 one day. Again, I am not trying to be -- I don't want to
15 get a chess clock. All right. You can inquire.
16    MR. ROSSMAN: Thank you, Your Honor. We do have,
17 of course, more binders just for the convenience of counsel
18 and the witness.
19 CROSS-EXAMINATION
20 BY MR. ROSSMAN:
21 Q. Mr. Ivankovich, what we've tried to do for you is give
22 you everything you need in one place for this examination so it
23 is a little duplicative of the others but, hopefully, you won't
24 have to be shuffling binders up there.
25    MR. ROSSMAN: May I proceed, Your Honor?
26 Q. Good afternoon, Mr. Ivankovich.

Page 273

S. Ivankovich - by Plaintiff - Cross (Rossman)

1     A. Hello.
2     Q. We met before. I am Andrew Rossman. I represent KKR.
3  Now, would you turn to DE-104 in your binder. Let me know when
4  you have that. It is a declaration that you submitted in
5  federal court; is that true?
6     A. Yes.
7     Q. And if you look at paragraph three, you say Atlas is
8  finalizing that loan with one of the largest lenders for HUD
9  insured loans in the country; do you see that?
10    A. Correct.
11    Q. And you're referring to the loan that was contemplated
12 in a nonbinding term sheet with Walker Dunlop; is that right?
13    A. Correct.
14    Q. And if you take a look at Plaintiffs' Exhibit 238,
15 probably toward the back of that binder.
16    A. I don't see a 238. There's a 243 and then before that
17 is 145.
18    Q. I already broke my first promise. If you look at the
19 other big binder, which is the exhibit binder that Mr. Meister
20 handed you, I will -- PX-238. When you get there, you'll
21 recognize it as the Walker Dunlop term sheet document.
22    A. Yes.
23    Q. Okay. Now, if you turn to the very first full
24 paragraph, it says this letter and the proposed terms are for
25 discussion purposes; do you see that?

Page 274

S. Ivankovich - by Plaintiff - Cross (Rossman)

1     A. Correct.
2     Q. Are intended as outlined only do not purport to
3  summarize all the terms and conditions of the loan and are not
4  intended to be and shall not be a commitment by the lender to
5  provide the loan or provide any other financial accommodation to
6  you or to any party; is that right?
7     A. Correct.
8     Q. And it goes on to describe it as a preliminary summary
9  framework for further discussions and negotiations, correct?
10    A. Correct.
11    Q. And that was unclear. At the end, it restates it shall
12 not be a binding obligation, true?
13    A. Correct.
14    Q. Five days before the auction, that's what you had from
15 Walker Dunlop, correct?
16    A. Correct.
17    Q. Now, if you turn to Defendants' Exhibit 70 which --
18    A. In your book?
19    Q. You could go back to my book. Hopefully, you're done
20 with the plaintiffs' binder for the moment. Let me know when
21 you're at Defendants' 70.
22    A. Go ahead.
23    Q. And you will recognize Defendant 70 as a bidding
24 certificate, the revised bidding certificate that Mr. Gonzalez
25 asked you about; is that correct?

Page 275

S. Ivankovich - by Plaintiff - Cross (Rossman)

1     A. Correct.
2     Q. And in Defendants' 70, you signed it on behalf of an
3  entity called Atlas MF Mezzanine Borrower; is that correct?
4     A. Correct.
5     Q. And if you look at the paragraph above the signature,
6  it says the company, that refers to -- by company that's
7  referring to Atlas MF Mezzanine Borrower LLC, true?
8     A. True. Correct.
9     Q. It says the company hereby certifies that the company,
10 among other things, sees has sufficient ready funds to consummate
11 the sale of the collateral, correct?
12    A. Correct.
13    Q. And the company didn't actually have those funds. The
14 company itself didn't have sufficient ready funds to consummate
15 the sale of the collateral, true?
16    A. That's an incorrect statement.
17    Q. Let's take a look at that. The company -- if you turn
18 to DE-75. Let me know when you have that.
19    A. Correct.
20    Q. And this is the Stifel account for Atlas MF Mezzanine
21 Borrower LLC, true?
22    A. True.
23          MR. MEISTER: Objection. Relevance, Your Honor.
24    This is not all the accounts of this company. This is one
25    account and what it tells us.

Page 276

S. Ivankovich - by Plaintiff - Cross (Rossman)

1          THE COURT: Overruled. You can bring in whatever
2    you need.
3     Q. Okay. This is the account that the company had at
4  Stifel?
5     A. This could be one of them, but, yes, this is an account
6  of the company.
7     Q. This account shows that the company had $0.42 on
8  deposit with Stifel, true?
9     A. True.
10    Q. Now, we don't have to debate it. Plainly, $0.42 wasn't
11 sufficient ready funds to close, true?
12    A. $0.42 was not sufficient ready funds to close.
13    Q. And I don't need you to juggle the binders. If you
14 went back, you recall, sir, that in that declaration you filed
15 in federal court you described the company Atlas MF Mezzanine
16 Borrower LLC as being in strong financial condition?
17    A. Correct.
18    Q. You agree you made that statement under oath to a
19 federal judge?
20    A. I do agree.
21    Q. Now, let's take a look at a couple of other account
22 statements if we could. If you go to Defendants' 74. Let me
23 know when you have that.
24    A. Go ahead.
25    Q. You are aware Defendants' 74 is the Stifel account for

Atlas v.
Macquarie et al (FINAL)                                      January 13, 2020

---

Page 277

S. Ivankovich - by Plaintiff - Cross (Rossman)

1    Atlas Multifamily Three LLC?
2    A.   Correct.
3    Q.   Just remind us of the relationship between Atlas
4    Multifamily Three LLC and the borrower entity we were looking at
5    a moment ago?
6    A.   One is the 100 percent owner of the other.
7    Q.   And this entity had in its account, Stifel, as of
8    February 28th, $1,360.09, true?
9    A.   It looks that way, yes.
10   Q.   And if you look at Defendants' 76, please, there's
11   another Stifel account.  This one is for Atlas Apartments
12   Holdings LLC?
13   A.   Correct.
14   Q.   Okay.  And you recall the relationship with that entity
15   to the company referenced in the bidding certificate?
16   A.   Correct.
17   Q.   I am asking you, sir, what is the relationship between
18   that entity and the company that's referenced in the bidding
19   certificate.
20   A.   Again, I believe, it's one of the companies in the
21   chain of holding and parent companies.
22   Q.   Can you tell us what's in the account at Stifel as of
23   February 28th for that company?  Is it $958.12?
24   A.   What's the exhibit?
25   Q.   You should be looking, if you're with me, at DE-76,

---

Page 278

S. Ivankovich - by Plaintiff - Cross (Rossman)

1    Defendants' 76.
2    A.   Yes, correct.
3    Q.   Okay.  Now, when you signed a bidding certificate where
4    you attested that Atlas MF Mezzanine Borrower had sufficient
5    ready funds to consummate a sale of a collateral, plainly, you
6    weren't relying on the funds in these accounts, true?
7    A.   True.
8    Q.   There are no funds in any accounts that those entities
9    held on that day that would have been sufficient to consummate
10   the sale of a collateral, true?
11   A.   True.
12   Q.   So when you signed that certificate and said in the
13   present tense that that company has the funds, you were relying
14   on funds elsewhere, true?
15   A.   We were relying on the funds in the chain of ownership
16   of those companies.
17   Q.   You were relying on funds that were held by the
18   Ivankovich family, true?
19   A.   Correct.  Who are the 100 percent owners of those
20   companies.  I will remind you, counselor, those are pass-through
21   entities so...
22   Q.   So what do you mean by that they are pass-through
23   entities?
24   A.   They are limited liability companies so that tax
25   liabilities pass through to the individual owners.

---

Page 279

S. Ivankovich - by Plaintiff - Cross (Rossman)

1    Q.   Is it your understanding that cash can flow freely
2    between those entities?
3    A.   Sure.
4    Q.   And the control of all those entities is ultimately
5    held by who?
6    A.   By 80 percent myself and -- 20 percent myself and
7    80 percent Anthony Ivankovich.
8    Q.   80 percent you?
9    A.   20 percent me and 80 percent Anthony Ivankovich with me
10   being the sole managing member.
11   Q.   Now, if you turn to Plaintiffs' Exhibit 70G.  I hope I
12   was considerate enough to put that in your binder that you have
13   open?
14   A.   This is the one you gave me or the old one.
15   Q.   The one I gave you.  About two-thirds back, two-thirds
16   a way back you should see a tab for PX-70G.  If that's not in
17   there, let me know.
18   A.   There is a PX-243, PX-145, nothing else.
19        MR. ROSSMAN:  Do we have those copies?
20   Q.   I think what you'll see it's attached to -- I am going
21   to approach the witness if I may, Your Honor.  Handing you
22   Plaintiffs' Exhibit 70G, all I need you to look at for the
23   moment, sir, is what's attached to the cover letter which is a
24   letter from Stifel from a Mr. David Morris.  Let me know when
25   you have that in front of you?

---

Page 280

S. Ivankovich - by Plaintiff - Cross (Rossman)

1    A.   I do.
2    Q.   And what you provided -- one of the things that you
3    provided to Macquarie in connection with the auction was a
4    February 25, 2017, letter from Mr. David Morris at Stifel; is
5    that right?
6    A.   Correct.
7    Q.   And what the letter cites is that as of the date of
8    this letter the principals of Atlas MF Mezzanine Borrower LLC
9    have an excess of $71 million in cash and marketable securities,
10   correct?
11   A.   Correct.
12   Q.   And you recall reviewing interrogatory responses that
13   you submitted in this litigation, sir?
14   A.   I don't.
15   Q.   Well, I can represent to you -- and I'll get them if
16   you need them -- that in response to our interrogatory number
17   five where we asked Atlas to identify each of the principals
18   referred to in this letter and the response that we received was
19   Anthony Ivankovich and Steven Ivankovich; is that correct?
20   A.   That is correct.
21   Q.   Very good.  Now, am I right, sir, that in the Stifel
22   letter dated February 25, 2017, there's no mention that the
23   principals of Atlas, yourself and your father, had committed to
24   use $71 million of cash and marketable securities or any portion
25   of that money in order to tender payment for the collateral?

