IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ZHU ZHAI HOLDINGS, LIMITED, and ) No. 20 C 4985
PETER PUI TAK LEE, )
)
              Plaintiffs, )
)
     v. )
)
STEVEN IVANKOVICH, ) August 31, 2022
) Chicago, Illinois
) 9:17 a.m.
             Defendant. ) Citation Hearing

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

APPEARANCES:

For the Plaintiffs:     KONICK & DILLON, P.C.
                          21 West State Street
                          Suite 3000
                          Geneva, Illinois  60134
                          BY:  MR. AMIR R. TAHMASSEBI

                          MANDEL HORN & RAUCH, P.C.
                          704 Adams Street
                          Suite F
                          Carmel, Indiana  46032
                          BY:  MR. STEVEN P. LAMMERS

For the Defendant:     MR. JASON M. WANDNER, P.A.
                          100 Biscayne Boulevard
                          Suite 1607
                          Miami, Florida  33132

TRACEY DANA McCULLOUGH, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 1232
Chicago, Illinois  60604
(312) 435-5570

1   APPEARANCES CONTINUED:

2   For Third Party LLCs:    CHUHAK & TECSON, P.C.
                             120 North LaSalle Street
3                            Suite 2000
                             Chicago, Illinois  60602
4                            BY:  MR. MICHAEL WILLIAM DEBRE, III
                                  MR. CECILIO IVAN PORRAS
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  20 CV 4985, Zhu Zhai Holdings Limited
2   versus Ivankovich.

3          THE COURT:  All right.  Plaintiff, go ahead.

4          MR. TAHMASSEBI:  Good morning, Your Honor.  Amir
5   Tahmassebi on behalf of the plaintiff.

6          MR. LAMMERS:  Good morning, Your Honor.  Steve
7   Lammers on behalf of the plaintiffs.

8          THE COURT:  All right.  Thank you.  Defense.

9          MR. WANDNER:  Good morning, Judge.  Good to see you
10  again.  Jason Wandner on behalf of Mr. Ivankovich.

11         THE COURT:  Hello.

12         MR. DEBRE:  Good morning, Your Honor.  Michael Debre
13  on behalf of the third party LLCs.

14         THE COURT:  All right.  Thank you.

15         MR. PORRAS:  Good morning, Your Honor.  Cy Porras on
16  behalf of the third party LLCs as well.

17         THE COURT:  All right.  Thank you.  And again, we do
18  have Mr. Ivankovich here.  That's the first step I guess,
19  correct, Counsel?

20         MR. TAHMASSEBI:  I agree, Judge.

21         THE COURT:  All right.  And have you all made your
22  arrangements to, to do what you need to do?

23         MR. TAHMASSEBI:  We're prepared to go forward with
24  the examination of Mr. Ivankovich.

25         THE COURT:  All right.  Mr. Ivankovich -- do we know

1   approximately how long it's going to take?  Because I may have

2   to take some breaks depending on what's going on.

3                MR. TAHMASSEBI:  I don't anticipate it going any more

4   than two hours, Your Honor.  And it could be --

5                THE COURT:  Well, we will not -- we're going to have

6   to take breaks.

7                MR. TAHMASSEBI:  Okay.

8                THE COURT:  Because I have other cases, and I'm the

9   emergency judge.

10               MR. TAHMASSEBI:  Okay.

11               THE COURT:  So we actually pushed -- and that's for

12  my whole -- for the next couple weeks, so okay.  All right.

13  Step over here, sir, Mr. Ivankovich.

14               MR. TAHMASSEBI:  Yes, Judge, I have an exhibit binder

15  for you as well.

16               THE COURT:  All right.

17               MR. TAHMASSEBI:  I'm going to try to do it

18  electronically too.

19               THE COURT:  Come on over here, sir.  Go all the way

20  at the end.

21   STEVEN IVANKOVICH, PLAINTIFFS' WITNESS, DULY SWORN

22               THE COURT:  All right.  You can step on up, sir.

23               MR. PORRAS:  And, Your Honor -- excuse me.  Cy Porras

24  here on behalf of the third party LLCs.

25               THE COURT:  Yes.

1    MR. PORRAS:  Just as a general housekeeping matter,

2  there are three pending motions before the Court.  So we know

3  kind of what to expect, does the Court anticipate hearing those

4  today?  We think that they're ripe for hearing.  They're fully

5  briefed, and we're prepared to move forward.

6    THE COURT:  If they're fully briefed, which I believe

7  they are, the Court will decide whether or not I need any

8  argument further today.  Other than that, though, the Court

9  will issue rulings on everything that I need to do.  Okay?

10    MR. PORRAS:  Thank you.

11    THE COURT:  All right.  Anytime you're ready, sir.

12    MR. TAHMASSEBI:  Bear with me one second.  I want to

13  pull this up.

14              DIRECT EXAMINATION

15  BY MR. TAHMASSEBI:

16  Q    Can you go ahead and state your name, please, sir.

17  A    Steven Ivankovich.

18  Q    And where do you currently reside, Mr. Ivankovich?

19  A    In Florida.

20  Q    And what's your address in Florida?

21  A    791 Crandon Boulevard.

22  Q    Is that a home or an apartment, a condo?

23  A    It's a condo.

24  Q    And do you own that condo?

25  A    No.

1  Q    Is it a lease on your part?  Do you lease it?

2  A    No.

3           THE COURT:  Can we have a city.

4           THE WITNESS:  Key Biscayne.

5           THE COURT:  Thank you.  Go ahead.

6           MR. TAHMASSEBI:  Thank you.

7  BY MR. TAHMASSEBI:

8  Q    Do you pay any rent to stay in that condo?

9  A    No.

10 Q    Who is it owned by?

11 A    I believe it's owned by my parents.

12 Q    And do you reside there alone, with family?

13 A    Sometimes alone.  Sometimes with family.

14 Q    And when you say sometimes with family, is that your wife

15 or children or your parents?

16 A    Everybody.

17 Q    And I don't want to get into your personal life, Mr.

18 Ivankovich, but it could be somewhat relevant --

19           THE COURT:  Oh, yes, we do.  Right.  I mean, what are

20 we doing here?

21           MR. TAHMASSEBI:  That's what we're here for.

22           THE COURT:  All right.

23           MR. TAHMASSEBI:  You'll see what I mean, Judge, when

24 I ask the next question.

25           THE COURT:  I understand, but I'm just saying.  Okay.

1  Go ahead.

2  BY MR. TAHMASSEBI:

3  Q    You -- I had heard from this being continued before that

4  you were going through a divorce.  Is that still pending?

5  A    Yes.

6  Q    Is it finalized, or are you still currently married to

7  your wife?

8  A    I'm still currently married.

9  Q    I kind of want to jump right into it, Mr. Ivankovich.  I'm

10  going to show you -- and there's a binder up there that has the

11  exhibits in it, and I'm also going to pull them up on the

12  screen, but I want to start with -- Judge, and if it's okay to

13  publish this.  There's no jury here, so I'd assume it's okay,

14  yes.

15           THE COURT:  Okay.

16  BY MR. TAHMASSEBI:

17  Q    I'm going to start with what's marked as Exhibit 3.  This

18  is a document that was produced in the course of discovery in

19  this action prior to the judgment.  And if you look, Mr.

20  Ivankovich, it's titled Personal Financial Statement, Steven

21  Ivankovich, August 2020.  Do you see that?

22  A    Yes.

23  Q    And then about two/thirds down there is a signature?

24  A    Yes.

25  Q    Is that your signature?

Ivankovich - direct by Tahmassebi

1  A    It appears to be, yes.

2  Q    And then the date of that is August 26th of 2020.  Do you

3  see that?

4  A    I do see the date, yeah.

5  Q    All right.  And then below it --

6         MR. TAHMASSEBI:  And, Judge, just for the record,

7  this is the complaint in this case.  And I'd ask the Court to

8  take judicial notice it was filed on August 24th of 2020.  It's

9  docket entry No. 1.

10        THE COURT:  All right.  The Court will take judicial

11  notice of the record.

12  BY MR. TAHMASSEBI:

13  Q    And then below your name, you say, "I, Steven Ivankovich,

14  certify that this financial statement dated March 9th," 2000 it

15  says 2, but I believe that's an error, it should be '22, "is

16  true, accurate, and fairly represents my financial condition."

17         Do you see that, sir?

18  A    I do see this, yes.

19  Q    And feel free to look through the document, if need be.

20  But you reviewed this financial -- this personal financial

21  statement before signing it?

22  A    I don't -- where does this come from?

23  Q    This is a document that was produced by your lawyers in

24  this litigation, and I can show you if you look there's a Bates

25  stamp number Ivankovich 248.

Ivankovich - direct by Tahmassebi

1  A    Okay.

2  Q    So you would have reviewed this personal financial

3  statement before you signed off on it for accuracy, right?

4  A    Yes, but this doesn't look correct, I mean, in the sense

5  that the bottom part --

6              THE COURT:  Hold on one second.

7       (Brief pause.)

8              THE WITNESS:  I wouldn't have signed a document -- I

9  mean, it looks, it looks like --

10             THE COURT:  Okay.  Hold on one second, sir.  Ask a

11 question, and then, sir, you have to answer his question.  You

12 can't have sort of a conversation.  Either you can say I don't

13 know what this is, but you can't just freestyle.  Okay.

14             THE WITNESS:  I don't believe this document is

15 something I would have reviewed or is accurate.

16             THE COURT:  All right.

17 BY MR. TAHMASSEBI:

18 Q    Is that your signature, Mr. Ivankovich, on the first page?

19 A    Yes, it appears to be a cut and paste of an electronic

20 signature.

21 Q    All right.  And then let's just -- let's look at this

22 personal financial statement from August 26th.

23             THE COURT:  Excuse me one second.

24             MR. TAHMASSEBI:  Sure, Judge.

25             THE COURT:  Once again, sir, he asked you if that was

1    your signature.  Do not give an explanation about it appears to

2    be a cut and paste.  It's either a signature or it isn't, and

3    then your lawyers can come back and clean it up, and then you

4    can get into a cut and paste, but you are not an expert.

5            THE WITNESS:  It appears to be a, a representation of

6    my signature, yes.

7            THE COURT:  All right.  Thank you.  I'll accept that

8    answer.

9            MR. TAHMASSEBI:  Thank you, Judge.

10   BY MR. TAHMASSEBI:

11   Q    And I want to just look at this personal financial

12   statement that bears your signature.  And I want to start

13   with -- I'm sorry.  Let me go back.  With the very beginning --

14   with the very top.  Okay.  There's a, there's a home address

15   listed at 791 Crandon Boulevard, Key Biscayne, Florida.  Do you

16   see that?

17   A    Correct.

18   Q    And is that where you resided in August of 2020?

19   A    Yes.

20   Q    And then it lists as -- if we go to the second column, it

21   has your birth date of February 14th, 1970.  Is that accurate?

22   A    Yes.

23   Q    And your home phone as (***)***-** -- ****, excuse me.  Is

24   that accurate?

25   A    Yes.

1    Q    All right.  And then it talks --

2              THE COURT:  Excuse me one second.

3              MR. TAHMASSEBI:  Sure, Judge.

4              THE COURT:  The court reporter will strike the phone

5    number.  Giving the actual numbers is not necessary and does

6    not need to be on the record.  It's stricken.

7              MR. TAHMASSEBI:  I apologize, Judge.  That's true.

8              THE COURT:  All right.  Go ahead.

9    BY MR. TAHMASSEBI:

10   Q    And then it talks about your annual gross salary as of

11   August of 2020 at 250,000.  Is that accurate?

12   A    I, I don't recall.

13   Q    And it says date of will and/or trust.  The answer is

14   various.  Do you have various, or did you in August of 2020

15   have various wills and trusts?

16   A    I don't recall if in 2020 I did.  But I did at some point

17   have various trusts, yes.

18   Q    Okay.  Thank you.  And was the name of the executor and/or

19   trustee Anthony Ivankovich?

20   A    On one of them, yes.

21   Q    And is that your brother, sir?

22   A    That's my father.

23   Q    Your father.  Okay.  I want to look at page 2.  The first

24   part I want to draw your attention to is the income statement

25   for the year ending 2019.

1    Let me ask you this:  Let me back up.  Did you have

2  any accountants that did work for you in the year 2019?

3  A    For me personally?

4  Q    Yes.

5  A    Yes.

6  Q    Okay.  And you actually in the year 2019 had a number of

7  financial statements put together for certain investments,

8  isn't that correct?

9  A    I don't recall.

10  Q    Do you recall signing guarantees where you represented

11  that you would be presenting personal financial statements?

12  A    No.

13    MR. TAHMASSEBI:  Judge, I'm going to tender another

14  exhibit.  For the record, Your Honor, I'm tendering to the

15  witness and the Court and opposing counsel what's called a

16  Limited Guaranty dated January 26th, 2019.  I've marked it as

17  Exhibit 15 for identification.

18    THE COURT:  Are these the same two you've given to

19  me?

20    MR. TAHMASSEBI:  Oh, I'm sorry.  One was for the

21  witness, Judge.  I apologize.

22    THE COURT:  All right.  I was wondering.  Thank you.

23  I gave the witness the unhighlighted one.

24    MR. TAHMASSEBI:  Oh.

25    THE COURT:  Or do you want him to have the

Ivankovich - direct by Tahmassebi

1   highlighted one?

2          MR. TAHMASSEBI:  No.  The unhighlighted one is fine,

3   Your Honor.  Thank you.

4   BY MR. TAHMASSEBI:

5   Q    If you go to the last page of Exhibit 15, the guaranty.

6   A    Can I please have a moment to read this.

7          THE COURT:  He's just directing you to where you need

8   to go.  And then, yes, you can read it as he asks you to read

9   it.  All right.

10  BY MR. TAHMASSEBI:

11  Q    So it's the second to last page.

12         THE COURT:  He wants to take you to the exact place

13  he's asking a question about.  Go ahead, Counsel.

14  BY MR. TAHMASSEBI:

15  Q    Okay.  Thank you.  Is your signature on the second to last

16  page?

