IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ZHU ZHAI HOLDINGS LIMITED and PETER PUI TAK LEE,<br>Plaintiffs,<br>v.<br>STEVEN IVANKOVICH,<br>Defendant. | Case No. 20-cv-4985 |

## SUPPLEMENTAL EVIDENCE AND BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER AND FOR CONTEMPT

Come now, Zhu Zhai Holdings Limited and Peter Pui Tak Lee ("Plaintiffs"), and seek a turnover order of funds identified as Ivankovich's, and in support, submits this supplemental evidence and brief in support of turnover of judgment funds.

### INTRODUCTION[1]

Steven Ivankovich ("Ivankovich") has attempted to evade the consequences of his defaults—first, under his agreements with Plaintiffs, and then in this lawsuit—every step of the way. This Court put an end to that gamesmanship and required him appear to testify. It is now readily apparent that Ivankovich has the ability to pay the judgment, which has been outstanding for a year. As illustrated below, his claim of poverty is belied by the evidence in this case and his explanation of the disappearance of over $11 million dollars of liquid assets and an additional $44 million in net worth is not credible. Plaintiffs have now set forth evidence of assets sufficient to satisfy their judgment. Under Illinois law, this Court can now Order it be paid or hold Ivankovich in contempt. 735 ILCS 5/2-1402(c). The Court should do so, as Plaintiffs will otherwise receive no redress for the millions of dollars Ivankovich pilfered from them and the hundreds of thousands

---

[1] Plaintiffs incorporate all arguments made in their prior motion for turnover (DOC#202).

1

of dollars in legal fees and costs they have spent seeking relief since this lawsuit was filed in August 2020.

**EVIDENCE OF ASSETS**

**I.      Ivankovich's Personal Finances**

On or around August 26, 2020, just weeks before this lawsuit was brought, Ivankovich signed a financial statement attesting to having a net worth of over $55,000,000 (Ex. 1, Bates #Ivankovich250 to Motion for Turnover; Ex. 3 to 8/31/22 Dep. of Ivankovich; Ex. A, pg. 8/31/22 Dep. of Ivankovich, pg. 28).[2] This included $1,103,196 in cash and $11,000,000 in marketable stocks and bonds including government securities. Just weeks before this lawsuit was filed in September of 2020, Ivankovich had over $13,000,000 in liquid assets alone. (DOC#1, Complaint). On August 17, 2021, this Court entered final judgment for $4,503,842. (DOC#92, Judgment Order). When examined, Ivankovich failed to give a plausible explanation as to why he could not pay the August 17, 2021 judgment when just one year earlier, according to his sworn personal financial statement, he had a net worth of over $55,000,000.

Ivankovich's explanation regarding where the $13,000,000 in cash and marketable liquid assets went was not plausible. He claims that he used this vast sum of money to pay obligations of his companies and to pay bills without any explanation or evidence that this was the case. (Ex. A, pg. 50-51). As one example of his blatant falsehoods, Ivankovich states some of the money was used for payroll for the companies during COVID. (Ex. A, pg. 52). However, he latest testified that his companies ***did not even have employees***:

> Q:      …as owner of these companies, didn't you have an interest --- somebody who was forking over $11 million from you said the time of COVID about

---

[2] Ex. 3 to Ivankovich's deposition is submitted to the Court *in camera* and is the same as Ex. 1 to the prior motion for turnover.

> until the end of 2021, did you ever think it might be a good idea to see if there's other avenues besides giving over your personal assets?
>
> A: I did. My recollection was – those programs were based on companies that had employees and none of these companies had employees… (Ex. A, pg. 88).

Moreover, based on Ivankovich's recent testimony, he transferred funds after the judgment was entered in this case. (Ex. A, pg. 50). Tellingly, Ivankovich could not even testify what companies the $11,000,000 went to.

> Q: So through the end of 2021, you continued to make transfers in your eyes to pay bills of the companies you had an interest in?
>
> A: No, not in my eyes. That was what the payments were for.
>
> Q: And then what companies of the $11 million did you transfer money to specifically or the LLCs specifically?
>
> A: Did I tranfer to?
>
> Q: Yeah.
>
> A: I don't know. (Ex. A, pg. 52-53).

It is difficult to reconcile how a businessman that deals in the multi-millions does not know where he transferred $11,000,000 to in the 18 months prior. This reflects a willful attempt to shelter his assets and render himself judgment proof; it does not establish that he is too impoverished to pay the judgment.