---

Atlas v.
Macquarie et al (FINAL)                                                              January 13, 2020

Page 281

S. Ivankovich - by Plaintiff - Cross (Rossman)

1  A. Correct. There's also no mention that I like pastrami
2  sandwiches is also correct.
3  Q. Good to know. Now, if I understand your testimony in
4  this case, it's your testimony that you could have gotten a
5  check from Stifel because your family held accounts individual
6  or LLC or trust accounts at Stifel? I am paraphrasing your
7  trial testimony from yesterday.
8  A. That's correct.
9  Q. Now, when you were saying that your family could have
10  gotten a check from Stifel, were you referring to a check for
11  the entire amount of the equity interest in the properties for
12  $71 million?
13  A. Are you referring to a statement I made in my
14  deposition?
15  Q. No. At trial yesterday, and I am referring to the
16  transcript at pages 136 and 137. And I'll just for clarity, I
17  will just turn it up. You were asked again what were your
18  options with respect to Stifel and you answered?
19       THE COURT: Do you have a page number?
20       MR. ROSSMAN: 136 starting at line 17, Your Honor.
21  Q. But, again, what were your options with respect to
22  Stifel. We absolutely could have gotten a check from Stifel
23  that day. We hadn't won the auction, so I stopped the process.
24  It didn't seem relevant at the time and we met with counsel and
25  figured out. Then there's interruption.

Page 282

S. Ivankovich - by Plaintiff - Cross (Rossman)

1       Now, in times, another question, now, in terms of the
2  Stifel account, some of those accounts, whose names are those
3  accounts in?
4       "ANSWER: Various sundry from family LLC to trust
5  accounts to individual family members, my father, my mother,
6  I'll stop there for the moment.
7       My simple question to you, sir, is when you
8  referred to the availability of family accounts at Stifel,
9  were you suggesting that there was sufficient cash and
10  marketable securities in your family accounts to put up
11  $71 million to buy the collateral?
12  A. In that specific testimony you are referring to, that's
13  referring to the auction bidding check.
14  Q. So I'll just ask you this question this way then.
15  There wasn't $71 million in cash in marketable securities in
16  Stifel accounts held by Ivankovich family members or trusts for
17  the benefit of Ivankovich family members to pay $71 million at
18  the auction, was there?
19  A. Yes, there was. The Ivankovich family actually had an
20  excess and still does of $71 million.
21  Q. Of cash or marketable --
22  A. Cash or marketable securities.
23  Q. Now, did you have the ability to -- sorry. Let me be
24  more precise. Did you have the authority to take whatever cash
25  or marketable securities you needed from those accounts to use

Page 283

S. Ivankovich - by Plaintiff - Cross (Rossman)

1  them at the auction?
2  A. Solely, no.
3  Q. You needed your father's authorization?
4  A. Yes.
5  Q. Okay. And can you describe for me what that process
6  was, how would you get written authority and move money from
7  accounts held by your father, your parents or the trust?
8  A. The process is fairly informal. We have a discussion
9  and either in a phone call or through the bank. I make a
10  request and the money is drawn down and transferred to whatever
11  account it's directed to.
12  Q. Now, I'm not aware of a single piece of paper that was
13  produced in this litigation reflecting an authorization to
14  transfer funds from an account that was controlled by your
15  father, your mother, both of them jointly or by any trusts that
16  were for the benefit of Ivankovich family members, have I missed
17  something? Is there such an authorization?
18  A. No, nor would there be.
19  Q. Now, could you turn to PX-243?
20  A. In your binder?
21  Q. Yes. Let me know when you're there. You'll see this
22  is the Stifel consolidated statement. Stifel Bank and Trust
23  agent, Anthony Ivankovich and Olga Ivankovich JT WROS. I assume
24  that is a joint account for your parents?
25  A. I guess so.

Page 284

S. Ivankovich - by Plaintiff - Cross (Rossman)

1  Q. And if you take a look at the third page of the
2  exhibit, the consolidated statement shows a net portfolio value
3  as of February 28th of $43 million and change; is that right?
4  A. Correct.
5  Q. And when you made a representation -- when Stifel made
6  a representation of $71 million held by the principals, it
7  included this $43 million as one of the components?
8  A. Could be.
9  Q. Okay. And am I right, sir, that the Olga Ivankovich is
10  that your mom?
11  A. Yes.
12  Q. Olga Ivankovich is not one of the principals of the
13  Atlas entities?
14  A. No.
15  Q. Now, if you look at that page as referencing a moment
16  ago, the first line is cash equivalents; do you see that?
17  A. I do.
18  Q. And it references cash equivalents of approximately
19  $8.9 million, true?
20  A. On which page?
21  Q. On the very first page where it says your Stifel
22  portfolio value. We were looking at a moment ago the net value
23  of 43?
24  A. Correct.
25  Q. February 28th cash equivalents $8.9 million, true?

Atlas v.
Macquarie et al (FINAL)                                        January 13, 2020

---

Page 285 | Ivankovich - Plaintiff - Cross (Mr. Rossman)   Page 287

**Page 285**

S. Ivankovich - by Plaintiff - Cross (Rossman)

1   A.  Yes.
2
3   Q.  Then it has a line for assets held at Stifel?
4   A.  Correct.
5   Q.  It has a line for assets not held at Stifel, true?
6   A.  Correct.
7   Q.  It all totals up to the $43 million that I mentioned
8   before, correct?
9   A.  Correct.
10  Q.  And it includes, am I right, that this includes -- it
11  is a consolidated statement -- actually, this is probably the
12  easiest way to do it. If you could flip to the fifth page of
13  the exhibit. Then you'll see a list of accounts. It list a
14  number of accounts including accounts held by your father
15  individually, partnership accounts, Roth IRA, individual account
16  of your mother and so forth, true?
17  A.  True.
18  Q.  Now, you didn't control any of these accounts I take
19  it, right?
20  A.  No.
21  Q.  And you recall being asked in your deposition about
22  whether you ever had a term sheet with any of your father's
23  entities, any of these trust accounts or any other entities
24  controlled by your father?
25  A.  I don't recall.
26  Q.  You don't recall asking about that? Do you recall

**Page 286**

S. Ivankovich - by Plaintiff - Cross (Rossman)

1
2   giving testimony at your deposition and the answer was no
3   because we had never gone down that route?
4   A.  I don't recall, but if it's in the deposition, it is
5   true.
6   Q.  We can take a look at it if you'd like and just for
7   reference it is pages 121 starting at line 20 to 122 starting at
8   line 18.
9       Is it true, sir, that you never went down the route of
10  asking your father for funds in order to close a loan, to buy
11  the assets at the auction?
12  A.  I think the comment is, and you are misconstruing my
13  statement, that never in the history of the $8 billion of real
14  estate that we transacted have I ever asked for, needed or
15  obtained a term sheet. That's not the practice what we do.
16  You're misconstruing my statement.
17  Q.  Okay. Why don't we take a minute then to make sure we
18  get it accurately. I have a copy of your deposition. Could I
19  hand it up?
20  A.  Sure.
21  Q.  Okay.
22       (Continued on next page)
23
24
25
26

**Page 287**

CROSS EXAMINATION CONTINUED

1   BY MR. ROSSMAN:
2
3       MR. ROSSMAN: I have one for the Court. If you
4   would do me a kindness and pass that to the Judge. Thank
5   you. I just didn't want to reach over the Reporter.
6   Q.  If you would, sir, turn to Page 121, starting at line
7   20. Let me know when you're there.
8       (Witness complies.)
9   A   Okay.
10  Q
11      "QUESTION: Was there ever a term sheet from your
12  father or any of your father's entities or from IIB that
13  indicated the willingness to pay back the Macquarie loan or
14  to buy the -- buy the equity that Macquarie held as
15  collateral for that loan?
16      "ANSWER: No. Because we had never gone down that
17  route. We were down the Timbercreek route, which of course
18  we had a term sheet. We were also working on a term sheet
19  also with Walker Dunlop at that point. Again, I think you're
20  leaping forward in the ability to be
21  invited to bid at an auction versus the ability to close the
22  deal.
23      I'm going to stop right there just for the sake of
24  brevity. The rest of it is on the transcript in front of you.
25  That was truthful testimony when you gave it?

**Page 288**

1   A   Yes.
2   Q   Okay. Now, could you turn to Defendant's Exhibit 108
3   for me.
4       (Witness complies.)
5   Q   We have attached to the cover is Personal Financial
6   Statement, Steven Ivankovich, as of March 2017. Do you see
7   that?
8       MR. WHITMER: I think we might have the wrong
9   exhibit there.
10      MR. ROSSMAN: Oh, I see what happened here. So if
11  you give me a moment. I think what we have is Defendant's
12  Exhibit 109 and it's missing a tab. That's what we have.
13  So let me see if I can clean this up for the record.
14  Q   So in your binder, the Exhibit that I'm going to refer
15  to is Defendant's Exhibit 109, okay? And if you look in your
16  binder, Mr. Ivankovich, behind Tab 108 is a document. And if
17  you flip that page, there's a separate document that we failed
18  to separate by a new tab and you should imagine in your mind
19  that there's a Tab 109 there, and you will see the sticker on
20  the front page of the document that says Defendant's Exhibit
21  109.
22  A   I have it.
23  Q   Are you with me?
24  A   Yeah.
25  Q   If you look at the front page of that document, is that