17  A    It appears to be, yes.

18  Q    And then did you sign this document on or around

19  January 26th of 2019?

20  A    I don't recall.

21  Q    And then if you go, sir, to page 4 of Exhibit 15.

22         THE COURT:  Counsel, before you want to go to the

23  next question --

24         MR. TAHMASSEBI:  Yes.

25         THE COURT:  -- you asked -- gave him a specific date.

1  Do you want -- if he doesn't recall, do you want to refer to

2  somewhere else in the document that might have the date as

3  opposed to letting it hang there?  How about the first page?

4          MR. TAHMASSEBI:  Thank you, Judge.

5  BY MR. TAHMASSEBI:

6  Q    The first page it says Limited Guaranty.  And it says,

7  this Limited Guaranty is made as of 26th day of January 2019 by

8  Steven Ivankovich, an individual.  And it goes on to discuss

9  the creditor Mr. Pete -- Lee, Peter Pui Tak.

10         Does that refresh your recollection, sir, of the time

11 when you signed this document?

12 A    No.

13 Q    And then if you look at page 4, paragraph 9.  Let me back

14 up.  I apologize.  Let me back up.  Back to page 1.

15         Did you make a guaranty as it references in paragraph

16 1 under guaranty of a million dollar loan that was received by

17 an entity that you had an interest in on or around January 26th

18 of 2019?

19 A    I did, but I never received the million dollars.

20 Q    And then if you go to paragraph 9.  So I'm clear, it's

21 your sworn statement that neither you or any of your entities

22 ever received the million dollar loan?

23 A    I've never received a million dollars from Mr. Lee.

24 Q    Paragraph 9 is titled Guarantor's Warranties and

25 Representations.  Guarantor hereby warrants and represents unto

1  creditor that all financial statements, balance sheets, net

2  worth statements, and other financial data, however designated,

3  which have there -- heretofore been furnished to creditor with

4  respect to any guarantor by or any -- by or on behalf of any

5  guarantor and accurately -- fairly and accurately present the

6  financial condition of such guarantor.

7        Do you see that?

8  A    Yes.

9  Q    Did you as required by this guaranty signed by you provide

10 accurate financial statements, balance sheets, and net worth to

11 Mr. Lee?

12 A    No, I don't recall ever supplying financial statements to

13 Mr. Lee.

14 Q    Okay.  If we can go back to Exhibit 3.  And I want to draw

15 your attention to page 3 of the personal financial statement.

16 And if we look at specifically the balance sheet, and we can

17 look at the schedules too, but I don't know if that's going to

18 be necessary, I want to look at the assets in dollars, omit

19 cents that are referenced here.

20       It says cash and short term investment Schedule A,

21 $1,103,196.  Do you see that?

22 A    I do.

23 Q    And then marketable stocks and bonds including government

24 securities, and it's listed at 11 million that you had on your

25 personal financial statement in August of 2020, correct?

1  A    Yes, that's what it says on this document.

2  Q    And then the total liquid and marketable assets on your

3  signed personal financial statement is $12,103,196, correct?

4  A    Correct.

5  Q    And then if we look at the completion of the balance

6  sheet, on the right-hand column there's liabilities listed, and

7  then under the signed personal financial statement your net

8  worth as of August 26th, 2020, was $55,367,404; correct?

9  A    I don't believe that's correct.

10 Q    Why do you believe this document is incorrect, Mr.

11 Ivankovich?

12 A    Well, in looking at it, and I'd have to study it more

13 closely, I believe this is a document from March 1, 2020.  If

14 you go to the first page where my signature is, it -- where it

15 says 202, it look likes -- it looks like that was either

16 entered after the fact or some previous document that the 2020

17 got erased.  And if you scroll down to the page you

18 highlighted, in the marginalia it says that there is zero

19 balance on the credit cards as of March 1st, 2020.

20      So it appears this isn't my statement from August,

21 but some altered version of my statement from March 1st, 2020.

22 Q    Well, if you go to page --

23 A    And it doesn't -- and it also doesn't jive with the second

24 page where it says year ending for 2019.  It looks like that

25 page was slip sheeted into some -- again, some previous version

1  of my financial statement, so I, I can't say.  This doesn't

2  look at all like an August 2020 document, but some doctored

3  version of a March 2020 statement.  Yeah, if you scroll down

4  right there.

5  Q    So I don't want to split hairs with you.  I do want to

6  point out, though, if you look at page 2 of the document --

7            THE COURT:  When you say the document, let's be

8  specific on which one.

9            MR. TAHMASSEBI:  Thank you, Judge.

10 BY MR. TAHMASSEBI:

11 Q    Page 2 of Exhibit 3, the personal financial statement.

12 About three quarters of the way down there's an asterisk.

13 There's two at -- there's one at the beginning, there's a

14 second one, and then there's a third one.  And I can highlight

15 it for you.

16 A    Correct.

17 Q    And the third one states about midway through, Neither the

18 vehicle, TRG International period.  And then it says there is a

19 zero balance on the credit cards as of August 1st, 2020.

20 A    No.  What you have in front of me says there's a zero

21 balance on the credit cards as of March 1, 2020.  Yep.

22 Again --

23 Q    I've highlighted it for you.

24            THE COURT:  Sir, there's not a question.  Wait.

25            THE WITNESS:  I see, I see that --

1    THE COURT:  Sir.

2    THE WITNESS:  I see that on this page, yes.

3    THE COURT:  There's not a question right now.

4    THE WITNESS:  Okay.

5    THE COURT:  Go ahead.

6  BY MR. TAHMASSEBI:

7  Q    So at least there is reference to the August time period

8  in more than one place in this personal financial statement, we

9  agree now?

10  A    There is a reference on page 1 for August 26th, 2020.  And

11  the reference you're showing me is August 1, 2020.

12  Q    Two references to an August 2020 date?

13  A    Yes.

14  Q    All right.  Now, so to go back to what you were saying,

15  Mr. Ivankovich, you believe this is actually a personal

16  financial statement of March 2020.  Is that your testimony?

17  A    It, it -- it could be.

18  Q    And as of March 2020 then, let's go back to my prior

19  question, if we look at your balance sheet, you believe this is

20  from March 2020.  Then as of March 2020 your net worth is

21  listed at $56,387,404, right?

22  A    It could have been, yes.

23  Q    Well, I would expect you had some idea of what your net

24  worth was in 2020 -- in 2019, 2020 when you're entering into

25  the P5 Portfolio real estate deal, right?

1  A    It could have been in that range.  I'd need to have my
2  exact financial statement in front of me to give you a correct
3  answer.

4  Q    Well, we are looking at a signed document from you that
5  says personal financial statement.  And it indicates a $56
6  million net worth.

7  A    Yeah, I'm not sure this signed document is something I
8  would have signed given the discrepancies in it.

9  Q    Are you familiar with a company called Walker Dunlop?

10 A    I am.

11 Q    And, in fact, you received a rather sizable loan from
12 Walker Dunlop in 2019?

13 A    No, that's not accurate.  The loan was made by a company
14 called Varadero I believe.

15 Q    Affiliated with Walker Dunlop, right?  Walker Dunlop was
16 the broker for the loan?

17 A    I don't know the relationship.

18 Q    All right.  Let's take a look at Exhibit No. 6.  Exhibit 6
19 is a document titled Asset Summary, and it talks about Atlas P5
20 Portfolio.

21 A    That's correct.

22 Q    And you're an owner in Atlas P5 and the companies that are
23 involved in Atlas P5 Portfolio?

24 A    Indirectly, yes, through a series of companies.

25 Q    And Atlas -- just tell the Court what Atlas P5 Portfolio

1  is.

2  A    It's a group of five apartment buildings -- a portfolio of

3  five residential apartment buildings.

4  Q    And have you seen this document before that's marked as

5  Exhibit No. 6?

6  A    No.

7  Q    Did you assist in providing information to Walker Dunlop

8  in order to create Exhibit No. 6?

9  A    I don't know.  I've never seen this document.  I don't

10  know what information I would have provided.

11  Q    Well, did you provide Walker Dunlop with information about

12  your net worth?

13  A    Yeah, at some point I probably did.

14  Q    Okay.  And when you provided Atlas information about your

15  net worth, were you accurate in the information that you

16  provided?

17  A    I'd have to see what information you're referring to, but

18  I've never, I've never provided inaccurate information to a

19  lender.

20  Q    That's what I mean.  You either did provide it accurately

21  or didn't.  You don't need to see it if you --

22  A    I, I provide accurate information.

23  Q    Okay.  You provide entities like Walker Dunlop who are

24  going to assist you in a real estate deal accurate financial

25  information, right?

1  A    Yes.

2  Q    And you do the same for all of your lenders, Mr.

3  Ivankovich, correct?  You like to provide accurate financial

4  information, right?

5  A    Correct.

6  Q    And when you sign a personal financial statement, whether

7  it's in March of 2020 or August of 2020, you would want to make

8  sure that personal financial statement is accurate before you

9  signed off on it, right?

10  A    When I do sign a document, yes.

11  Q    If we can turn to page 12 of Exhibit 6.  And if we look

12  midway down on page 12, there's a bold thing that says

13  guarantor.  I've got it pulled up for you here.  And the name

14  is Steven Ivankovich.  That's you, right?  You were the

15  guarantor of a loan?

16  A    Correct.

17  Q    And that was related to the P5 Portfolio?

18  A    Yes.

19  Q    The same one that the plaintiffs in the case also loaned

20  you money for, correct?

21  A    I don't believe they loaned me money for this portfolio.

22  Q    Okay.  Just so I understand, it's your sworn testimony --

23  you understand who the plaintiffs are in this case, right, the

24  Zhu Zhai Holding Company and Peter Lee?

25  A    Yes.

1  Q    It's your sworn testimony you never received funds from

2  them or any of the entities they are involved in relating to

3  the P5 Portfolio, is that correct?

4  A    No, it wasn't solely related to the P5 Portfolio.

5  Q    Okay.  So let's, let's -- let's be clear then.  You did

6  receive some funds?

7  A    I received some funds, correct.

8  Q    For the P5 Portfolio?

9  A    Not specifically for the P5 Portfolio, no.

10 Q    What were the funds for, Mr. Ivankovich, so we're not

11 going back and forth?

12 A    The funds were part of a public offering to, to underwrite

13 a public offering of parts of the Atlas business for a listing

14 on the Hong Kong Stock Exchange.

15 Q    And some of those funds related to the P5 Portfolio, but

16 not all, that's what you're telling me?

17 A    I don't think any of the funds related to the P5

18 Portfolio.  It was purely for a listing on the Hong Kong Stock

19 Exchange.

20 Q    Did you ever use those funds for that?

21 A    Yes.

22 Q    Now, look, Mr. Ivankovich, at the -- back to Exhibit No.

23 6, page 12.  If you look at what I highlighted, Walker Dunlop

24 says net worth $42.7 million, cash slash cash equivalency,

25 $12.1 million.  Do you see that?

1  A    Yes.

2  Q    Is that information about your net worth and about your

3  cash, cash equivalents that you would have provided to Walker

4  Dunlop?

5  A    As of January 2019 I don't know specifically.  It could be

6  in the range.  I would need to go back and look at a financial

7  statement from that time period.

8  Q    Okay.  Well, you don't have any reason to believe that

9  anybody from Walker Dunlop would misrepresent what you told

10 them about your net worth or 12.1 million in cash that you had,

11 do you?

12 A    I don't.

13 Q    And then -- and I'll move on from this, but if we look

14 then another paragraph down, so we are a little more precise,

15 here they say in this document Mr. Ivankovich reports his

16 tangible net worth and liquidity to be 42.7 million and

17 12.1 million respectively as of January 2019.  Do you see that?

18 A    Yes.

19 Q    And is that something that you reported to Walker Dunlop?

20 Is that an accurate statement -- sorry.  Let me rephrase that.

21        Is that an accurate statement of your net worth and

22 liquidity was in -- as of January of 2019?

23 A    I don't recall reporting that.  And again, it could be an

24 accurate statement.  I would need to go back and look

25 specifically to understand what my financial condition was on

1  those dates.

2  Q    Who was handling --

3           THE COURT:  All right.  One second.  One second.

4       (Brief pause.)

5           THE COURT:  All right.  We're going to take a break.

6           All right.  Sir, if you want, you can either step

7  down or sit in one of those seats right over there, and we'll

8  be right back up.

9           THE WITNESS:  Thank you.

10          THE COURT:  All right.  Thank you.

11      (Whereupon, another matter was heard in open court.)

12          THE COURT:  All right.  We need one more second,

13 guys.

14      (Brief pause.)

15          THE COURT:  I'll tell you what we're looking for now,

16 so the important point about this matter being here in my

17 courtroom was that we could not get this done, right.

18 Otherwise it's a straight up deposition.

19          MR. TAHMASSEBI:  Right.

20          THE COURT:  And so we are trying to find a court

21 reporter because I have an emergency TRO that I am taking.  I

22 have to hear, and that's going to be coming up at --

23          THE CLERK:  11:00 o'clock.

24          THE COURT:  At 11.  But before that, I have a couple

25 of other cases that have to be heard.  And so we're trying to

1  work around this.  But we have a place where you can go with a

2  court reporter and finish this up so it's not a wasted trip.

3  He's already been sworn in.  He's under oath.  You go ahead and

4  finish that today, and that will -- it can still be done in the

5  same time period.  It just won't be me sitting there.  You'll

6  be doing a regular deposition.  Counsel.

7           MR. WANDNER:  Yes, Judge.  That's fine.  Obviously we

8  all appreciate Your Honor's time, and you're a servant to the

9  public and everybody else has, has rights -- access to you as

10 well.  Just housekeeping.  I anticipated, perhaps I was

11 misguided in that, that this was going to be happening this

12 morning and over and done this morning based upon I think what

13 the guidance we had gotten from the Court when set.

14           THE COURT:  When you say over and done?

15           MR. WANDNER:  This aspect of the deposition.

16           THE COURT:  Yes, and be done this morning.  That's my

17 intent.

18           MR. WANDNER:  Right.  So --

19           THE COURT:  That's why I want it to be done, yes.

20           MR. WANDNER:  Just, just because counsel had

21 indicated two hours, you know, that's fine.  I have a 12:30

22 Zoom hearing in a case from Miami, and I have a 1:30 flight

23 back home.  So again, he has a right to do what he's doing.  I

24 have no problem with that.  I just want to make sure that --

25           THE COURT:  You have some time concerns.

1      MR. WANDNER:  -- when we're not, when we're not in

2  front of you, that it goes efficiently and ends in a time that

3  I can get what I have to do with my other matters done.  That's

4  all I'm saying.