Ivankovich's testimony with regard to the disposition of his liquid assets simply is not credible. He cannot state where the money was transferred or how the real estate holdings he owns are now worth nothing. Plaintiffs have signed sworn financial statements showing the assets,

which is sufficient to meet their burden, and easily outweighs Ivankovich's inconsistent and non-credible testimony to the contrary.[3]

## II. Ivankovich's Real Estate Holdings

Ivankovich's claim that his real-estate empire—which once spanned many properties in multiple states—collapsed is also belied by the P5 Portfolio managed by Walker Dunlop. First, the asset summary put together by Walker Dunlop in 2019 shows that there will be substantial holdings for the P5 entities, *i.e.*, the Pilgrim entities (Ex. 6 to 8/31/22 Dep. of Ivankovich), all of which Ivankovich owns nearly the entire stake through a company called Overlook Managing Member LLC ("Overlook"). *Id.* The P5 Portfolio consists of the five (5) Pilgrim LLCs all of which are wholly owned by Overlook, of which Ivankovich owns over ninety-five (95) percent. Ivankovich confirmed this is the case:

> Q: You do have a ninety-some percent interest in Overlook, right?
>
> A: Yes.
>
> Q: And Overlook still owns the P5 entities 100% and the P5 entities have an interest in the three [remaining] properties we listed as part of this portfolio [Walker Dunlop], correct?
>
> A: That's correct. (Ex. A, pg. 65).

Ivankovich claims that their values were negative. However, this is belied by the recent sale of part of the portfolio of which Walker Dunlap is holding funds to distribute to P5/Pilgrim Entities. The P5 entities have filed motions to have these funds released and, tellingly, Ivankovich recently filed a brief in support of releasing those funds to the P5 entities. If the P5 Portfolio/Pilgrim Entities real estate holdings were as worthless as Ivankovich claims, then Walker

---

[3] Plaintiffs note that residential real estate in Florida and Texas historically went up during COVID, further calling into question Ivankovich's newly discovered excuse.

Dunlap would not have money to distribute for the sale. Moreover, if in fact, the remaining real estate under the P5 portfolio was also worthless, then it follows there would be foreclosure actions; this has not occurred. If there was no profit after the loans and expenses were paid there would be no money to distribute. This establishes yet another misrepresentation by Ivankovich.

Ivankovich's testimony that the P5 portfolio is worthless is inconsistent with Walker Dunlop being repaid the loan and having money to distribute. Ivankovich testified:

> Q: As far as the Pilgrim (same as P5) entities, the five Pilgrim entities, Overlook and you have 95 percent interest in Overlook and Overlook having 100 percent interest in the P five entities, that part is accurate?
>
> A: Approximately, yes.
>
> Q: How much did the Pilgrim entities receive as part of the P5 – Atlas P5 Portfolio?
>
> A: I don't know. (Ex. A, pg. 40)

It simply is not credible that a real estate investor who has handled billions of dollars in transactions[4] and whose company just received a payout would not have *any* idea of the amount. The Walker Dunlop funds are, in reality, those belonging to Ivankovich.[5]

For clarity, Plaintiffs insert an organization chart which Ivankovich has agreed is accurate and shows that he owns ninety-five (95) percent of the parent – Overlook. (Ex. A, pg. 39-40). The below illustrates that Overlook is the parent of many Ivankovich entities and he owns nearly the

---

[4] The current website for Ivankovich's business states that Ivankovich "has been involved in over US$7 billion of property transactions to date." *See* https://atlasresidentialusa.com/executive-officers/ (last accessed Sept. 28, 2022).
[5] The State Court cited in DOC#231 is unrelated to this debt. Moreover, the testimony of Ivankovich had not yet been transcribed and was not available in that case.

entire company. At minimum, he has the ability to pay the judgment or alternatively, assign his interest in Overlook, of which he has 97% interest and majority voting rights.[6] (Ex. A, pg. 67).

[INTENTIONALLY LEFT BLANK]



Further undermining his credibility is Ivankovich's claim the funds Plaintiffs loaned had nothing to do with the P5 Portfolio. (Ex. A, pg. 22). However, an investment agreement between Plaintiff Lee and Ivankovich explicitly states that the funds will be used for the P5 Portfolio. It states:

---

[6] The organizational chart states Ivankovich has a 95% interest in Overlook. However, he testified he has a 97% interest in Overlook. (Ex. A, pg. 67).