---

Atlas v.
Macquarie et al (FINAL)                                                                                    January 13, 2020

| Ivankovich - Plaintiff - Cross (Mr. Rossman)          Page 289 |
| --- |

1   your signature on it, sir?
2      A   Yes.
3      Q   This is a personal financial statement?
4      A   Correct.
5      Q   For you as of that date, correct?
6      A   Correct.
7      Q   Okay. You indicate, if you would --
8          MR. ROSSMAN: If anyone needs, I have loose copies.
9    If anyone needs them.
10     Q   Now if you turn to the second page.
11     A   Correct.
12     Q   You will see on the balance sheet it has a line item
13  for net worth. What does it list your net worth as?
14     A   28 million 512 -- 28,512,949.
15     Q   That 28 million, in addition to statement for the
16  consolidated statement for your father and your parents and the
17  family trust adds up to 71; is that right? 43 plus 28 is 71.
18     A   No. No. You're -- that's not the full consolidated
19  statement of the family's worth. You're cherry picking
20  information.
21     Q   I'm simply asking you if the 43 million dollars plus
22  the 28 million dollars total 71.
23     A   You mean the consolidated statement for those specific
24  accounts or the total consolidated statement of assets?
25     Q   The consolidated statement for the Stifel accounts for

| Ivankovich - Plaintiff - Cross (Mr. Rossman)          Page 290 |
| --- |

1   your father, your mother and the joint accounts. We just saw it
2   a moment ago.
3      A   No. That's not the complete Stifel consolidated
4   accounts.
5      Q   If you would try your best to follow my question, I
6   will absolutely give you a chance to answer.
7      A   Absolutely.
8      Q   So consolidated Stifel account statement that we saw a
9   moment ago was for 43 million dollars and change, true?
10     A   For that specific exhibit, yes. True.
11     Q   We're looking now at your net worth for 28 million
12  dollars, right?
13     A   Correct.
14     Q   Okay. Now, am I right that this was a net worth
15  statement that you supplied to Walker and Dunlop in March 2017?
16     A   I believe it -- yeah. Something very similar.
17     Q   If you look at the balance sheet in terms of cash, it
18  shows 1.076 million dollars, correct?
19     A   Correct.
20     Q   Marketable stocks, 5 million dollars; is that right?
21     A   Correct.
22     Q   The -- there's a line item for 20.9 million dollars,
23  and that's listed as non-marketable stocks, correct?
24     A   Correct.
25     Q   You would not consider non-marketable stocks to be

| Ivankovich - Plaintiff - Cross (Mr. Rossman)          Page 291 |
| --- |

1   ready funds, right?
2      A   I would consider them to be non-marketable.
3      Q   Now, this financial statement was something that you
4   provided to Walker Dunlop after you signed the term sheet with
5   Walker Dunlop for a potential financing, true?
6      A   No. I think they already had this based on a term
7   sheet we had signed for a previous deal we were closing.
8      Q   The date of this is March 1, 2017?
9      A   Yeah.
10     Q   Okay. If you would take a look back to Plaintiff's
11  Exhibit 238. Unfortunately it will carry you to the other
12  binder for a minute.
13     A   I kept it open for you.
14     Q   Okay. Thank you. Appreciate your kindness.
15         When you look at that, the term sheet has a term there.
16  By the way, what's the date of the term sheet?
17     A   February 21st, 2017.
18     Q   February 21st. Okay. So before the net worth
19  statement, true?
20     A   Yes.
21     Q   Okay. If you look at Page 1, it has some terms that
22  are defined, true?
23     A   On the cover letter or the actual term sheet.
24     Q   On the term sheet itself.
25     A   Yes.

| Ivankovich - Plaintiff - Cross (Mr. Rossman)          Page 292 |
| --- |

1      Q   Okay. Term sheet has defined terms. I guess that
2   shouldn't surprise us. The one I want you to look at is the one
3   for guarantor.
4      A   Yes.
5      Q   Lists you as guarantor, right?
6      A   Yes.
7      Q   You personally?
8      A   Yes.
9      Q   And if you look at the limited recourse provision.
10     A   Correct.
11         THE COURT: Counsel, we have about five before we
12  have to take our break.
13         MR. ROSSMAN: Thank you, your Honor. Should I try
14  to finish this document at least?
15         THE COURT: Sure.
16         MR. ROSSMAN: I will make sure that no matter what
17  I do I'm done in five minutes.
18     Q   Now, in limited recourse provision it indicates that at
19  closing and throughout the term of the loan, guarantor must have
20  a minimum tangible net worth of 86 million dollars and a minimum
21  liquidity of 8.6 million dollars, excluding the value of any
22  direct or indirect interest in the property, correct?
23     A   Correct.
24     Q   Okay. You, personally, as guarantor, at least
25  according to this personal information statement didn't have the

Atlas v.
Macquarie et al (FINAL)                                            January 13, 2020

Ivankovich - Plaintiff - Cross (Mr. Rossman)            Page 293

1    tangible net worth of 86 million dollars, did you?
2        A    That's what I -- this statement is what I chose to
3    disclose. It's not complete, but this is what I'm showing, so
4    the answer at the time is correct.
5        Q    You also didn't show the liquidity of 8.6 million
6    dollars that was required by the term sheet, right?
7        A    Correct, but again, I don't believe that this statement
8    is specifically tailored to this loan. It was for another loan
9    we were in the process of.
10       Q    Walker Dunlop was doing due diligence on you in
11   connection with this potential financing, right?
12       A    They had done the diligence for the previous loan
13   already. Correct.
14       Q    One of the representations you made in the term sheet
15   -- I'm sorry -- one of the representations you made in your
16   personal financial statement was that you had no judgments
17   against you, true?
18       A    I don't know. Maybe.
19       Q    If you look at the second page, Page 203. Are there
20   any unsatisfied judgments against you? And you'll see you
21   indicated N for no, correct?
22       A    Correct.
23       Q    Okay. In fact, there was an outstanding tax lien in
24   the amount of 2 million dollars, correct?
25       A    No. That had been cured at that time.

Ivankovich - Plaintiff - Cross (Mr. Rossman)            Page 294

1        Q    There was in fact a judgment against you in the amount
2    of 12 million dollars; isn't that right?
3        A    Again, the judgment, we have a statement from the
4    lawyer at the time that the judgment was deemed vacated because
5    the debtor entity had resolved.
6        Q    Sorry?
7        A    The debtor entity had been resolved.
8        Q    And, in fact, one of the things that came out is that
9    -- well, one thing that's true is that you had not filed
10   personal tax returns since 2012?
11       A    Correct.
12       MR. ROSSMAN: We can stop here, your Honor.
13       THE COURT: Okay. 2:15 we will be back up. Again
14   you're in the middle of cross-examination, so you can't talk
15   to your counsel about your testimony during this time.
16       THE COURT OFFICER: Mr. Ivankovich, you may step
17   down.
18       (Whereupon, the witness was excused from the
19   stand.)
20       (Luncheon recess taken.)
21       A F T E R N O O N   S E S S I O N.
22       THE COURT OFFICER: All rise. Part 3 is back in
23   session. You may be seated.
24       (Witness resumes the stand.)
25       THE COURT: Good afternoon. Everybody ready? So

Ivankovich - Plaintiff - Cross (Mr. Rossman)            Page 295

1    have you had a chance to either confer or think about the
2    schedule ahead for the week and how long we need for various
3    witnesses?
4        MR. MENNITT: Your Honor, the defendants have
5    conferred and let me just sort of talk first about what we
6    have left.
7        As the Court is aware there have been five directs
8    submitted by affidavit for all of the defendants live
9    witnesses. So Miss Hamilton direct testimony has been
10   submitted. KKR has submitted the direct testimony of
11   Mr. Brudney and Mr. Morales, and we have also submitted the
12   direct testimony of our two experts.
13       So what we have left in terms of live testimony on
14   the schedule, the plan that the parties have been
15   discussing, and obviously it's been getting tweaked
16   day-to-day, was to try to get through Mr. Ivankovich today
17   and then the plaintiff was going to call David Morris, who
18   is the Stifel banker, who I assume will be fairly short.
19   His relevance is pretty -- his purported relevance is pretty
20   narrow. They're planning to call the junior guy on the
21   Macquarie team Min Wang. We accepted a service of process
22   for him. He lives here in New York. So those two
23   witnesses, depending on what happens with Mr. Ivankovich, we
24   may not get through those today, but those are going to be
25   fairly short witnesses, we would think, on the stand; and

Ivankovich - Plaintiff - Cross (Mr. Rossman)            Page 296

1    then we have the four experts, two of whom -- the two
2    valuation experts we have scheduled to both testify tomorrow
3    morning, and then Miss Hamilton will be the balance of the
4    day tomorrow. So we would hope that, again, we don't need
5    to do her direct on the stand, so we would hope that we are
6    able to get through that, through Miss Hamilton tomorrow and
7    then we have the crosses of Mr. Brudney and Mr. Morales
8    which will be on Thursday.
9        The other eight witnesses that are listed for both
10   sides are all video or transcript designations, and so if
11   we're not -- if we push, you know, through on Friday and we
12   are not able to get that, you know, the Court could, if you
13   wanted to either take the transcripts or take the video and
14   you can watch it, you know -- I don't want to say when you
15   want, but, you know, at your -- at the least inconvenient
16   moment, let's put it that way, or obviously if you wanted us
17   to come back we could have a day of video.
18       All that video for those eight witnesses, we have
19   cut the video and it comes out to be less than seven hours,
20   6 .7 hours for all eight witnesses. The longest witnesses
21   are maybe 90 minutes of video.
22       THE COURT: Okay. The list you started with
23   strikes me as awfully ambitious. As long as you prevent
24   Mr. Meister from cross-examining any of them we might get
25   through it, but I suspect he won't agree to that. Then

1  there's this Mr. Smith. Is it Smith?
2         MR. MENNITT: Jones. Jones was the fellow there
3  has been some testimony about him.
4         THE COURT: No. I just got it wrong. But there's
5  this issue about whether you will accept service and
6  attempt.
7         MR. MEISTER: Well, he's been served. He's been
8  served, and we think he's a vital witness, and we think the
9  Court should issue a bench warrant. We would like to get
10  him here.
11        Look, your Honor, we are, I think you can see we're
12  trying to move forward quickly. We're on our first witness,
13  and, you know, we are in the afternoon of the second day of
14  trial. There are four fact witnesses away from Mr. Jones,
15  five with Mr. Jones, Morales, Brudney, Hamilton, Wang and
16  Jones and then there's -- and then there's Morris, which
17  would be six, and then there's --
18        THE COURT: Four experts.
19        MR. MEISTER: Four experts which have to be at
20  least cross-examined, and in my case, direct examined. So I
21  just don't know -- I don't mean to be the bearer of bad
22  news, but I don't want to be misleading or inaccurate. I
23  don't know how that gets done by Friday.
24        THE COURT: Well, it's not good or bad. It's that
25  we need to be done in two more days other than this week,