5      THE COURT:  Well, you definitely have a right to say

6  that, Counsel.  It's also just not up to counsel.  It's up to

7  your client.

8      MR. WANDNER:  I understand.

9      THE COURT:  So, you know, depending on some of the

10  answers to some of the questions, it may take more time for him

11  to get the information or at least to get an answer that he is

12  trying to get.  If your client keeps saying I don't understand

13  or I don't know if this is my signature or I don't remember

14  talking to somebody, if he keeps saying that, I mean, that's

15  his right.  That's going to be part of the transcript that I

16  review too.

17      MR. WANDNER:  Of course.

18      THE COURT:  So but, you know, that's where we are.

19  Is that what you would be saying, Counsel?  But you also do --

20  I would say you're going to be in one of my rooms.  They're

21  trying to find a court reporter during Labor Day week, and so

22  we're doing our best to find that.  But right now I have to

23  continue with my call, and I am emergency judge.  And again, a

24  lot of the judges are gone.  That's why I'm emergency judge.

25      MR. WANDNER:  May I make one suggestion.

1          THE COURT:  Before you do ...

2          MR. WANDNER:  Yes, ma'am.

3          THE COURT:  Go ahead, Counsel.

4          MR. TAHMASSEBI:  No, I -- and that's part of the

5     problem, Judge.  I'm having to go to other documents to get

6     confirmation on information that I -- was part of what should

7     have been up front.  But, in any event, I understand Mr.

8     Ivankovich made the trip.  We've made some progress.  I would

9     just as soon come back before Your Honor, because I do

10    antici --

11         THE COURT:  Counsel.  Counsel.

12         MR. TAHMASSEBI:  Even not today, but whenever --

13         THE COURT:  No, we have him here.

14         MR. TAHMASSEBI:  Okay.

15         THE COURT:  He's finishing it today.

16         MR. TAHMASSEBI:  Okay.

17         THE COURT:  All right.  So you figure that out.

18    You've got a partner.  You guys figure it out.  Anything else?

19         MR. WANDNER:  No, Judge.

20         THE COURT:  All right.  Yes.  All right.  We're

21    getting ready to start this.  As soon as we see the phone

22    numbers pop up, we'll get this phone one out of the way, and

23    you can keep going.

24         MR. TAHMASSEBI:  Okay.  Great.

25         THE COURT:  All right.

1     (Short break taken.)

2          THE COURT:  Is everybody going to be here on Ligas,

3    or are they going to be on the phone, Counsel?

4          MR. TAYLOR:  Barry Taylor on behalf of the plaintiffs

5    in Ligas.  My understanding is everyone is coming in for the

6    status.

7          THE COURT:  All right.  So we're going to go ahead

8    and go on with our testimony for a little while.  All right.

9    Go ahead, Counsel.

10          MR. TAHMASSEBI:  Thank you, Judge.

11    BY MR. TAHMASSEBI:

12    Q    Mr. Ivankovich, I want to go back to now Exhibit No. 3,

13    which is the personal financial statement.  And we had a little

14    bit of a back and forth of whether it was signed in March of

15    2020 or August of 2020.

16          In any event, I want to be clear that whether it was

17    March of 2020 or August of 2020, your net worth was reported

18    around $56,367,404 according to the personal financial

19    statement, correct?

20    A    Correct.

21    Q    And then if we turn to Exhibit 7, Exhibit 7 is a document

22    titled a Complete Guaranty.  And if you go to the back of

23    Exhibit 7 -- excuse me, let me just be clear.  And it's dated

24    June 18th of 2019.  And you are listed as the guarantor, Walker

25    Dunlop is listed as the lender.  And then if you can go to the

1  last page and just confirm that that is your signature as

2  guarantor, and it looks like it was notarized actually on

3  August 16th of 2016.

4  A    You mean the document that says Completion Guaranty, not

5  Complete Guaranty?

6  Q    Completion Guaranty.  Thank you.

7  A    Yes, correct, that is my signature.

8  Q    All right.  And then the -- if you look under Section 1.2,

9  definition of guaranteed loan obligations, it says, In order to

10  induce the Lender to loan Borrower the sum of 53,200,000

11  evidenced by a secured promissory note, and it goes on to talk

12  about this guaranty.  You've seen this document before,

13  correct?

14  A    I must have at some point, but I don't recall it

15  specifically.

16  Q    And then if you look at page 10, Section 3.4, again, this

17  is a representation made by you.  And I'm not going to read the

18  whole thing because of time, but Section 3.4 says, We agree

19  that you have sufficient -- about midway down, have property

20  and assets sufficient to repay its obligations and liabilities

21  including the Guaranteed Obligations.  Do you see that?

22  A    Yes, I see that paragraph.

23  Q    So as of June -- excuse me.  As of the time you signed

24  this document, August 16th, 2020, you were representing to

25  Walker Dunlop that you personally, Mr. Ivankovich, had

1  sufficient assets and funds to repay a 53 -- $53,200,000 loan,
2  right?
3  A    No, that's not what this document says.
4  Q    Well, the loan received was 53,200,000, right?
5  A    It seems to be, yes.
6  Q    Okay.  And you received those funds.  That's not a small
7  sum of money.  I would expect you would have remembered if you
8  or one of the entities you controlled received those funds,
9  right?
10 A    I didn't receive those funds, but one of the entities that
11 I was an executive --
12 Q    Okay.  And then you, you in signing this --
13        MR. WANDNER:  Judge, I'd ask that he be allowed to
14 finish his answer, please.
15        MR. TAHMASSEBI:  Oh, I'm sorry.  I didn't mean to cut
16 him off.
17        THE COURT:  Oh, okay.  He says he didn't mean to cut
18 him off.  Go ahead, sir.
19        THE WITNESS:  No, I didn't receive those funds.  The
20 Alliance HTFL, LLC received those funds.
21 BY MR. TAHMASSEBI:
22 Q    And that's a company that you have management control
23 over, right?
24 A    I am a manager -- no, I don't, I don't even think I'm a
25 manager of this company.

Ivankovich - direct by Tahmassebi

1  Q    Are you affiliated with it in some way, shape, or form,
2  either ownership, member, manager?
3  A    No.
4  Q    You have no affiliation to that company?
5  A    I have an affiliation, but I'm not a member or a manager.
6  Q    I want to focus on the guaranty that you signed.
7  A    Yes.
8  Q    Okay.  And what you understood when you signed this
9  guaranty, you were saying you could guarantee repayment of the
10 loan made to the corporation?
11 A    That's incorrect.  The section you're referring to is
12 specifically I'm guaranteeing to proceed with and to complete
13 the construction of the required repairs and approved
14 renovations in accordance with the construction schedule and
15 plans, free and clear.  This is not a financial guaranty.  This
16 is a construction completion guaranty that I am undertaking on
17 behalf of the company, will complete the construction budget.
18 Not guarantee the payment of the loan.  So your statement is
19 patently incorrect.
20            And if you let me read these --
21            THE COURT:  Sir.  Sir, this still is a deposition.
22 It doesn't mean you get to freestyle the whole time.  And I'm
23 going to stop everybody because we have a court reporter.  She
24 is now set up in our jury room, which is you go out the door to
25 the left, and she will be there.  And it's a bigger room than

1    the witness room, so people have room to move around.  And

2    there will be where you will finish the dep.

3            I know counsel expected it to take a couple of hours.

4    We have probably done about 45 minutes of actual work on this

5    thus far.  And so the court reporter -- actually you all can

6    get set up.  I saw her just dashing down the hall, but her

7    equipment is there, and she will be ready to proceed with this,

8    and you all can finish this.  The other matters, if I need any

9    argument on the fully briefed motions, I will let you know at a

10   different time.  All right.  But we wanted to have this done.

11           Anything else to say plaintiff?

12           MR. TAHMASSEBI:  Yes, real quick, Judge.  Yes, I

13   appreciate getting this done today.  We had what's triggered

14   this a motion for turnover based on, you know, certain statutes

15   and what we say he really has.  And I think what might be

16   appropriate is that we amend that and put forth this testimony

17   in front of you if you think that's necessary, Judge, to

18   show -- I guess I think it would somewhat --

19           THE COURT:  Well, I think that would assist if you

20   have this testimony that you didn't have before.

21           MR. TAHMASSEBI:  Yes.

22           THE COURT:  I think that would assist.  And, you

23   know, I mean both sides will have access to get the

24   transcripts.  All right.  Again, these are not court ordered

25   transcripts, all right.  So you guys give the ladies their

1  money.  All right.

2         MR. TAHMASSEBI:  We will.

3         THE COURT:  All right.  Yes.

4         MR. PORRAS:  Your Honor, there is one thing that I

5  wanted to bring up.

6         THE COURT REPORTER:  Can you just state your name

7  again, Counsel.

8         MR. PORRAS:  Of course.  I apologize.  Cy Porras on

9  behalf of the third party LLCs.  P-O-R-R-A-S is my last name.

10        Your Honor, so as we mentioned, there are three

11 motions outstanding.  They're fully briefed.  The Court has

12 them.  However, one thing that maybe didn't come across

13 extremely clear is that this matter as it relates to the Walker

14 Dunlop funds is extremely urgent because the LLCs need those

15 funds to make payments for their bills.  So I only bring that

16 up because we have an affidavit from the vice president of

17 Asset Management for one of the LLCs.  The Court had previously

18 mentioned that she didn't want any more filings.

19        THE COURT:  You can file it.

20        MR. PORRAS:  Okay, Your Honor.  Thanks.

21        THE COURT:  You know, you can file it.  You both will

22 be able to file within seven days.  You get your transcripts,

23 you get whatever you need to get on this, the extra

24 information, within seven days get it filed.  All right.

25        MR. PORRAS:  Great.  Thank you, Your Honor.

1       THE COURT:  We'll make that part of the order, but I

2   expect you all to go right down the hall.  Sir, I believe, and

3   you tell me, if I'm wrong, Yvette -- this isn't on the record.

4   This part isn't on the record.

5       (Off the record discussion.)

6       (End of proceedings in the courtroom.)

7                       CERTIFICATE

8       I HEREBY CERTIFY that the foregoing is a true,

9   correct and complete transcript of the proceedings had at the

10  hearing of the aforementioned cause on the day and date hereof.

11

12  /s/TRACEY D. McCULLOUGH                    September 8, 2022

13  Official Court Reporter                         Date
    United States District Court
14  Northern District of Illinois
    Eastern Division

15

16

17

18

19

20

21

22

23

24

25

1    (WHEREUPON, an exchange of reporters took place; after

2    which the following proceedings were held in the jury room:)

3    BY MR. TAHMASSEBI:

4    Q    Okay.  If we can go back to Exhibit No. 6,

5    Mr. Ivankovich, the Atlas P5 Portfolio asset summary --

6              COURT REPORTER:  I'm sorry, you have to speak

7    louder.

8              MR. TAHMASSEBI:  Oh, I'm sorry.

9    BY MR. TAHMASSEBI:

10   Q    Yeah, the asset summary, Atlas P5 Portfolio.  These --

11   they list five different -- at the first page, it lists five

12   different properties, five assets, 1,208-unit Multifamily

13   Portfolio.  Was this -- were these units built,

14   reconstructed, whatever the case?

15   A    Were they built or reconstructed?

16   Q    Yes.

17   A    I don't understand the question.

18   Q    Sure.  Did the -- when we talk about the 448 units, 188

19   units, 152, 276, 144, were those -- are those units that

20   exist today?

21   A    I believe they do exist today, yes.

22   Q    Okay.  And did you or any of the entities you have an

23   affiliation with have an interest in that portfolio?

24   A    Yes.

25   Q    Okay.  And which entities -- I'm assuming because you

1  don't do anything individually that you individually had no

2  interest in that P5 Portfolio; is that accurate?

3  A    Correct.

4  Q    Okay.  And then what entities that you are affiliated

5  with, in fact, did have an interest in the P5 -- Atlas P5

6  Portfolio?

7  A    I don't know sitting here right now.  I'd have to go

8  back and look at the organizational charts.

9  Q    All right.  Does the entity Pilgrim LLC ring a bell?

10 A    Not --

11        COURT REPORTER:  I'm sorry, you have to speak

12 clearer.

13        THE WITNESS:  I'm sorry.  Not Pilgrim LLC.

14 BY MR. TAHMASSEBI:

15 Q    Pilgrim Wind Tree LLC.

16 A    Yes.

17 Q    Okay.  That has an interest in the P5 Portfolio?

18 A    I don't think so.  Not directly.

19 Q    Okay.  Has the P5 Portfolio -- strike that.  Have any of

20 the Pilgrim entities -- I'm going to list them for you --

21 Pilgrim Wind Tree, LLC, Pilgrim Coulter LLC, Pilgrim Warwick

22 LLC, Pilgrim Caribbean L -- Isle, LLC, and Pilgrim Forest

23 Park LLC, those are all entities that you have an interest in

24 through a company called Overlook Managing Member LLC,

25 correct?

1    A    Correct.

2    Q    Okay.  And then the ownership of Overlook Managing

3    Member LLC is 95 percent you approximately, 90 -- I think

4    it's 97 percent now and the remaining percentage to a

5    gentleman named Romaniello, R-o-m-a-n-i-e-l-l-o, correct?

6    A    I don't think Gary Romaniello owns any part of Overlook

7    directly.

8    Q    Okay.  Is your interest still in the 90, 95 percentile

9    range?  Is it --

10   A    Yeah.  It's in the 90s.  It's not 100 percent.

11   Q    Okay.  Who is the other member then of Outlook?

12   A    There's a corporation whose name escapes me, I believe.

13   Q    Now the assets listed on Exhibit No. 6, the five

14   properties, have any of those been sold since the year 2019?

15   A    Yes.  Caribbean Isle; Forest Park.

16   Q    And when were they sold?

17   A    In -- oh, I can't tell you the exact date.

18   Q    Give me a ballpark.

19   A    End of 2021, beginning of 2022.

20   Q    And did any entities that you have an interest or

21   affiliation with receive proceeds from the sale of either the

22   Caribbean Isle or Forest Park properties?

23   A    Yes.

24   Q    Okay.  And which entities were those?

25   A    The document -- the entities you mentioned on the

1   organizational chart.