> The Sponsor is currently in the process of raising $300,000,000 of preferred equity which will be used to acquire approximately a 48.0% interest in a portfolio, which includes the Pilgrim V Portfolio ("**P5**") in Appendix F and other assets itemized in Appendix H to be injected into ListCo. Subsequent to the Pre-IPO financing the Sponsor will engage a top-tier Investment Bank and commence the process of an initial public offering on the Hong Kong Stock Exchange. The objective will be to raise $750,000,000 in equity funding which will be equal to approximately 43.5% of the ListCo, at which time the Pre-IPO financing will convert to equity.

(Ex. 15, Investment Agreement with Plaintiff Peter Lee).

Despite all his assets, Ivankovich now wants this Court to believe his net worth is zero. But Ivankovich can give no plausible explanation as to where the $55,000,000 in assets went. His sole explanation was COVID. Remarkably, he testified as follows:

> Q: So in the year August 20, 2020 until the end of 2021, your net worth went from approximately 55,367,404 to pretty much zero, is that right?
>
> A: Correct.
>
> Q: And your explanation for that is because you made transfers in order to meet the obligations of the companies in which you had an interest?
>
> A: My explanation is COVID. (Ex. A, pg. 58-59).

His evasive and inconsistent responses are too many to individually include in this brief. *See* Ex. A, pg. 11-15, 19, 23, 52, 73.

The evidence before the Court is that Ivankovich has the personal assets or interests in companies he owns and controls necessary to satisfy the judgment. This Court should not allow his cavalier approach to his legal obligations to continue. If he cannot satisfy this judgment, this Court should hold him in contempt. His final words, when asked about his current dealings, best summarize his approach. When asked how he spends his days, if he is truly broke and has lost his properties, he testified:

7

| | | |
|---|---|---|
| Q: | So you spend your days – | |
| A: | Do some fishing, look at women on the beach when I'm there, which is why I'm getting a divorce. | |
| Q: | …So most of your days are spent playing tennis, gym looking at women on the beach, time on the beach? | |

    \*   \*   \*

| | |
|---|---|
| A: | Yes. (Ex. A, pg. 84-85). |

## ARGUMENT

The evidence before this Court is that just weeks before this lawsuit was filed Ivankovich had a net worth of over $55,000,000, including over $12,000,000 in liquid assets. (Ex. 1, 8/26/20 Ivankovich Personal Financial Statement; Ex. 3 to 8/31/22 Dep. of Ivankovich). The judgment in this matter was entered on August 17, 2021. (DOC#92). As illustrated, *supra*, Ivankovich's claims that he has no funds to pay the judgment are unsubstantiated and not believable. Plaintiffs request this Court now require payment or hold Ivankovich in contempt.

### I.  Ivankovich should be compelled to pay the judgment.

Illinois law allows for this Court to compel payment of judgment when there is evidence of sufficient assets to pay it. 735 ILCS 5/2-1402(c)(1) states:

(c) When assets or income of the judgment debtor not exempt from the satisfaction of a judgment, a deduction order or garnishment are discovered, the court may, by appropriate order or judgment:

> (1) Compel the judgment debtor to deliver up, to be applied in satisfaction of the judgment, in whole or in part, money, choses in action, property or effects in his or her possession or control, so discovered, capable of delivery and to which his or her title or right of possession is not substantially disputed.

Ivankovich has failed to put forth any credible or substantial dispute that he cannot pay the judgment. *First*, his personal financial statement is undisputed and evidence of ability to pay the judgment. *Second*, his ninety-seven percent (97%) ownership of Overlook is undisputed. (Ex. 1; Ex. A, pg. 67). It is also undisputed that Overlook is the parent of the P5 Entities. Moreover, there are funds being held that ultimately flow to Ivankovich given his majority control of Overlook. Ivankovich admits he has the majority voting rights in Overlook. (Ex. A, pg. 67). *Third*, his testimony regarding the Stifel accounts and ability to move money with the swipe of a pen further evidences his ability to pay.

Accordingly, the competent evidence before this Court is that Ivankovich through his personal finances and property interests has the ability to pay. Pursuant to 735 ILCS 5/2-1402(c), Plaintiffs request this Court compel payment.