1  and so, recognizing gas expense to fill the size of the
2  bottle, we just need to make the bottle the size that I just
3  described and you need to plan accordingly. I think most of
4  the direct for the defendants are already submitted, so it's
5  about cross-examination, and, you know, let's just see how
6  we do.
7         I don't know what to do with the former employee.
8  I'm assuming that your position is that he's not within your
9  control at this point.
10        MR. MENNITT: That's correct, your Honor. He's a
11  former employee who lives in New Jersey. Apparently he was
12  in New York today, assuming that the video indeed shows
13  Mr. Jones. I was able to look at at least part of it with
14  Mr. Bianco at the break. He does not take the subpoena and
15  throw it on the ground, he keeps his hands in his pockets
16  and keeps walking. So I don't, you know, but that's between
17  him. He mentions on the video having an attorney. I don't
18  know who that is.
19        THE COURT: You're not -- no contact information,
20  you don't know anything about where he is? This is what I
21  was going to get to. I was going to get to the point of,
22  let's assume that it's accurate that he's not under your
23  control. I would -- see if you can find a way to convey
24  that, you know, assuming the service actually happened that
25  I would expect him to be here and that it's in his interest

1  not to press the point to the level where more extreme
2  actions have to be taken. I don't really know, you know,
3  what the full panoply of options there are. I haven't been
4  in the bench warrant business yet, but I would certainly
5  convey that if he got a subpoena he's supposed to be here.
6         MR. MENNITT: Your Honor, I will say, I did call
7  what I had for a cell phone number for him and called him, I
8  think, called him multiple times. He didn't pick me up and
9  I left a voicemail saying to call me. Certainly that's what
10  I would convey, if you were served, you know, you're under a
11  legal obligation, but I'm not his attorney.
12        THE COURT: All right. Well, I don't want to wade
13  through the pluses and minuses on how I enforce this
14  exactly, and maybe, you know, I guess Mr. Meister you would
15  have to put together an application with what has occurred
16  and including what you propose in the way of enforcement.
17        MR. MEISTER: Honestly, I haven't been in this
18  business either, so I have to look at that to be candid, but
19  we certainly will do that. We should send an email out to
20  get that done in our office this afternoon, please. So I'm
21  not fresh on this either, your Honor.
22        THE COURT: Okay. All right. Why don't we --
23  anything else? It sounds like a fairly ambitious week so,
24  we might as well get on with it.
25        MR. MEISTER: One thing, I'm not pressing this,

1  just throwing this out as a thought. I did -- Mr. Morris is
2  here. We did say to him that we thought he would be on this
3  afternoon. I don't know how much more --
4         THE COURT: Which one is Morris again?
5         MR. BIANCO: Stifel account representative.
6         MR. MEISTER: Who I agreed with Mr. Mennitt is
7  probably not a long witness. I don't know how much more
8  Mr. Rossman has on cross-examination, obviously, of
9  Mr. Ivankovich, but one possibility is to insert him in. I
10  I'm just throwing that out.
11        THE COURT: I think if he's a non-party and he's
12  here, we should do what we can to get that done.
13        MR. MEISTER: He's not in the courtroom now, right.
14        MR. BIANCO: He's not. As I explained, your Honor,
15  I told his counsel to make sure he was not in the courtroom.
16        THE COURT: How long?
17        MR. ROSSMAN: I have been slashing and burning as
18  much as I can, but I've got some more wood to chop with
19  Mr. Ivankovich. I do think we could finish this today and
20  have time for Mr. Morris to testify, if we could just get on
21  with it.
22        THE COURT: That's fine. I don't know how much
23  redirect plaintiff is likely to have.
24        MR. MEISTER: Well, I certainly would be happy to
25  do the redirect after Mr. Morris so that Mr. Morris could

Ivankovich - Plaintiff - Cross (Mr. Rossman)                         Page 301

1   get on.
2         MR. ROSSMAN: I would object to that. There's
3   overlapping factual knowledge between these two witnesses
4   and I would not want to have this witness still open, have
5   Mr. Morris testify, and then have this witness be recalled.
6         THE COURT: I thought that might be your response
7   there. All right. Let's see how we do. Let's see if we
8   can try to get -- I'm sure Mr. Ivankovich would be
9   heartbroken to be done soon, but let's see if we can get it
10  done.
11        MR. ROSSMAN: To the limites of the Court Reporter
12  being mad with me, I will go as quickly as I can, your
13  Honor.
14  CROSS EXAMINATION CONTINUED
15  BY MR. ROSSMAN:
16  Q   Mr. Ivankovich, I want to understand something. The
17  Atlas entity, Atlas -- Atlas MF Mezzaine Borrower, LLC is the
18  plaintiff entity in this case, correct?
19  A   Correct.
20  Q   Okay. I want to make sure that we're on the same page
21  about what the actual financial condition of that entity is.
22      You were in the courtroom yesterday when Mr. Meister
23  represented that we don't have any money. He said that on Page
24  31 of the transcript referring to Atlas.
25  A   I don't recall that statement.

Ivankovich - Plaintiff - Cross (Mr. Rossman)                         Page 302

1   Q   Do you recall your counsel said, prior hearing January
2   7th, 2020 hearing in this case, I'm referring to transcript Page
3   14, Atlas, the entity that is the party here, is obviously at
4   the moment bereft of assets because the assets that it had was
5   the equity collateral that was sold at the auction, is that a
6   true statement?
7   A   Yeah. I would categorize that as true.
8   Q   Would you like, sir, in your binder, there's a copy of
9   the Verified First Amended Complaint that was filed in this
10  action.
11  A   This is your binder.
12  Q   Yes. The cross-examination examination binder that I
13  gave you. It's toward the back of that binder. You see
14  something that's First Amended Complaint. It's a Verified
15  Complaint, which means you actually had to sign verification to
16  the truthfulness of it's contents, are you aware of that?
17  A   Correct.
18  Q   Okay. This is a complaint that was filed in this Court
19  on October 30th, 2017. Let me know when you're there.
20  A   Yep. I'm here.
21  Q   Okay. If you turn to paragraph 43 you'll see the
22  statement, Atlas still today is in a strong financial position
23  and is able to obtain financing to pay off the Mezzanine Loan?
24  A   Paragraph 43?
25  Q   43. It's in the back of that --

Ivankovich - Plaintiff - Cross (Mr. Rossman)                         Page 303

1   A   My paragraph 43 says, however, despite the harm caused
2   by Macquarie's wrongful notice of a default on the Mezzanine
3   Loan, Atlas still today is in a strong financial position and is
4   able to obtain financing to pay off the Mezzanine Loan.
5   Q   So focusing on the second half of that sentence, where
6   it's true, the verified complaint says that Atlas still today is
7   in a strong financial position, correct?
8   A   Correct.
9   Q   Was that a true statement?
10  A   Yes.
11  Q   At the time you signed the verification?
12  A   Yes.
13  Q   Okay. Now, can you explain to me, sir, how it is that
14  on October 30th, 2017 and this is about five months after --
15  more than five months after the closing of my client's purchase
16  of the equity interest in the properties, how you could
17  represent to the Court that that entity was in a strong
18  financial condition?
19  A   I take that to mean that the overall Atlas entity,
20  which includes the Atlas principals. We could capitalize that
21  entity in five minutes.
22  Q   Now, if you turn to the first page of the Complaint,
23  the Verified Complaint.
24  A   Yes.
25  Q   Atlas is defined as the plaintiff, Atlas MF Mezzaine

Ivankovich - Plaintiff - Cross (Mr. Rossman)                         Page 304

1   Borrower, LLC. Do you see that term Atlas?
2   A   I see that.
3   Q   So you're now telling me that that statement in the
4   Verified Complaint, in paragraph 43 that that particular entity
5   was in a strong financial condition, is that an untrue statement
6   or a true statement?
7   A   Absolutely. That's a true statement.
8   Q   How is it that your counsel could represent to this
9   Court yesterday that that entity has no assets?
10  A   The specific entity doesn't, but the chain of
11  ownership, as I said, has plenty of assets. We could populate
12  that entity with the signing of a pen and a phone call in a
13  matter of minutes.
14  Q   Is it your testimony, sir, in this Court under oath
15  that you have the authority to move money as you see fit to that
16  entity or away from that entity?
17  A   I don't have the authority, but I have the ability.
18  Q   Okay. Now, the -- I want to turn your attention to the
19  subject of obtaining a bank check for the auction that took
20  place on February 27th, 2017.
21      Do you recall testifying about that in response to
22  Mr. Gonzalez's questions?
23  A   Yes.
24  Q   You talked about not being able to get a check from JP
25  Morgan Chase that day, correct?

Atlas v.
Macquarie et al (FINAL)                                                    January 13, 2020

| Ivankovich - Plaintiff - Cross (Mr. Rossman)                Page 305 | Ivankovich - Plaintiff - Cross (Mr. Rossman)                Page 307 |

1    A   Correct.
2    Q   You were aware that you were in the middle of a
3  litigation that you had commenced on, actually, as it turns out,
4  litigation was filed February 14th, 2017, correct?
5    A   That's an important date because that's my birthday.
6    Q   You filed that lawsuit, you weren't sued, you filed the
7  lawsuit?
8    A   No, I filed it.
9    Q   When you failed to get a check on the date of the
10  auction you felt it was important to gather evidence from the JP
11  Morgan banker, true?
12   A   Yes.
13   Q   Okay. And on that same day you didn't get any evidence
14  from your trusted banker at Stifel where you tried to get a
15  check, right?
16   A   I did not.
17   Q   There's none in this record, right?
18   A   The -- the --
19   Q   Is there any evidence in this record, sir?
20   A   No.
21   Q   Now, if you would turn to Defendant's Exhibit 67.
22       (Witness complies.)
23   Q   Let me know when you're there.
24       Defendant's 67 is the Chase letter that you referred to
25  before, right?