2   Q    Okay.  So the five entities that I mentioned each

3   received proceeds?

4   A    I don't know if it would have been all five but

5   certainly some of those entities would have.

6   Q    And where were those proceeds paid from, was it from

7   Walker Dunlop that ultimately paid -- in other words, who

8   sent the money, who sent the check, Walker Dunlop or some

9   other entity?

10  A    Probably -- well, maybe.  I don't know actually sitting

11  here where those proceeds came from.

12  Q    Okay.  Who at Pilgrim Wind Tree LLC would know how they

13  received the proceeds?

14  A    Probably one of the attorneys that handled the closing.

15  Q    Okay.  Who was that?

16  A    It would have been Cadwalader, Wickersham & Taft.

17  Q    I'm sorry.  Did you say Cad --

18  A    Cadwalader, Wickersham & Taft were the attorneys --

19          COURT REPORTER:  Can you spell that for me?

20          THE WITNESS:  C-a-d-w-a-l-a-d-e-r, comma,

21  Wickersham, W-i-c-k-e-r-s-h-a-m, ampersand, Taft, T-a-f-t.

22  BY MR. TAHMASSEBI:

23  Q    And who was the individual at that firm that handled

24  that?

25  A    Okay.  I don't think there was one individual.  I think

1  there was numerous.  I can't -- I don't even know the names

2  of the people that --

3  Q    And they represented the Pilgrim LLCs at the closings?

4  A    Yeah.

5  Q    And give me one individual if you can, Mr. Ivankovich.

6  A    I actually -- I had no contact with the lawyers

7  directly.

8  Q    Who did have the contact with the lawyers?

9  A    A gentleman named Mark Brown.

10 Q    And who is Mark Brown?

11 A    Mark Brown is another manager of this organizational

12 chart.

13 Q    Okay.  What -- and so the organizational chart, just so

14 we're on the same page and the record is clear, if you look

15 at Exhibit 9.  And I see you saw what I was looking at --

16 A    Oh, yes.

17          COURT REPORTER:  I'm sorry, I didn't understand

18 you.

19          MR. TAHMASSEBI:  Oh, sure.

20 BY MR. TAHMASSEBI:

21 Q    Exhibit 9, that's the organizational chart you and I

22 have been referring to, fair?

23 A    Uh-huh.

24 Q    Yes?

25 A    Yes.

1    Q    And this is an accurate representation as far as you can

2    say today of the organizations with the exception of

3    Mr. Romaniello still being a member of Overlook?

4    A    Yeah.  I don't think that part is correct.  I --

5    Q    Okay.  Let's do this so we're not getting too much in

6    the weeds.  As far as the Pilgrim entities, the five Pilgrim

7    entities, Overlook and you having a 95 percent interest in

8    Overlook, Overlook having 100 percent interest in the P --

9    five P entities, that part is accurate?

10   A    Approximately, yes.

11   Q    How much did the Pilgrim entities receive as a result of

12   the sale of part of the P5 -- Atlas P5 Portfolio?

13   A    I don't know.

14   Q    Who would know the answer to that how much money P5

15   received?

16   A    Maybe Mr. Brown.  I don't know specifically.

17   Q    All right.  Who else had involvement in the closing of

18   those properties besides Mr. Brown and the lawyers, if

19   anybody?

20   A    I don't think anybody else.  I mean, I would imagine

21   Walker Dunlop as well since they were repaid their loan.

22   Q    Do you know what those properties sold for?

23   A    I don't.

24   Q    Since Pilgrim received funds from the sale of the

25   Caribbean Isle, Forest Park properties, had they transferred

1   any money out of any accounts that they hold?

2   A    I don't know.

3   Q    Who would know the answer as to whether or not money has

4   been transferred from the P5 accounts?

5   A    Probably Mr. Brown as well.

6   Q    Where is Mr. Brown located?

7   A    Colorado.

8   Q    Where in Colorado?

9   A    I believe Colorado.

10  Q    Okay.  Where in Colorado?

11  A    An area called -- what's the name of the town?  Give me

12  a moment to try and recall the town.

13  Q    Sure.

14       (Brief pause.)

15       THE WITNESS:  It's a small town near Breckenridge,

16  Colorado.  I don't know the specific name of the town.

17  BY MR. TAHMASSEBI:

18  Q    Do you know what company he's affiliated with?

19  A    Yeah, of the -- of Atlas -- Atlas Apartment Homes LLC.

20  Q    Who was the managing member of the P5 entities?

21  A    I don't know.  I don't believe there was a managing

22  member.  I believe it was the corp -- I think the corporate

23  managing member.  I'd have to look at the documents, but I

24  think there was a corporate managing member.  I don't think

25  there was an individual.  I don't know specifically.

1    Q    Who handles the accounting for the Pilgrim, the P5 LLCs?

2    A    Currently or in 2017?

3    Q    Both, if you could.

4    A    In 2017 it would have been a company called RealPage.

5    Q    Where are they out of?

6    A    I don't know.

7    Q    Who was the individual at RealPage that handled the

8    accounting?

9    A    I don't know.

10   Q    Okay.  How about today?

11   A    It's in-house with Alliance -- not Alliance.  With Atlas

12   Apartment Homes LLC --

13   Q    Atlas --

14   A    -- but I'm not entirely sure.

15   Q    Atlas Apartment Homes LLC, is it still operating?

16   A    I believe so.

17   Q    Is that bank accounts?

18   A    I don't know.  I would imagine so.  I don't know.

19   Q    Well, who would know if Atlas Apartment Homes LLC has

20   any --

21   A    Mr. Brown would.

22        COURT REPORTER:  I'm sorry, I couldn't understand

23   you.

24        MR. TAHMASSEBI:  Sorry.  I keep putting my mouth --

25        COURT REPORTER:  I know it's a little informal.

1  You probably feel like it's informal in here but I have to
2  take a record.
3          MR. TAHMASSEBI:  No, I don't feel like it's
4  informal.  Less formal than out there, I suppose.
5          COURT REPORTER:  Exactly; so just reminding you.
6  BY MR. TAHMASSEBI:
7  Q    So Mr. Brown would be the individual that knows about
8  the finances of Atlas Apartment Homes LLC, correct?
9  A    Yes.
10 Q    Do you know who the accountants are for Atlas Apartment
11 Homes LLC, the same ones that we already mentioned or is
12 there somebody new?
13 A    It changed from RealPage to another provider but I don't
14 know specifically which provider it changed to.
15 Q    In 2020, did you have interest in any other real
16 estate -- strike that.  In 2020, did you or any entity you
17 have an interest in have any other real estate holdings?
18 A    Yes.
19 Q    Okay.  Tell me about those.
20 A    Similar apartment complexes to the ones on this page.
21 Q    Well, where are they, how many are there, things like
22 that?
23 A    Oh, Texas, Florida, Illinois that I recall.
24 Q    And then how were those -- how was that real estate
25 held, in a company, in a corporation?

1   A    Yeah, that's -- I suspect that would have been the case.

2   Q    In which entity that you have an interest in has an

3   interest in those real estate holdings?

4   A    Oh, I couldn't tell you sitting here.  I'd have to go

5   back and look.  There's quite a few.

6   Q    Well, when you say "quite a few" --

7   A    It's similar to the org chart that we're looking at

8   right now that says "Pilgrim V Portfolio Organizational

9   Chart."

10  Q    Okay.  So Exhibit 9 is an organizational chart that

11  covers kind of the P5 Portfolio; is that right?

12  A    Correct.

13  Q    Okay.  And then for your holdings in Texas, Florida, and

14  Illinois, you have another kind of myriad of LLCs that have

15  different ownership interests?

16  A    Yes.

17  Q    And then ultimately in that myriad of LLCs that have

18  those ownership interests, are those also 100 percent owned

19  by Outlook or are they 100 percent owned by a different

20  entity?

21  A    No, no.  This would have -- it would have been a

22  different entity.

23  Q    Okay.  And then the -- that entity that's at the top,

24  like Outlook is here, who would be the majority owner of that

25  entity you, you, correct?

1   A     I don't think Outlook.  I think Overlook Managing Member

2   LLC which -- I'd have to see the documents -- seems to be the

3   manager of the Pilgrims to your previous question.

4   Q     I'm sorry.  I misspoke.  Overlook is the --

5   A     Yeah.

6   Q     -- 100 percent owner of the other myriad of LLCs?

7   A     Yes.

8   Q     In your other holdings in Texas, Florida, and Illinois,

9   do you ultimately have a parent company that owns 100 percent

10  the other LLCs below it?

11  A     I think every structure is different based on the

12  ownership structure.

13  Q     Well, that's what I'm trying to find out so -- and you

14  said you have three or four other properties but you might --

15  A     I did at the time.  I don't anymore.

16  Q     Do you have any real estate holdings currently?

17  A     Individually, no, except for my home on Menomonee Street

18  in Chicago.  There's a residential residence; not my home.

19  Q     No.  I'm not talking individually.  Let me make a clear

20  question.  Do any of the entities that you have an interest

21  in currently have real estate holdings today?

22  A     Yes.

23  Q     Okay.  And what are the names of those entities?

24  A     I believe just Overlook Managing Member.

25  Q     Okay.  Is Overlook Managing Member 100 percent owner of

1    other entities aside from the P5 LLCs that are depicted on

2    Exhibit 9?

3    A    I don't believe so, no.

4    Q    Okay.  And there's -- is there another parent company --

5    what I'm trying to find out is what LLC owns the property in

6    Texas, what LLC owns the property in Florida, what LLC owns

7    the property in Illinois?

8    A    Well, that owned.  That was previously.  So Overlook

9    Managing Member owns Pilgrim Wind Tree, Pilgrim Coulter,

10   Pilgrim Warwick, which owned three properties in Texas and

11   that's it.

12   Q    And that's all that is currently -- you currently have?

13   A    Correct.

14   Q    What's the value of those properties in Texas?

15   A    Oh, I have no idea.  I'm not sure the last time it was

16   valued.

17   Q    Where are they located?

18   A    That's a good question.  I believe Abilene and Amarillo,

19   Texas.

20   Q    Who manages those properties?

21   A    Atlas -- Atlas Apartment Homes LLC.

22   Q    Is Atlas Homes LLC also the entity that would collect

23   the rents for those properties?

24   A    No.

25   Q    Okay.  What's the name of the entity that would collect

1    the rents for those properties?

2    A    I believe the rents go into the Pilgrim Wind Tree LLC,

3    Pilgrim Coulter LLC, and Pilgrim Warwick LLC companies.

4    Those would collect the rents.

5    Q    And those three Pilgrim entities are still collecting

6    rents today?

7    A    I hope so.  I don't know.

8    Q    Okay.  All right.  You would expect so, right?

9    A    After COVID, I don't expect anything anymore.

10   Q    Okay.  And then those three entities or all five

11   entities I think we said are 100 owned by Overlook Managing

12   Member LLC?

13   A    That's correct.

14   Q    All right.  Do you currently own any other properties

15   today?  Let me ask it again.  Did any entities that you have

16   an interest in currently own any other properties today?

17   A    No.

18   Q    What is your membership interest in Atlas Apartment

19   Homes LLC?

20   A    I don't know specifically.  I don't remember.

21   Q    Who handles the accounting for Atlas Apartment Homes

22   LLC?  I think I asked you that but --

23   A    Again, it would have been one of the vendors or

24   RealPage, or whoever is doing it now.

25   Q    And Mr. Brown would know the answer to that if you can't

1   answer it?

2   A    Yes.

3   Q    Let's go back to Exhibit 3 and I want to talk about

4   the -- by the way, just so we're clear, if you look at

5   Exhibit 3, Mr. Ivankovich, there's a Bates stamp at the

6   bottom, at the very bottom right that says "Ivankovich 248,"

7   do you see that?

8   A    I do.

9   Q    Do you understand this was a document produced by your

10  attorneys in this litigation before the judgment was entered

11  against you?

12  A    I don't.

13  Q    Did you know that your lawyers represented that this was

14  a true and accurate copy of your financials -- personal

15  financials in August -- on August 26th of 2020?

16  A    I do not.

17  Q    Did you know there was a court order requiring you to

18  produce this accurate financial statement in the year August

19  26th of 2020?

20  A    It's possible I knew then.  I don't recall.

21  Q    It's possible you knew back at the time this personal

22  financial statement was produced that it, in fact, had to be

23  signed and attested to and produced, fair?

24  A    I -- I actually don't recall that.

25  Q    Let's look at the fourth page.  In the second -- well,

1  let's look at Schedule A and I know it's a little difficult

2  to read.

3  A    I got it.  I got my readers on.

4  Q    Okay.  All right.  Good.  There -- it talks about "Cash,

5  Checking and Saving Accounts, Certificates or Deposits, Money

6  Market Funds" and then the total that's listed there on this

7  personal financial statement is $1,103,196.  Do you see that?

8  A    Yes.

9  Q    And that was accurate in 2020 for the amount of cash,

10  checking and savings that you had?

11  A    Sounds accurate.

12  Q    And today is that money still in a cash, checking or

13  savings account today?

14  A    No.

15  Q    Do you have a bank account today?

16  A    No.

17  Q    Do you have any personal assets today?

18  A    My interest in my home.  Well, in the home on -- in the

19  real estate owned jointly with my wife on Menomonee.

20  Q    So you were served with this complaint in September of

21  2020, the complaint that was filed by my clients?

22  A    Yes.

23  Q    Okay.  And at what point in time did you transfer money

24  from these cash, checking and savings accounts listed on

25  Exhibit 3, Page 3?  Page 4, excuse me.

1   A    When you say "transfer," would you be more specific?

2   Q    Sure.  As of 2020, you had $1,103,196 according to your

3   personal financial statements, right?

4   A    Yes.

5   Q    And today you're telling me you have zero, right?

6   A    Correct.

7   Q    And when was this money transferred out?

8   A    Well, it was spent over the course of 2020, 2021 to

9   pay bills --

10  Q    Okay.

11  A    -- to pay obligations of the companies.

12  Q    So you used your personal funds to pay obligations of

13  the companies?

14  A    Yes.

15  Q    Okay.  And that was through 2020 and 2021, correct?

16  A    It started in 2019 as well.

17  Q    Okay.  And then -- and then what -- who was the one that

18  authorized payment of your personal funds to pay obligations

19  of the companies, it had to be you, right?