## II. Ivankovich should be held in contempt for his willful refusal to comply with past Court Orders and failure to pay the judgment if it is not satisfied within thirty (30) days.[7]

Civil contempt is appropriate for a party's failure to pay a judgment or obey a discovery order. *Lebeda v. Weinberg Mediation Grp., LLC*, 2021 WL 4549406, at *2 (N.D. Ill. Feb. 16, 2021). Rule 69(a) dictates the procedure for enforcement of a money judgment in a civil case. In pertinent part, the rule provides:

> Process to enforce a judgment for the payment of money shall be by writ of execution, *unless the court directs otherwise.* The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.

---

[7] Plaintiffs' pending motion for turnover also seeks a contempt Order so Ivankovich cannot claim surprise regarding this prayer for relief.

(Emphasis added.) The "unless" clause in Rule 69 gives courts means other than execution to satisfy or compel a money judgment. *Robbins v. Labor Transp. Corp.*, 599 F. Supp. 705, 707 (N.D. Ill. 1984). Under 28 U.S.C. § 2007 and Rule 69(a), a judgment debtor may be imprisoned for contempt for nonpayment of a judgment if such a sanction is permitted under the law of the state where the court is sitting. *Id.*; *citing* 7 Moore's Federal Practice, ¶ 69.04[2], at 69–21. Therefore, this Court can look to Illinois law to determine whether a contempt Order is warranted.

The Illinois Supreme Court has explained, "Vital to the administration of justice is the inherent power of courts to compel compliance with their orders." *Sanders v. Shephard*, 163 Ill. 2d 534, 540 (1994). In pursuit of that purpose, a party may be held in civil contempt for willfully failing to comply with a court order. *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (1st Dist. 2006). Civil contempt proceedings "are coercive, that is, the civil contempt procedure is designed to compel the contemnor to perform a specific act." *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 52. Once the party bringing the contempt petition establishes a *prima facie* case of disobedience of a court order, the burden shifts to the alleged contemnor to prove that the failure to comply was not willful or contumacious and that there exists a valid excuse for his failure. *See id.* ¶¶ 52-53.

When the alleged inability to comply with an order is due to financial circumstances, a defense to contempt exists "where the failure of a person to obey an order to pay is due to poverty, insolvency, or other misfortune, unless that inability to pay is the result of a wrongful or illegal act." *In re Marriage of Betts*, 155 Ill. App. 3d 85, 100, 107 (1st Dist. 1987). "To prove this defense, a defendant must show that he neither has money now with which he can pay, nor has disposed wrongfully of money or assets with which he might have paid." *Logston*, 103 Ill. 2d at 285.

**Financial inability to comply with an order must be shown by definite and explicit evidence**. *In re Marriage of Chenoweth*, 134 Ill. App. 3d 1015, 1018-19 (1st Dist. 1985).

It is not disputed Ivankovich has failed to comply numerous Court Orders, including the Judgment Order. His defense to any contempt appears to be an inability to pay the judgment. Ivankovich's own testimony falls short of establishing an inability to pay. Ivankovich's flippant testimony, in light of his personal financial statement and real estate holdings, fails to meet this burden. He has failed to competently show an inability to pay the judgment. Moreover, it is now clear that to the extent funds have left Ivankovich's control since judgment was entered (which the evidence disproves), this only occurred because Ivankovich deliberately moved funds around to render himself judgment proof. As such, given the history of this case and evidence of Ivankovich's assets, this Court should hold Ivankovich in civil contempt unless he pays the judgment within 30 days.

## CONCLUSION

WHEREFORE, Plaintiffs seek a turnover Order from this Court in an amount that will fully satisfy the judgment amount, interest and attorneys' fees and, if the judgment is not satisfied within thirty (30) days hold Ivankovich in contempt for his willful failure to satisfy the judgment. Dated: September 28, 2022.

Respectfully submitted,

/s/ Amir Tahmassebi
Amir Tahmassebi, Bar #6287787
Konicek & Dillon, P.C.
70 W. Madison, Suite 2060
Chicago, IL 60602
(312) 328-9166 (Direct)
(630) 262-9659 (Fax)
amir@konicekdillonlaw.com

Steven Lammers, Bar #6294413
Mandel Rauch & Lammers, P.C.
704 Adams Street, Suite F
Carmel, IN 46032
(317) 581-7440 (Direct)
(317) 848-6197 (Fax)
slammers@mhmrlaw.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing was filed with the Court on September 28, 2022 causing all counsel of record to be served via the Court's CM/ECF filing system.

/s/ Amir R. Tahmassebi
Amir R. Tahmassebi