1    Q   JP Morgan Chase, right?
2    A   Right.
3    Q   He was referring to this account, true?
4    A   I would imagine so.
5    Q   Okay. And if you look at the Checking Summary on Page
6  5 of 10 you will see the beginning balance was $11,954 and
7  change.
8    A   I'm sorry. On what page?
9    Q   Page 5 of 10 of the Exhibit, about third of the way
10  down. You see something that says Checking Summary?
11   A   Correct.
12   Q   It shows you a beginning balance and it shows you an
13  ending balance, right?
14   A   Correct.
15   Q   And it shows deposits and additions in the meantime,
16  right?
17   A   Correct.
18   Q   Okay. Starting with $11,954 in that account that
19  month, right?
20   A   Right.
21   Q   At the end of the month on the 28th for $382,000 and
22  change, correct?
23   A   Correct.
24   Q   Deposits and additions made during the month were a
25  total of 1.34 million dollars, correct?

| Ivankovich - Plaintiff - Cross (Mr. Rossman)                Page 306 | Ivankovich - Plaintiff - Cross (Mr. Rossman)                Page 308 |

1    A   Correct.
2    Q   It references wires being received on that date. Do
3  you see that?
4    A   Correct.
5    Q   Okay. These are wires into the Atlas Apartment Homes,
6  LLC account, true?
7    A   Yes.
8    Q   Okay. Single account, right?
9    A   Yes.
10   Q   Now, that account did not receive 4.125 million dollars
11  in wires that day, did it?
12   A   Not when I stopped the transactions, no.
13   Q   Would you turn to DE83, Defendant's Exhibit 83, please.
14       (Witness complies.)
15   Q   This is an email chain and what's attached to the email
16  chain is a bank statement for JP Morgan Chase Bank, NA for Atlas
17  Apartment Homes, LLC, correct? That's page 5 of 10 of the
18  exhibit, sir.
19   A   Yeah. I believe so.
20   Q   And it indicates that that's a statement for, upper
21  right-hand side, for the period from February 1st, 2017 to
22  February 28, 2017, correct?
23   A   Correct.
24   Q   Okay. And that was the account that was the subject of
25  Mr. Alem's, A-L-E-M, letter. That's the gentleman from

1    A   True.
2    Q   The grand total of all the deposits and additions that
3  weren't made to that account were close to 4.125 million dollars,
4  true?
5    A   Right.
6    Q   If you turn just very quickly to Pages 6 and 7, you
7  will see a series of wires that were sent on the 27th?
8    A   Correct.
9    Q   Do you recognize those?
10   A   Not particularly, but there were wires sent on those
11  dates.
12   Q   These are wires, for example, on the 27th, you will see
13  a wire from Wells Fargo Bank. Beneficiary is Atlas Vistas of
14  Pinnacle Park, I believe that says.
15   A   What page are you referring to?
16   Q   I'm on the sixth page, towards the bottom.
17   A   Yep.
18   Q   Okay. That references one of the properties that was
19  the subject of the Mezzanine Loan, right?
20   A   Correct.
21   Q   So am I right on the 27th you made an effort to make a
22  series of transfers from those properties, LLCs into that Atlas
23  account, JP Morgan Chase, right?
24   A   Those and other accounts, correct.
25   Q   That didn't total up to anything close to 4 million

Ivankovich - Plaintiff - Cross (Mr. Rossman)                    Page 309

1  dollars, true?
2     A   No.  Not at the time we stopped the accounts.
3     Q   Now, would you turn to DE71 for me, please.
4         (Witness complies.)
5     Q   DE71, you will see something called a permanent letter
6  of authorization for wires with no further credit, do you see
7  that?
8     A   Yes.
9     Q   And that's from Stifel, correct?
10    A   It is to Stifel.
11    Q   If you look at the signature, do you recognize the
12  signature on that page?
13    A   Yes.  That's mine.
14    Q   It's dated February 27, 2017, the date of the auction,
15  true?
16    A   Correct.
17    Q   Okay.  And the account name is Atlas Multifamily Three,
18  (Holdco) correct?
19    A   Correct.
20    Q   And that's in the from column, if you will, right?
21    A   Correct.
22    Q   That's where the money is coming from and it's going to
23  JP Morgan Chase, right?
24    A   Correct.
25    Q   Okay.  Now, am I right, sir, that you never produced a

Ivankovich - Plaintiff - Cross (Mr. Rossman)                    Page 310

1  -- an authorization for wire transfers with your father's
2  signature on it?
3     A   Well, it wouldn't have been an authorization for wire
4  transfers.  The answer is no because it wasn't necessary.
5     Q   So the answer to my question is, no, you didn't produce
6  such a thing?
7     A   But I also didn't produce a pastrami sandwich.  It is
8  an irrelevant question.
9     Q   Well, I suppose --
10    A   There wouldn't have been --
11    Q   I suppose his Honor will tell us what is relevant or
12  not relevant.
13    A   You're mis-categorizing.
14    Q   If I may, Mr. Ivankovich, allow me to ask the question.
15  I promise I will allow to you answer it.
16    A   Okay.
17    Q   Now, you did have to sign an authorization in order for
18  you to have the ability to transfer funds from this Stifel
19  account for Atlas Multifamily Three into the account of
20  JP Morgan Chase that day, correct?
21    A   Correct.
22    Q   Okay.  And the reason why you did it was specifically
23  so that you could wire funds into the account, true?
24    A   Correct.
25    Q   Okay.  Now, the -- am I right -- well, try to summarize

Ivankovich - Plaintiff - Cross (Mr. Rossman)                    Page 311

1  it this way, there were no actual transfers into that JP Morgan
2  Chase account from any Stifel family account on the 27th of
3  February, correct?
4     A   That's correct.
5     Q   There were no transfers leading up to the 27th of
6  February, correct?
7     A   That's correct.
8     Q   Okay.  Now, you've testified about a telephone call
9  that you had with Stifel on Sunday the 26th, do you remember
10  that?
11    A   Correct, yes.
12    Q   Okay.  And this is, I'm reading from the transcript,
13  Page 132 starting at line 19.  You said you called into all our
14  banks to figure out what's the best and most efficient way to do
15  it, referring to best and most efficient way to get a bank check
16  for the auction; is that correct?
17    A   Correct.
18    Q   Okay.  And you also testified you made calls, referring
19  to Page 143 of the transcript starting at line 2, calls into the
20  bank of Stifel telling them, look, we need to be prepared to
21  wire money to a Chase account first thing in the morning when you
22  get there because we need to generate this cashier's check.
23        Do you recall giving that testimony?
24    A   I do.
25    Q   The call was to Mr. Morris; is that right?

Ivankovich - Plaintiff - Cross (Mr. Rossman)                    Page 312

1     A   Yes.
2     Q   And after you had the call with Mr. Morris, the
3  conclusion that you reached was the best and most efficient way
4  to get the funds would be to wire them into a Chase account to
5  New York, true?
6     A   Yes.
7     Q   Now, you didn't find out from Mr. Morris on Sunday that
8  he had a Stifel office in New York that can cut you a cashier's
9  check directly, did you?
10    A   No.  We knew Stifel had an office in New York.
11    Q   Follow my question very specifically.  You didn't find
12  out from Mr. Morris in your conversation on Sunday that Stifel
13  had an office in New York that was capable of rendering a
14  cashier's check for you?
15    A   I didn't find out because I didn't ask him the
16  question.
17    Q   You told him what you needed to do, right?  You told
18  him you needed -- let me phrase the question more completely.
19        You told Mr. Morris you needed a cashier's check in
20  hand for the auction on Monday in New York, did you not?
21    A   No, I didn't.
22    Q   You didn't tell him that?
23    A   No.
24    Q   Okay.  Now, you -- one moment please.
25        If you knew that you could have gotten a certified

| Ivankovich - Plaintiff - Cross (Mr. Rossman)      Page 313 | Page 315 |
|---|---|

**Page 313**

1 check from Stifel in an office in New York there would be no
2 need to sign this authorization form authorizing Stifel to
3 transfer the money to a JP Morgan Chase account, correct?
4   A   Incorrect.
5   Q   Okay. Now, you -- the Stifel office that you referred
6 to in New York, if I recall your testimony, you used the phrase
7 divine intervention. Do you recall that?
8   A   I do.
9   Q   Okay. You said by divine intervention the Stifel
10 office in New York in the same building of Dechert had its
11 offices and was running the auction that day, correct?
12   A   Correct.
13   Q   Okay. Now, you were not in contact with the Stifel
14 New York office on the 27th of February, correct?
15   A   Nor have I ever been.
16   Q   Okay. You didn't go up there and visit with them,
17 right?
18   A   Nor have I ever.
19   Q   You walked into a random branch of JP Morgan instead
20 that day, right?
21   A   Correct.
22   Q   All right. When that exercise failed you didn't go
23 walk into the Stifel office in New York?
24   A   It wasn't a random bank. It was a specific branch that
25 we identified as being closest to the auction.

**Page 314**

1   Q   You identified it by it's proximity, not based on the
2 relationship you had, right?
3   A   Correct.
4   Q   Okay. Now, you didn't ask the New York office of
5 Stifel to issue a cashier's check or a bank check that day,
6 right?
7   A   We didn't. The auction was over by the time I realized
8 we had to do that.
9        (Continued on next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 315**

1        S. Ivankovich - by Plaintiff - Cross (Rossman)
2   CONT'D CROSS-EXAMINATION
3   BY MR. ROSSMAN:
4   Q   Now, I want you to be clear with me about this. Tell
5 me to the best of your recollection when did you learn that
6 there was a Stifel office in New York that you contend had the
7 ability to render a certified check?
8   A   I am not sure that I contend that or not. I've always
9 known there was a Stifel office in New York.
10   Q   Do you know, as you sit here on the stand today under
11 oath in this courtroom whether or not that Stifel office in
12 New York has even had the capability to issue a certified check?
13   A   They might not.
14   Q   Now, when you testified about this in your deposition,
15 you were asked how Stifel could issue you a certified check and
16 get it to New York that day. Do you remember what your answer
17 was, it was a colorful answer?
18   A   I recall I probably would have asked them to deliver it
19 from whatever office could issue a check.
20   Q   Do you remember using the phrase miracle of flight?
21   A   Yes.
22   Q   I am referring to your deposition transcript starting
23 at page 133. So at the time of your deposition, your
24 explanation was the Stifel banker would get a certified check
25 issued in Chicago by the miracle of flight, come to New York and
26 deliver that check, true?