20  A    Yes.

21  Q    And how did you transfer funds to these companies --

22  well, which funds did you pay expenses for or obligations

23  for, which corporations?

24  A    All of them.

25  Q    And how were the funds transferred?

1    A    It would have been any way transferring funds.  It would

2    have been just bank transfers, wire transfers, check, you

3    know, any means people use to pay bills.

4    Q    The cash on hand, the 500,000, where was that held in

5    2020?

6    A    Good question.  It could have been --

7              COURT REPORTER:  I'm sorry, can you take your hand

8    away?

9              THE WITNESS:  Oh, I'm sorry.  Good question.  It

10    could have been either -- probably Glenview State Bank.

11    BY MR. TAHMASSEBI:

12    Q    Anywhere else?

13    A    No.  That's probably where I kept my -- most of the cash

14    accounts.

15    Q    Here in Glenview, Illinois?

16    A    Yes.

17    Q    And then if you go down to Schedule B, it talks about

18    "Marketable Securities, Stocks, Bonds, U.S. Government" and

19    the total market value you have is $11 million, do you see

20    that?

21    A    Yes.

22    Q    This is again on your personal financial statement?

23    A    Yes.

24    Q    And today, Mr. Ivankovich, do you still have that $11

25    million in marketable securities, stocks, bonds, and U.S.

1    government?

2    A    No.

3    Q    Okay.  And are you telling me then between again 2020

4    and today August 2022, all of that money was transferred out?

5    A    It was used to pay bills.

6    Q    Okay.  And what bills was it used to pay?

7    A    Payroll for the companies, mortgage payments, reserve

8    payments, just the expenses of the companies when everything

9    shut down during COVID.

10   Q    You knew in 2021 -- excuse me, in 2020, August -- 2020

11   September that there was a lawsuit filed against you, right?

12   A    Which lawsuit specifically?

13   Q    This lawsuit, I'm sorry, the one we're sitting here for.

14   You were served in September of 2020 with this lawsuit, okay?

15   A    Yeah.  I know -- I remember the court call with Coleman

16   where you guys alleged to serve me but I don't think I was

17   ever personally served with the summons for this.

18   Q    Well, if you remember the court call, you were aware of

19   the lawsuit?

20   A    I was aware of the lawsuit and the court call, yeah,

21   whatever that date was.

22   Q    Okay.  Well, it was sometime in September of 2020?

23   A    Yes.

24   Q    In any event, after that date you continued to transfer

25   money from certain accounts, right?

1   A    I continued to pay obligations, yes.  I continued to pay

2   bills.

3   Q    And then where would I find the transfers that you made

4   of the $11 million between -- and those transfers that were

5   made were made between August 2020 and all the way up through

6   present?

7   A    No.  I would have said probably to the end of COVID,

8   whenever that is, that sort of 20 --

9   Q    Well, any that date.  2021?

10  A    Through the end of 2021.

11  Q    Okay.  So through the end of 2021, you continued to make

12  transfers in your eyes to pay bills of the companies you had

13  an interest in?

14  A    No, not in my eyes.  That was what the payments were

15  for.

16  Q    And then what companies of the $11 million did you

17  transfer money to specifically or LLCs specifically?

18  A    Did I transfer to?

19  Q    Yeah.

20  A    I don't know sitting here.

21       (Counsel conferring.)

22  BY MR. TAHMASSEBI:

23  Q    Oh, yeah.  What entities were you paying bills for in

24  2021, 2022?

25  A    The Atlas entities, the entities that owned apartment

1    complexes where there was debt and payroll obligations.

2    Q    And those -- and those -- that and payroll obligations

3    you were making payments from your personal finances through

4    approximately December 2021, January 2022, fair?

5    A    No, no, before that but toward the end of the third

6    quarter 2021, maybe beginning of the fourth quarter.  I was

7    getting notices by the Department of Labor.

8    Q    Okay.  You were paying, let's just say after -- it went

9    into October, November 2021 when you were paying bills

10   through your personal finances?

11   A    Something like that.  Maybe sooner than that.

12        (Counsel conferring.)

13   BY MR. TAHMASSEBI:

14   Q    Oh, yeah.  So there's two, under Schedule B, the stocks,

15   it says they were held in -- is it Stifel and Oppenheimer?

16   A    Yes.

17   Q    And that was an account -- that was in your account at

18   Stifel and Oppenheimer?

19   A    It wouldn't have been in my name personally.  It would

20   have been probably a trust account.

21   Q    But you had the ability personally to make the decision

22   to use those funds for other obligations of entities you had

23   an interest in?

24   A    No.

25   Q    Okay.  All right.  I'm going to leave it at that.  The

1  last schedule, Schedule G, do you see that three quarters of

2  the way down?

3  A    Yes.

4  Q    The third one is Atlas P5 Portfolio.  That's the

5  portfolio we had just been discussing, right?

6  A    Yes.

7  Q    All right.  And that's valued at approximately

8  $29,140,000 in your personal financial statement, do you see

9  that?

10  A    Are you saying that is the value of the portfolio?

11  Q    I'm sorry.  That's what it is listed as your -- the

12  value of what your ownership was.  Maybe I wasn't being

13  precise.

14  A    Correct.

15  Q    Okay.  So the value of what your ownership was in the

16  Atlas P5 Portfolio, so we're clear, was listed in August of

17  2020 as 29,140,000?

18  A    Yes.

19  Q    All right.  And then if we go down the rest of the

20  properties -- and I'm going to list them -- Alliance Holding

21  HT LLC, Atlas P --

22  A    I'm having a tough time reading this but I think what I

23  see, it says Atlas P5 Portfolio, that would have been -- my

24  interest would have been held in the Deerfield irrevocable

25  trust.

1    Q    Okay.  I'm beyond that at this point.

2    A    Okay.  Well, that's just to clarify the question.  I'm

3    having a tough time reading this but I'm -- yes.

4    Q    Okay.  All right.  So if we go through the -- there's

5    another one.  I'm just going to read the entities so we have

6    a clear record.

7    A    Uh-huh.

8    Q    Alliance Holdings HT LLC is the entity listed.  Atlas P2

9    Managing Member LLC is an entity listed.

10   A    Yes.

11   Q    Atlas Birchwood LLC is an entity listed, right?

12   A    Yes.

13   Q    Atlas Multifamily 3 LLC is an entity listed?

14   A    Yes.

15   Q    Hazardous Sports LLC is an entity listed?

16   A    Yes.

17   Q    HC -- S Venture Incorporated is an entity listed?

18   A    Yes.

19   Q    Modline (sic) International S.A.M. is an entity listed.

20   Am I saying that right?

21   A    Yeah.  I'm not seeing --

22          MR. WANDNER:  Modulac (sic).

23          MR. TAHMASSEBI:  Modulac (sic), yeah.

24          THE WITNESS:  I can't tell what that is, that word

25   is.

1  BY MR. TAHMASSEBI:

2  Q    Okay.  All right.  That's a small "l."

3            MR. TAHMASSEBI:  What's the next one, Steven?

4  BY MR. TAHMASSEBI:

5  Q    Gesterchel (phonetic) LLC is an entity listed.

6  A    I'm not -- yeah, I can't make out that word.

7  Q    Okay.  Atlas GP SCI is an entity listed, right?

8  A    Yes.

9  Q    Gruppo C'E Incorporated is an entity listed?

10  A    Yes.

11  Q    And ZIP LLC is an entity listed, right?

12  A    Right.  Yes.

13  Q    And under all those entities that I listed, your

14  personal financial statement under Ownership states your

15  name, correct?

16  A    Not entirely, no.

17  Q    Mr. Ivankovich, if you look at the document, there's a

18  column called Ownership.

19  A    Yes.

20  Q    In the ones that I listed, the last one, two -- so you

21  start from the fourth one down, Atlas Alliance Holdings HT

22  says the owner is Steven Ivankovich.  Do you see that?

23  A    Yes.  From the fourth one down, that's correct.

24  Q    Okay.  So from the fourth down, all those entities that

25  I just listed under Ownership in your personal financial

1    statement it states your name, right?

2    A    Correct.

3    Q    Okay.  Do you still have an ownership in all of those

4    entities that are listed under Schedule G?

5    A    In so much as the entities exist, I probably do.

6    Q    The last page, TRG International, what does that do real

7    quick?

8    A    Nothing anymore.  It used to be a real estate

9    development company here in Chicago.

10   Q    ZIP LLC, same question.

11   A    It used to run a sports car team.

12   Q    Is it around anymore?  It doesn't look like it.

13   A    It doesn't exist, no.

14   Q    Do any of these entities listed on schedule -- on

15   Schedule of Officer Positions exist at the present time?

16   A    They're not active.  I don't know if they still exist on

17   the register of companies but they're not active companies.

18   Q    When was the last time one of these companies was

19   active?

20   A    I don't know.

21   Q    Just give me a ballpark, two years ago, five years ago?

22   A    Based on this document, probably 2013.

23   Q    So in the year from August 2020 until the end of 2021,

24   your net worth went from approximately 55,367,404 to pretty

25   much zero; is that right?

1    A    Correct.

2    Q    And your explanation for that is because you made

3    transfers in order to meet the obligations of the companies

4    in which you had an interest?

5    A    My explanation of that is COVID.

6    Q    My question is a little bit different.  The money had to

7    go somewhere, right?

8    A    Yes.

9    Q    And your explanation as to where the money went was the

10   money was transferred in 2019, 2020, 2021 -- strike that.

11   Your explanation of what happened to the -- your $55 million

12   net worth that you indicate on your signed financial

13   statement in 2020 is that that money was transferred to pay

14   obligations and expenses of LLCs in which you had an

15   interest, correct?

16   A    Well, no.  55 million wouldn't have been transferred.

17   You're -- I think you're -- it's not correct.  It's not a

18   correct statement.

19   Q    Well, let's -- let's find out why because again, your

20   net worth is 55,367,404 as of August of 2020.  Today you're

21   telling me your net worth is almost zero, right?

22   A    Yes, but that's not because I transferred 54 million

23   dollars of cash.  That $54 million doesn't represent my net

24   worth as being cash.

25   Q    Well, I understand that.  Then do you still hold

1  securities, stocks, other real estate that gives you a net

2  worth of anything?

3  A    I'd like to think that maybe the three companies in

4  Texas have some -- have a value but I don't know what it is.

5  Q    When you say "the three companies in Texas," what are

6  you referring to?

7  A    The three companies that are left at the bottom of the

8  organizational chart of the P5 Portfolio.

9  Q    Who would have an idea of what those three companies are

10  worth?

11  A    I don't know.  An appraiser.

12  Q    You're in real estate but you have no idea about what

13  these entities that you're invested in might be worth?

14  A    I have an idea but I haven't looked at the financials.

15  I mean right now based on the financial condition as I know

16  it, they are probably worth zero.

17  Q    Okay.  Exhibit 6 -- again, you can go to it if you want

18  but I'm just going to read it -- Page 12, Walker Dunlop says

19  that you -- and this is about five paragraphs down.

20  A    What page is this?

21  Q    Sure.  Page 12 of Exhibit 6.

22  A    Yep.

23  Q    It says you have been involved in -- this is under

24  Comments -- over 7 billion of property transactions to date

25  and have overseen annual construction and renovation budgets

1  in the tens of millions of dollars; is that true?

2  A    It is true.

3  Q    But as you sit here today, you believe your net worth is

4  limited to the three properties in Texas that we talked about

5  of the P5 that are left and whatever equity you have in your

6  current home?

7  A    Correct.

8  Q    And so today, your net worth is nowhere near the 55

9  million 367 it was in August of 2020, is that your sworn

10  testimony?

11  A    Unfortunately, that's not the net worth.  That is my

12  sworn testimony; yes.

13  Q    These entities -- you mentioned COVID, Mr. Ivankovich.

14  COVID, are you saying -- these are residential properties,

15  right?

16  A    Correct.

17  Q    And you're saying COVID caused the downfall of these

18  residential properties somehow?

19  A    Correct.

20  Q    Okay.  And so the residential properties are all in --

21  sounds like most of them are in Texas or Florida, right?

22  A    And Illinois, yes.

23  Q    Well, how many are in Illinois?

24  A    Not anymore.

25  Q    Okay.  The majority of your portfolio back in 2020 and

1    2021 was in Texas and Florida, right?

2    A    Correct.

3    Q    And you're telling me that because of COVID, those

4    properties in Texas and Florida no longer were able to be

5    profitable?

6    A    Not only profitable but they were negative, yes.

7    Q    Who has the financial statements for those properties to

8    show that they were negative and received your funds in 2021?

9    A    You could get those from Mr. Brown, Mark Brown.

10   Q    And then that should also reflect you'll receive from

11   Mr. Brown money that you paid in to those companies in 2020,

12   2021, right?

13   A    It should, yes.

14   Q    And the market in Texas and Florida, I'm assuming it's

15   your sworn testimony based on your education and experience,

16   when COVID hit, the residential market went down, not up?

17   A    Well, this is a -- these buildings are an aspect of the

18   residential market called multi-family so they're

19   commercialized residential.  They're not single-family homes.

20   Q    What was the occupancy rate in the Texas and Florida

21   properties in 2020, 2021, do you have any idea?

22   A    I don't know but I recall that the occupancy and more

23   importantly the economic occupancy dropped almost to zero.

24   Q    In your -- as you were transferring this 58 million in

25   2020 and 2021 or approximately that amount of your personal

1    assets, who was making the requests on behalf of these

2    entities?

3    A    I never transferred $58 million.

4    Q    How much did you transfer?  How much from your total --

5    your total net worth as shown is 58 million.  Today you're

6    telling me it's almost zero.  How much money did you

7    transfer, Mr. Ivankovich, in 2020 and 2021 to go from 58

8    million to nearly zero?

9    A    To clarify your statement, the financial statement you

10   showed me and as it read was approximately $11 million of

11   liquidity and the rest was interest in unmarketable

12   securities, mostly these real estate assets.  So the cash

13   portion of that was used to pay the deficits of the apartment

14   companies and --

15   Q    Which ones?

16   A    All of them in the Atlas world, if you will.  Anywhere

17   there was an employee employed by Atlas or a building owned

18   by an Atlas entity, I had to make payments to subsidize those

19   buildings and to pay debt service, so.