**Page 316**

1        S. Ivankovich - by Plaintiff - Cross (Rossman)
2   A   True.
3   Q   Okay, now, you remember -- I want to be clear about
4 this, okay. You used the phrase in your testimony you said
5 Mr. Morris was in the process of processing it, referring to the
6 check. Do you recall saying that?
7   A   Not specifically, no.
8   Q   Give me one second. Let me get it to make sure I got a
9 reference for you. I am referring to page 133 of your
10 deposition. You were asked this question starting at line 20
11 and this is in reference to Mr. Morris at Stifel. Did he in
12 fact obtain a $4.125 million cashier's check?
13   A   What page?
14   Q   Page 133 starting at line 20.
15   A   123.
16   Q   133.
17   A   Yes, go ahead.
18   Q   "QUESTION: Did he, in fact, obtain a $4.125 million
19 cashier's check?
20        "ANSWER: He was in the process of processing it."
21        Do you recall giving that testimony?
22   A   If it's here, I must have given it. I don't recall it
23 specifically.
24   Q   Was it the truth when you gave that sworn testimony in
25 your deposition?
26   A   I believe it was.

Page 317

S. Ivankovich - by Plaintiff - Cross (Rossman)

1       Q.   What was he doing when you said he was in the process
2  of processing that $4.125 million check?
3       A.   You are going to have the opportunity to ask him later
4  yourself.
5       Q.   I am asking you based on the testimony you gave at this
6  deposition?
7       A.   I don't know what he was doing. I was in New York.
8       Q.   The process of processing didn't mean anything, did it,
9  sir?
10      A.   I don't know. I am sure it doesn't mean processing,
11 but let me get this straight. You're saying we couldn't have
12 produced a $4.125 million cashier's check with at least
13 $85 million in the bank at Stifel. Is that what you're asking
14 me?
15           MR. ROSSMAN: Move to strike, Your Honor.
16           THE COURT: Sustained.
17      Q.   If I may, Mr. Ivankovich, all I want to understand from
18 you is what did you mean when you gave that testimony?
19      A.   That it was processing.
20      Q.   Okay. Now, you didn't tell your lawyer Miss Rothell,
21 who was in the auction room on February 27th, that you were in
22 the process of getting a check from Stifel, correct?
23      A.   I did not.
24      Q.   Turn to DE-66 for me, would you?
25      A.   DE-66.
26

Page 318

S. Ivankovich - by Plaintiff - Cross (Rossman)

1       Q.   Defendants' Exhibit 66. Now, you recognized that these
2  are text messages that were exchanged between you and Bonnie
3  Rothell on February 27, 2016?
4       A.   Correct.
5       Q.   You communicated with her via text to give her
6  instructions regarding how to handle the auction that was
7  ongoing, right?
8       A.   Correct.
9       Q.   You were updating her on your efforts to get a check
10 while you were at JP Morgan Chase that morning and she was
11 updating you what was happening in the auction room, right?
12      A.   Correct.
13      Q.   And you had no reason to lie or to hide facts from your
14 lawyer, right?
15      A.   Nope.
16      Q.   Now, if you turn to 11:03 a.m. do you see that text?
17      A.   Sorry? Which one?
18      Q.   Bottom of the first page of the exhibit at 11:03 a.m.,
19 do you see that?
20      A.   Yes.
21      Q.   Okay. And there is an "S" next to it. I take it
22 that's your text?
23      A.   Yes.
24      Q.   By implication the others are Miss Rothell, true?
25      A.   Correct.
26

Page 319

S. Ivankovich - by Plaintiff - Cross (Rossman)

1       Q.   And you were awaiting for Chase to process, right?
2       A.   Correct.
3       Q.   And she tells you we're in but we don't have a paddle
4  to bid. They ask to see our check and I said you're getting it.
5  And then she follows up. It looks like 11:11 a.m. they won't
6  let us bid. And then you respond because we are not there with
7  a check; do you see that?
8       A.   There is a question, yes.
9       Q.   And then if you look at 11:14 a.m. you say, bank taking
10 forever because wire just came in this morning saying funds need
11 to season, right?
12      A.   Correct.
13      Q.   And if you could just flip quickly to the page 6 of 9
14 in this exhibit. If she tells you you won the high bid, do you
15 see that at 11:23 a.m.?
16      A.   Correct.
17      Q.   You won the high bid, but Macquarie gets to determine
18 if we get bid?
19      A.   Correct.
20      Q.   You respond same way 11:23 a.m. Chase needs time to let
21 the money settle, right?
22      A.   Correct.
23      Q.   And then again 11 -- on the next page 8 of 9, it looks
24 like 11:28 waiting on Chase still, right?
25      A.   Correct.
26

Page 320

S. Ivankovich - by Plaintiff - Cross (Rossman)

1       Q.   Okay. Despite all these mentions of Chase, okay, you
2  didn't tell her that you were getting a check from Stifel or in
3  the process of getting a check from Stifel, true?
4       A.   There is a whole lot of things I didn't tell Miss
5  Rothell by text, correct.
6       Q.   She told you, she told you first they won't let us bid,
7  okay?
8       A.   She did.
9       Q.   At the time you got that text, you knew you didn't have
10 a check in hand from JP Morgan Chase, right?
11      A.   Correct.
12      Q.   And you didn't say hold on. I can get one from Stifel,
13 right?
14      A.   I did not.
15      Q.   She told you you won the high bid but Macquarie gets to
16 determine if we get the bid and you're at Chase not getting a
17 check, right?
18      A.   I was at Chase doing lots of things.
19      Q.   One of them was not getting a certified check, right?
20      A.   From Chase.
21      Q.   And you didn't tell her hang on. I'll get a check from
22 Stifel, right?
23      A.   There was -- I didn't tell her that. I also didn't
24 tell her I like pastrami sandwiches.
25      Q.   Now, you can put that to the side for a moment. Now, I
26

Page 321

S. Ivankovich - by Plaintiff - Cross (Rossman)

1        S. Ivankovich - by Plaintiff - Cross (Rossman)
2  want -- you already told me that there was no transfer -- well,
3  just to make sure the record is clear, there was no actual
4  transfer of any funds from any personal Ivankovich accounts to
5  an Atlas entity on the 27th of February, correct?
6    A. Correct.
7    Q. And I want to understand this. If you had made a
8  deposit in the amount of $4.125 million that day, okay, it would
9  have been funded in your testimony by Ivankovich family funds,
10  true?
11    A. Correct.
12    Q. Okay. And you would have been making that deposit
13  putting funds at risk, right?
14    A. Correct.
15    Q. It was a hard money deposit. If you failed to close,
16  you lose the deposit, right?
17    A. We had thought so. It didn't turn out to be that way.
18  We had thought so based on the documents we had.
19    Q. I want to understand what your mind set was at the
20  time. Atlas owned -- the Atlas Entity is controlled by your
21  family owned five percent of the equity in this investment,
22  right?
23    A. It was more than that but, yes.
24    Q. I think your testimony is it was also a profit interest
25  that might be as much as 20 percent?
26    A. No, there were different tiers of equity, common equity

Page 322

S. Ivankovich - by Plaintiff - Cross (Rossman)

1        S. Ivankovich - by Plaintiff - Cross (Rossman)
2  at five percent that we had preferred equity in this structure
3  that totaled about 20 percent with a promoted profit of forty.
4    Q. You certainly were a minority owner?
5    A. Correct.
6    Q. The testimony is actually true Atlas was the owner of
7  five percent of the common equity, correct?
8    A. That's not entirely correct.
9    Q. Are you unfamiliar with the joint statement of
10  stipulated facts where your lawyers have agreed that that's
11  true?
12    A. Well, that's not -- that might be true in form but in
13  substance. It is not true in form. Our economic benefit of the
14  common equity was five percent.
15    Q. So your testimony is that you would have been putting
16  your family's funds, your father's funds, potentially your
17  mother's funds at risk to support that minority interest?
18    A. Correct.
19    Q. And if you were going to fund the $4.125 million from
20  IIB, the Bahrain Bank, you would have had to issue a capital
21  call that day, right?
22    A. Yes, that's -- we don't call it a capital call but,
23  yes.
24    Q. And you would have needed IIB authorization to issue a
25  capital call, true?
26    A. Incorrect.

Page 323

S. Ivankovich - by Plaintiff - Cross (Rossman)

1        S. Ivankovich - by Plaintiff - Cross (Rossman)
2    Q. Well, there is an agreement that we don't need to
3  quibble with that on the stand. There is a governing agreement
4  that tells us what the answer is. There is an advisory
5  agreement, correct?
6    A. That agreement says that any party may issue a capital
7  call and no party has to participate.
8    Q. I understand that's your interpretation. I could spend
9  time on the agreement with you, but we'll leave it to the
10  briefing and the judge --
11    A. Okay.
12    Q. -- to decide what the agreement actually says.
13    Now, you didn't get a written capital call issued with
14  IIB that day, right?
15    A. We did not.
16    Q. In any event, IIB couldn't fund the money that day,
17  right?
18    A. No, which is why we volunteered to do it.
19    Q. It was already past business hours in the middle east,
20  right?
21    A. I don't know what the business hours are in the middle
22  east.
23    Q. Bahrain is eight hours ahead of New York at that time
24  of year, you are aware of that?
25    A. I don't know what their working day is. It is eight
26  hours ahead.