20   Q    You individually were paying those employees?

21   A    Yes.  Well, no.  That's not true.  The proper

22   channels --

23   Q    Now it's not true?

24           MR. WANDNER:  Counsel, let him answer the question.

25           THE WITNESS:  There would have been a capital call

1   made from those entities.  I would have funded those entities

2   who would have then in turn pay the obligations of those

3   entities.

4   BY MR. TAHMASSEBI:

5   Q    Who made the capital call?

6   A    The company.

7   Q    When were they made?  When were these capital calls

8   made?

9             COURT REPORTER:  I'm sorry, I didn't hear you.

10            MR. TAHMASSEBI:  Oh, sorry.

11  BY MR. TAHMASSEBI:

12  Q    Yeah, when were these capital calls made?

13  A    Beginning -- it was a routine part of business.

14       (Interruption in proceedings.)

15            THE WITNESS:  These companies had capital calls

16  starting going back to 2016 as a normal part of business and

17  escalated during COVID.

18  BY MR. TAHMASSEBI:

19  Q    Who made the decision as part of these entities to make

20  the capital call, was that you?

21  A    No, not solely.

22  Q    Okay.  Who else?

23  A    The members of the company.

24  Q    And how was the capital call done, was it something done

25  in writing, did you have a meeting?  Let me ask you this:  Do

1   you have any evidence that any capital calls were made by any

2   of the entities that you have an interest in in 2020 and 21,

3   any documentation?

4   A    I don't sitting here but there are -- there are capital

5   call documents; correct.

6   Q    Okay.  And who -- where are those documents?

7   A    You could ask Mr. Brown about those documents.   In

8   addition to that, there was demand letters from the

9   Department of Labor that were sent to me as the manager of

10  those companies.  I didn't know this but payrolls flows

11  personally through managers at the company so I had lots of

12  letters and interactions from the Department of Labor to make

13  sure the companies were funded to fund people's payrolls.

14  Q    Let me ask you this:  Of the 58 million that are

15  listed -- that's listed as your net worth in 2020, how much

16  of that do you have access to today?

17  A    None.

18  Q    You do have a ninety-some percent interest in Overlook,

19  right?

20  A    Yes.

21  Q    And Overlook still owns the P5 entities 100 percent and

22  the P5 entities have an interest in the three properties we

23  listed as part of the portfolio, correct?

24  A    That's correct.

25  Q    And if you were, based on your education and experience,

1    in over a billion dollars in real estate transactions to give

2    me an estimate of what those properties are worth today, what

3    would you say?

4           MR. WANDNER:  Objection.  Asked and answered.

5    BY MR. TAHMASSEBI:

6    Q    You can answer.

7    A    I would have to see the financials but last time I

8    checked, their values were negative.

9    Q    There was a big, I guess, huge change from your

10   financial wherewithal and status in August of 2020 until

11   today that appears?

12   A    Correct.

13   Q    Okay.  And in the interim between August of 2020 when

14   you had a net worth of 58 million and today, you also had a

15   judgment in this case entered against you.  You're aware of

16   that?

17   A    Yes.

18   Q    And you've taken zero steps to attempt to pay that

19   judgment, correct?

20   A    No.  I haven't taken any steps --

21          COURT REPORTER:  I can't hear you.

22          THE WITNESS:  No, I haven't taken any steps to pay

23   the judgment.

24   BY MR. TAHMASSEBI:

25   Q    Do you believe you have an obligation to pay that

1    judgment?

2    A    I do.

3    Q    Have you gone, Mr. Ivankovich, to any of the entities

4    that you have an interest in and attempt to either sell that

5    interest or somehow withdraw funds so that you had the

6    ability to pay this judgment?

7    A    There are no funds to withdraw from those entities

8    and --

9    Q    Have you looked into assigning your interest in the

10   Pilgrim entities to the plaintiffs in this case who have a

11   judgment in order to satisfy your obligations to the

12   plaintiffs?

13   A    I don't have an interest in the Pilgrim entities.

14   Q    You have a 97 percent interest in Overlook Managing

15   Member LLC, right?

16   A    That's correct.

17   Q    Which would give you the majority of voting rights,

18   correct?

19   A    In Overlook, yes.

20   Q    You have -- Overlook then has 100 percent interest in

21   the five Pilgrim entities which have the interest in the

22   properties we talked about as part of the portfolio, correct?

23   A    Correct.

24   Q    Take a look at Exhibit 14.  By the way, you've sued

25   Stifel down in Florida?

1   A    Yes.

2   Q    You used to have a friend that was an advisor at Stifel,

3   right?

4   A    Please be specific.

5   Q    Yeah.  Did you -- there was a gentleman at Stifel that's

6   no longer there that you have a -- had a professional

7   relationship with and you now have a personal relationship

8   with, correct?

9   A    Are you asking me to guess on the gentleman?  Please

10  tell me.

11  Q    You don't know his name?

12  A    I don't know his name.  I don't know who you're

13  referring to.

14  Q    You don't know -- you've never been seen with this

15  gentleman on different boats, on different yachts?  You don't

16  know who I'm talking about?

17         MR. WANDNER:  Counsel, counsel, if you have a name

18  that you're asking, please ask him.  You're asking him

19  to speculate.

20  BY MR. TAHMASSEBI:

21  Q    Mr. Ivankovich --

22         MR. WANDNER:  Objection as to speculation.

23  BY MR. TAHMASSEBI:

24  Q    -- is there a gentleman from Stifel that you have been

25  seen going on yacht trips with, going out to dinners with,

1    having wine with that rings a bell anywhere?

2    A    No.

3    Q    Okay.  You want to stick with that as your answer,

4    you've never -- never been seen with a gentleman who used to

5    be at Stifel on a boat down in southern Florida?

6    A    Or a gentlewoman, no.

7    Q    Okay.  All right.  Back to -- is it 14 I marked it as --

8    the answer to the amended citation, have you seen this

9    document before?

10   A    No.

11   Q    Third page, there's a chart and I want to talk about

12   just the last two.  Okay, sir?  There's a number 13 is under

13   "P2 Portfolio Managing Member LLC" and then the amount in the

14   account, account balance is 10 million 991 dollars --

15            Excuse me.  I have to get the right one.

16        (Brief pause.)

17   BY MR. TAHMASSEBI:

18   Q    -- the amount in the account is $10,991,073.82.

19   A    Which page of the document are you looking at?

20   Q    Sure.  Page 3 --

21   A    Yep.

22   Q    -- in the chart at the -- there's numbers on the

23   left-hand side, the very bottom in the middle of the page.

24   A    Okay.

25   Q    There's two accounts there, P2 Portfolio Managing Member

1  LLC, what's your interest in that entity?

2  A    Maybe I'm a -- I think I'm 5 percent --

3          COURT REPORTER:  Can you speak up for me?

4          THE WITNESS:  I believe I'm 5 percent owner of that

5  entity.

6  BY MR. TAHMASSEBI:

7  Q    Did you have the ability to transfer funds out of the

8  Stifel account for P2 Portfolio Managing Member LLC?

9  A    Not on my own, no.

10  Q    Well, who else would have to assist you?

11  A    Anthony Ivankovich.

12  Q    Your father?

13  A    Yes.

14  Q    How old is your father?

15  A    82, I believe.

16  Q    Where does he reside?

17  A    In Florida.

18  Q    Where in Florida?  What's the address?

19  A    Key Biscayne, Florida.

20  Q    What's the address?

21  A    791 Crandon Boulevard, Key Biscayne, Florida.

22  Q    Does he reside there alone, with his wife, your mother?

23  A    With his wife and with me.

24  Q    Is he retired?

25  A    He's retired from being a physician; yes.

1    Q     And then the Ivankovich family -- by the way, who

2    handles the finances for P2 Portfolio Managing Member LLC?

3    A     Again, it would have been the successor to RealPage.

4    Q     Who, the successor to RealPage?

5    A     To RealPage.

6    Q     Well, when you say "the successor," is that a different

7    firm or did they merge or --

8    A     I don't know if they merged but it's not RealPage

9    anymore.

10   Q     Ivankovich Family LLC, what's your interest in that

11   company?

12   A     Again, in the 5 percent range.

13   Q     And it looks like the account there is $19,042,437, do

14   you see that?

15   A     Yes.

16   Q     And the individuals that would have to authorize

17   transfer any of those funds would be yourself and your

18   father?

19   A     Myself, my father, and my mother.

20   Q     Okay.  And has either -- has any money been transferred

21   out of P2 Portfolio Managing Member LLC or the Ivankovich

22   Family LLC that are listed here in the Stifel accounts?

23   A     I'm sure money was transferred in the normal course of

24   business.

25   Q     Since April 6th of 2022, has any money been transferred

1  out of the P2 Portfolio Managing Member LLC or Ivankovich

2  Family LLC accounts?

3  A    I'm sure there was.

4  Q    Well, did you authorize those transfers?

5  A    No, not entirely.

6  Q    Well, you were involved with them, right?

7  A    Yeah.

8  Q    And --

9  A    I was involved in the organization.

10 Q    And how much was transferred out?

11 A    I don't know.

12 Q    Where was it transferred to?

13 A    I don't know.

14 Q    Well, when you authorized the transfer, you didn't ask

15 what are -- where is the money going?

16 A    Well, you're using the term transfers but in the normal

17 course of business, there are transfers all the time anywhere

18 from a dollar to any amount so you have to be specific what

19 you're asking me.

20 Q    Well, I'm asking you, if you -- you said money was moved

21 from the P2 and Ivankovich accounts to somewhere else.

22 A    I didn't say money was moved.  I said -- you asked me if

23 money was transferred, so.

24 Q    Okay.  Let me do it this way, Mr. Ivankovich.  When you

25 and your mother and your father sat down since April of 2022

1  and said we're going to take money from one place and either
2  spend it or put it in another place, what term would you like
3  me to use for that?
4  A     I like to use the term specific to what you're asking
5  me.
6  Q     Was any money moved out of the P2 Portfolio Member LLC
7  account and the Ivankovich Family LLC investment account
8  since April of 2022?
9  A     Can you please repeat the question?
10  Q     Sure.  Was any money moved out of the P2 Portfolio or
11  Ivankovich Family LLC Stifel accounts since April of 2022?
12  A     Well, I imagine there was.  Yes.
13  Q     Okay.  And then how much was moved?  And if you need to
14  do it by P2 and Ivankovich, you can do that.
15  A     I can't tell you sitting here.
16  Q     Why was any money moved?
17  A     Because these are companies that conduct business so to
18  pay bills, to make investments.
19  Q     Okay.  What bills were needed to be paid by P2 Portfolio
20  Managing?
21  A     I don't know.
22  Q     Who would know?
23  A     My father would know.
24  Q     Okay.  Ivankovich Family LLC, again, money was moved.
25  I'd have to ask your father why it was moved?

1    A    Ask my father, my mother; yes.

2    Q    Okay.  You want me to ask your 82-year-old father or

3    your mother why money would have been moved since April of

4    '22 out of these two LLCs, correct?

5    A    I don't want you to.

6    Q    Well, you just said they were the ones that would know,

7    not you, so, I mean, that to me is telling me that's who I

8    have to ask --

9    A    Correct.

10   Q    -- so we'll ask them.  Now --

11        (Counsel conferring.)

12   BY MR. TAHMASSEBI:

13   Q    Did you ever have an individual account with Stifel?

14   A    No.

15   Q    The -- going back to Exhibit 14, the accounts

16   themselves, account ending 1602, did you have any interest in

17   that account, you individually?

18   A    I don't understand the question when you say "interest

19   in the account."

20   Q    Yeah.  Was it -- did you have a -- did you take money

21   from that account?

22   A    No, not on my own volition.

23   Q    Same with the 4799, did you have any interest in that

24   account itself?

25   A    Again, when you say "interest," I don't know what you

1    mean.

2    Q    Did you move money from that account?

3    A    Not on my own, no.

4    Q    Okay.  And then so you were in New York for a trial, do

5    you remember that?

6    A    Yeah, many years ago.

7    Q    Relating to Atlas?

8    A    Correct.

9    Q    And when you were asked about the Ivankovich Family LLC

10   and the P2, you told the court that you could use those funds

11   to populate an entity with the signing of a pen and a phone

12   call in a matter of minutes, do you remember that testimony?

13   A    I don't.  Can I -- I do not.

14   Q    Was that true that if you wanted to move money, in this

15   case you were saying you could have gotten it out of these

16   Stifel accounts and sent it to an Atlas account with the

17   signing of a pen and a phone call in a matter of minutes,

18   were you telling the truth when you told that to the New York

19   court?

20   A    I don't believe that's the testimony.

21   Q    We could populate that answer -- Page 2 -- Exhibit --

22   well, let's see.  Page 303 (sic) of the transcript from

23   January 13th, 2020, in answer to a question "the specific

24   entity doesn't, but the chain of ownership, as I said, has

25   plenty of assets.  We could populate that entity with the

1  signing of a pen and a phone call in a matter of minutes," is

2  that your testimony?

3  A    You'd have to show me the document so I can look at it.

4  Q    I can mark your testimony, sure.  Let's call this

5  Exhibit --

6        (Counsel conferring.)

7  BY MR. TAHMASSEBI:

8  Q    Exhibit 13 is the transcript from January 13th, 2020.

9        (Brief pause.)

10 BY MR. TAHMASSEBI:

11 Q    I highlighted it for you.  I just need you to confirm

12 that's what you testified to and that you were telling the

13 truth when you made those statements.  That's the only

14 question I'm asking you.

15 A    What is the question you were asking?

16 Q    Yeah.  Is that your testimony that I just showed you on

17 Page 304?

18 A    I'm looking at a copy of my testimony but what is the

19 question you're asking?

20 Q    Were you telling the truth when you said that to the

21 judge in New York?

22 A    When I said what's -- in this testimony?

23 Q    Yes.

24 A    Is this testimony my truth?

25 Q    Yes.

1  A  The truth?

2  Q  Yes.

3  A  Yes.

4  Q  Okay.  You can set that aside.  She's going to take it.

5        COURT REPORTER:  Can I ask a quick question?

6        MR. TAHMASSEBI:  Sure.

7     (Discussion off the record.)