Page 324

S. Ivankovich - by Plaintiff - Cross (Rossman)

1        S. Ivankovich - by Plaintiff - Cross (Rossman)
2    Q. The last time you asked IIB to help you with a
3  deposit -- you recall asking them to fund the $250,000 deposit
4  for Timbercreek?
5    A. Yes.
6    Q. And they told you it would take them three or four days
7  to get that money, right?
8    A. Correct.
9    Q. And even then, while you were bumping up against the
10  maturity date, I believe that was right at the end of December,
11  December 30, 2017 -- 2016 if my memory is correct, you didn't
12  fund them with personal funds of 250, right?
13    A. We didn't because IIB funded it.
14    Q. Funded 95 percent, right?
15    A. Correct.
16    Q. Now, I want to ask you about a different subject. I
17  want to ask you about the right of redemption. Do you recall
18  giving testimony about that?
19    A. Yes.
20    Q. Now, if you look at page 138, the trial transcript if
21  you -- those of you who are following I want to take a look
22  this is what I am going to be referencing. Do you recall giving
23  testimony in some or substance that based on the advice of
24  counsel you believed that you did not have the right to redeem
25  after the auction?
26    A. Correct.

Page 325

S. Ivankovich - by Plaintiff - Cross (Rossman)
1   Q.   But that's not what you were telling people at the
3   time, were you?
4   A.   I was giving my best opinion. I was hoping we would be
5   able to redeem.
6   Q.   You were giving people your best opinion of what you
7   believed at the time?
8   A.   Yes.
9   Q.   Would you turn to Defendants' Exhibit 41.
10  A.   Yes.
11  Q.   Now Defendants' Exhibit 41 is an e-mail you sent to
12  Walker Dunlop on January 18, 2017, correct?
13  A.   Correct.
14  Q.   And you were hoping to get refinancing from Walker
15  Dunlop to take out the mezzanine loan, true?
16  A.   Correct.
17  Q.   And if you look at that, you describe on February 27th
18  Macquarie would conduct an auction and would only declare who's
19  the winning bidder. After this, the winning bidder must get HUD
20  approval; do you see that?
21  A.   Yep.
22  Q.   That was true as you understood it, right?
23  A.   Yes.
24  Q.   Based upon, it continues, the next paragraph, based
25  upon HUD's approval process, it would take time to get this
26  approval and to meet all of their requirements; do you see that?

Page 326

S. Ivankovich - by Plaintiff - Cross (Rossman)
1
2   A.   Correct.
3   Q.   In the third sentence of that paragraph you say as
4   follows, during that time, we have the right to pay off the loan
5   during this time plus we continue to both own and control the
6   properties during this period. That was a truthful statement of
7   your belief at the time you sent it to Walker Dunlop?
8   A.   At the time, but it turned out to be incorrect.
9   Q.   Okay. And at the time, you didn't merely send that to
10  Walker Dunlop. You sent -- you made that same statement to
11  others; isn't that true?
12  A.   Yes.
13  Q.   Now, if you look at Defendants' Exhibit 40, it is
14  January 16, 2017. It is an e-mail to Timbercreek, correct?
15  A.   Yes.
16  Q.   Okay. Actually, January 15th is your e-mail. And you
17  write to Timbercreek. And if you look down starting on the
18  second page on February 27th, Macquarie would conduct an
19  auction. You see very similar language to what we were looking
20  at a minute ago, right?
21  A.   Correct.
22  Q.   And, again, you say during that time, I am referring to
23  the paragraph below that, fourth line, during that time, we have
24  the right to pay off the loan during this time, right?
25  A.   Yes.
26  Q.   So you told Walker Dunlop, you told Timbercreek, and if

Page 327

S. Ivankovich - by Plaintiff - Cross (Rossman)
1
2   you look at the top e-mail of this Exhibit DE-40 January 16th,
3   you then forwarded this communication to your majority partner
4   IIB, correct?
5   A.   Correct.
6   Q.   So you told Timbercreek, you told IIB, and you told
7   Walker Dunlop that you had the right to redeem, true?
8   A.   True.
9   Q.   Now, you said in this court, okay, that the attorneys
10  that had given you the advice that you couldn't redeem one of
11  them was DLA?
12  A.   Yes.
13  Q.   And the attorney at DLA you are referring to is David
14  Broderick, correct?
15  A.   Correct. I don't think I testified they gave me advice
16  I couldn't redeem. I think I testified that I asked for legal
17  opinions to be able to produce to lenders a definitive
18  conclusion.
19  Q.   Okay. You were asked this question in trial, direct
20  testimony yesterday, 138 line 3.
21       "So what was your understanding, if you had one,
22  you obviously were counseled by a number of different firms
23  as to your redemption right?
24       "ANSWER: That after the auction it goes away."
25       That was truthful testimony yesterday?
26  A.   Yes.

Page 328

S. Ivankovich - by Plaintiff - Cross (Rossman)
1
2   Q.   One of the lawyers who counseled you was David
3   Broderick at DLA, right?
4   A.   Yes.
5   Q.   If you could turn to your deposition transcript
6   starting on page 175 line 12.
7   A.   Page 175.
8   Q.   175 line 12. Okay, you'll see -- you are asking if the
9   question is referring to that line that we read a few minutes
10  ago in your e-mails to IIB and Timbercreek and Walker Dunlop
11  during that time you have the right to pay off the loan; do you
12  see what I am referring to starting on line 12?
13  A.   Um, hum.
14  Q.   And the question is, yes, I am. And the answer is,
15  yeah, at the time of writing this e-mail, based upon the opinion
16  of David Broderick that was my belief?
17  A.   Correct.
18  Q.   That was truthful testimony when you gave at your
19  deposition?
20  A.   Yes.
21  Q.   And it wasn't just Mr. Broderick that you were relying
22  on. You were also relying on advice that you had received from
23  Miss Rothell, right?
24  A.   Yes.
25  Q.   Okay. And am I right -- now, you say at that time that
26  was January of 2017. It's true that even as late, before we get

Page 329

S. Ivankovich - by Plaintiff - Cross (Rossman)
1    S. Ivankovich - by Plaintiff - Cross (Rossman)
2  to Rothell testimony, even as late as May of 2017, you're still
3  hoping you could redeem, right?
4    A.  I had hoped so, yes.
5    Q.  And Miss Rothell, okay, if you take a look at DE-86,
6  she was communicating about the redemption right in May of 2017,
7  correct?
8    A.  DE-86?
9    Q.  Yes, Defendants' Exhibit 86.
10   A.  Okay.  I'm there.
11   Q.  Okay.  She was communicating with, among other people,
12  individuals at HUD, right?
13   A.  The e-mail is to people at HUD.
14   Q.  Okay.  And she sends, May 3, 2017, 8:20 p.m. you see in
15  the middle of the first page of the exhibit, she sends an e-mail
16  to Christian Newhouse at HUD, right?
17   A.  Correct.
18   Q.  Where she says in the fourth line Atlas has a right of
19  redemption, correct?
20   A.  Correct.
21   Q.  Okay.  So that's what she was telling the federal
22  government in May, right?
23   A.  Yes.
24   Q.  And she testified, it's in the record or transcript at
25  page 100 line 7 through 10.
26        "QUESTION: Did you believe that Atlas had a right

Page 330

1    S. Ivankovich - by Plaintiff - Cross (Rossman)
2  of redemption at the time you said this to HUD and she
3  answered, yes.
4        You don't have any reason to believe she was being
5  untruthful when she said that, do you?
6    A.  Nope.
7    Q.  Okay.  Now, you also recall you were asked about a
8  provision in the PSA, Purchase and Sale Agreement, that my client
9  signed about the equity interest in the property that referenced
10  the redemption rights, correct?
11   A.  Correct.
12   Q.  And there's no -- I don't think there is any
13  disagreement between us that the PSA has a provision that
14  specifically says that Atlas could pay off the loan before the
15  closing, correct?
16   A.  I need to see it, but if, I believe, that's the case,
17  yes.
18   Q.  And you testified yesterday on direct, and I'm
19  referring to the transcript in the trial page 141 starting at
20  line 4, that you got that document, the PSA, during discovery in
21  this case and after the May 3rd closing, correct?
22   A.  The final PSA not the one of the date at the auction,
23  correct.
24   Q.  You have, meaning the final PSA between the KKR entity
25  that purchased the equity and Macquarie?
26   A.  Yes.

Page 331

1    S. Ivankovich - by Plaintiff - Cross (Rossman)
2    Q.  Now, could you turn to PX-16.  It should be in your
3  binder.  It's in the binder Mr. Meister gave you.  Turn to PX-16
4  if you can.
5    A.  There is no 16 in this binder.  It starts at seven and
6  then it goes to 27.
7    Q.  Give me a moment.  And this is a copy of the contract
8  of sale that was signed between KKR and Macquarie, correct?
9    A.  Yeah, it looks like it.  It is missing some signatures
10  but, yeah.
11   Q.  I think you'll see signatures in the pages prior to
12  that.
13   A.  I see them.  It is missing the escrow agent and the
14  title insurance company, but I see the signature from KKR and
15  Macquarie.
16   Q.  Okay.  Now, I want to focus your attention on the line,
17  go to the second page of the document.  Do you see there is a
18  line all the way at the top of the document?  It says file
19  New York County Clerk 10/30/2017.  That means it was filed on
20  the docket in this case; do you understand that?
21   A.  Yep.
22   Q.  If you look below that, you will see it references case
23  one colon 17-CB-01138-LLS filed 3/24/17; do you see that?
24   A.  Correct.
25   Q.  Okay.  You understand that's a reference to this
26  document being filed on the docket in the federal court in the

Page 332

1    S. Ivankovich - by Plaintiff - Cross (Rossman)
2  case that was pending before Judge Stanton?
3    A.  I don't understand, but I have no reason to believe you
4  would mislead me.
5    Q.  If what I just told you is correct, it is there for all
6  the public to see, on the federal court docket, then certainly
7  your counsel in that case was aware of as of March 24, 2017, that
8  the contract of sale had a redemption provision in it, correct?
9    A.  I can't testify as to what my counsel wasn't aware of.
10   Q.  Now, you were in constant contact with your counsel
11  both about the case and about the possibility of your trying to
12  purchase the properties, right?
13   A.  I was.
14   Q.  You could put that to the side.  Now, Mr. Ivankovich, I
15  want to ask you about the auction.  Okay.  Now, as the auction
16  approached, which is February 27th, you were in communication
17  with IIB, correct?
18   A.  Yes.
19   Q.  And I want you to turn now to Defendants' Exhibit 60 on
20  that subject.  It should be in the large binder that I gave you.
21  And this is an e-mail exchange that you had with Marcus Scott at
22  IIB on the 25th do you see that?
23   A.  Yep.
24   Q.  And when you say to Mr. Scott, okay, is all the way at
25  the bottom, the first page of the exhibit, you're talking about
26  the auction, you say, remember, any amount that is bid beyond