8  BY MR. TAHMASSEBI:

9  Q  Do you have any income today, sir?

10 A  No.

11 Q  How did you get up here?

12 A  Airplane from Miami.

13 Q  Who paid for it?

14 A  My father.

15 Q  Who pays for your daily living expenses?

16 A  My parents.

17 Q  How old are you again?

18 A  52.

19 Q  And who pays to assist in running the entities you still

20 have an interest in so far like Overlook Management (sic)

21 Member LLC or the P5 entities?

22 A  Whatever income I would imagine comes off the properties

23 pays for the staff there.

24 Q  Anything else?

25 A  No.

1  Q   Do you have any involvement in paying the staff there?

2  A   No.

3  Q   Who does?

4  A   When you say "who does," meaning --

5  Q   Yeah.  I mean, who is the one that's taking the income

6  from the properties and paying staff?

7  A   I don't believe staff is paid directly.  I believe it --

8  there's a management contract.

9  Q   And who is that with?

10 A   With Atlas Apartment Homes LLC but I actually don't know

11 how the staff is paid at this point.

12 Q   How do you pay -- do you have a car?

13 A   No.

14 Q   How do you get around?

15 A   Uber, walk.

16 Q   Okay.  Who pays for your Uber?

17 A   My father.

18 Q   Do you have a credit card?

19 A   No.  I use his.

20 Q   Who pays your lawyers?

21         MR. WANDNER:  Objection.  Move to strike.

22 BY MR. TAHMASSEBI:

23 Q   You can answer.

24         MR. WANDNER:  No.  I'm instructing him not to

25 answer unless the Court orders him to.

1   BY MR. TAHMASSEBI:

2   Q    Did you retain Mr. Wandner to represent you in this

3   matter?

4           MR. WANDNER:  I object.  I instruct you not to

5   answer --

6           MR. TAHMASSEBI:  Whether or not he retained you is

7   not --

8           COURT REPORTER:  I'm sorry, I have to -- one at a

9   time.

10          MR. WANDNER:  I'm objecting and I'm instructing him

11  not to answer unless the Court orders him to answer that.

12  It's not an appropriate question.

13          MR. TAHMASSEBI:  I just asked him whether he

14  retained you to be able to represent him.

15          MR. WANDNER:  It's still -- it violates the

16  attorney-client privilege, counsel.

17  BY MR. TAHMASSEBI:

18  Q    Okay.  Who is paying Mr. Wandner's bill, do you know?

19          MR. WANDNER:  Objection.  Same objection.

20  BY MR. TAHMASSEBI:

21  Q    Who hired the -- is it "Chukek" or Chuhak -- guys that

22  are sitting here, your lawyers that are sitting here to

23  represent the LLCs?

24          MR. PORRAS:  Objection --

25          MR. DEBRE:  Objection.

1           MR. WANDNER:  Objection.

2           MR. PORRAS:  -- as to foundation.

3    BY MR. TAHMASSEBI:

4    Q    Did you hire the Chuhak lawyers to represent the LLCs?

5    A    I can't answer the question on advice of attorney.

6    Q    No one has told you not to answer.

7           MR. WANDNER:  I'm objecting to these questions.

8    They impact the attorney-client privilege, counsel.

9    BY MR. TAHMASSEBI:

10   Q    Are you following his advice?

11   A    I am.

12   Q    Okay.  Who is paying the Chuhak lawyers for the P2 --

13          MR. WANDNER:  Same objection.  Asked and answered.

14          MR. TAHMASSEBI:  Guys, you gotta -- Hey, gentlemen,

15   let's just -- there's a method to my madness, okay?  I'm

16   not -- let's be professional.  Let me finish the question --

17          MR. WANDNER:  I am being professional.

18          MR. TAHMASSEBI:  -- and I respect that you have to

19   make an objection and if you instruct him not to answer,

20   that's fine, but I need a record so that if I decide to go to

21   the Judge, we're not talking over each other and also for the

22   benefit of the reporter so please let me finish and then you

23   can make your objection.

24   BY MR. TAHMASSEBI:

25   Q    Mr. Ivankovich, do you know who hired the Chuhak &

1  Tecson lawyers to represent the LLCs, specifically the

2  Ivankovich Family LLC, the P2 LLC and the Pilgrim LLCs, the

3  P5?

4           MR. PORRAS:  At this point I'd like to make a

5  standing objection for any further questions relating to

6  communications with Chuhak & Tecson on behalf of the LLCs.

7  We're asking that Mr. Ivankovich not answer the questions.

8  BY MR. TAHMASSEBI:

9  Q   Okay.  And you're following that advice?

10  A   I am.

11          MR. TAHMASSEBI:  See, guys, not that hard.

12  BY MR. TAHMASSEBI:

13  Q   While we're on this Exhibit No. 1, this is an Alias

14  Citation to Discover Assets to Steven Ivankovich and if you

15  go to Page 5 -- excuse me, Page 7 --

16  A   Go ahead.

17  Q   On 7, there's a statement, I certify everything that --

18  in the answer to the citation proceedings is true and

19  accurate.  I understand that making a false statement on this

20  form is perjury and has penalties provided by law.  Do you

21  see that?

22  A   I do.

23  Q   And that's your signature, correct?

24  A   It is.

25  Q   And your name above there?

1  A    Yes.

2  Q    And do you remember actually signing this document?

3  A    I don't.

4  Q    Did you sign this document?

5  A    Yes.  That's my signature.

6  Q    Turn back, if you could for me, to Page 5.

7  A    Sure.

8  Q    It says you own property 235 West Menonee,

9  M-e-n-o-n-e-e, Street and 234 Willow Street --

10         MR. WANDNER:  That's Page 6, counsel.

11         MR. TAHMASSEBI:  I'm sorry.  Page 6.

12         THE WITNESS:  Yes, although there's a typo on West

13  Menomonee.  It should be Menomonee, M-e-n-o-m-e-e (sic).

14  BY MR. TAHMASSEBI:

15  Q    And on the Menomonee property, what type of property is

16  that?

17  A    It's a single-family home.

18  Q    In the North Chicago area?

19  A    Yeah.

20  Q    And is there a mortgage on that property?

21  A    Yes.

22  Q    With what bank?

23  A    Originally it was with a bank called Cole Taylor but

24  there's been five different mergers and acquisitions since

25  then so I'm not sure who the current bank is.

1    Q    Well, who do you pay your mortgage to?

2    A    I don't pay the mortgage.

3    Q    Who does pay the mortgage?

4    A    Nobody.  The home is in foreclosure.

5    Q    When is the last time you paid the mortgage on the 235

6    West Menomonee property?

7    A    2019.

8    Q    The same time you were putting a lot of your own

9    personal assets into the entities that you had an interest

10   in, right?

11   A    Correct.

12   Q    Is this --

13   A    By the way, I may not have even owned it anymore.  I

14   think there was a share scale -- sale scheduled in August so

15   I don't know if that happened or not yet.

16   Q    Did you own it yourself or with your wife, the Menomonee

17   property?

18   A    It's owned jointly with my wife.

19   Q    The 234 West Willow property, is that owned by you

20   individually or with your wife?

21   A    It's the same residence.  It's a contiguous lot --

22   Q    Got it.

23   A    -- or I think they call them a tandem lot.

24   Q    When is the last time you paid the mortgage on that

25   property?

1    A    The same.  It's the same -- it's one mortgage, I think,

2    covering both.

3    Q    All right.  Just so I'm clear, back in 2020 you had a

4    net worth of approximately 58 million and today you depend

5    upon your father to provide you with a living space, right?

6    A    And my mother.

7    Q    And your mother; I'm sorry.  And your mother to provide

8    you with a living space, right?

9    A    Yes.

10   Q    To pay any bills that you have, if you have any?

11   A    I don't have any more anymore, thankfully.

12   Q    To make sure you get transportation to anywhere you need

13   to go, right?

14   A    Yes.

15   Q    And, for example, the flight that you got up here today,

16   you didn't pay for that, did you?

17   A    No.

18   Q    And what -- on a daily basis, Mr. Ivankovich, then what

19   do you spend your time doing unless you have a job that I

20   didn't see but I thought you said you were unemployed.

21   A    No.  Play tennis, do a lot of reading.

22   Q    So how you spend your day --

23   A    Go to the gym.

24   Q    Okay.  So you spend your days --

25   A    Do some fishing, look at women on the beach when I'm

1    there, which is why I'm getting a divorce.

2    Q    All right.  Exhibit No. 2, if you could, please.  So

3    most of your days are spent, I guess, tennis, gym, looking at

4    women on the beach, time on the beach --

5              MR. WANDNER:  Sorry.  Objection, asked and

6    answered.

7    BY MR. TAHMASSEBI:

8    Q    -- right, fair enough?

9    A    (Nodding).

10   Q    You got to say "yes" for her.

11   A    Yes.

12   Q    Okay.  Exhibit 2 is a financial statement dated April of

13   2017.  Do you see that?

14   A    Yes.

15   Q    And is that your signature?

16   A    Yes.

17   Q    Okay.  Do you have any reason to believe you did not

18   sign this on or around April of 2017?

19   A    No.

20   Q    Second page.  Your salary at that time was 250,000?

21   A    Correct.

22   Q    And if we go to the balance sheet from 2017, at this

23   time you had liquid marketable assets of around $6,103,196,

24   does that sound about right?

25   A    Yes.  That's what the document says, correct.

1    Q    And then the net worth is 28 million 603 thousand

2    approximately?

3    A    Yes, correct.

4    Q    So from 2017 up until 2020, you actually did fairly well

5    and your assets and net worth improved up until that year,

6    right?

7    A    Yes.

8         MR. TAHMASSEBI:  What time is your call?  Off the

9    record.  Sorry.

10        (Recess taken.)

11        MR. WANDNER:  You say you have about 20 minutes

12   left?

13        MR. TAHMASSEBI:  Yes.

14        MR. WANDNER:  Okay.

15   BY MR. TAHMASSEBI:

16   Q    Mr. Ivankovich, when is the last time you filed a tax

17   return?

18   A    Maybe 2017.

19   Q    2017 was the last time you filed an individual tax

20   return?

21   A    Yep.

22   Q    And who filed that for you?

23   A    I think a company called Professional Financial

24   Consultants.  That sounds about right.

25   Q    Are you planning to file tax returns anytime soon?

1  A    Yeah.

2  Q    Did you get extensions for your tax returns?

3  A    I did get extensions but I think the extension is only

4  for a year.

5  Q    Have you paid taxes since 2017?

6  A    No.  I also think there's a -- I've got like a $2

7  million federal tax lien that I have on there.

8  Q    Do you know that the judgment in this case was entered

9  against -- did you know on or around August 17th of 2021 that

10  there was a judgment in this case entered against you?

11  A    I probably did, yes.  I don't recall the specific day.

12  Q    Did you have a bank account in August -- on August -- on

13  or around August of 2021?

14        MR. WANDNER:  I object.  Asked and answered.  You

15  asked him if he had bank accounts earlier.

16        THE WITNESS:  A personal bank account?

17  BY MR. TAHMASSEBI:

18  Q    You got to listen to the question.

19  A    Yeah.  No.

20  Q    When was the last time you had a personal bank account?

21  A    2016, '17.

22  Q    The companies that you said you had to use your personal

23  finances for, the 58 million, did any of those companies

24  apply for any governmental assistance during COVID?

25  A    I didn't say I used $58 million.  Let's get that clear.

1    I didn't use $58 million in those companies.

2    Q    Well, how much did you transfer to those companies?

3    A    In the $12 million range.

4    Q    Okay.  So then of your $56 million net worth, you still

5    have a significant amount of that?

6    A    No.

7    Q    So what happened to the rest of the --

8    A    As the assets' value went to zero or foreclosed upon,

9    those interests disappeared.

10    Q    Did any of your companies during COVID that you had an

11    interest in apply for any governmental assistance relating to

12    COVID?

13    A    I don't know.

14    Q    Well, as an interested -- as an owner of these

15    companies, didn't you have an interest -- somebody who was

16    forking over $11 million from the year two thousand -- from

17    you said the time of COVID about until the end of 2021, did

18    you ever think it might be a good idea to see if there's

19    other avenues besides giving over your personal assets?

20    A    I did.  My recollection was that was -- those programs

21    were based on companies with employees and none of these

22    companies have employees.  There's only one company that had

23    any employees, that was Atlas Apartment Homes, and it's

24    possible that may have applied for something.

25    Q    Well, hold on.  You said earlier you used money from the

1    11 million for payroll?

2    A    Yes.

3    Q    But now you're saying the payroll consisted of just one

4    person?

5    A    No, no.  Of one company.

6    Q    Okay.  One company?

7    A    Yes.

8    Q    Okay.  What -- which company was that?

9    A    Atlas Apartment Homes.

10   Q    Okay.  And did Atlas Apartment Homes apply for a PPP

11   loan or any of the other programs that the government had

12   during COVID?

13   A    I don't know.

14   Q    Did you ever ask that somebody from Atlas Homes apply

15   for that program so that you don't have to yourself put in

16   your personal assets to the tune of $11 million according to

17   what you said today?

18   A    I don't think I asked; no.

19   Q    Why not?

20   A    I'm just not used to taking money from the government.

21   Q    Did you ever consult with anybody in 2020, 2021 as to

22   whether or not these entities that you put this $11 million

23   into could have received funds from the government, loans

24   that were ultimately forgiven as a result of the COVID

25   crisis?

1          MR. WANDNER:  Object to the form of the question.

2          MR. TAHMASSEBI:  Did you say "no"?

3          THE WITNESS:  I didn't consult with anybody but I

4   recall reading about the programs.

5   BY MR. TAHMASSEBI:

6   Q    But you never consulted with anybody as to whether or

7   not those programs, the COVID programs that the government

8   put forth specifically for companies like yours made sense,

9   fair?

10  A    I didn't consult with anybody; no.

11  Q    Do you own any jewelry, any -- anything else of value,

12  antiques, anything like that, just so --

13  A    No.

14  Q    No?

15  A    No.

16  Q    Do you plan to move out of your parents' home anytime

17  soon?

18  A    No.

19  Q    Okay.  If you do, will you please have your lawyer

20  contact me?