Page 333

S. Ivankovich - by Plaintiff - Cross (Rossman)

1 the deck comes back to us. So MBL bids up to their deck and we
2 can bid to infinity. That's what you told Mr. Scott, right?
3    A.  Yes.
4    Q.  And when you said bid to infinity, you -- I believe you
5 testified in substance on direct that you meant bid up to the
6 full equity value of the property?
7    A.  What we felt the equity value was.
8    Q.  I think you testified that was about 110 to
9 $111 million after giving --
10    A.  I'd look at the overall value if that's what the value,
11 you know, the 250 million equates to then, yes.
12    Q.  And that's because, as you explained to him, if you won
13 any bid above, the loan comes back to you as cash, right?
14    A.  Correct. It is our equity.
15    Q.  And I want to focus on the different scenario. If you
16 bid up the auction and you lost, then the proceeds of the sale
17 above the loan amount would also go to you, right?
18    A.  Yeah. After costs, correct.
19    Q.  If you bid up and the result was that you caused
20 someone else to pay more, you would have benefited from that
21 more, right?
22    A.  If I bid to protect my equity, I would have benefited
23 as well.
24    Q.  But to answer my question, if you were bidding to cause
25 my client KKR to pay more, then that more above the cost of the

Page 334

S. Ivankovich - by Plaintiff - Cross (Rossman)

1 loan you expected that you would receive in proceeds?
2    A.  If they outbid me, yes.
3    Q.  Now, the amount of the mezzanine loan we all agreed was
4 $71 million?
5    A.  Yes.
6    Q.  And had you exercised your right to redeem you could
7 have kept the properties and just paid off the loan at 71
8 million, true?
9    A.  Well, in addition to the cost and fees that were put on
10 to it.
11    Q.  Which made it about 73.5 million which was Macquarie
12 credit bid at the auction, correct?
13    A.  Even I think before that when we got the estimate of
14 redemption it was closed at 73 with costs and fees and other
15 things.
16    Q.  Okay. Now, your last bid at the auction was
17 $77 million, right?
18    A.  Yes.
19    Q.  If you implemented the strategy bid to infinity, you would
20 stop somewhere around 110 and 111 roughly?
21    A.  We would have stopped at the overall value in the 250.
22    Q.  Do you remember the nonbinding term sheet that you had
23 with Walker Dunlop to finance your bid?
24    A.  I do.
25    Q.  That was only for $75 million, right?

Page 335

S. Ivankovich - by Plaintiff - Cross (Rossman)

1    A.  Yes.
2    Q.  And that's because it was specifically intended to give
3 you -- it was specifically set at a price level based on the
4 amount of the mezzanine loan plus expenses, right?
5    A.  I don't think that's the case, no.
6    Q.  In any event, it was 75 million. It wasn't 110, right?
7    A.  It was 75, yes.
8    Q.  And in your text messages that you were looking at
9 before with Miss Rothell at DE-66, why don't we turn that up so
10 you have it in front of you real quick.
11    A.  DE-66.
12    Q.  DE-66. You could turn to page three when you're ready.
13    A.  Go ahead.
14    Q.  Okay. She texted you we're up to 74.5 million. Do you
15 see that on page three?
16    A.  I do.
17    Q.  And you respond 11:15, good, keep going, right?
18    A.  Yes.
19    Q.  And then you, on page 4 of 9, you say mezz plus our
20 equity is $105 million; do you see that?
21    A.  Yes.
22    Q.  And you said that to indicate what infinity meant to
23 you, right? You were willing to go up to 105 million?
24    A.  No. I think it just says what it says. Mezz plus our
25 equity is 105. I think the overall value that we believed it

Page 336

S. Ivankovich - by Plaintiff - Cross (Rossman)

1 was more than that.
2    Q.  Now, if KKR kept bidding at the auction above your 77
3 million, you would have kept bidding, right?
4    A.  Yes.
5    Q.  And if ultimately KKR had won, whatever number it
6 landed on above 77 million, would have went down to your
7 benefit, right?
8    A.  We would have gotten our equity back, yes.
9    Q.  In fact -- withdrawn.
10    Now, knowing that whatever additional amount my client
11 would have to bid would ultimately go to your benefit. You not
12 only bid past the $71 million. You bid past the credit bid of
13 $73.5 million. You bid beyond the $75 million in the Walker
14 Dunlop term sheet, correct?
15    A.  Correct.
16    Q.  Now, if you had $71 million or 73 and a half million
17 dollars in ready funds available to close the transaction, why
18 didn't you redeem your loan?
19    A.  We were getting absolutely no responses from Macquarie
20 at that end.
21    Q.  If you look --
22    A.  It took us forever to even get a payoff letter that was
23 accurate.
24    Q.  When you walked into the auction, and you can look at
25 it Plaintiffs' Exhibit 127, Mr. Gonzalez showed it to you. If

Atlas v.
Macquarie et al (FINAL)                                                    January 13, 2020

---

Page 337

S. Ivankovich - by Plaintiff - Cross (Rossman)

1      S. Ivankovich - by Plaintiff - Cross (Rossman)
2  you want to have it handy -- when you walked into the auction
3  you had a payoff letter; did you not?
4    A.  We had a payoff letter.  We didn't believe it was
5  accurate.  We had a payoff letter.
6    Q.  And you were quibbling with the payoff letter because
7  you thought they were charging you too much in legal fees
8  $510,000, true?
9    A.  And other costs, correct.
10        (Continued on next page)

---

Page 338

Ivankovich - Plaintiff - Cross (Rossman)

1  CROSS EXAMINATION CONTINUED
2  BY MR. ROSSMAN:
3    Q.  Okay.  But if you thought this was worth something on
4  the order of 40 million dollars in equity and if you genuinely
5  had ready funds in the amount of 71 million dollars or more to
6  buy this, you could have redeemed it at the auction or right
7  after the auction, right?
8    A.  Absolutely not.
9    Q.  You didn't redeem it before the auction, right?
10    A.  We certainly tried to.  We didn't not because of us.
11    Q.  There's zero doubt in this courtroom that you had the
12  right to redeem prior to the auction, right?
13    A.  Zero doubt by whom?
14    Q.  You had no doubt at all in your mind that you could
15  have redeemed and paid off the loan before the auction, right?
16    A.  If Macquarie allowed us to, yes.
17    Q.  Okay.  Well, Macquarie is a bank that's in the business
18  of receiving funds, is it not?
19    A.  We thought so.
20    Q.  You had a Payoff Letter, you just didn't like it,
21  right?
22    A.  It was inaccurate.  I mean, you're very wealthy, but
23  half a million dollars is a lot of money to me.
24    Q.  I think half a million dollars is a lot of money.  Be
25  that as it may, if you had 71 million dollars nothing was

---

Page 339

Ivankovich - Plaintiff - Cross (Rossman)

1  stopping you from closing by paying off that loan with your own
2  funds and then refinancing it after the fact, isn't that right?
3    A.  Macquarie was stopping us.  Correct.
4    Q.  I'm sorry?
5    A.  Macquarie was stopping us from doing that.
6    Q.  That's your testimony?  Macquarie was stopping you from
7  giving them cash to pay off a loan?
8    A.  Yes.
9    Q.  Now, you're aware our clients closed this transaction
10  in early May 2017, I believe the day was May 3rd, 2017, right?
11    A.  Yes.
12    Q.  And you've already admitted in this case that after
13  that date, approximately 1.433 million dollars was caused by you
14  to be transferred out of Wells Fargo bank accounts controlled by
15  the Property Levels, LLC, are you aware of that?
16    A.  Yes.
17    Q.  That was transferred from those Property Level accounts
18  into accounts that were controlled by you and your family at
19  Atlas, right?
20    A.  Just by Atlas.
21    Q.  Okay.  Just by Atlas.  I have one question for you
22  about that.
23      Mr. Ivankovich, did it occur to you that transferring
24  those funds from the Property Level, LLCs, skipping the
25  entities, the Atlas entities, that my client then owned the

---

Page 340

Ivankovich - Plaintiff - Cross (Rossman)

1  equity of and transferring them directly into Atlas entities
2  that your family controlled directly, even after the sale, did
3  it occur to you that that would violate your Bad Boy Guarantee?
4    A.  That was an incorrect statement.  My family doesn't
5  control those accounts.
6    Q.  You do?
7    A.  Myself and other Atlas employees do.
8      Number 2, the answer is no, it didn't occur to me
9  because those monies were for liabilities incurred and owing by
10  the properties.  That actually was the right thing to do because
11  your client had stopped paying bills.
12    Q.  Are you aware that we've asked you for documents
13  showing that the monies that you transferred after the closing
14  were used towards paying any bills at properties, are you aware
15  of that?
16    A.  Yes.
17    Q.  Are you aware that we received nothing?
18    A.  I don't think that's correct.
19    Q.  Okay.  The answer you got the 1.4 million dollars in
20  change and you put in your pocket, right?
21    A.  Absolutely not.
22    MR. ROSSMAN:  Now, I just have a couple of things
23  and I'm done, and I will pass this witness, your Honor, if I
24  may.
25    Q.  I want to be clear about one thing.  You've made

---



**From:** Jason Wandner <jason@wandnerlaw.com>
**Sent:** Thursday, June 9, 2022 8:16 PM
**To:** Marc S. Dobin <mdobin@dobinlaw.com>
**Cc:** Gary Goldstein <gary@gagpa.com>
**Subject:** Re: Stifel

Marc please confirm that all the frozen money will be unfrozen and promptly available to be transferred if it has not already been done.

**EXHIBIT 3**