21  A    Sure.

22  Q    How old are your children now?

23  A    15 and 11.

24  Q    Do they live with you?

25  A    No.

1    Q    Where does your wife reside?

2    A    I believe in Chicago.

3    Q    What's the address?

4    A    I don't know.

5    Q    You don't know your wife's address?

6    A    No.  We haven't spoken since she filed for divorce in

7    October.

8    Q    Does your wife work?

9    A    I don't know.

10   Q    Well, okay.  Let me go back then.  In October, the last

11   time you spoke to her, did she have employment?

12   A    No.

13   Q    When is the last time she worked at all that you're

14   aware of?

15   A    In -- it would be when we met in 2005, 2006.

16   Q    Okay.  So once you guys met and married, she -- she

17   stopped working?

18   A    No.  She didn't stop working but --

19   Q    I didn't mean it like that.  I mean she didn't have

20   employment.

21   A    She was a professional mother and housewife.

22   Q    Okay.  The hardest job.  All right.  The -- and that

23   wasn't sarcastic just anyone that's reading this knows.  The

24   15-year-old and 11-year-old, where do they go to school?

25            MR. WANDNER:  I'd like to interpose an objection.

1    Is this really necessary --

2                MR. TAHMASSEBI:  Yeah.

3                MR. WANDNER:  -- to get into his children's lives?

4                MR. TAHMASSEBI:  I'm not asking him any more

5    questions about them.  It is necessary.

6                MR. WANDNER:  Well, you're asking a question about

7    them, about his children's lives.  Why is that relevant?

8                MR. TAHMASSEBI:  It's relevant because if they go

9    to a certain school --

10               MR. WANDNER:  Okay.  So why don't you ask him if

11   the kids go to a private school?

12               MR. TAHMASSEBI:  No.  Let me just ask him how I'm

13   doing it.

14               MR. WANDNER:  Well, I'm going to object to you

15   asking those questions.

16   BY MR. TAHMASSEBI:

17   Q    Where -- where do your kids go to school?

18               MR. WANDNER:  I'm going to object --

19               MR. TAHMASSEBI:  Okay.  You can object.

20               MR. WANDNER:  -- and instruct him not to answer

21   unless the Court orders him to answer the question.

22               MR. LAMMERS:  There's no privilege for asking about

23   relevant information.

24               MR. WANDNER:  It's not relevant where his children

25   go to school.

1    MR. LAMMERS:  You can't instruct someone --

2    MR. WANDNER:  If you want to ask him --

3    BY MR. TAHMASSEBI:

4    Q    Do your children --

5    MR. WANDNER:  -- if he personally --

6    COURT REPORTER:  I'm sorry, I have to make a

7    record.

8    MR. WANDNER:  -- if he personally pays for a

9    private school for his kids, then I won't object to that as

10   relevance, but asking them where they go to school on a

11   public document I believe is not proper.

12   BY MR. TAHMASSEBI:

13   Q    Do your children go to private school or public school?

14   A    They go to private school.

15   Q    And who pays for that private school?

16   A    At this point, I don't know.

17   Q    When was the last time you paid for your children's

18   private education?

19   A    2019.

20   Q    2019?

21   A    Yep.

22   Q    What's the cost of their private schooling?

23   A    I don't know.

24   Q    What was it in 2019?

25   A    In the range of $10,000 per year.

1  Q    For each, right?

2  A    Yes.

3  Q    What is A & O Family LLC?

4  A    A limited liability company.

5  Q    Well, I get that but what does it do?

6  A    I don't know.

7  Q    Who are the members?

8  A    I don't know exhaustively but members of my family.

9  Q    Okay.  Give me the ones that you do know.

10  A    Anthony Ivankovich, Olga Ivankovich, Daniel Ivankovich,

11  Sophie Ivankovich, Anthony Ivankovich the second, Lucas

12  Ivankovich, Katarina Ivankovich.  That's all I know.

13  Q    And you are not a member?

14  A    And me, yes.

15  Q    Okay.  And what does that LLC do?

16  A    I believe it's an investment company.

17  Q    Where does A & O Family LLC bank?

18  A    I believe it does have -- it does have accounts at

19  Stifel.

20  Q    How much are in those accounts, do you know?

21  A    I don't know.

22  Q    10,000, 10 million like the other ones?

23  A    I don't know.  I'm not privy to those statements.

24  Q    All right.

25       (Counsel conferring.)

1    BY MR. TAHMASSEBI:

2    Q    As far as the P5 Portfolio, the Warwick property, the

3    Wind Tree property and the Coulter Landing property I think

4    we said those still are -- those have not been sold, right?

5    A    Correct.

6    Q    And those are owned as far as who has title to those

7    by -- is it Atlas Apartments Management LLC?

8    A    No.

9    Q    Okay.  Who is it?

10   A    Do you know what page the org chart was on?

11   Q    Sure.  9.

12   A    The Alliance HTTX Limited Partnership.

13   Q    Okay.  So the Alliance HTTX GP Limited Partnership, got

14   it, owns the three properties.  All right.  Did you ever give

15   personal money to -- I'm sorry, just so -- let me just ask a

16   better question so we can be done.  The personal funds that

17   you disbursed into the LLCs in 2020, '21, would have gone to

18   a variety of LLCs of which are listed in the organizational

19   chart marked as Exhibit 9?

20   A    Yes.

21   Q    Oh, yeah.  The residential properties that you owned,

22   were those always owned by you and your wife or at some point

23   were they owned by just you, the two Chicago properties?

24   A    Yeah.  I owned it prior to us getting married.

25   Q    And then it was transferred over at the time you were

1  married?

2  A   Yes.

3  Q   And that was what date?

4  A   2006.

5  Q   Have you ever owned any property, you individually, in

6  Florida?

7  A   No.

8  Q   How about your wife?

9  A   I don't know.

10  Q   Not since you've known her?

11  A   Not since I've known her.  It's possible she does.  I

12  don't know about --

13  Q   And then --

14      (Brief pause.)

15  BY MR. TAHMASSEBI:

16  Q   Did you provide -- and if you want something to

17  reference, I'm going back to Page 12 of Exhibit 6.

18  A   Go ahead.

19  Q   The last paragraph that starts with "Mr. Ivankovich

20  reports --"

21          COURTROOM DEPUTY:  Hi.  Judge says she's going to

22  give you guys another ten, 15 minutes.

23          MR. TAHMASSEBI:  We're about -- we're done in like

24  two.

25          COURTROOM DEPUTY:  Okay.  Perfect.

1              MR. TAHMASSEBI:  Yeah.

2              MR. WANDNER:  I have a couple questions, too.

3      Please.

4              MR. TAHMASSEBI:  Oh, all right.  Okay.  Maybe we

5      will need ten minutes.  Sorry.

6              COURTROOM DEPUTY:  Okay.  So ten minutes then.

7              MR. TAHMASSEBI:  Got it.  Thanks.

8              COURTROOM DEPUTY:  All right.

9              THE WITNESS:  Go ahead.  I'm on Page 12.

10     BY MR. TAHMASSEBI:

11     Q     Yeah.  The information on that last paragraph, did you

12     provide documentation to support your net worth and liquidity

13     of 42.7 million and 12.7 million to Walker Dunlop?

14     A     Yes.

15     Q     Okay.  And who did that documentation come from, you

16     directly or one of your professionals?

17     A     Me directly.

18     Q     Was it via email, was it mailed, how would you have done

19     that?

20     A     Hard to say.  Probably either -- some private way.  It's

21     sensitive information so either by courier --

22     Q     All right.

23             MR. TAHMASSEBI:  So I'll make a formal --

24     Mr. Wander?

25             MR. WANDNER:  Yes, sir?

1          MR. TAHMASSEBI:  I'm going to make a formal request

2     for additional documents.

3          MR. WANDNER:  File what you need to file.

4          MR. TAHMASSEBI:  Those are what I need.  And then

5     the last thing is, I want to put on the record I'm handing --

6     I'm handing Mr. Ivankovich a Citation to Discover Assets in

7     the Atlas LLC case in the collection portion, 2019 L 454, so

8     I'm just serving you with that document to respond to.  And

9     also appear --

10          MR. WANDNER:  Can I have a copy of it?

11          MR. TAHMASSEBI:  Yeah, absolutely.  And also appear

12     for another citation exam.  That's all I have.

13          MR. WANDNER:  Can I ask you why you didn't

14     coordinate the dates on this with his counsel?

15          MR. TAHMASSEBI:  Because I didn't -- I didn't know

16     what the Judge had in mind.  We can go off the record.

17          (Discussion off the record.)

18          MR. WANDNER:  I just have a few questions.

19                    CROSS EXAMINATION

20     BY MR. WANDNER:

21     Q    Mr. Ivankovich, early on in the first part of the depo,

22     you had said something about a cut-and-paste of your

23     financial statements.  Did you want to expand on your answer

24     at all?

25     A    Yeah.  I have to study the document closer but this

1    doesn't look like something I would have produced.  There's

2    just too many inconsistencies on the pages that I can see.  I

3    mean, for example, in 2020, I would have been 50 years old

4    and my kids would have been older.  This -- this statement

5    below I don't ever recall having that in my financial

6    statements.  It just doesn't seem right.

7    Q    Did you see where Exhibit 2 and Exhibit 3 on the

8    signature page, one seems to be in blue ink and one seems to

9    be more of a copy?

10   A    Yes.  Yeah, yeah.  That's --

11   Q    Is that also something that raises questions?

12   A    Yeah, that looks fishy.

13   Q    Okay.  Now you brought up in your answers that there

14   seems to be some differences internally within Exhibit 3

15   referenced to the date of August 26th, 2020, and March of

16   2020, which is interspersed within the document.  Did you

17   reference that?

18   A    Yeah.  It's not just that.  I mean, there's all sorts of

19   dates in here.

20   Q    Can you tell for the record purposes what happened in

21   and around March of 2020 to the world?

22   A    Oh, I think we got locked down with COVID.

23   Q    Okay.  And did that have a negative effect upon your

24   assets?

25   A    Oh, yeah.  Everyone stopped paying rent.

1   Q    Okay.  And when -- when renters stopped paying rent, did

2   that stop the obligations of the landlords, whomever they

3   were, to pay their bills?

4   A    No.

5   Q    And was there negative consequences to the entities and

6   to the renters if the landlord stopped paying their bills?

7   A    Oh, yeah.  The water shut down, the mortgage foreclosure

8   power would have got shut down, no insurance.  I mean --

9   Q    And you said --

10  A    -- all of that happened.

11  Q    And you said you got some notices from the Department of

12  Labor that there's personal obligations to, you know, take

13  care of certain things --

14  A    Yeah.

15  Q    -- on behalf of corporate entities?

16  A    Yeah.

17  Q    Okay.

18  A    Yeah, I didn't -- I didn't realize that the payroll goes

19  personally to the manager of the company.

20  Q    Did the entities -- and I'm not going to get into the --

21  using counsel's term getting into weeds on which ones, but

22  the entities that were referenced here today, did they have

23  tax burdens and tax obligations that were documented during

24  that period of time?

25  A    We had to pay.  We had to continue to pay real estate

1  taxes; yes.

2  Q    Okay.  And do you know whether those entities or some of

3  those entities indicated losses during the time period

4  reflected between August of 2020 and today?

5  A    They all had losses.

6  Q    Millions of dollars in losses?

7  A    Yes.

8  Q    You said some of -- some of the assets were in Florida,

9  right?

10  A    Yes.

11  Q    Okay.  Do you know whether the State of Florida

12  specifically had passed some rules in response to COVID where

13  people who failed to pay rent could not be evicted?

14  A    Yeah.  There was an eviction moratorium everywhere,

15  Texas, Florida, Illinois, everywhere.

16  Q    And did that negatively affect your assets during the

17  period of time from when the documents reflected in what

18  Mr. --

19          MR. WANDNER:  I'm sorry.

20          MR. TAHMASSEBI:  Mr. Tahmassebi.

21          THE WITNESS:  Tahmassebi.

22          MR. TAHMASSEBI:  It doesn't bother me.

23  BY MR. WANDNER:

24  Q    -- Tahmassebi referenced and as we sit here today?

25  A    Yeah, people stopped paying rent essentially.

1    Q    But again, that didn't stop bills coming in, right?

2    A    No, no.  And we -- we asked.  We tried to get the water

3    company to give us a pass but they shut down the water unless

4    we paid the bills.

5    Q    Do you have any other judgments against you personally

6    out there?

7    A    Yeah.  There's --

8    Q    You mentioned a tax lien.

9    A    Yeah.

10   Q    What else?

11   A    In reading this document, it's referenced on -- in one

12   of these exhibits.  There's a judgment now for a million

13   eight on my home mortgage and I think the company is called

14   Edgefield.  There's a $26 million judgment from 2019 --

15   Q    Okay.

16   A    -- I believe.

17   Q    And in your testimony that counsel asked a couple of

18   random questions about, did you ever indicate that you had

19   the authority to use moneys from these LLCs to pay your own

20   debts?

21   A    No.

22   Q    In fact, didn't you indicate specifically that you were

23   not authorized to use the money to pay your own debts without

24   gaining authority?

25   A    Yes.

1  Q    And, in fact, in -- even in the cite to the transcript

2  that counsel mentioned, he said "a stroke of the pen and a

3  phone call," the phone call was to the person who you needed

4  to gain authority from which to make a move; isn't that

5  correct?

6  A    I'd have to go back and re-read it but I didn't have

7  authority on my own to move money.  That's correct.

8  Q    Okay.  So the bottom line is, like a banker who has the

9  key to the vault at a bank, he has the ability to move money,

10 that doesn't mean he has the authority to move money; is that

11 right?

12 A    I believe that's right.  Yes.

13 Q    Okay.  Like a banker who is a manager of Wells Fargo has

14 the key to the vault, he can't go in there, take half a

15 million and go pay his water bill with it, right?

16 A    I couldn't -- I couldn't -- I can't move money without

17 my permission.

18 Q    Okay.

19         MR. WANDNER:   One second.

20      (Brief pause.)

21         MR. WANDNER:   That's all I have.  Thank you, guys.

22         MR. TAHMASSEBI:   We're done.

23      (Proceedings concluded at 12:07 p.m.)

24

25

C E R T I F I C A T E

       I hereby certify that the foregoing is a complete, true

and accurate transcript of the proceedings had in the

above-entitled matter before the Honorable Sharon Johnson

Coleman at Chicago, Illinois, on August 31, 2022.


/s/*Laura LaCien*                    September 7, 2022
Official Court Reporter              DATE