IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ZHU ZHAI HOLDINGS LIMITED and PETER PUI TAK LEE, | ) | |
| | ) | |
| Plaintiffs/Judgment Creditors, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-4985 |
| | ) | |
| STEVEN IVANKOVICH, | ) | Honorable Susan E. Cox |
| | ) | |
| Defendant/Judgment Debtor. | ) | |

## PLAINTIFFS' MOTION TO COMPEL AND EXTEND THE HOLD ON THE WALKER & DUNLOP FUNDS

Plaintiffs/Judgment Creditors, ZHU ZHAI HOLDING LIMITED and PETER PUI TAK LEE, by their attorneys, KONICEK & DILLON, P.C., pursuant to Federal Rules of Civil Procedure 26 and 37 and Local Rule 37.2, hereby move this Court to compel Defendant/Judgment Debtor, STEVEN IVANKOVICH, to produce all documentation evidencing any and all transfers made by Judgment Debtor to or from entities he owned, operated, managed, maintained, controlled, had an interest in or was a signatory to from 2018 to present and to extend the hold on the Walker & Dunlop funds. In support thereof, Judgment Creditors state as follows:

### FACTS

**A.** **Judgment Creditors Obtain a Judgment Against Judgment Debtor and Judgment Debtor Produces Personal Financial Statement Evidencing Amount of Net Worth**

On August 17, 2021, Judgment Creditors obtained a judgment in the amount of $4,503,842.00 (the "Judgement") against Judgment Debtor. (Dkt. 92). Later, the Judgment Debtor provided Judgment Creditors with an August 26, 2020, sworn personal financial statement in response to a citation issued to Judgment Debtor. (Ex. 1, Judgment Debtor's Personal Financial

Statement).[1]  The sworn personal financial statement established that Judgment Debtor had a total net worth in excess of $55,000,000 at the time Judgment Debtor executed the personal financial statement.  *Id.*

**B.     Judgment Debtor Testifies That He Uses Personal Finances to Fulfill "Obligations" Owed by Entities He Owns, Operates, Manages, Maintains, Controls, Has an Interest In or Is a Signatory To**

On August 31, 2022, the Judgment Debtor was deposed.  (Ex. 2, Deposition of Judgment Debtor).  The Judgment Debtor testified that he used millions of dollars in "personal funds" to pay "obligations" owed by companies Judgment Debtor owned, operated, managed, maintained, controlled, had an interest in or was a signatory to.  That is, he repeatedly used personal funds to pay obligations owed by his network of companies:

> Q:     So you used personal funds to pay obligations of the companies?
>
> A:     Yes.
>
> Q:     Okay.  And that was through 2020 and 2021, correct?
>
> A:     It started in 2019 as well.
>
> Q:     Okay.  And then – and then what – who was the one that authorized payment of your personal funds to pay obligations of the companies, it had to be you, right?
>
> A:     Yes.
>
> Q:     And how did you transfer funds to these companies – well, which funds did you pay expenses for or obligations for, which corporations?
>
> A:     All of them.
>
> Q:     And how were those funds transferred?
>
> A:     It would have been any way transferring funds.  It would have been just bank transfers, wire transfers, check, you know, any means people use to pay bills.

*Id.* at 50:12 – 51:3.

---

[1] This exhibit is submitted *in camera* as it has been designated as confidential.

Indeed, Judgment Debtor moved over $11 million of his own liquid assets to pay bills

owed by entities he controlled or had an interest in:

Q:    And then if you go down to Schedule B, it talks about "Marketable Securities, Stocks, Bonds, U.S. Government" and the total market value you have is $11 million, do you see that?

A:    Yes.

Q:    This is again on your personal financial statement?

A:    Yes.

Q:    And today, Mr. Ivankovich, do you still have that $11 million in marketable securities, stocks, bonds, and U.S. government?

A:    No.

Q:    Okay. And are you telling me that between again 2020 and today August 2022, all of that money was transferred out?

A:    It was used to pay bills.

Q:    Okay. And what bills was it used to pay?

A:    Payroll for the companies, mortgage payments, reserve payments, just the expenses of the companies when everything shut down during COVID.

*Id.* at 51:17 – 52:9.

Judgment Debtor Ivankovich also asserted that his net worth went from $55,000,000 to

effectively zero in a short period of time because of COVID-19:

Q:    So in the year from August 2020 until the end of 2021, your net worth went from approximately 55,367,404 to pretty much zero; is that right?

A:    Correct.

Q:    And your explanation for that is because you made transfers in order to meet the obligations of companies in which you had an interest?

A:    My explanation of that is COVID.

*Id.* at 58:23 – 59:5.

However, Debtor Ivankovich admitted he has been involved in the movement of his personal funds among company accounts as recently as April of last year:

> Q: Since April 6th of 2022, has any money been transferred out of the P2 Portfolio Managing Member LLC or Ivankovich Family LLC accounts?
>
> A: I'm sure there was.
> …
>
> Q: Well, you were involved with them, right?
>
> A: Yeah.
>
> Q: And –
>
> A: I was involved in the organization.
>
> Q: And how much was transferred out?
>
> A: I don't know.
> …
>
> Q: Why was any money moved?
>
> A: Because these are companies that conduct business so to pay bills, to make investments.

*Id.* 71:25 – 72:13; 73:16-17.

**C.    Judgment Creditors Issue Rule 37 Letter to Judgment Debtor Seeking Production of Any and All Documents Evidencing Transfers Judgment Debtor Testified To During His August 31, 2022, Deposition**

On February 3, 2023, counsel for Judgment Creditors wrote counsel for Judgment Debtor a Rule 37 letter requesting the production of all documentation evidencing any and all transfers made by Judgment Debtor to entities he owned, operated, managed, maintained, controlled, had an interest in or was a signatory to from 2018 to present.  (Ex. 3, February 3, 2023, Letter).  The letter included the above testimony in support.  *Id.*

4

Roughly two weeks later, Gary Goldstein – a lawyer who has no formal appearance on file in this matter – called counsel for Judgment Creditor. (Ex. 4, March 1, 2023, Correspondence). Mr. Goldstein advised that the Judgment Creditor would be producing documents responsive to the Judgment Creditor's February 3, 2023, Rule 37 letter. *Id.* On March 1, 2023, counsel for Judgment Creditor followed up with Mr. Goldstein. *Id.* The latter advised the former that the production responses would be made available to Judgement Creditor by March 8, 2023. *Id.* Thereafter, Judgment Debtor produced documents, but they were not responsive to Judgment Creditors' requests.

**D. Judgment Debtor Produces Inadequate Production Responses**

The documents Judgment Debtor produced were not responsive because they were mere supplements of what Judgment Debtor had already produced in this action; namely, documents evidencing transactions for some, but not nearly all, of the entities Judgment Debtor has an interest in. Critically, the documents produced in early March did not show proof of the transactions Judgment Debtor testified to during his deposition wherein he said he used personal finances to fulfill "obligations" of entities he owned, operated, managed, maintained, controlled, had an interest in or was a signatory to.

On March 22, 2023, counsel for Judgment Creditor followed up with Mr. Goldstein as none of the production responses propounded upon the Judgment Creditor at that time evidenced the transactions that Judgment Debtor testified to during his deposition. (Ex. 5, March 22, 2023, and April 4, 2023, Correspondence). A week later, Mr. Goldstein finally responded. *Id.* In his response, Mr. Goldstein indicated that Judgment Debtor would have a further formal production response by April 4, 2023. *Id.* That date has come and gone and Judgment Debtor has still not

provided Judgment Creditor with financial documents responsive to Judgment Creditor's February 3, 2023, Rule 37 letter.

**E.      Judgment Debtor's Separated Wife Testifies That He Recently Bought a $3.5 Million Yacht, Has Control Over Countless Entities and Comingles Personal and Business Finances**

Importantly, on March 23, 2023, Judgment Debtor's separated wife, Ms. Jeanette Ivankovich, was deposed.    (Ex. 6, Deposition of Jeanette Ivankovich).    Ms. Ivankovich contradicted many of the Judgment Debtor's sworn statements.  She testified that, contrary to Judgment Debtor's assertions, COVID did *not* affect their extravagant lifestyle whatsoever. Instead, if anything, Ms. Ivankovich testified there was an uptick in their lifestyle.  *Id.* at 10:14-16; 11:3.  For example, Judgment Debtor purchased a *$3.5 million yacht* on September 30, 2021 (approximately one month after judgment was entered in this action):

> Q:      Okay.  So you say here, While I am unclear of Steven's income from all sources, on or about September 30, 2021, Steven purchased a five-bedroom, 150-foot yacht for $3.5 million.  Do you see that?
>
> A:      Yes.
>
> Q:      And as far as you know, that did occur by Mr. Ivankovich?
>
> A:      Yes.
>
> Q:      And you, in fact – at that time were you guys still together, or was that –
>
> A:      Yes.

*Id.* at 24:11-22.

According to Ms. Ivankovich, "Steven had – he has involvement in everything Atlas." *Id.* at 42:11-12.  Ms. Ivankovich made clear that Judgment Debtor is involved in a plethora of Atlas entities:

> Q:      Okay.  And what are the names of those LLCs that are under the umbrella of Atlas Alliance?

…

> A:    Atlas Homes, Atlas Management, Atlas, LLC, Atlas P2, P3, P4, Atlas Caribbean, Atlas – I mean, they're all, right?

*Id.* at 59:9-16.

Ms. Ivankovich further testified that Judgment Debtor controlled the transfer of funds from a number, if not all, of the entities he has an interest in. *Id.* at 66:5-9; 84:3-7. Judgment Debtor's own testimony during a trial of an action pending in New York State against one of his entities confirmed that he can move monies to and from the entities he owns, operates, manages, maintains, controls, has an interest in or is a signatory to:

> Q:    How is it that your counsel could represent to this Court yesterday that that entity has no assets?
>
> A:    The specific entity doesn't, but the chain of ownership, as I said, has plenty of assets. **We could populate that entity with the signing of a pen and a phone call in a matter of minutes.**
>
> Q:    Is it your testimony, sir, in this Court under oath that you have the authority to move money as you see fit to that entity or away from that entity?
>
> A:    I don't have the authority, **but I have the ability**.

Ex. 7, Excerpt of January 13, 2020, Trial Transcript at 304:8-17. (Emphasis added).

Additionally, the Judgment Debtor has an interest in the Ivankovich Family LLC. Ex. 6 at 42:13-24. Remarkably, Judgment Debtor and Ms. Ivankovich never had a personal bank account during their marriage. Instead, the couple's personal finances were always comingled with the businesses Judgment Debtor owned, operated, managed, maintained, controlled, had an interest in or was a signatory to:

> Q:    On that, I guess, as far as when you were married, before the divorce was filed, did the – did you guys have a personal bank account?
>
> A:    No.

Q:     Okay.  Were all your accounts through –

A:     Business.

Q:     Businesses?

A:     Yes.

*Id.* at 31:22 – 32:5.

Further, according to Ms. Ivankovich, Judgment Debtor's business expenses are comingled with his personal expenses:

Q:     I think you said earlier that as far as you understood there was always somewhat of a blur between Mr. Ivankovich's personal finances and what he would take from the businesses.

A:     Correct.
…

Q:     But as far as you understood that the – a lot of Mr. Ivankovich's – Steven Ivankovich's business expenses were intermingled with some of the personal expenses?

A:     Yes.

*Id.* at 33:9-13; 34:14-18.

That Judgment Debtor comingles his personal finances and business expenses is further confirmed by the fact that Judgment Debtor uses his entities to execute long-term apartment leases. For example, on May 16, 2019, Judgment Debtor executed a 24-month lease with monthly rent costing almost $9,000 a month wherein the tenant was Atlas Holdings Investment LLC.  (Ex. 8, May 2019 Atlas Lease).  The lease identifies Judgment Debtor as the Manager of Atlas Holdings Investment LLC.  *Id.*  Later, on December 21, 2021, Judgment Debtor renewed a lease with a landlord wherein the tenant he acted on behalf of was Atlas Apartment Acquisition, LLC.  (Ex. 9, December 2021 Atlas Lease).  The monthly rent for said lease was $9,000 per month.  *Id.*

To date, none of the documents produced by Judgment Debtor show proof of transfers testified to by Judgment Debtor or Ms. Ivankovich. Moreover, the documents produced to date do not suggest that monies were transferred to offshore bank accounts from entities Judgment Debtor owns, operates, manages, maintains, controls, has an interest in or is a signatory to. However, it is uncontroverted that Judgment Debtor has such offshore bank accounts. Ms. Ivankovich testified that Judgment Debtor has multiple offshore bank accounts:

> Q:  Are there any other entities that we haven't talked about so far, Ms. Ivankovich, that your husband mentioned he had some ownership interest in or control over?
>
> A:  I did see approximately seven overseas accounts that Steven had bank numbers to on his desk. They were under the heading Overseas Accounts. They had the bank account numbers. But at this point – I took a picture of them because we were not doing well, and he had already filed for divorce a few times. And I sent it somewhere. I don't recall where I sent it just yet. But there are overseas accounts that he must have access to or otherwise he would not have had those numbers.

Ex. 6 at 43:23 – 44:13.

## ARGUMENT

**I.    The Judgment Creditor Should Be Required to Produce Documentation of the Testified to Transactions**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim … and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "The scope of post-judgment discovery is broad and permits the judgment creditor to obtain information about the debtor's current and past financial assets which could reasonably lead to the discovery of concealed or fraudulently transferred assets." *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Neurobehavioral Assocs.*, 1997 WL 757879, at *2 (N.D. Ill. Dec. 2, 1997) (citations omitted). The Federal Rules of Civil Procedure governing post-judgment discovery are "quire permissive," generally allowing a judgment creditor to obtain discovery from any person, including the judgment debtor, as provided in the federal rules or by the procedure of the state in

which the court is located.  *Leibovitch v. Islamic Republic of Iran*, 297 F. Supp. 3d 816, 825 (N.D. Ill. February 27, 2018) (citing Fed. R. Civ. P. 69(a)(2)).

§ 2-1402 of the Illinois Code of Civil Procedure provides a court with broad powers, including the power to "compel any person cited … to deliver up any assets so discovered, to be applied in satisfaction of the judgment, in whole or in part, when those assets are held under such circumstances that in an action by the judgement debtor the debtor could recover them."  735 ILCS 5/2-1402(c)(3).  What must be alleged to pierce the corporate veil does not fall within the scope of what may be heard in a supplementary proceeding.  *Star Ins. Co. v. Risk Mktg. Group, Inc.*, 561 F .3d 656, 660 (7th Cir. 2009).  The only relevant inquiries in supplementary proceedings are (1) whether the judgement debtor is in possession of assets that should be applied to satisfy the judgment or (2) whether a third party is holding assets of the judgement debtor that should be applied to satisfy the judgement.  *Id.* at 660-61.

Here, the Judgment Debtor's testimony highlighted above establishes that he used his many millions of dollars of personal liquid assets to pay "obligations" of companies he owned, operated, managed, maintained, controlled, had an interest in or was a signatory to.  However, the fact remains that Judgment Debtor was unable (or unwilling) to recall with specificity which entities' obligations were paid with his personal assets and when.  Additionally, it is irrefutable that Judgment Debtor comingles his personal and business finances to fund his extravagant lifestyle and to pay for high-end rental units.  Given this, there must be financial documents evincing proof of as much.  However, to date, Judgment Debtor's counsel has failed to produce documents responsive to the Judgment Creditors' February 3, 2023, letter requesting the production of said transactions.

The documentation of said transactions is highly relevant to the Judgment Creditors' claim against the Judgment Debtor. The transactional documents will allow the Judgment Creditors to establish that Judgment Creditor was both in control of the companies that he used his personal assets to pay obligations for and or that Judgement Creditor simply used said companies to hold his own personal assets in an effort to avoid paying the instant judgment. Therefore, this Court should compel Judgment Debtor to produce said transactions as they are relevant pursuant to Rule 26 and this proceeding more generally.

Finally, Plaintiffs ask that this Court extend the hold on the frozen Walker & Dunlop funds due to Plaintiffs' difficulty in obtaining the aforementioned transactional documents. In short, Plaintiff has shown there is good cause for this Court to require Walker & Dunlop to hold the funds for an extended period of time. See Ill. S. Ct. R. 277(f) (permitting the Court to "grant extensions … as justice may require.").

WHEREFORE, Plaintiffs/Judgment Creditors, ZHU ZHAI HOLDING LIMITED and PETER PUI TAK LEE, respectfully request this Court enter an order extending the hold on the Walker & Dunlop funds and requiring Judgment Debtor to produce the following:

1. Documentation evidencing any and all transactions made by Judgment Debtor to or from entities he owned, operated, managed, maintained, controlled, had an interest in or was a signatory of from 2018 to the present;

2. Documentation evidencing any and all transactions made by Judgment Debtor to or from the following entities from 2018 to the present:[2]

- Overlook Managing Member LLC
- PILGRIM Windtree LLC

---

[2] Attached hereto is Plaintiffs' Exhibit 10. Of import, said exhibit is from the website https://opencorporates.com. A search of "Steven Ivankovich" on the website indicates that Judgment Debtor is or was an officer of at least 115 different entities. It is immaterial that many of the entities are inactive as the inactive entities might still conduct transactions or maintain bank accounts.

- PILGRIM Coulter LLC
- PILGRIM Warrick LLC
- PILGRIM Caribbean Isle LLC
- PILGRIM Forest Park LLC
- Alliance HTTX GP, LLC
- Alliance HTFL GP, LLC
- Alliance HTTX Limited Partnership
- Alliance HTFL Limited Partnership
- Atlas Apartment Acquisitions LLC
- Atlas Apartment Homes LLC
- 2519 Halsted Properties LLC
- Tyler Atlas, LLC
- Alliance SH 2GP, Inc.
- IMG Marine LLC
- J&S Family LLC
- Atlas Residential Solutions Management UK Limited
- Atlas Residential LLC
- Alliance Residential Management LLC
- April 2022 Sale of PILGRIM Caribbean Isle LLC, PILGRIM Forest Park LLC and Cypress Lakes
- Glencoe Family LLC
- A&O Family LLC
- Consilient Holdings Investments LLC
- Atlas P2 Managing Member LLC
- Atlas Holdings Investments LLC

3.      Documentation evidencing any and all transactions made by Judgment Debtor to or from JP Morgan Chase & Co. from 2018 to the present.

Dated: April 24, 2023

Respectfully submitted,

/s/ Amir Tahmassebi
Amir Tahmassebi, Bar #6287787
Konicek & Dillon, P.C.
70 W. Madison, Suite 2060
Chicago, IL 60602
(312) 328-9166 (Direct)
(630) 262-9659 (Fax)
amir@konicekdillonlaw.com

Steven Lammers, Bar #6294413
Mandel Rauch & Lammers, P.C.
704 Adams Street, Suite F
Carmel, IN 46032

12

(317) 581-7440 (Direct)
(317) 848-6197 (Fax)
slammers@mhmrlaw.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing was filed with the Court on April 24, 2023, causing all counsel of record to be served via the Court's CM/ECF filing system.

<p style="text-align: right;">/s/ Amir R. Tahmassebi<br>Amir R. Tahmassebi</p>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ZHU ZHAI HOLDINGS, LIMITED, and    ) No. 20 C 4985
PETER PUI TAK LEE,                 )
                                   )
                    Plaintiffs,    )
                                   )
          v.                       )
                                   )
STEVEN IVANKOVICH,                 ) August 31, 2022
                                   ) Chicago, Illinois
                                   ) 9:17 a.m.
                    Defendant.     ) Citation Hearing


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

APPEARANCES:

For the Plaintiffs:    KONICK & DILLON, P.C.
                       21 West State Street
                       Suite 3000
                       Geneva, Illinois  60134
                       BY:  MR. AMIR R. TAHMASSEBI

                       MANDEL HORN & RAUCH, P.C.
                       704 Adams Street
                       Suite F
                       Carmel, Indiana  46032
                       BY:  MR. STEVEN P. LAMMERS

For the Defendant:     MR. JASON M. WANDNER, P.A.
                       100 Biscayne Boulevard
                       Suite 1607
                       Miami, Florida  33132


TRACEY DANA McCULLOUGH, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 1232
Chicago, Illinois  60604
(312) 435-5570

EXHIBIT
2

1   APPEARANCES CONTINUED:

2   For Third Party LLCs:      CHUHAK & TECSON, P.C.
                               120 North LaSalle Street
3                              Suite 2000
                               Chicago, Illinois  60602
4                              BY:  MR. MICHAEL WILLIAM DEBRE, III
                                    MR. CECILIO IVAN PORRAS
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  20 CV 4985, Zhu Zhai Holdings Limited

2    versus Ivankovich.

3          THE COURT:  All right.  Plaintiff, go ahead.

4          MR. TAHMASSEBI:  Good morning, Your Honor.  Amir

5    Tahmassebi on behalf of the plaintiff.

6          MR. LAMMERS:  Good morning, Your Honor.  Steve

7    Lammers on behalf of the plaintiffs.

8          THE COURT:  All right.  Thank you.  Defense.

9          MR. WANDNER:  Good morning, Judge.  Good to see you

10   again.  Jason Wandner on behalf of Mr. Ivankovich.

11         THE COURT:  Hello.

12         MR. DEBRE:  Good morning, Your Honor.  Michael Debre

13   on behalf of the third party LLCs.

14         THE COURT:  All right.  Thank you.

15         MR. PORRAS:  Good morning, Your Honor.  Cy Porras on

16   behalf of the third party LLCs as well.

17         THE COURT:  All right.  Thank you.  And again, we do

18   have Mr. Ivankovich here.  That's the first step I guess,

19   correct, Counsel?

20         MR. TAHMASSEBI:  I agree, Judge.

21         THE COURT:  All right.  And have you all made your

22   arrangements to, to do what you need to do?

23         MR. TAHMASSEBI:  We're prepared to go forward with

24   the examination of Mr. Ivankovich.

25         THE COURT:  All right.  Mr. Ivankovich -- do we know

```
1   approximately how long it's going to take?  Because I may have
2   to take some breaks depending on what's going on.
3             MR. TAHMASSEBI:  I don't anticipate it going any more
4   than two hours, Your Honor.  And it could be --
5             THE COURT:  Well, we will not -- we're going to have
6   to take breaks.
7             MR. TAHMASSEBI:  Okay.
8             THE COURT:  Because I have other cases, and I'm the
9   emergency judge.
10            MR. TAHMASSEBI:  Okay.
11            THE COURT:  So we actually pushed -- and that's for
12  my whole -- for the next couple weeks, so okay.  All right.
13  Step over here, sir, Mr. Ivankovich.
14            MR. TAHMASSEBI:  Yes, Judge, I have an exhibit binder
15  for you as well.
16            THE COURT:  All right.
17            MR. TAHMASSEBI:  I'm going to try to do it
18  electronically too.
19            THE COURT:  Come on over here, sir.  Go all the way
20  at the end.
21   STEVEN IVANKOVICH, PLAINTIFFS' WITNESS, DULY SWORN
22            THE COURT:  All right.  You can step on up, sir.
23            MR. PORRAS:  And, Your Honor -- excuse me.  Cy Porras
24  here on behalf of the third party LLCs.
25            THE COURT:  Yes.
```

Ivankovich - direct by Tahmassebi

1    MR. PORRAS:  Just as a general housekeeping matter,
2   there are three pending motions before the Court.  So we know
3   kind of what to expect, does the Court anticipate hearing those
4   today?  We think that they're ripe for hearing.  They're fully
5   briefed, and we're prepared to move forward.
6    THE COURT:  If they're fully briefed, which I believe
7   they are, the Court will decide whether or not I need any
8   argument further today.  Other than that, though, the Court
9   will issue rulings on everything that I need to do.  Okay?
10    MR. PORRAS:  Thank you.
11    THE COURT:  All right.  Anytime you're ready, sir.
12    MR. TAHMASSEBI:  Bear with me one second.  I want to
13   pull this up.
14                        DIRECT EXAMINATION
15   BY MR. TAHMASSEBI:
16   Q    Can you go ahead and state your name, please, sir.
17   A    Steven Ivankovich.
18   Q    And where do you currently reside, Mr. Ivankovich?
19   A    In Florida.
20   Q    And what's your address in Florida?
21   A    791 Crandon Boulevard.
22   Q    Is that a home or an apartment, a condo?
23   A    It's a condo.
24   Q    And do you own that condo?
25   A    No.

Ivankovich - direct by Tahmassebi

1  Q    Is it a lease on your part?  Do you lease it?

2  A    No.

3           THE COURT:  Can we have a city.

4           THE WITNESS:  Key Biscayne.

5           THE COURT:  Thank you.  Go ahead.

6           MR. TAHMASSEBI:  Thank you.

7  BY MR. TAHMASSEBI:

8  Q    Do you pay any rent to stay in that condo?

9  A    No.

10 Q    Who is it owned by?

11 A    I believe it's owned by my parents.

12 Q    And do you reside there alone, with family?

13 A    Sometimes alone.  Sometimes with family.

14 Q    And when you say sometimes with family, is that your wife

15 or children or your parents?

16 A    Everybody.

17 Q    And I don't want to get into your personal life, Mr.

18 Ivankovich, but it could be somewhat relevant --

19          THE COURT:  Oh, yes, we do.  Right.  I mean, what are

20 we doing here?

21          MR. TAHMASSEBI:  That's what we're here for.

22          THE COURT:  All right.

23          MR. TAHMASSEBI:  You'll see what I mean, Judge, when

24 I ask the next question.

25          THE COURT:  I understand, but I'm just saying.  Okay.

Ivankovich - direct by Tahmassebi

1  Go ahead.

2  BY MR. TAHMASSEBI:

3  Q    You -- I had heard from this being continued before that

4  you were going through a divorce.  Is that still pending?

5  A    Yes.

6  Q    Is it finalized, or are you still currently married to

7  your wife?

8  A    I'm still currently married.

9  Q    I kind of want to jump right into it, Mr. Ivankovich.  I'm

10  going to show you -- and there's a binder up there that has the

11  exhibits in it, and I'm also going to pull them up on the

12  screen, but I want to start with -- Judge, and if it's okay to

13  publish this.  There's no jury here, so I'd assume it's okay,

14  yes.

15            THE COURT:  Okay.

16  BY MR. TAHMASSEBI:

17  Q    I'm going to start with what's marked as Exhibit 3.  This

18  is a document that was produced in the course of discovery in

19  this action prior to the judgment.  And if you look, Mr.

20  Ivankovich, it's titled Personal Financial Statement, Steven

21  Ivankovich, August 2020.  Do you see that?

22  A    Yes.

23  Q    And then about two/thirds down there is a signature?

24  A    Yes.

25  Q    Is that your signature?

Ivankovich - direct by Tahmassebi

1   A    It appears to be, yes.

2   Q    And then the date of that is August 26th of 2020.  Do you

3   see that?

4   A    I do see the date, yeah.

5   Q    All right.  And then below it --

6        MR. TAHMASSEBI:  And, Judge, just for the record,

7   this is the complaint in this case.  And I'd ask the Court to

8   take judicial notice it was filed on August 24th of 2020.  It's

9   docket entry No. 1.

10       THE COURT:  All right.  The Court will take judicial

11  notice of the record.

12  BY MR. TAHMASSEBI:

13  Q    And then below your name, you say, "I, Steven Ivankovich,

14  certify that this financial statement dated March 9th," 2000 it

15  says 2, but I believe that's an error, it should be '22, "is

16  true, accurate, and fairly represents my financial condition."

17       Do you see that, sir?

18  A    I do see this, yes.

19  Q    And feel free to look through the document, if need be.

20  But you reviewed this financial -- this personal financial

21  statement before signing it?

22  A    I don't -- where does this come from?

23  Q    This is a document that was produced by your lawyers in

24  this litigation, and I can show you if you look there's a Bates

25  stamp number Ivankovich 248.

Ivankovich - direct by Tahmassebi

1   A    Okay.

2   Q    So you would have reviewed this personal financial

3   statement before you signed off on it for accuracy, right?

4   A    Yes, but this doesn't look correct, I mean, in the sense

5   that the bottom part --

6            THE COURT:  Hold on one second.

7        (Brief pause.)

8            THE WITNESS:  I wouldn't have signed a document -- I

9   mean, it looks, it looks like --

10           THE COURT:  Okay.  Hold on one second, sir.  Ask a

11  question, and then, sir, you have to answer his question.  You

12  can't have sort of a conversation.  Either you can say I don't

13  know what this is, but you can't just freestyle.  Okay.

14           THE WITNESS:  I don't believe this document is

15  something I would have reviewed or is accurate.

16           THE COURT:  All right.

17  BY MR. TAHMASSEBI:

18  Q    Is that your signature, Mr. Ivankovich, on the first page?

19  A    Yes, it appears to be a cut and paste of an electronic

20  signature.

21  Q    All right.  And then let's just -- let's look at this

22  personal financial statement from August 26th.

23           THE COURT:  Excuse me one second.

24           MR. TAHMASSEBI:  Sure, Judge.

25           THE COURT:  Once again, sir, he asked you if that was

Ivankovich - direct by Tahmassebi

1  your signature.  Do not give an explanation about it appears to

2  be a cut and paste.  It's either a signature or it isn't, and

3  then your lawyers can come back and clean it up, and then you

4  can get into a cut and paste, but you are not an expert.

5          THE WITNESS:  It appears to be a, a representation of

6  my signature, yes.

7          THE COURT:  All right.  Thank you.  I'll accept that

8  answer.

9          MR. TAHMASSEBI:  Thank you, Judge.

10 BY MR. TAHMASSEBI:

11 Q    And I want to just look at this personal financial

12 statement that bears your signature.  And I want to start

13 with -- I'm sorry.  Let me go back.  With the very beginning --

14 with the very top.  Okay.  There's a, there's a home address

15 listed at 791 Crandon Boulevard, Key Biscayne, Florida.  Do you

16 see that?

17 A    Correct.

18 Q    And is that where you resided in August of 2020?

19 A    Yes.

20 Q    And then it lists as -- if we go to the second column, it

21 has your birth date of February 14th, 1970.  Is that accurate?

22 A    Yes.

23 Q    And your home phone as (***)***-** -- ****, excuse me.  Is

24 that accurate?

25 A    Yes.

Ivankovich - direct by Tahmassebi

1  Q    All right.  And then it talks --

2          THE COURT:  Excuse me one second.

3          MR. TAHMASSEBI:  Sure, Judge.

4          THE COURT:  The court reporter will strike the phone

5  number.  Giving the actual numbers is not necessary and does

6  not need to be on the record.  It's stricken.

7          MR. TAHMASSEBI:  I apologize, Judge.  That's true.

8          THE COURT:  All right.  Go ahead.

9  BY MR. TAHMASSEBI:

10 Q    And then it talks about your annual gross salary as of

11 August of 2020 at 250,000.  Is that accurate?

12 A    I, I don't recall.

13 Q    And it says date of will and/or trust.  The answer is

14 various.  Do you have various, or did you in August of 2020

15 have various wills and trusts?

16 A    I don't recall if in 2020 I did.  But I did at some point

17 have various trusts, yes.

18 Q    Okay.  Thank you.  And was the name of the executor and/or

19 trustee Anthony Ivankovich?

20 A    On one of them, yes.

21 Q    And is that your brother, sir?

22 A    That's my father.

23 Q    Your father.  Okay.  I want to look at page 2.  The first

24 part I want to draw your attention to is the income statement

25 for the year ending 2019.

Ivankovich - direct by Tahmassebi

1    Let me ask you this: Let me back up. Did you have
2    any accountants that did work for you in the year 2019?
3  A    For me personally?
4  Q    Yes.
5  A    Yes.
6  Q    Okay. And you actually in the year 2019 had a number of
7    financial statements put together for certain investments,
8    isn't that correct?
9  A    I don't recall.
10 Q    Do you recall signing guarantees where you represented
11   that you would be presenting personal financial statements?
12 A    No.
13        MR. TAHMASSEBI: Judge, I'm going to tender another
14   exhibit. For the record, Your Honor, I'm tendering to the
15   witness and the Court and opposing counsel what's called a
16   Limited Guaranty dated January 26th, 2019. I've marked it as
17   Exhibit 15 for identification.
18        THE COURT: Are these the same two you've given to
19   me?
20        MR. TAHMASSEBI: Oh, I'm sorry. One was for the
21   witness, Judge. I apologize.
22        THE COURT: All right. I was wondering. Thank you.
23   I gave the witness the unhighlighted one.
24        MR. TAHMASSEBI: Oh.
25        THE COURT: Or do you want him to have the

Ivankovich - direct by Tahmassebi

1  highlighted one?

2          MR. TAHMASSEBI:  No.  The unhighlighted one is fine,

3  Your Honor.  Thank you.

4  BY MR. TAHMASSEBI:

5  Q    If you go to the last page of Exhibit 15, the guaranty.

6  A    Can I please have a moment to read this.

7          THE COURT:  He's just directing you to where you need

8  to go.  And then, yes, you can read it as he asks you to read

9  it.  All right.

10 BY MR. TAHMASSEBI:

11 Q    So it's the second to last page.

12         THE COURT:  He wants to take you to the exact place

13 he's asking a question about.  Go ahead, Counsel.

14 BY MR. TAHMASSEBI:

15 Q    Okay.  Thank you.  Is your signature on the second to last

16 page?

17 A    It appears to be, yes.

18 Q    And then did you sign this document on or around

19 January 26th of 2019?

20 A    I don't recall.

21 Q    And then if you go, sir, to page 4 of Exhibit 15.

22         THE COURT:  Counsel, before you want to go to the

23 next question --

24         MR. TAHMASSEBI:  Yes.

25         THE COURT:  -- you asked -- gave him a specific date.

14

Ivankovich - direct by Tahmassebi

1  Do you want -- if he doesn't recall, do you want to refer to
2  somewhere else in the document that might have the date as
3  opposed to letting it hang there?  How about the first page?
4           MR. TAHMASSEBI:  Thank you, Judge.
5  BY MR. TAHMASSEBI:
6  Q    The first page it says Limited Guaranty.  And it says,
7  this Limited Guaranty is made as of 26th day of January 2019 by
8  Steven Ivankovich, an individual.  And it goes on to discuss
9  the creditor Mr. Pete -- Lee, Peter Pui Tak.
10          Does that refresh your recollection, sir, of the time
11 when you signed this document?
12 A    No.
13 Q    And then if you look at page 4, paragraph 9.  Let me back
14 up.  I apologize.  Let me back up.  Back to page 1.
15          Did you make a guaranty as it references in paragraph
16 1 under guaranty of a million dollar loan that was received by
17 an entity that you had an interest in on or around January 26th
18 of 2019?
19 A    I did, but I never received the million dollars.
20 Q    And then if you go to paragraph 9.  So I'm clear, it's
21 your sworn statement that neither you or any of your entities
22 ever received the million dollar loan?
23 A    I've never received a million dollars from Mr. Lee.
24 Q    Paragraph 9 is titled Guarantor's Warranties and
25 Representations.  Guarantor hereby warrants and represents unto

Ivankovich - direct by Tahmassebi

1    creditor that all financial statements, balance sheets, net

2    worth statements, and other financial data, however designated,

3    which have there -- heretofore been furnished to creditor with

4    respect to any guarantor by or any -- by or on behalf of any

5    guarantor and accurately -- fairly and accurately present the

6    financial condition of such guarantor.

7            Do you see that?

8    A    Yes.

9    Q    Did you as required by this guaranty signed by you provide

10   accurate financial statements, balance sheets, and net worth to

11   Mr. Lee?

12   A    No, I don't recall ever supplying financial statements to

13   Mr. Lee.

14   Q    Okay.  If we can go back to Exhibit 3.  And I want to draw

15   your attention to page 3 of the personal financial statement.

16   And if we look at specifically the balance sheet, and we can

17   look at the schedules too, but I don't know if that's going to

18   be necessary, I want to look at the assets in dollars, omit

19   cents that are referenced here.

20           It says cash and short term investment Schedule A,

21   $1,103,196.  Do you see that?

22   A    I do.

23   Q    And then marketable stocks and bonds including government

24   securities, and it's listed at 11 million that you had on your

25   personal financial statement in August of 2020, correct?

Ivankovich - direct by Tahmassebi

1   A    Yes, that's what it says on this document.

2   Q    And then the total liquid and marketable assets on your

3   signed personal financial statement is $12,103,196, correct?

4   A    Correct.

5   Q    And then if we look at the completion of the balance

6   sheet, on the right-hand column there's liabilities listed, and

7   then under the signed personal financial statement your net

8   worth as of August 26th, 2020, was $55,367,404; correct?

9   A    I don't believe that's correct.

10  Q    Why do you believe this document is incorrect, Mr.

11  Ivankovich?

12  A    Well, in looking at it, and I'd have to study it more

13  closely, I believe this is a document from March 1, 2020.  If

14  you go to the first page where my signature is, it -- where it

15  says 202, it look likes -- it looks like that was either

16  entered after the fact or some previous document that the 2020

17  got erased.  And if you scroll down to the page you

18  highlighted, in the marginalia it says that there is zero

19  balance on the credit cards as of March 1st, 2020.

20         So it appears this isn't my statement from August,

21  but some altered version of my statement from March 1st, 2020.

22  Q    Well, if you go to page --

23  A    And it doesn't -- and it also doesn't jive with the second

24  page where it says year ending for 2019.  It looks like that

25  page was slip sheeted into some -- again, some previous version

Ivankovich - direct by Tahmassebi

1   of my financial statement, so I, I can't say.  This doesn't
2   look at all like an August 2020 document, but some doctored
3   version of a March 2020 statement.  Yeah, if you scroll down
4   right there.
5   Q    So I don't want to split hairs with you.  I do want to
6   point out, though, if you look at page 2 of the document --
7           THE COURT:  When you say the document, let's be
8   specific on which one.
9           MR. TAHMASSEBI:  Thank you, Judge.
10  BY MR. TAHMASSEBI:
11  Q    Page 2 of Exhibit 3, the personal financial statement.
12  About three quarters of the way down there's an asterisk.
13  There's two at -- there's one at the beginning, there's a
14  second one, and then there's a third one.  And I can highlight
15  it for you.
16  A    Correct.
17  Q    And the third one states about midway through, Neither the
18  vehicle, TRG International period.  And then it says there is a
19  zero balance on the credit cards as of August 1st, 2020.
20  A    No.  What you have in front of me says there's a zero
21  balance on the credit cards as of March 1, 2020.  Yep.
22  Again --
23  Q    I've highlighted it for you.
24          THE COURT:  Sir, there's not a question.  Wait.
25          THE WITNESS:  I see, I see that --

Ivankovich - direct by Tahmassebi

1    THE COURT:  Sir.

2    THE WITNESS:  I see that on this page, yes.

3    THE COURT:  There's not a question right now.

4    THE WITNESS:  Okay.

5    THE COURT:  Go ahead.

6  BY MR. TAHMASSEBI:

7  Q    So at least there is reference to the August time period

8  in more than one place in this personal financial statement, we

9  agree now?

10  A    There is a reference on page 1 for August 26th, 2020.  And

11  the reference you're showing me is August 1, 2020.

12  Q    Two references to an August 2020 date?

13  A    Yes.

14  Q    All right.  Now, so to go back to what you were saying,

15  Mr. Ivankovich, you believe this is actually a personal

16  financial statement of March 2020.  Is that your testimony?

17  A    It, it -- it could be.

18  Q    And as of March 2020 then, let's go back to my prior

19  question, if we look at your balance sheet, you believe this is

20  from March 2020.  Then as of March 2020 your net worth is

21  listed at $56,387,404, right?

22  A    It could have been, yes.

23  Q    Well, I would expect you had some idea of what your net

24  worth was in 2020 -- in 2019, 2020 when you're entering into

25  the P5 Portfolio real estate deal, right?

19

Ivankovich - direct by Tahmassebi

1    A    It could have been in that range.  I'd need to have my

2    exact financial statement in front of me to give you a correct

3    answer.

4    Q    Well, we are looking at a signed document from you that

5    says personal financial statement.  And it indicates a $56

6    million net worth.

7    A    Yeah, I'm not sure this signed document is something I

8    would have signed given the discrepancies in it.

9    Q    Are you familiar with a company called Walker Dunlop?

10   A    I am.

11   Q    And, in fact, you received a rather sizable loan from

12   Walker Dunlop in 2019?

13   A    No, that's not accurate.  The loan was made by a company

14   called Varadero I believe.

15   Q    Affiliated with Walker Dunlop, right?  Walker Dunlop was

16   the broker for the loan?

17   A    I don't know the relationship.

18   Q    All right.  Let's take a look at Exhibit No. 6.  Exhibit 6

19   is a document titled Asset Summary, and it talks about Atlas P5

20   Portfolio.

21   A    That's correct.

22   Q    And you're an owner in Atlas P5 and the companies that are

23   involved in Atlas P5 Portfolio?

24   A    Indirectly, yes, through a series of companies.

25   Q    And Atlas -- just tell the Court what Atlas P5 Portfolio

Ivankovich - direct by Tahmassebi

1  is.

2  A    It's a group of five apartment buildings -- a portfolio of

3  five residential apartment buildings.

4  Q    And have you seen this document before that's marked as

5  Exhibit No. 6?

6  A    No.

7  Q    Did you assist in providing information to Walker Dunlop

8  in order to create Exhibit No. 6?

9  A    I don't know.  I've never seen this document.  I don't

10 know what information I would have provided.

11 Q    Well, did you provide Walker Dunlop with information about

12 your net worth?

13 A    Yeah, at some point I probably did.

14 Q    Okay.  And when you provided Atlas information about your

15 net worth, were you accurate in the information that you

16 provided?

17 A    I'd have to see what information you're referring to, but

18 I've never, I've never provided inaccurate information to a

19 lender.

20 Q    That's what I mean.  You either did provide it accurately

21 or didn't.  You don't need to see it if you --

22 A    I, I provide accurate information.

23 Q    Okay.  You provide entities like Walker Dunlop who are

24 going to assist you in a real estate deal accurate financial

25 information, right?

Ivankovich - direct by Tahmassebi

1   A    Yes.

2   Q    And you do the same for all of your lenders, Mr.

3   Ivankovich, correct?  You like to provide accurate financial

4   information, right?

5   A    Correct.

6   Q    And when you sign a personal financial statement, whether

7   it's in March of 2020 or August of 2020, you would want to make

8   sure that personal financial statement is accurate before you

9   signed off on it, right?

10  A    When I do sign a document, yes.

11  Q    If we can turn to page 12 of Exhibit 6.  And if we look

12  midway down on page 12, there's a bold thing that says

13  guarantor.  I've got it pulled up for you here.  And the name

14  is Steven Ivankovich.  That's you, right?  You were the

15  guarantor of a loan?

16  A    Correct.

17  Q    And that was related to the P5 Portfolio?

18  A    Yes.

19  Q    The same one that the plaintiffs in the case also loaned

20  you money for, correct?

21  A    I don't believe they loaned me money for this portfolio.

22  Q    Okay.  Just so I understand, it's your sworn testimony --

23  you understand who the plaintiffs are in this case, right, the

24  Zhu Zhai Holding Company and Peter Lee?

25  A    Yes.

Ivankovich - direct by Tahmassebi

1  Q    It's your sworn testimony you never received funds from
2  them or any of the entities they are involved in relating to
3  the P5 Portfolio, is that correct?
4  A    No, it wasn't solely related to the P5 Portfolio.
5  Q    Okay.  So let's, let's -- let's be clear then.  You did
6  receive some funds?
7  A    I received some funds, correct.
8  Q    For the P5 Portfolio?
9  A    Not specifically for the P5 Portfolio, no.
10 Q    What were the funds for, Mr. Ivankovich, so we're not
11 going back and forth?
12 A    The funds were part of a public offering to, to underwrite
13 a public offering of parts of the Atlas business for a listing
14 on the Hong Kong Stock Exchange.
15 Q    And some of those funds related to the P5 Portfolio, but
16 not all, that's what you're telling me?
17 A    I don't think any of the funds related to the P5
18 Portfolio.  It was purely for a listing on the Hong Kong Stock
19 Exchange.
20 Q    Did you ever use those funds for that?
21 A    Yes.
22 Q    Now, look, Mr. Ivankovich, at the -- back to Exhibit No.
23 6, page 12.  If you look at what I highlighted, Walker Dunlop
24 says net worth $42.7 million, cash slash cash equivalency,
25 $12.1 million.  Do you see that?

Ivankovich - direct by Tahmassebi

1  A    Yes.

2  Q    Is that information about your net worth and about your

3  cash, cash equivalents that you would have provided to Walker

4  Dunlop?

5  A    As of January 2019 I don't know specifically.  It could be

6  in the range.  I would need to go back and look at a financial

7  statement from that time period.

8  Q    Okay.  Well, you don't have any reason to believe that

9  anybody from Walker Dunlop would misrepresent what you told

10 them about your net worth or 12.1 million in cash that you had,

11 do you?

12 A    I don't.

13 Q    And then -- and I'll move on from this, but if we look

14 then another paragraph down, so we are a little more precise,

15 here they say in this document Mr. Ivankovich reports his

16 tangible net worth and liquidity to be 42.7 million and

17 12.1 million respectively as of January 2019.  Do you see that?

18 A    Yes.

19 Q    And is that something that you reported to Walker Dunlop?

20 Is that an accurate statement -- sorry.  Let me rephrase that.

21       Is that an accurate statement of your net worth and

22 liquidity was in -- as of January of 2019?

23 A    I don't recall reporting that.  And again, it could be an

24 accurate statement.  I would need to go back and look

25 specifically to understand what my financial condition was on

Ivankovich - direct by Tahmassebi

1   those dates.

2   Q    Who was handling --

3            THE COURT:  All right.  One second.  One second.

4       (Brief pause.)

5            THE COURT:  All right.  We're going to take a break.

6            All right.  Sir, if you want, you can either step

7   down or sit in one of those seats right over there, and we'll

8   be right back up.

9            THE WITNESS:  Thank you.

10           THE COURT:  All right.  Thank you.

11      (Whereupon, another matter was heard in open court.)

12           THE COURT:  All right.  We need one more second,

13  guys.

14      (Brief pause.)

15           THE COURT:  I'll tell you what we're looking for now,

16  so the important point about this matter being here in my

17  courtroom was that we could not get this done, right.

18  Otherwise it's a straight up deposition.

19           MR. TAHMASSEBI:  Right.

20           THE COURT:  And so we are trying to find a court

21  reporter because I have an emergency TRO that I am taking.  I

22  have to hear, and that's going to be coming up at --

23           THE CLERK:  11:00 o'clock.

24           THE COURT:  At 11.  But before that, I have a couple

25  of other cases that have to be heard.  And so we're trying to

1  work around this. But we have a place where you can go with a

2  court reporter and finish this up so it's not a wasted trip.

3  He's already been sworn in. He's under oath. You go ahead and

4  finish that today, and that will -- it can still be done in the

5  same time period. It just won't be me sitting there. You'll

6  be doing a regular deposition. Counsel.

7          MR. WANDNER: Yes, Judge. That's fine. Obviously we

8  all appreciate Your Honor's time, and you're a servant to the

9  public and everybody else has, has rights -- access to you as

10  well. Just housekeeping. I anticipated, perhaps I was

11  misguided in that, that this was going to be happening this

12  morning and over and done this morning based upon I think what

13  the guidance we had gotten from the Court when set.

14          THE COURT: When you say over and done?

15          MR. WANDNER: This aspect of the deposition.

16          THE COURT: Yes, and be done this morning. That's my

17  intent.

18          MR. WANDNER: Right. So --

19          THE COURT: That's why I want it to be done, yes.

20          MR. WANDNER: Just, just because counsel had

21  indicated two hours, you know, that's fine. I have a 12:30

22  Zoom hearing in a case from Miami, and I have a 1:30 flight

23  back home. So again, he has a right to do what he's doing. I

24  have no problem with that. I just want to make sure that --

25          THE COURT: You have some time concerns.

26

1         MR. WANDNER:  -- when we're not, when we're not in
2  front of you, that it goes efficiently and ends in a time that
3  I can get what I have to do with my other matters done.  That's
4  all I'm saying.

5         THE COURT:  Well, you definitely have a right to say
6  that, Counsel.  It's also just not up to counsel.  It's up to
7  your client.

8         MR. WANDNER:  I understand.

9         THE COURT:  So, you know, depending on some of the
10  answers to some of the questions, it may take more time for him
11  to get the information or at least to get an answer that he is
12  trying to get.  If your client keeps saying I don't understand
13  or I don't know if this is my signature or I don't remember
14  talking to somebody, if he keeps saying that, I mean, that's
15  his right.  That's going to be part of the transcript that I
16  review too.

17         MR. WANDNER:  Of course.

18         THE COURT:  So but, you know, that's where we are.
19  Is that what you would be saying, Counsel?  But you also do --
20  I would say you're going to be in one of my rooms.  They're
21  trying to find a court reporter during Labor Day week, and so
22  we're doing our best to find that.  But right now I have to
23  continue with my call, and I am emergency judge.  And again, a
24  lot of the judges are gone.  That's why I'm emergency judge.

25         MR. WANDNER:  May I make one suggestion.

1          THE COURT:  Before you do ...

2          MR. WANDNER:  Yes, ma'am.

3          THE COURT:  Go ahead, Counsel.

4          MR. TAHMASSEBI:  No, I -- and that's part of the

5    problem, Judge.  I'm having to go to other documents to get

6    confirmation on information that I -- was part of what should

7    have been up front.  But, in any event, I understand Mr.

8    Ivankovich made the trip.  We've made some progress.  I would

9    just as soon come back before Your Honor, because I do

10   antici --

11         THE COURT:  Counsel.  Counsel.

12         MR. TAHMASSEBI:  Even not today, but whenever --

13         THE COURT:  No, we have him here.

14         MR. TAHMASSEBI:  Okay.

15         THE COURT:  He's finishing it today.

16         MR. TAHMASSEBI:  Okay.

17         THE COURT:  All right.  So you figure that out.

18   You've got a partner.  You guys figure it out.  Anything else?

19         MR. WANDNER:  No, Judge.

20         THE COURT:  All right.  Yes.  All right.  We're

21   getting ready to start this.  As soon as we see the phone

22   numbers pop up, we'll get this phone one out of the way, and

23   you can keep going.

24         MR. TAHMASSEBI:  Okay.  Great.

25         THE COURT:  All right.

Ivankovich - direct by Tahmassebi

1     (Short break taken.)

2          THE COURT:  Is everybody going to be here on Ligas,

3     or are they going to be on the phone, Counsel?

4          MR. TAYLOR:  Barry Taylor on behalf of the plaintiffs

5     in Ligas.  My understanding is everyone is coming in for the

6     status.

7          THE COURT:  All right.  So we're going to go ahead

8     and go on with our testimony for a little while.  All right.

9     Go ahead, Counsel.

10         MR. TAHMASSEBI:  Thank you, Judge.

11    BY MR. TAHMASSEBI:

12    Q    Mr. Ivankovich, I want to go back to now Exhibit No. 3,

13    which is the personal financial statement.  And we had a little

14    bit of a back and forth of whether it was signed in March of

15    2020 or August of 2020.

16         In any event, I want to be clear that whether it was

17    March of 2020 or August of 2020, your net worth was reported

18    around $56,367,404 according to the personal financial

19    statement, correct?

20    A    Correct.

21    Q    And then if we turn to Exhibit 7, Exhibit 7 is a document

22    titled a Complete Guaranty.  And if you go to the back of

23    Exhibit 7 -- excuse me, let me just be clear.  And it's dated

24    June 18th of 2019.  And you are listed as the guarantor, Walker

25    Dunlop is listed as the lender.  And then if you can go to the

Ivankovich - direct by Tahmassebi

1  last page and just confirm that that is your signature as

2  guarantor, and it looks like it was notarized actually on

3  August 16th of 2016.

4  A    You mean the document that says Completion Guaranty, not

5  Complete Guaranty?

6  Q    Completion Guaranty.  Thank you.

7  A    Yes, correct, that is my signature.

8  Q    All right.  And then the -- if you look under Section 1.2,

9  definition of guaranteed loan obligations, it says, In order to

10  induce the Lender to loan Borrower the sum of 53,200,000

11  evidenced by a secured promissory note, and it goes on to talk

12  about this guaranty.  You've seen this document before,

13  correct?

14  A    I must have at some point, but I don't recall it

15  specifically.

16  Q    And then if you look at page 10, Section 3.4, again, this

17  is a representation made by you.  And I'm not going to read the

18  whole thing because of time, but Section 3.4 says, We agree

19  that you have sufficient -- about midway down, have property

20  and assets sufficient to repay its obligations and liabilities

21  including the Guaranteed Obligations.  Do you see that?

22  A    Yes, I see that paragraph.

23  Q    So as of June -- excuse me.  As of the time you signed

24  this document, August 16th, 2020, you were representing to

25  Walker Dunlop that you personally, Mr. Ivankovich, had

Ivankovich - direct by Tahmassebi

1  sufficient assets and funds to repay a 53 -- $53,200,000 loan,
2  right?
3  A    No, that's not what this document says.
4  Q    Well, the loan received was 53,200,000, right?
5  A    It seems to be, yes.
6  Q    Okay.  And you received those funds.  That's not a small
7  sum of money.  I would expect you would have remembered if you
8  or one of the entities you controlled received those funds,
9  right?
10  A    I didn't receive those funds, but one of the entities that
11  I was an executive --
12  Q    Okay.  And then you, you in signing this --
13          MR. WANDNER:  Judge, I'd ask that he be allowed to
14  finish his answer, please.
15          MR. TAHMASSEBI:  Oh, I'm sorry.  I didn't mean to cut
16  him off.
17          THE COURT:  Oh, okay.  He says he didn't mean to cut
18  him off.  Go ahead, sir.
19          THE WITNESS:  No, I didn't receive those funds.  The
20  Alliance HTFL, LLC received those funds.
21  BY MR. TAHMASSEBI:
22  Q    And that's a company that you have management control
23  over, right?
24  A    I am a manager -- no, I don't, I don't even think I'm a
25  manager of this company.

Ivankovich - direct by Tahmassebi

1  Q    Are you affiliated with it in some way, shape, or form,
2  either ownership, member, manager?
3  A    No.
4  Q    You have no affiliation to that company?
5  A    I have an affiliation, but I'm not a member or a manager.
6  Q    I want to focus on the guaranty that you signed.
7  A    Yes.
8  Q    Okay.  And what you understood when you signed this
9  guaranty, you were saying you could guarantee repayment of the
10 loan made to the corporation?
11 A    That's incorrect.  The section you're referring to is
12 specifically I'm guaranteeing to proceed with and to complete
13 the construction of the required repairs and approved
14 renovations in accordance with the construction schedule and
15 plans, free and clear.  This is not a financial guaranty.  This
16 is a construction completion guaranty that I am undertaking on
17 behalf of the company, will complete the construction budget.
18 Not guarantee the payment of the loan.  So your statement is
19 patently incorrect.
20            And if you let me read these --
21            THE COURT:  Sir.  Sir, this still is a deposition.
22 It doesn't mean you get to freestyle the whole time.  And I'm
23 going to stop everybody because we have a court reporter.  She
24 is now set up in our jury room, which is you go out the door to
25 the left, and she will be there.  And it's a bigger room than

32

 1  the witness room, so people have room to move around.  And

 2  there will be where you will finish the dep.

 3         I know counsel expected it to take a couple of hours.

 4  We have probably done about 45 minutes of actual work on this

 5  thus far.  And so the court reporter -- actually you all can

 6  get set up.  I saw her just dashing down the hall, but her

 7  equipment is there, and she will be ready to proceed with this,

 8  and you all can finish this.  The other matters, if I need any

 9  argument on the fully briefed motions, I will let you know at a

10  different time.  All right.  But we wanted to have this done.

11         Anything else to say plaintiff?

12         MR. TAHMASSEBI:  Yes, real quick, Judge.  Yes, I

13  appreciate getting this done today.  We had what's triggered

14  this a motion for turnover based on, you know, certain statutes

15  and what we say he really has.  And I think what might be

16  appropriate is that we amend that and put forth this testimony

17  in front of you if you think that's necessary, Judge, to

18  show -- I guess I think it would somewhat --

19         THE COURT:  Well, I think that would assist if you

20  have this testimony that you didn't have before.

21         MR. TAHMASSEBI:  Yes.

22         THE COURT:  I think that would assist.  And, you

23  know, I mean both sides will have access to get the

24  transcripts.  All right.  Again, these are not court ordered

25  transcripts, all right.  So you guys give the ladies their

33

1   money.  All right.

2               MR. TAHMASSEBI:  We will.

3               THE COURT:  All right.  Yes.

4               MR. PORRAS:  Your Honor, there is one thing that I

5   wanted to bring up.

6               THE COURT REPORTER:  Can you just state your name

7   again, Counsel.

8               MR. PORRAS:  Of course.  I apologize.  Cy Porras on

9   behalf of the third party LLCs.  P-O-R-R-A-S is my last name.

10              Your Honor, so as we mentioned, there are three

11  motions outstanding.  They're fully briefed.  The Court has

12  them.  However, one thing that maybe didn't come across

13  extremely clear is that this matter as it relates to the Walker

14  Dunlop funds is extremely urgent because the LLCs need those

15  funds to make payments for their bills.  So I only bring that

16  up because we have an affidavit from the vice president of

17  Asset Management for one of the LLCs.  The Court had previously

18  mentioned that she didn't want any more filings.

19              THE COURT:  You can file it.

20              MR. PORRAS:  Okay, Your Honor.  Thanks.

21              THE COURT:  You know, you can file it.  You both will

22  be able to file within seven days.  You get your transcripts,

23  you get whatever you need to get on this, the extra

24  information, within seven days get it filed.  All right.

25              MR. PORRAS:  Great.  Thank you, Your Honor.

34

1    THE COURT:  We'll make that part of the order, but I

2 expect you all to go right down the hall.  Sir, I believe, and

3 you tell me, if I'm wrong, Yvette -- this isn't on the record.

4 This part isn't on the record.

5    (Off the record discussion.)

6    (End of proceedings in the courtroom.)

7                       CERTIFICATE

8    I HEREBY CERTIFY that the foregoing is a true,

9 correct and complete transcript of the proceedings had at the

10 hearing of the aforementioned cause on the day and date hereof.

11

12 /s/TRACEY D. McCULLOUGH                    September 8, 2022

13 Official Court Reporter                          Date
   United States District Court
14 Northern District of Illinois
   Eastern Division

15

16

17

18

19

20

21

22

23

24

25

1      (WHEREUPON, an exchange of reporters took place; after
2   which the following proceedings were held in the jury room:)
3   BY MR. TAHMASSEBI:
4   Q    Okay.  If we can go back to Exhibit No. 6,
5   Mr. Ivankovich, the Atlas P5 Portfolio asset summary --
6           COURT REPORTER:  I'm sorry, you have to speak
7   louder.
8           MR. TAHMASSEBI:  Oh, I'm sorry.
9   BY MR. TAHMASSEBI:
10  Q    Yeah, the asset summary, Atlas P5 Portfolio.  These --
11  they list five different -- at the first page, it lists five
12  different properties, five assets, 1,208-unit Multifamily
13  Portfolio.  Was this -- were these units built,
14  reconstructed, whatever the case?
15  A    Were they built or reconstructed?
16  Q    Yes.
17  A    I don't understand the question.
18  Q    Sure.  Did the -- when we talk about the 448 units, 188
19  units, 152, 276, 144, were those -- are those units that
20  exist today?
21  A    I believe they do exist today, yes.
22  Q    Okay.  And did you or any of the entities you have an
23  affiliation with have an interest in that portfolio?
24  A    Yes.
25  Q    Okay.  And which entities -- I'm assuming because you

1   don't do anything individually that you individually had no

2   interest in that P5 Portfolio; is that accurate?

3   A    Correct.

4   Q    Okay.  And then what entities that you are affiliated

5   with, in fact, did have an interest in the P5 -- Atlas P5

6   Portfolio?

7   A    I don't know sitting here right now.  I'd have to go

8   back and look at the organizational charts.

9   Q    All right.  Does the entity Pilgrim LLC ring a bell?

10  A    Not --

11              COURT REPORTER:  I'm sorry, you have to speak

12  clearer.

13              THE WITNESS:  I'm sorry.  Not Pilgrim LLC.

14  BY MR. TAHMASSEBI:

15  Q    Pilgrim Wind Tree LLC.

16  A    Yes.

17  Q    Okay.  That has an interest in the P5 Portfolio?

18  A    I don't think so.  Not directly.

19  Q    Okay.  Has the P5 Portfolio -- strike that.  Have any of

20  the Pilgrim entities -- I'm going to list them for you --

21  Pilgrim Wind Tree, LLC, Pilgrim Coulter LLC, Pilgrim Warwick

22  LLC, Pilgrim Caribbean L -- Isle, LLC, and Pilgrim Forest

23  Park LLC, those are all entities that you have an interest in

24  through a company called Overlook Managing Member LLC,

25  correct?

1    A    Correct.

2    Q    Okay.  And then the ownership of Overlook Managing

3    Member LLC is 95 percent you approximately, 90 -- I think

4    it's 97 percent now and the remaining percentage to a

5    gentleman named Romaniello, R-o-m-a-n-i-e-l-l-o, correct?

6    A    I don't think Gary Romaniello owns any part of Overlook

7    directly.

8    Q    Okay.  Is your interest still in the 90, 95 percentile

9    range?  Is it --

10   A    Yeah.  It's in the 90s.  It's not 100 percent.

11   Q    Okay.  Who is the other member then of Outlook?

12   A    There's a corporation whose name escapes me, I believe.

13   Q    Now the assets listed on Exhibit No. 6, the five

14   properties, have any of those been sold since the year 2019?

15   A    Yes.  Caribbean Isle; Forest Park.

16   Q    And when were they sold?

17   A    In -- oh, I can't tell you the exact date.

18   Q    Give me a ballpark.

19   A    End of 2021, beginning of 2022.

20   Q    And did any entities that you have an interest or

21   affiliation with receive proceeds from the sale of either the

22   Caribbean Isle or Forest Park properties?

23   A    Yes.

24   Q    Okay.  And which entities were those?

25   A    The document -- the entities you mentioned on the

1    organizational chart.

2    Q    Okay.  So the five entities that I mentioned each

3    received proceeds?

4    A    I don't know if it would have been all five but

5    certainly some of those entities would have.

6    Q    And where were those proceeds paid from, was it from

7    Walker Dunlop that ultimately paid -- in other words, who

8    sent the money, who sent the check, Walker Dunlop or some

9    other entity?

10   A    Probably -- well, maybe.  I don't know actually sitting

11   here where those proceeds came from.

12   Q    Okay.  Who at Pilgrim Wind Tree LLC would know how they

13   received the proceeds?

14   A    Probably one of the attorneys that handled the closing.

15   Q    Okay.  Who was that?

16   A    It would have been Cadwalader, Wickersham & Taft.

17   Q    I'm sorry.  Did you say Cad --

18   A    Cadwalader, Wickersham & Taft were the attorneys --

19              COURT REPORTER:  Can you spell that for me?

20              THE WITNESS:  C-a-d-w-a-l-a-d-e-r, comma,

21   Wickersham, W-i-c-k-e-r-s-h-a-m, ampersand, Taft, T-a-f-t.

22   BY MR. TAHMASSEBI:

23   Q    And who was the individual at that firm that handled

24   that?

25   A    Okay.  I don't think there was one individual.  I think

1    there was numerous.  I can't -- I don't even know the names

2    of the people that --

3    Q    And they represented the Pilgrim LLCs at the closings?

4    A    Yeah.

5    Q    And give me one individual if you can, Mr. Ivankovich.

6    A    I actually -- I had no contact with the lawyers

7    directly.

8    Q    Who did have the contact with the lawyers?

9    A    A gentleman named Mark Brown.

10   Q    And who is Mark Brown?

11   A    Mark Brown is another manager of this organizational

12   chart.

13   Q    Okay.  What -- and so the organizational chart, just so

14   we're on the same page and the record is clear, if you look

15   at Exhibit 9.  And I see you saw what I was looking at --

16   A    Oh, yes.

17              COURT REPORTER:  I'm sorry, I didn't understand

18   you.

19              MR. TAHMASSEBI:  Oh, sure.

20   BY MR. TAHMASSEBI:

21   Q    Exhibit 9, that's the organizational chart you and I

22   have been referring to, fair?

23   A    Uh-huh.

24   Q    Yes?

25   A    Yes.

1    Q    And this is an accurate representation as far as you can

2    say today of the organizations with the exception of

3    Mr. Romaniello still being a member of Overlook?

4    A    Yeah.  I don't think that part is correct.  I --

5    Q    Okay.  Let's do this so we're not getting too much in

6    the weeds.  As far as the Pilgrim entities, the five Pilgrim

7    entities, Overlook and you having a 95 percent interest in

8    Overlook, Overlook having 100 percent interest in the P --

9    five P entities, that part is accurate?

10   A    Approximately, yes.

11   Q    How much did the Pilgrim entities receive as a result of

12   the sale of part of the P5 -- Atlas P5 Portfolio?

13   A    I don't know.

14   Q    Who would know the answer to that how much money P5

15   received?

16   A    Maybe Mr. Brown.  I don't know specifically.

17   Q    All right.  Who else had involvement in the closing of

18   those properties besides Mr. Brown and the lawyers, if

19   anybody?

20   A    I don't think anybody else.  I mean, I would imagine

21   Walker Dunlop as well since they were repaid their loan.

22   Q    Do you know what those properties sold for?

23   A    I don't.

24   Q    Since Pilgrim received funds from the sale of the

25   Caribbean Isle, Forest Park properties, had they transferred

1    any money out of any accounts that they hold?

2    A    I don't know.

3    Q    Who would know the answer as to whether or not money has

4    been transferred from the P5 accounts?

5    A    Probably Mr. Brown as well.

6    Q    Where is Mr. Brown located?

7    A    Colorado.

8    Q    Where in Colorado?

9    A    I believe Colorado.

10   Q    Okay.  Where in Colorado?

11   A    An area called -- what's the name of the town?  Give me

12   a moment to try and recall the town.

13   Q    Sure.

14        (Brief pause.)

15        THE WITNESS:  It's a small town near Breckenridge,

16   Colorado.  I don't know the specific name of the town.

17   BY MR. TAHMASSEBI:

18   Q    Do you know what company he's affiliated with?

19   A    Yeah, of the -- of Atlas -- Atlas Apartment Homes LLC.

20   Q    Who was the managing member of the P5 entities?

21   A    I don't know.  I don't believe there was a managing

22   member.  I believe it was the corp -- I think the corporate

23   managing member.  I'd have to look at the documents, but I

24   think there was a corporate managing member.  I don't think

25   there was an individual.  I don't know specifically.

1    Q    Who handles the accounting for the Pilgrim, the P5 LLCs?

2    A    Currently or in 2017?

3    Q    Both, if you could.

4    A    In 2017 it would have been a company called RealPage.

5    Q    Where are they out of?

6    A    I don't know.

7    Q    Who was the individual at RealPage that handled the

8    accounting?

9    A    I don't know.

10   Q    Okay.  How about today?

11   A    It's in-house with Alliance -- not Alliance.  With Atlas

12   Apartment Homes LLC --

13   Q    Atlas --

14   A    -- but I'm not entirely sure.

15   Q    Atlas Apartment Homes LLC, is it still operating?

16   A    I believe so.

17   Q    Is that bank accounts?

18   A    I don't know.  I would imagine so.  I don't know.

19   Q    Well, who would know if Atlas Apartment Homes LLC has

20   any --

21   A    Mr. Brown would.

22            COURT REPORTER:  I'm sorry, I couldn't understand

23   you.

24            MR. TAHMASSEBI:  Sorry.  I keep putting my mouth --

25            COURT REPORTER:  I know it's a little informal.

1   You probably feel like it's informal in here but I have to
2   take a record.
3           MR. TAHMASSEBI:  No, I don't feel like it's
4   informal.  Less formal than out there, I suppose.
5           COURT REPORTER:  Exactly; so just reminding you.
6   BY MR. TAHMASSEBI:
7   Q   So Mr. Brown would be the individual that knows about
8   the finances of Atlas Apartment Homes LLC, correct?
9   A   Yes.
10  Q   Do you know who the accountants are for Atlas Apartment
11  Homes LLC, the same ones that we already mentioned or is
12  there somebody new?
13  A   It changed from RealPage to another provider but I don't
14  know specifically which provider it changed to.
15  Q   In 2020, did you have interest in any other real
16  estate -- strike that.  In 2020, did you or any entity you
17  have an interest in have any other real estate holdings?
18  A   Yes.
19  Q   Okay.  Tell me about those.
20  A   Similar apartment complexes to the ones on this page.
21  Q   Well, where are they, how many are there, things like
22  that?
23  A   Oh, Texas, Florida, Illinois that I recall.
24  Q   And then how were those -- how was that real estate
25  held, in a company, in a corporation?

1    A    Yeah, that's -- I suspect that would have been the case.

2    Q    In which entity that you have an interest in has an

3    interest in those real estate holdings?

4    A    Oh, I couldn't tell you sitting here.  I'd have to go

5    back and look.  There's quite a few.

6    Q    Well, when you say "quite a few" --

7    A    It's similar to the org chart that we're looking at

8    right now that says "Pilgrim V Portfolio Organizational

9    Chart."

10   Q    Okay.  So Exhibit 9 is an organizational chart that

11   covers kind of the P5 Portfolio; is that right?

12   A    Correct.

13   Q    Okay.  And then for your holdings in Texas, Florida, and

14   Illinois, you have another kind of myriad of LLCs that have

15   different ownership interests?

16   A    Yes.

17   Q    And then ultimately in that myriad of LLCs that have

18   those ownership interests, are those also 100 percent owned

19   by Outlook or are they 100 percent owned by a different

20   entity?

21   A    No, no.  This would have -- it would have been a

22   different entity.

23   Q    Okay.  And then the -- that entity that's at the top,

24   like Outlook is here, who would be the majority owner of that

25   entity you, you, correct?

1   A    I don't think Outlook.  I think Overlook Managing Member

2   LLC which -- I'd have to see the documents -- seems to be the

3   manager of the Pilgrims to your previous question.

4   Q    I'm sorry.  I misspoke.  Overlook is the --

5   A    Yeah.

6   Q    -- 100 percent owner of the other myriad of LLCs?

7   A    Yes.

8   Q    In your other holdings in Texas, Florida, and Illinois,

9   do you ultimately have a parent company that owns 100 percent

10  the other LLCs below it?

11  A    I think every structure is different based on the

12  ownership structure.

13  Q    Well, that's what I'm trying to find out so -- and you

14  said you have three or four other properties but you might --

15  A    I did at the time.  I don't anymore.

16  Q    Do you have any real estate holdings currently?

17  A    Individually, no, except for my home on Menomonee Street

18  in Chicago.  There's a residential residence; not my home.

19  Q    No.  I'm not talking individually.  Let me make a clear

20  question.  Do any of the entities that you have an interest

21  in currently have real estate holdings today?

22  A    Yes.

23  Q    Okay.  And what are the names of those entities?

24  A    I believe just Overlook Managing Member.

25  Q    Okay.  Is Overlook Managing Member 100 percent owner of

1    other entities aside from the P5 LLCs that are depicted on

2    Exhibit 9?

3    A    I don't believe so, no.

4    Q    Okay.  And there's -- is there another parent company --

5    what I'm trying to find out is what LLC owns the property in

6    Texas, what LLC owns the property in Florida, what LLC owns

7    the property in Illinois?

8    A    Well, that owned.  That was previously.  So Overlook

9    Managing Member owns Pilgrim Wind Tree, Pilgrim Coulter,

10   Pilgrim Warwick, which owned three properties in Texas and

11   that's it.

12   Q    And that's all that is currently -- you currently have?

13   A    Correct.

14   Q    What's the value of those properties in Texas?

15   A    Oh, I have no idea.  I'm not sure the last time it was

16   valued.

17   Q    Where are they located?

18   A    That's a good question.  I believe Abilene and Amarillo,

19   Texas.

20   Q    Who manages those properties?

21   A    Atlas -- Atlas Apartment Homes LLC.

22   Q    Is Atlas Homes LLC also the entity that would collect

23   the rents for those properties?

24   A    No.

25   Q    Okay.  What's the name of the entity that would collect

1    the rents for those properties?

2    A    I believe the rents go into the Pilgrim Wind Tree LLC,

3    Pilgrim Coulter LLC, and Pilgrim Warwick LLC companies.

4    Those would collect the rents.

5    Q    And those three Pilgrim entities are still collecting

6    rents today?

7    A    I hope so.  I don't know.

8    Q    Okay.  All right.  You would expect so, right?

9    A    After COVID, I don't expect anything anymore.

10    Q    Okay.  And then those three entities or all five

11    entities I think we said are 100 owned by Overlook Managing

12    Member LLC?

13    A    That's correct.

14    Q    All right.  Do you currently own any other properties

15    today?  Let me ask it again.  Did any entities that you have

16    an interest in currently own any other properties today?

17    A    No.

18    Q    What is your membership interest in Atlas Apartment

19    Homes LLC?

20    A    I don't know specifically.  I don't remember.

21    Q    Who handles the accounting for Atlas Apartment Homes

22    LLC?  I think I asked you that but --

23    A    Again, it would have been one of the vendors or

24    RealPage, or whoever is doing it now.

25    Q    And Mr. Brown would know the answer to that if you can't

1    answer it?

2    A    Yes.

3    Q    Let's go back to Exhibit 3 and I want to talk about

4    the -- by the way, just so we're clear, if you look at

5    Exhibit 3, Mr. Ivankovich, there's a Bates stamp at the

6    bottom, at the very bottom right that says "Ivankovich 248,"

7    do you see that?

8    A    I do.

9    Q    Do you understand this was a document produced by your

10   attorneys in this litigation before the judgment was entered

11   against you?

12   A    I don't.

13   Q    Did you know that your lawyers represented that this was

14   a true and accurate copy of your financials -- personal

15   financials in August -- on August 26th of 2020?

16   A    I do not.

17   Q    Did you know there was a court order requiring you to

18   produce this accurate financial statement in the year August

19   26th of 2020?

20   A    It's possible I knew then.  I don't recall.

21   Q    It's possible you knew back at the time this personal

22   financial statement was produced that it, in fact, had to be

23   signed and attested to and produced, fair?

24   A    I -- I actually don't recall that.

25   Q    Let's look at the fourth page.  In the second -- well,

1    let's look at Schedule A and I know it's a little difficult

2    to read.

3    A    I got it.  I got my readers on.

4    Q    Okay.  All right.  Good.  There -- it talks about "Cash,

5    Checking and Saving Accounts, Certificates or Deposits, Money

6    Market Funds" and then the total that's listed there on this

7    personal financial statement is $1,103,196.  Do you see that?

8    A    Yes.

9    Q    And that was accurate in 2020 for the amount of cash,

10   checking and savings that you had?

11   A    Sounds accurate.

12   Q    And today is that money still in a cash, checking or

13   savings account today?

14   A    No.

15   Q    Do you have a bank account today?

16   A    No.

17   Q    Do you have any personal assets today?

18   A    My interest in my home.  Well, in the home on -- in the

19   real estate owned jointly with my wife on Menomonee.

20   Q    So you were served with this complaint in September of

21   2020, the complaint that was filed by my clients?

22   A    Yes.

23   Q    Okay.  And at what point in time did you transfer money

24   from these cash, checking and savings accounts listed on

25   Exhibit 3, Page 3?  Page 4, excuse me.

 1    A    When you say "transfer," would you be more specific?

 2    Q    Sure.  As of 2020, you had $1,103,196 according to your

 3    personal financial statements, right?

 4    A    Yes.

 5    Q    And today you're telling me you have zero, right?

 6    A    Correct.

 7    Q    And when was this money transferred out?

 8    A    Well, it was spent over the course of 2020, 2021 to

 9    pay bills --

10    Q    Okay.

11    A    -- to pay obligations of the companies.

12    Q    So you used your personal funds to pay obligations of

13    the companies?

14    A    Yes.

15    Q    Okay.  And that was through 2020 and 2021, correct?

16    A    It started in 2019 as well.

17    Q    Okay.  And then -- and then what -- who was the one that

18    authorized payment of your personal funds to pay obligations

19    of the companies, it had to be you, right?

20    A    Yes.

21    Q    And how did you transfer funds to these companies --

22    well, which funds did you pay expenses for or obligations

23    for, which corporations?

24    A    All of them.

25    Q    And how were the funds transferred?

1    A    It would have been any way transferring funds.  It would

2    have been just bank transfers, wire transfers, check, you

3    know, any means people use to pay bills.

4    Q    The cash on hand, the 500,000, where was that held in

5    2020?

6    A    Good question.  It could have been --

7            COURT REPORTER:  I'm sorry, can you take your hand

8    away?

9            THE WITNESS:  Oh, I'm sorry.  Good question.  It

10   could have been either -- probably Glenview State Bank.

11   BY MR. TAHMASSEBI:

12   Q    Anywhere else?

13   A    No.  That's probably where I kept my -- most of the cash

14   accounts.

15   Q    Here in Glenview, Illinois?

16   A    Yes.

17   Q    And then if you go down to Schedule B, it talks about

18   "Marketable Securities, Stocks, Bonds, U.S. Government" and

19   the total market value you have is $11 million, do you see

20   that?

21   A    Yes.

22   Q    This is again on your personal financial statement?

23   A    Yes.

24   Q    And today, Mr. Ivankovich, do you still have that $11

25   million in marketable securities, stocks, bonds, and U.S.

1  government?

2  A    No.

3  Q    Okay.  And are you telling me then between again 2020

4  and today August 2022, all of that money was transferred out?

5  A    It was used to pay bills.

6  Q    Okay.  And what bills was it used to pay?

7  A    Payroll for the companies, mortgage payments, reserve

8  payments, just the expenses of the companies when everything

9  shut down during COVID.

10 Q    You knew in 2021 -- excuse me, in 2020, August -- 2020

11 September that there was a lawsuit filed against you, right?

12 A    Which lawsuit specifically?

13 Q    This lawsuit, I'm sorry, the one we're sitting here for.

14 You were served in September of 2020 with this lawsuit, okay?

15 A    Yeah.  I know -- I remember the court call with Coleman

16 where you guys alleged to serve me but I don't think I was

17 ever personally served with the summons for this.

18 Q    Well, if you remember the court call, you were aware of

19 the lawsuit?

20 A    I was aware of the lawsuit and the court call, yeah,

21 whatever that date was.

22 Q    Okay.  Well, it was sometime in September of 2020?

23 A    Yes.

24 Q    In any event, after that date you continued to transfer

25 money from certain accounts, right?

1    A     I continued to pay obligations, yes.  I continued to pay
2    bills.
3    Q     And then where would I find the transfers that you made
4    of the $11 million between -- and those transfers that were
5    made were made between August 2020 and all the way up through
6    present?
7    A     No.  I would have said probably to the end of COVID,
8    whenever that is, that sort of 20 --
9    Q     Well, any that date.  2021?
10   A     Through the end of 2021.
11   Q     Okay.  So through the end of 2021, you continued to make
12   transfers in your eyes to pay bills of the companies you had
13   an interest in?
14   A     No, not in my eyes.  That was what the payments were
15   for.
16   Q     And then what companies of the $11 million did you
17   transfer money to specifically or LLCs specifically?
18   A     Did I transfer to?
19   Q     Yeah.
20   A     I don't know sitting here.
21         (Counsel conferring.)
22   BY MR. TAHMASSEBI:
23   Q     Oh, yeah.  What entities were you paying bills for in
24   2021, 2022?
25   A     The Atlas entities, the entities that owned apartment

1    complexes where there was debt and payroll obligations.

2    Q    And those -- and those -- that and payroll obligations

3    you were making payments from your personal finances through

4    approximately December 2021, January 2022, fair?

5    A    No, no, before that but toward the end of the third

6    quarter 2021, maybe beginning of the fourth quarter.  I was

7    getting notices by the Department of Labor.

8    Q    Okay.  You were paying, let's just say after -- it went

9    into October, November 2021 when you were paying bills

10   through your personal finances?

11   A    Something like that.  Maybe sooner than that.

12        (Counsel conferring.)

13   BY MR. TAHMASSEBI:

14   Q    Oh, yeah.  So there's two, under Schedule B, the stocks,

15   it says they were held in -- is it Stifel and Oppenheimer?

16   A    Yes.

17   Q    And that was an account -- that was in your account at

18   Stifel and Oppenheimer?

19   A    It wouldn't have been in my name personally.  It would

20   have been probably a trust account.

21   Q    But you had the ability personally to make the decision

22   to use those funds for other obligations of entities you had

23   an interest in?

24   A    No.

25   Q    Okay.  All right.  I'm going to leave it at that.  The

1  last schedule, Schedule G, do you see that three quarters of

2  the way down?

3  A     Yes.

4  Q     The third one is Atlas P5 Portfolio.  That's the

5  portfolio we had just been discussing, right?

6  A     Yes.

7  Q     All right.  And that's valued at approximately

8  $29,140,000 in your personal financial statement, do you see

9  that?

10 A     Are you saying that is the value of the portfolio?

11 Q     I'm sorry.  That's what it is listed as your -- the

12 value of what your ownership was.  Maybe I wasn't being

13 precise.

14 A     Correct.

15 Q     Okay.  So the value of what your ownership was in the

16 Atlas P5 Portfolio, so we're clear, was listed in August of

17 2020 as 29,140,000?

18 A     Yes.

19 Q     All right.  And then if we go down the rest of the

20 properties -- and I'm going to list them -- Alliance Holding

21 HT LLC, Atlas P --

22 A     I'm having a tough time reading this but I think what I

23 see, it says Atlas P5 Portfolio, that would have been -- my

24 interest would have been held in the Deerfield irrevocable

25 trust.

1    Q    Okay.  I'm beyond that at this point.

2    A    Okay.  Well, that's just to clarify the question.  I'm

3    having a tough time reading this but I'm -- yes.

4    Q    Okay.  All right.  So if we go through the -- there's

5    another one.  I'm just going to read the entities so we have

6    a clear record.

7    A    Uh-huh.

8    Q    Alliance Holdings HT LLC is the entity listed.  Atlas P2

9    Managing Member LLC is an entity listed.

10    A    Yes.

11    Q    Atlas Birchwood LLC is an entity listed, right?

12    A    Yes.

13    Q    Atlas Multifamily 3 LLC is an entity listed?

14    A    Yes.

15    Q    Hazardous Sports LLC is an entity listed?

16    A    Yes.

17    Q    HC -- S Venture Incorporated is an entity listed?

18    A    Yes.

19    Q    Modline (sic) International S.A.M. is an entity listed.

20    Am I saying that right?

21    A    Yeah.  I'm not seeing --

22              MR. WANDNER:  Modulac (sic).

23              MR. TAHMASSEBI:  Modulac (sic), yeah.

24              THE WITNESS:  I can't tell what that is, that word

25    is.

 1    BY MR. TAHMASSEBI:

 2    Q    Okay.  All right.  That's a small "l."

 3              MR. TAHMASSEBI:  What's the next one, Steven?

 4    BY MR. TAHMASSEBI:

 5    Q    Gesterchel (phonetic) LLC is an entity listed.

 6    A    I'm not -- yeah, I can't make out that word.

 7    Q    Okay.  Atlas GP SCI is an entity listed, right?

 8    A    Yes.

 9    Q    Gruppo C'E Incorporated is an entity listed?

10    A    Yes.

11    Q    And ZIP LLC is an entity listed, right?

12    A    Right.  Yes.

13    Q    And under all those entities that I listed, your

14    personal financial statement under Ownership states your

15    name, correct?

16    A    Not entirely, no.

17    Q    Mr. Ivankovich, if you look at the document, there's a

18    column called Ownership.

19    A    Yes.

20    Q    In the ones that I listed, the last one, two -- so you

21    start from the fourth one down, Atlas Alliance Holdings HT

22    says the owner is Steven Ivankovich.  Do you see that?

23    A    Yes.  From the fourth one down, that's correct.

24    Q    Okay.  So from the fourth down, all those entities that

25    I just listed under Ownership in your personal financial

1    statement it states your name, right?

2    A    Correct.

3    Q    Okay.  Do you still have an ownership in all of those

4    entities that are listed under Schedule G?

5    A    In so much as the entities exist, I probably do.

6    Q    The last page, TRG International, what does that do real

7    quick?

8    A    Nothing anymore.  It used to be a real estate

9    development company here in Chicago.

10   Q    ZIP LLC, same question.

11   A    It used to run a sports car team.

12   Q    Is it around anymore?  It doesn't look like it.

13   A    It doesn't exist, no.

14   Q    Do any of these entities listed on schedule -- on

15   Schedule of Officer Positions exist at the present time?

16   A    They're not active.  I don't know if they still exist on

17   the register of companies but they're not active companies.

18   Q    When was the last time one of these companies was

19   active?

20   A    I don't know.

21   Q    Just give me a ballpark, two years ago, five years ago?

22   A    Based on this document, probably 2013.

23   Q    So in the year from August 2020 until the end of 2021,

24   your net worth went from approximately 55,367,404 to pretty

25   much zero; is that right?

1   A     Correct.

2   Q     And your explanation for that is because you made

3   transfers in order to meet the obligations of the companies

4   in which you had an interest?

5   A     My explanation of that is COVID.

6   Q     My question is a little bit different.  The money had to

7   go somewhere, right?

8   A     Yes.

9   Q     And your explanation as to where the money went was the

10  money was transferred in 2019, 2020, 2021 -- strike that.

11  Your explanation of what happened to the -- your $55 million

12  net worth that you indicate on your signed financial

13  statement in 2020 is that that money was transferred to pay

14  obligations and expenses of LLCs in which you had an

15  interest, correct?

16  A     Well, no.  55 million wouldn't have been transferred.

17  You're -- I think you're -- it's not correct.  It's not a

18  correct statement.

19  Q     Well, let's -- let's find out why because again, your

20  net worth is 55,367,404 as of August of 2020.  Today you're

21  telling me your net worth is almost zero, right?

22  A     Yes, but that's not because I transferred 54 million

23  dollars of cash.  That $54 million doesn't represent my net

24  worth as being cash.

25  Q     Well, I understand that.  Then do you still hold

1  securities, stocks, other real estate that gives you a net

2  worth of anything?

3  A    I'd like to think that maybe the three companies in

4  Texas have some -- have a value but I don't know what it is.

5  Q    When you say "the three companies in Texas," what are

6  you referring to?

7  A    The three companies that are left at the bottom of the

8  organizational chart of the P5 Portfolio.

9  Q    Who would have an idea of what those three companies are

10  worth?

11  A    I don't know.  An appraiser.

12  Q    You're in real estate but you have no idea about what

13  these entities that you're invested in might be worth?

14  A    I have an idea but I haven't looked at the financials.

15  I mean right now based on the financial condition as I know

16  it, they are probably worth zero.

17  Q    Okay.  Exhibit 6 -- again, you can go to it if you want

18  but I'm just going to read it -- Page 12, Walker Dunlop says

19  that you -- and this is about five paragraphs down.

20  A    What page is this?

21  Q    Sure.  Page 12 of Exhibit 6.

22  A    Yep.

23  Q    It says you have been involved in -- this is under

24  Comments -- over 7 billion of property transactions to date

25  and have overseen annual construction and renovation budgets

1    in the tens of millions of dollars; is that true?

2    A    It is true.

3    Q    But as you sit here today, you believe your net worth is

4    limited to the three properties in Texas that we talked about

5    of the P5 that are left and whatever equity you have in your

6    current home?

7    A    Correct.

8    Q    And so today, your net worth is nowhere near the 55

9    million 367 it was in August of 2020, is that your sworn

10   testimony?

11   A    Unfortunately, that's not the net worth.  That is my

12   sworn testimony; yes.

13   Q    These entities -- you mentioned COVID, Mr. Ivankovich.

14   COVID, are you saying -- these are residential properties,

15   right?

16   A    Correct.

17   Q    And you're saying COVID caused the downfall of these

18   residential properties somehow?

19   A    Correct.

20   Q    Okay.  And so the residential properties are all in --

21   sounds like most of them are in Texas or Florida, right?

22   A    And Illinois, yes.

23   Q    Well, how many are in Illinois?

24   A    Not anymore.

25   Q    Okay.  The majority of your portfolio back in 2020 and

1    2021 was in Texas and Florida, right?

2    A    Correct.

3    Q    And you're telling me that because of COVID, those

4    properties in Texas and Florida no longer were able to be

5    profitable?

6    A    Not only profitable but they were negative, yes.

7    Q    Who has the financial statements for those properties to

8    show that they were negative and received your funds in 2021?

9    A    You could get those from Mr. Brown, Mark Brown.

10   Q    And then that should also reflect you'll receive from

11   Mr. Brown money that you paid in to those companies in 2020,

12   2021, right?

13   A    It should, yes.

14   Q    And the market in Texas and Florida, I'm assuming it's

15   your sworn testimony based on your education and experience,

16   when COVID hit, the residential market went down, not up?

17   A    Well, this is a -- these buildings are an aspect of the

18   residential market called multi-family so they're

19   commercialized residential.  They're not single-family homes.

20   Q    What was the occupancy rate in the Texas and Florida

21   properties in 2020, 2021, do you have any idea?

22   A    I don't know but I recall that the occupancy and more

23   importantly the economic occupancy dropped almost to zero.

24   Q    In your -- as you were transferring this 58 million in

25   2020 and 2021 or approximately that amount of your personal

1  assets, who was making the requests on behalf of these
2  entities?

3  A    I never transferred $58 million.

4  Q    How much did you transfer?  How much from your total --
5  your total net worth as shown is 58 million.  Today you're
6  telling me it's almost zero.  How much money did you
7  transfer, Mr. Ivankovich, in 2020 and 2021 to go from 58
8  million to nearly zero?

9  A    To clarify your statement, the financial statement you
10  showed me and as it read was approximately $11 million of
11  liquidity and the rest was interest in unmarketable
12  securities, mostly these real estate assets.  So the cash
13  portion of that was used to pay the deficits of the apartment
14  companies and --

15  Q    Which ones?

16  A    All of them in the Atlas world, if you will.  Anywhere
17  there was an employee employed by Atlas or a building owned
18  by an Atlas entity, I had to make payments to subsidize those
19  buildings and to pay debt service, so.

20  Q    You individually were paying those employees?

21  A    Yes.  Well, no.  That's not true.  The proper
22  channels --

23  Q    Now it's not true?

24          MR. WANDNER:  Counsel, let him answer the question.
25          THE WITNESS:  There would have been a capital call

1    made from those entities.  I would have funded those entities

2    who would have then in turn pay the obligations of those

3    entities.

4    BY MR. TAHMASSEBI:

5    Q    Who made the capital call?

6    A    The company.

7    Q    When were they made?  When were these capital calls

8    made?

9              COURT REPORTER:  I'm sorry, I didn't hear you.

10             MR. TAHMASSEBI:  Oh, sorry.

11   BY MR. TAHMASSEBI:

12   Q    Yeah, when were these capital calls made?

13   A    Beginning -- it was a routine part of business.

14        (Interruption in proceedings.)

15             THE WITNESS:  These companies had capital calls

16   starting going back to 2016 as a normal part of business and

17   escalated during COVID.

18   BY MR. TAHMASSEBI:

19   Q    Who made the decision as part of these entities to make

20   the capital call, was that you?

21   A    No, not solely.

22   Q    Okay.  Who else?

23   A    The members of the company.

24   Q    And how was the capital call done, was it something done

25   in writing, did you have a meeting?  Let me ask you this:  Do

1    you have any evidence that any capital calls were made by any

2    of the entities that you have an interest in in 2020 and 21,

3    any documentation?

4    A    I don't sitting here but there are -- there are capital

5    call documents; correct.

6    Q    Okay.  And who -- where are those documents?

7    A    You could ask Mr. Brown about those documents.  In

8    addition to that, there was demand letters from the

9    Department of Labor that were sent to me as the manager of

10   those companies.  I didn't know this but payrolls flows

11   personally through managers at the company so I had lots of

12   letters and interactions from the Department of Labor to make

13   sure the companies were funded to fund people's payrolls.

14   Q    Let me ask you this:  Of the 58 million that are

15   listed -- that's listed as your net worth in 2020, how much

16   of that do you have access to today?

17   A    None.

18   Q    You do have a ninety-some percent interest in Overlook,

19   right?

20   A    Yes.

21   Q    And Overlook still owns the P5 entities 100 percent and

22   the P5 entities have an interest in the three properties we

23   listed as part of the portfolio, correct?

24   A    That's correct.

25   Q    And if you were, based on your education and experience,

1    in over a billion dollars in real estate transactions to give

2    me an estimate of what those properties are worth today, what

3    would you say?

4            MR. WANDNER:  Objection.  Asked and answered.

5    BY MR. TAHMASSEBI:

6    Q    You can answer.

7    A    I would have to see the financials but last time I

8    checked, their values were negative.

9    Q    There was a big, I guess, huge change from your

10   financial wherewithal and status in August of 2020 until

11   today that appears?

12   A    Correct.

13   Q    Okay.  And in the interim between August of 2020 when

14   you had a net worth of 58 million and today, you also had a

15   judgment in this case entered against you.  You're aware of

16   that?

17   A    Yes.

18   Q    And you've taken zero steps to attempt to pay that

19   judgment, correct?

20   A    No.  I haven't taken any steps --

21           COURT REPORTER:  I can't hear you.

22           THE WITNESS:  No, I haven't taken any steps to pay

23   the judgment.

24   BY MR. TAHMASSEBI:

25   Q    Do you believe you have an obligation to pay that

1    judgment?

2    A    I do.

3    Q    Have you gone, Mr. Ivankovich, to any of the entities

4    that you have an interest in and attempt to either sell that

5    interest or somehow withdraw funds so that you had the

6    ability to pay this judgment?

7    A    There are no funds to withdraw from those entities

8    and --

9    Q    Have you looked into assigning your interest in the

10   Pilgrim entities to the plaintiffs in this case who have a

11   judgment in order to satisfy your obligations to the

12   plaintiffs?

13   A    I don't have an interest in the Pilgrim entities.

14   Q    You have a 97 percent interest in Overlook Managing

15   Member LLC, right?

16   A    That's correct.

17   Q    Which would give you the majority of voting rights,

18   correct?

19   A    In Overlook, yes.

20   Q    You have -- Overlook then has 100 percent interest in

21   the five Pilgrim entities which have the interest in the

22   properties we talked about as part of the portfolio, correct?

23   A    Correct.

24   Q    Take a look at Exhibit 14.  By the way, you've sued

25   Stifel down in Florida?

1  A    Yes.

2  Q    You used to have a friend that was an advisor at Stifel,

3  right?

4  A    Please be specific.

5  Q    Yeah.  Did you -- there was a gentleman at Stifel that's

6  no longer there that you have a -- had a professional

7  relationship with and you now have a personal relationship

8  with, correct?

9  A    Are you asking me to guess on the gentleman?  Please

10  tell me.

11  Q    You don't know his name?

12  A    I don't know his name.  I don't know who you're

13  referring to.

14  Q    You don't know -- you've never been seen with this

15  gentleman on different boats, on different yachts?  You don't

16  know who I'm talking about?

17         MR. WANDNER:  Counsel, counsel, if you have a name

18  that you're asking, please ask him.  You're asking him

19  to speculate.

20  BY MR. TAHMASSEBI:

21  Q    Mr. Ivankovich --

22         MR. WANDNER:  Objection as to speculation.

23  BY MR. TAHMASSEBI:

24  Q    -- is there a gentleman from Stifel that you have been

25  seen going on yacht trips with, going out to dinners with,

1    having wine with that rings a bell anywhere?

2    A    No.

3    Q    Okay.  You want to stick with that as your answer,

4    you've never -- never been seen with a gentleman who used to

5    be at Stifel on a boat down in southern Florida?

6    A    Or a gentlewoman, no.

7    Q    Okay.  All right.  Back to -- is it 14 I marked it as --

8    the answer to the amended citation, have you seen this

9    document before?

10   A    No.

11   Q    Third page, there's a chart and I want to talk about

12   just the last two.  Okay, sir?  There's a number 13 is under

13   "P2 Portfolio Managing Member LLC" and then the amount in the

14   account, account balance is 10 million 991 dollars --

15        Excuse me.  I have to get the right one.

16        (Brief pause.)

17   BY MR. TAHMASSEBI:

18   Q    -- the amount in the account is $10,991,073.82.

19   A    Which page of the document are you looking at?

20   Q    Sure.  Page 3 --

21   A    Yep.

22   Q    -- in the chart at the -- there's numbers on the

23   left-hand side, the very bottom in the middle of the page.

24   A    Okay.

25   Q    There's two accounts there, P2 Portfolio Managing Member

1  LLC, what's your interest in that entity?

2  A    Maybe I'm a -- I think I'm 5 percent --

3          COURT REPORTER:  Can you speak up for me?

4          THE WITNESS:  I believe I'm 5 percent owner of that

5  entity.

6  BY MR. TAHMASSEBI:

7  Q    Did you have the ability to transfer funds out of the

8  Stifel account for P2 Portfolio Managing Member LLC?

9  A    Not on my own, no.

10 Q    Well, who else would have to assist you?

11 A    Anthony Ivankovich.

12 Q    Your father?

13 A    Yes.

14 Q    How old is your father?

15 A    82, I believe.

16 Q    Where does he reside?

17 A    In Florida.

18 Q    Where in Florida?  What's the address?

19 A    Key Biscayne, Florida.

20 Q    What's the address?

21 A    791 Crandon Boulevard, Key Biscayne, Florida.

22 Q    Does he reside there alone, with his wife, your mother?

23 A    With his wife and with me.

24 Q    Is he retired?

25 A    He's retired from being a physician; yes.

1   Q    And then the Ivankovich family -- by the way, who

2   handles the finances for P2 Portfolio Managing Member LLC?

3   A    Again, it would have been the successor to RealPage.

4   Q    Who, the successor to RealPage?

5   A    To RealPage.

6   Q    Well, when you say "the successor," is that a different

7   firm or did they merge or --

8   A    I don't know if they merged but it's not RealPage

9   anymore.

10  Q    Ivankovich Family LLC, what's your interest in that

11  company?

12  A    Again, in the 5 percent range.

13  Q    And it looks like the account there is $19,042,437, do

14  you see that?

15  A    Yes.

16  Q    And the individuals that would have to authorize

17  transfer any of those funds would be yourself and your

18  father?

19  A    Myself, my father, and my mother.

20  Q    Okay.  And has either -- has any money been transferred

21  out of P2 Portfolio Managing Member LLC or the Ivankovich

22  Family LLC that are listed here in the Stifel accounts?

23  A    I'm sure money was transferred in the normal course of

24  business.

25  Q    Since April 6th of 2022, has any money been transferred

1      out of the P2 Portfolio Managing Member LLC or Ivankovich

2      Family LLC accounts?

3    A     I'm sure there was.

4    Q     Well, did you authorize those transfers?

5    A     No, not entirely.

6    Q     Well, you were involved with them, right?

7    A     Yeah.

8    Q     And --

9    A     I was involved in the organization.

10    Q     And how much was transferred out?

11    A     I don't know.

12    Q     Where was it transferred to?

13    A     I don't know.

14    Q     Well, when you authorized the transfer, you didn't ask

15      what are -- where is the money going?

16    A     Well, you're using the term transfers but in the normal

17      course of business, there are transfers all the time anywhere

18      from a dollar to any amount so you have to be specific what

19      you're asking me.

20    Q     Well, I'm asking you, if you -- you said money was moved

21      from the P2 and Ivankovich accounts to somewhere else.

22    A     I didn't say money was moved.  I said -- you asked me if

23      money was transferred, so.

24    Q     Okay.  Let me do it this way, Mr. Ivankovich.  When you

25      and your mother and your father sat down since April of 2022

1  and said we're going to take money from one place and either

2  spend it or put it in another place, what term would you like

3  me to use for that?

4  A   I like to use the term specific to what you're asking

5  me.

6  Q   Was any money moved out of the P2 Portfolio Member LLC

7  account and the Ivankovich Family LLC investment account

8  since April of 2022?

9  A   Can you please repeat the question?

10 Q   Sure.  Was any money moved out of the P2 Portfolio or

11 Ivankovich Family LLC Stifel accounts since April of 2022?

12 A   Well, I imagine there was.  Yes.

13 Q   Okay.  And then how much was moved?  And if you need to

14 do it by P2 and Ivankovich, you can do that.

15 A   I can't tell you sitting here.

16 Q   Why was any money moved?

17 A   Because these are companies that conduct business so to

18 pay bills, to make investments.

19 Q   Okay.  What bills were needed to be paid by P2 Portfolio

20 Managing?

21 A   I don't know.

22 Q   Who would know?

23 A   My father would know.

24 Q   Okay.  Ivankovich Family LLC, again, money was moved.

25 I'd have to ask your father why it was moved?

1    A    Ask my father, my mother; yes.

2    Q    Okay.  You want me to ask your 82-year-old father or

3    your mother why money would have been moved since April of

4    '22 out of these two LLCs, correct?

5    A    I don't want you to.

6    Q    Well, you just said they were the ones that would know,

7    not you, so, I mean, that to me is telling me that's who I

8    have to ask --

9    A    Correct.

10   Q    -- so we'll ask them.  Now --

11        (Counsel conferring.)

12   BY MR. TAHMASSEBI:

13   Q    Did you ever have an individual account with Stifel?

14   A    No.

15   Q    The -- going back to Exhibit 14, the accounts

16   themselves, account ending 1602, did you have any interest in

17   that account, you individually?

18   A    I don't understand the question when you say "interest

19   in the account."

20   Q    Yeah.  Was it -- did you have a -- did you take money

21   from that account?

22   A    No, not on my own volition.

23   Q    Same with the 4799, did you have any interest in that

24   account itself?

25   A    Again, when you say "interest," I don't know what you

1    mean.

2    Q    Did you move money from that account?

3    A    Not on my own, no.

4    Q    Okay.  And then so you were in New York for a trial, do

5    you remember that?

6    A    Yeah, many years ago.

7    Q    Relating to Atlas?

8    A    Correct.

9    Q    And when you were asked about the Ivankovich Family LLC

10   and the P2, you told the court that you could use those funds

11   to populate an entity with the signing of a pen and a phone

12   call in a matter of minutes, do you remember that testimony?

13   A    I don't.  Can I -- I do not.

14   Q    Was that true that if you wanted to move money, in this

15   case you were saying you could have gotten it out of these

16   Stifel accounts and sent it to an Atlas account with the

17   signing of a pen and a phone call in a matter of minutes,

18   were you telling the truth when you told that to the New York

19   court?

20   A    I don't believe that's the testimony.

21   Q    We could populate that answer -- Page 2 -- Exhibit --

22   well, let's see.  Page 303 (sic) of the transcript from

23   January 13th, 2020, in answer to a question "the specific

24   entity doesn't, but the chain of ownership, as I said, has

25   plenty of assets.  We could populate that entity with the

1    signing of a pen and a phone call in a matter of minutes," is

2    that your testimony?

3    A    You'd have to show me the document so I can look at it.

4    Q    I can mark your testimony, sure.  Let's call this

5    Exhibit --

6         (Counsel conferring.)

7    BY MR. TAHMASSEBI:

8    Q    Exhibit 13 is the transcript from January 13th, 2020.

9         (Brief pause.)

10    BY MR. TAHMASSEBI:

11    Q    I highlighted it for you.  I just need you to confirm

12    that's what you testified to and that you were telling the

13    truth when you made those statements.  That's the only

14    question I'm asking you.

15    A    What is the question you were asking?

16    Q    Yeah.  Is that your testimony that I just showed you on

17    Page 304?

18    A    I'm looking at a copy of my testimony but what is the

19    question you're asking?

20    Q    Were you telling the truth when you said that to the

21    judge in New York?

22    A    When I said what's -- in this testimony?

23    Q    Yes.

24    A    Is this testimony my truth?

25    Q    Yes.

1    A    The truth?

2    Q    Yes.

3    A    Yes.

4    Q    Okay.  You can set that aside.  She's going to take it.

5              COURT REPORTER:  Can I ask a quick question?

6              MR. TAHMASSEBI:  Sure.

7         (Discussion off the record.)

8    BY MR. TAHMASSEBI:

9    Q    Do you have any income today, sir?

10   A    No.

11   Q    How did you get up here?

12   A    Airplane from Miami.

13   Q    Who paid for it?

14   A    My father.

15   Q    Who pays for your daily living expenses?

16   A    My parents.

17   Q    How old are you again?

18   A    52.

19   Q    And who pays to assist in running the entities you still

20   have an interest in so far like Overlook Management (sic)

21   Member LLC or the P5 entities?

22   A    Whatever income I would imagine comes off the properties

23   pays for the staff there.

24   Q    Anything else?

25   A    No.

| | | |
|---|---|---|
| 1 | Q | Do you have any involvement in paying the staff there? |
| 2 | A | No. |
| 3 | Q | Who does? |
| 4 | A | When you say "who does," meaning -- |
| 5 | Q | Yeah.  I mean, who is the one that's taking the income |
| 6 | | from the properties and paying staff? |
| 7 | A | I don't believe staff is paid directly.  I believe it -- |
| 8 | | there's a management contract. |
| 9 | Q | And who is that with? |
| 10 | A | With Atlas Apartment Homes LLC but I actually don't know |
| 11 | | how the staff is paid at this point. |
| 12 | Q | How do you pay -- do you have a car? |
| 13 | A | No. |
| 14 | Q | How do you get around? |
| 15 | A | Uber, walk. |
| 16 | Q | Okay.  Who pays for your Uber? |
| 17 | A | My father. |
| 18 | Q | Do you have a credit card? |
| 19 | A | No.  I use his. |
| 20 | Q | Who pays your lawyers? |
| 21 | | MR. WANDNER:  Objection.  Move to strike. |
| 22 | | BY MR. TAHMASSEBI: |
| 23 | Q | You can answer. |
| 24 | | MR. WANDNER:  No.  I'm instructing him not to |
| 25 | | answer unless the Court orders him to. |

1    BY MR. TAHMASSEBI:

2    Q    Did you retain Mr. Wandner to represent you in this

3    matter?

4         MR. WANDNER:  I object.  I instruct you not to

5    answer --

6         MR. TAHMASSEBI:  Whether or not he retained you is

7    not --

8         COURT REPORTER:  I'm sorry, I have to -- one at a

9    time.

10        MR. WANDNER:  I'm objecting and I'm instructing him

11   not to answer unless the Court orders him to answer that.

12   It's not an appropriate question.

13        MR. TAHMASSEBI:  I just asked him whether he

14   retained you to be able to represent him.

15        MR. WANDNER:  It's still -- it violates the

16   attorney-client privilege, counsel.

17   BY MR. TAHMASSEBI:

18   Q    Okay.  Who is paying Mr. Wandner's bill, do you know?

19        MR. WANDNER:  Objection.  Same objection.

20   BY MR. TAHMASSEBI:

21   Q    Who hired the -- is it "Chukek" or Chuhak -- guys that

22   are sitting here, your lawyers that are sitting here to

23   represent the LLCs?

24        MR. PORRAS:  Objection --

25        MR. DEBRE:  Objection.

1    MR. WANDNER:  Objection.

2    MR. PORRAS:  -- as to foundation.

3    BY MR. TAHMASSEBI:

4    Q    Did you hire the Chuhak lawyers to represent the LLCs?

5    A    I can't answer the question on advice of attorney.

6    Q    No one has told you not to answer.

7    MR. WANDNER:  I'm objecting to these questions.

8    They impact the attorney-client privilege, counsel.

9    BY MR. TAHMASSEBI:

10   Q    Are you following his advice?

11   A    I am.

12   Q    Okay.  Who is paying the Chuhak lawyers for the P2 --

13   MR. WANDNER:  Same objection.  Asked and answered.

14   MR. TAHMASSEBI:  Guys, you gotta -- Hey, gentlemen,

15   let's just -- there's a method to my madness, okay?  I'm

16   not -- let's be professional.  Let me finish the question --

17   MR. WANDNER:  I am being professional.

18   MR. TAHMASSEBI:  -- and I respect that you have to

19   make an objection and if you instruct him not to answer,

20   that's fine, but I need a record so that if I decide to go to

21   the Judge, we're not talking over each other and also for the

22   benefit of the reporter so please let me finish and then you

23   can make your objection.

24   BY MR. TAHMASSEBI:

25   Q    Mr. Ivankovich, do you know who hired the Chuhak &

1    Tecson lawyers to represent the LLCs, specifically the

2    Ivankovich Family LLC, the P2 LLC and the Pilgrim LLCs, the

3    P5?

4         MR. PORRAS:  At this point I'd like to make a

5    standing objection for any further questions relating to

6    communications with Chuhak & Tecson on behalf of the LLCs.

7    We're asking that Mr. Ivankovich not answer the questions.

8    BY MR. TAHMASSEBI:

9    Q    Okay.  And you're following that advice?

10   A    I am.

11        MR. TAHMASSEBI:  See, guys, not that hard.

12   BY MR. TAHMASSEBI:

13   Q    While we're on this Exhibit No. 1, this is an Alias

14   Citation to Discover Assets to Steven Ivankovich and if you

15   go to Page 5 -- excuse me, Page 7 --

16   A    Go ahead.

17   Q    On 7, there's a statement, I certify everything that --

18   in the answer to the citation proceedings is true and

19   accurate.  I understand that making a false statement on this

20   form is perjury and has penalties provided by law.  Do you

21   see that?

22   A    I do.

23   Q    And that's your signature, correct?

24   A    It is.

25   Q    And your name above there?

1    A    Yes.

2    Q    And do you remember actually signing this document?

3    A    I don't.

4    Q    Did you sign this document?

5    A    Yes.  That's my signature.

6    Q    Turn back, if you could for me, to Page 5.

7    A    Sure.

8    Q    It says you own property 235 West Menonee,

9    M-e-n-o-n-e-e, Street and 234 Willow Street --

10             MR. WANDNER:  That's Page 6, counsel.

11             MR. TAHMASSEBI:  I'm sorry.  Page 6.

12             THE WITNESS:  Yes, although there's a typo on West

13   Menomonee.  It should be Menomonee, M-e-n-o-m-e-e (sic).

14   BY MR. TAHMASSEBI:

15   Q    And on the Menomonee property, what type of property is

16   that?

17   A    It's a single-family home.

18   Q    In the North Chicago area?

19   A    Yeah.

20   Q    And is there a mortgage on that property?

21   A    Yes.

22   Q    With what bank?

23   A    Originally it was with a bank called Cole Taylor but

24   there's been five different mergers and acquisitions since

25   then so I'm not sure who the current bank is.

1   Q    Well, who do you pay your mortgage to?

2   A    I don't pay the mortgage.

3   Q    Who does pay the mortgage?

4   A    Nobody.  The home is in foreclosure.

5   Q    When is the last time you paid the mortgage on the 235

6   West Menomonee property?

7   A    2019.

8   Q    The same time you were putting a lot of your own

9   personal assets into the entities that you had an interest

10  in, right?

11  A    Correct.

12  Q    Is this --

13  A    By the way, I may not have even owned it anymore.  I

14  think there was a share scale -- sale scheduled in August so

15  I don't know if that happened or not yet.

16  Q    Did you own it yourself or with your wife, the Menomonee

17  property?

18  A    It's owned jointly with my wife.

19  Q    The 234 West Willow property, is that owned by you

20  individually or with your wife?

21  A    It's the same residence.  It's a contiguous lot --

22  Q    Got it.

23  A    -- or I think they call them a tandem lot.

24  Q    When is the last time you paid the mortgage on that

25  property?

1    A    The same.  It's the same -- it's one mortgage, I think,
2    covering both.
3    Q    All right.  Just so I'm clear, back in 2020 you had a
4    net worth of approximately 58 million and today you depend
5    upon your father to provide you with a living space, right?
6    A    And my mother.
7    Q    And your mother; I'm sorry.  And your mother to provide
8    you with a living space, right?
9    A    Yes.
10   Q    To pay any bills that you have, if you have any?
11   A    I don't have any more anymore, thankfully.
12   Q    To make sure you get transportation to anywhere you need
13   to go, right?
14   A    Yes.
15   Q    And, for example, the flight that you got up here today,
16   you didn't pay for that, did you?
17   A    No.
18   Q    And what -- on a daily basis, Mr. Ivankovich, then what
19   do you spend your time doing unless you have a job that I
20   didn't see but I thought you said you were unemployed.
21   A    No.  Play tennis, do a lot of reading.
22   Q    So how you spend your day --
23   A    Go to the gym.
24   Q    Okay.  So you spend your days --
25   A    Do some fishing, look at women on the beach when I'm

1    there, which is why I'm getting a divorce.

2    Q    All right.  Exhibit No. 2, if you could, please.  So

3    most of your days are spent, I guess, tennis, gym, looking at

4    women on the beach, time on the beach --

5              MR. WANDNER:  Sorry.  Objection, asked and

6    answered.

7    BY MR. TAHMASSEBI:

8    Q    -- right, fair enough?

9    A    (Nodding).

10   Q    You got to say "yes" for her.

11   A    Yes.

12   Q    Okay.  Exhibit 2 is a financial statement dated April of

13   2017.  Do you see that?

14   A    Yes.

15   Q    And is that your signature?

16   A    Yes.

17   Q    Okay.  Do you have any reason to believe you did not

18   sign this on or around April of 2017?

19   A    No.

20   Q    Second page.  Your salary at that time was 250,000?

21   A    Correct.

22   Q    And if we go to the balance sheet from 2017, at this

23   time you had liquid marketable assets of around $6,103,196,

24   does that sound about right?

25   A    Yes.  That's what the document says, correct.

1  Q    And then the net worth is 28 million 603 thousand

2  approximately?

3  A    Yes, correct.

4  Q    So from 2017 up until 2020, you actually did fairly well

5  and your assets and net worth improved up until that year,

6  right?

7  A    Yes.

8         MR. TAHMASSEBI:  What time is your call?  Off the

9  record.  Sorry.

10         (Recess taken.)

11         MR. WANDNER:  You say you have about 20 minutes

12  left?

13         MR. TAHMASSEBI:  Yes.

14         MR. WANDNER:  Okay.

15  BY MR. TAHMASSEBI:

16  Q    Mr. Ivankovich, when is the last time you filed a tax

17  return?

18  A    Maybe 2017.

19  Q    2017 was the last time you filed an individual tax

20  return?

21  A    Yep.

22  Q    And who filed that for you?

23  A    I think a company called Professional Financial

24  Consultants.  That sounds about right.

25  Q    Are you planning to file tax returns anytime soon?

1    A    Yeah.

2    Q    Did you get extensions for your tax returns?

3    A    I did get extensions but I think the extension is only

4    for a year.

5    Q    Have you paid taxes since 2017?

6    A    No.  I also think there's a -- I've got like a $2

7    million federal tax lien that I have on there.

8    Q    Do you know that the judgment in this case was entered

9    against -- did you know on or around August 17th of 2021 that

10    there was a judgment in this case entered against you?

11    A    I probably did, yes.  I don't recall the specific day.

12    Q    Did you have a bank account in August -- on August -- on

13    or around August of 2021?

14              MR. WANDNER:  I object.  Asked and answered.  You

15    asked him if he had bank accounts earlier.

16              THE WITNESS:  A personal bank account?

17    BY MR. TAHMASSEBI:

18    Q    You got to listen to the question.

19    A    Yeah.  No.

20    Q    When was the last time you had a personal bank account?

21    A    2016, '17.

22    Q    The companies that you said you had to use your personal

23    finances for, the 58 million, did any of those companies

24    apply for any governmental assistance during COVID?

25    A    I didn't say I used $58 million.  Let's get that clear.

1    I didn't use $58 million in those companies.

2    Q    Well, how much did you transfer to those companies?

3    A    In the $12 million range.

4    Q    Okay.  So then of your $56 million net worth, you still

5    have a significant amount of that?

6    A    No.

7    Q    So what happened to the rest of the --

8    A    As the assets' value went to zero or foreclosed upon,

9    those interests disappeared.

10   Q    Did any of your companies during COVID that you had an

11   interest in apply for any governmental assistance relating to

12   COVID?

13   A    I don't know.

14   Q    Well, as an interested -- as an owner of these

15   companies, didn't you have an interest -- somebody who was

16   forking over $11 million from the year two thousand -- from

17   you said the time of COVID about until the end of 2021, did

18   you ever think it might be a good idea to see if there's

19   other avenues besides giving over your personal assets?

20   A    I did.  My recollection was that was -- those programs

21   were based on companies with employees and none of these

22   companies have employees.  There's only one company that had

23   any employees, that was Atlas Apartment Homes, and it's

24   possible that may have applied for something.

25   Q    Well, hold on.  You said earlier you used money from the

1    11 million for payroll?

2    A    Yes.

3    Q    But now you're saying the payroll consisted of just one

4    person?

5    A    No, no.  Of one company.

6    Q    Okay.  One company?

7    A    Yes.

8    Q    Okay.  What -- which company was that?

9    A    Atlas Apartment Homes.

10   Q    Okay.  And did Atlas Apartment Homes apply for a PPP

11   loan or any of the other programs that the government had

12   during COVID?

13   A    I don't know.

14   Q    Did you ever ask that somebody from Atlas Homes apply

15   for that program so that you don't have to yourself put in

16   your personal assets to the tune of $11 million according to

17   what you said today?

18   A    I don't think I asked; no.

19   Q    Why not?

20   A    I'm just not used to taking money from the government.

21   Q    Did you ever consult with anybody in 2020, 2021 as to

22   whether or not these entities that you put this $11 million

23   into could have received funds from the government, loans

24   that were ultimately forgiven as a result of the COVID

25   crisis?

1          MR. WANDNER:  Object to the form of the question.

2          MR. TAHMASSEBI:  Did you say "no"?

3          THE WITNESS:  I didn't consult with anybody but I

4     recall reading about the programs.

5     BY MR. TAHMASSEBI:

6     Q    But you never consulted with anybody as to whether or

7     not those programs, the COVID programs that the government

8     put forth specifically for companies like yours made sense,

9     fair?

10    A    I didn't consult with anybody; no.

11    Q    Do you own any jewelry, any -- anything else of value,

12    antiques, anything like that, just so --

13    A    No.

14    Q    No?

15    A    No.

16    Q    Do you plan to move out of your parents' home anytime

17    soon?

18    A    No.

19    Q    Okay.  If you do, will you please have your lawyer

20    contact me?

21    A    Sure.

22    Q    How old are your children now?

23    A    15 and 11.

24    Q    Do they live with you?

25    A    No.

1    Q    Where does your wife reside?

2    A    I believe in Chicago.

3    Q    What's the address?

4    A    I don't know.

5    Q    You don't know your wife's address?

6    A    No.  We haven't spoken since she filed for divorce in

7    October.

8    Q    Does your wife work?

9    A    I don't know.

10   Q    Well, okay.  Let me go back then.  In October, the last

11   time you spoke to her, did she have employment?

12   A    No.

13   Q    When is the last time she worked at all that you're

14   aware of?

15   A    In -- it would be when we met in 2005, 2006.

16   Q    Okay.  So once you guys met and married, she -- she

17   stopped working?

18   A    No.  She didn't stop working but --

19   Q    I didn't mean it like that.  I mean she didn't have

20   employment.

21   A    She was a professional mother and housewife.

22   Q    Okay.  The hardest job.  All right.  The -- and that

23   wasn't sarcastic just anyone that's reading this knows.  The

24   15-year-old and 11-year-old, where do they go to school?

25              MR. WANDNER:  I'd like to interpose an objection.

1    Is this really necessary --

2              MR. TAHMASSEBI:  Yeah.

3              MR. WANDNER:  -- to get into his children's lives?

4              MR. TAHMASSEBI:  I'm not asking him any more

5    questions about them.  It is necessary.

6              MR. WANDNER:  Well, you're asking a question about

7    them, about his children's lives.  Why is that relevant?

8              MR. TAHMASSEBI:  It's relevant because if they go

9    to a certain school --

10             MR. WANDNER:  Okay.  So why don't you ask him if

11   the kids go to a private school?

12             MR. TAHMASSEBI:  No.  Let me just ask him how I'm

13   doing it.

14             MR. WANDNER:  Well, I'm going to object to you

15   asking those questions.

16   BY MR. TAHMASSEBI:

17   Q    Where -- where do your kids go to school?

18             MR. WANDNER:  I'm going to object --

19             MR. TAHMASSEBI:  Okay.  You can object.

20             MR. WANDNER:  -- and instruct him not to answer

21   unless the Court orders him to answer the question.

22             MR. LAMMERS:  There's no privilege for asking about

23   relevant information.

24             MR. WANDNER:  It's not relevant where his children

25   go to school.

| 1 | MR. LAMMERS:  You can't instruct someone -- |
| 2 | MR. WANDNER:  If you want to ask him -- |
| 3 | BY MR. TAHMASSEBI: |
| 4 | Q    Do your children -- |
| 5 | MR. WANDNER:  -- if he personally -- |
| 6 | COURT REPORTER:  I'm sorry, I have to make a |
| 7 | record. |
| 8 | MR. WANDNER:  -- if he personally pays for a |
| 9 | private school for his kids, then I won't object to that as |
| 10 | relevance, but asking them where they go to school on a |
| 11 | public document I believe is not proper. |
| 12 | BY MR. TAHMASSEBI: |
| 13 | Q    Do your children go to private school or public school? |
| 14 | A    They go to private school. |
| 15 | Q    And who pays for that private school? |
| 16 | A    At this point, I don't know. |
| 17 | Q    When was the last time you paid for your children's |
| 18 | private education? |
| 19 | A    2019. |
| 20 | Q    2019? |
| 21 | A    Yep. |
| 22 | Q    What's the cost of their private schooling? |
| 23 | A    I don't know. |
| 24 | Q    What was it in 2019? |
| 25 | A    In the range of $10,000 per year. |

1    Q    For each, right?

2    A    Yes.

3    Q    What is A & O Family LLC?

4    A    A limited liability company.

5    Q    Well, I get that but what does it do?

6    A    I don't know.

7    Q    Who are the members?

8    A    I don't know exhaustively but members of my family.

9    Q    Okay.  Give me the ones that you do know.

10   A    Anthony Ivankovich, Olga Ivankovich, Daniel Ivankovich,

11   Sophie Ivankovich, Anthony Ivankovich the second, Lucas

12   Ivankovich, Katarina Ivankovich.  That's all I know.

13   Q    And you are not a member?

14   A    And me, yes.

15   Q    Okay.  And what does that LLC do?

16   A    I believe it's an investment company.

17   Q    Where does A & O Family LLC bank?

18   A    I believe it does have -- it does have accounts at

19   Stifel.

20   Q    How much are in those accounts, do you know?

21   A    I don't know.

22   Q    10,000, 10 million like the other ones?

23   A    I don't know.  I'm not privy to those statements.

24   Q    All right.

25        (Counsel conferring.)

1    BY MR. TAHMASSEBI:

2    Q    As far as the P5 Portfolio, the Warwick property, the

3    Wind Tree property and the Coulter Landing property I think

4    we said those still are -- those have not been sold, right?

5    A    Correct.

6    Q    And those are owned as far as who has title to those

7    by -- is it Atlas Apartments Management LLC?

8    A    No.

9    Q    Okay.  Who is it?

10   A    Do you know what page the org chart was on?

11   Q    Sure.  9.

12   A    The Alliance HTTX Limited Partnership.

13   Q    Okay.  So the Alliance HTTX GP Limited Partnership, got

14   it, owns the three properties.  All right.  Did you ever give

15   personal money to -- I'm sorry, just so -- let me just ask a

16   better question so we can be done.  The personal funds that

17   you disbursed into the LLCs in 2020, '21, would have gone to

18   a variety of LLCs of which are listed in the organizational

19   chart marked as Exhibit 9?

20   A    Yes.

21   Q    Oh, yeah.  The residential properties that you owned,

22   were those always owned by you and your wife or at some point

23   were they owned by just you, the two Chicago properties?

24   A    Yeah.  I owned it prior to us getting married.

25   Q    And then it was transferred over at the time you were

1   married?

2   A    Yes.

3   Q    And that was what date?

4   A    2006.

5   Q    Have you ever owned any property, you individually, in

6   Florida?

7   A    No.

8   Q    How about your wife?

9   A    I don't know.

10  Q    Not since you've known her?

11  A    Not since I've known her.  It's possible she does.  I

12  don't know about --

13  Q    And then --

14       (Brief pause.)

15  BY MR. TAHMASSEBI:

16  Q    Did you provide -- and if you want something to

17  reference, I'm going back to Page 12 of Exhibit 6.

18  A    Go ahead.

19  Q    The last paragraph that starts with "Mr. Ivankovich

20  reports --"

21       COURTROOM DEPUTY:  Hi.  Judge says she's going to

22  give you guys another ten, 15 minutes.

23       MR. TAHMASSEBI:  We're about -- we're done in like

24  two.

25       COURTROOM DEPUTY:  Okay.  Perfect.

 1                  MR. TAHMASSEBI:  Yeah.

 2                  MR. WANDNER:  I have a couple questions, too.

 3          Please.

 4                  MR. TAHMASSEBI:  Oh, all right.  Okay.  Maybe we

 5          will need ten minutes.  Sorry.

 6                  COURTROOM DEPUTY:  Okay.  So ten minutes then.

 7                  MR. TAHMASSEBI:  Got it.  Thanks.

 8                  COURTROOM DEPUTY:  All right.

 9                  THE WITNESS:  Go ahead.  I'm on Page 12.

10          BY MR. TAHMASSEBI:

11          Q    Yeah.  The information on that last paragraph, did you

12          provide documentation to support your net worth and liquidity

13          of 42.7 million and 12.7 million to Walker Dunlop?

14          A    Yes.

15          Q    Okay.  And who did that documentation come from, you

16          directly or one of your professionals?

17          A    Me directly.

18          Q    Was it via email, was it mailed, how would you have done

19          that?

20          A    Hard to say.  Probably either -- some private way.  It's

21          sensitive information so either by courier --

22          Q    All right.

23                  MR. TAHMASSEBI:  So I'll make a formal --

24          Mr. Wander?

25                  MR. WANDNER:  Yes, sir?

1          MR. TAHMASSEBI:  I'm going to make a formal request

2    for additional documents.

3          MR. WANDNER:  File what you need to file.

4          MR. TAHMASSEBI:  Those are what I need.  And then

5    the last thing is, I want to put on the record I'm handing --

6    I'm handing Mr. Ivankovich a Citation to Discover Assets in

7    the Atlas LLC case in the collection portion, 2019 L 454, so

8    I'm just serving you with that document to respond to.  And

9    also appear --

10          MR. WANDNER:  Can I have a copy of it?

11          MR. TAHMASSEBI:  Yeah, absolutely.  And also appear

12    for another citation exam.  That's all I have.

13          MR. WANDNER:  Can I ask you why you didn't

14    coordinate the dates on this with his counsel?

15          MR. TAHMASSEBI:  Because I didn't -- I didn't know

16    what the Judge had in mind.  We can go off the record.

17        (Discussion off the record.)

18          MR. WANDNER:  I just have a few questions.

19                    CROSS EXAMINATION

20    BY MR. WANDNER:

21    Q   Mr. Ivankovich, early on in the first part of the depo,

22    you had said something about a cut-and-paste of your

23    financial statements.  Did you want to expand on your answer

24    at all?

25    A   Yeah.  I have to study the document closer but this

1  doesn't look like something I would have produced.  There's

2  just too many inconsistencies on the pages that I can see.  I

3  mean, for example, in 2020, I would have been 50 years old

4  and my kids would have been older.  This -- this statement

5  below I don't ever recall having that in my financial

6  statements.  It just doesn't seem right.

7  Q    Did you see where Exhibit 2 and Exhibit 3 on the

8  signature page, one seems to be in blue ink and one seems to

9  be more of a copy?

10 A    Yes.  Yeah, yeah.  That's --

11 Q    Is that also something that raises questions?

12 A    Yeah, that looks fishy.

13 Q    Okay.  Now you brought up in your answers that there

14 seems to be some differences internally within Exhibit 3

15 referenced to the date of August 26th, 2020, and March of

16 2020, which is interspersed within the document.  Did you

17 reference that?

18 A    Yeah.  It's not just that.  I mean, there's all sorts of

19 dates in here.

20 Q    Can you tell for the record purposes what happened in

21 and around March of 2020 to the world?

22 A    Oh, I think we got locked down with COVID.

23 Q    Okay.  And did that have a negative effect upon your

24 assets?

25 A    Oh, yeah.  Everyone stopped paying rent.

1  Q   Okay.  And when -- when renters stopped paying rent, did

2  that stop the obligations of the landlords, whomever they

3  were, to pay their bills?

4  A   No.

5  Q   And was there negative consequences to the entities and

6  to the renters if the landlord stopped paying their bills?

7  A   Oh, yeah.  The water shut down, the mortgage foreclosure

8  power would have got shut down, no insurance.  I mean --

9  Q   And you said --

10  A   -- all of that happened.

11  Q   And you said you got some notices from the Department of

12  Labor that there's personal obligations to, you know, take

13  care of certain things --

14  A   Yeah.

15  Q   -- on behalf of corporate entities?

16  A   Yeah.

17  Q   Okay.

18  A   Yeah, I didn't -- I didn't realize that the payroll goes

19  personally to the manager of the company.

20  Q   Did the entities -- and I'm not going to get into the --

21  using counsel's term getting into weeds on which ones, but

22  the entities that were referenced here today, did they have

23  tax burdens and tax obligations that were documented during

24  that period of time?

25  A   We had to pay.  We had to continue to pay real estate

1    taxes; yes.

2    Q    Okay.  And do you know whether those entities or some of

3    those entities indicated losses during the time period

4    reflected between August of 2020 and today?

5    A    They all had losses.

6    Q    Millions of dollars in losses?

7    A    Yes.

8    Q    You said some of -- some of the assets were in Florida,

9    right?

10   A    Yes.

11   Q    Okay.  Do you know whether the State of Florida

12   specifically had passed some rules in response to COVID where

13   people who failed to pay rent could not be evicted?

14   A    Yeah.  There was an eviction moratorium everywhere,

15   Texas, Florida, Illinois, everywhere.

16   Q    And did that negatively affect your assets during the

17   period of time from when the documents reflected in what

18   Mr. --

19              MR. WANDNER:  I'm sorry.

20              MR. TAHMASSEBI:  Mr. Tahmassebi.

21              THE WITNESS:  Tahmassebi.

22              MR. TAHMASSEBI:  It doesn't bother me.

23   BY MR. WANDNER:

24   Q    -- Tahmassebi referenced and as we sit here today?

25   A    Yeah, people stopped paying rent essentially.

1    Q    But again, that didn't stop bills coming in, right?

2    A    No, no.  And we -- we asked.  We tried to get the water

3    company to give us a pass but they shut down the water unless

4    we paid the bills.

5    Q    Do you have any other judgments against you personally

6    out there?

7    A    Yeah.  There's --

8    Q    You mentioned a tax lien.

9    A    Yeah.

10   Q    What else?

11   A    In reading this document, it's referenced on -- in one

12   of these exhibits.  There's a judgment now for a million

13   eight on my home mortgage and I think the company is called

14   Edgefield.  There's a $26 million judgment from 2019 --

15   Q    Okay.

16   A    -- I believe.

17   Q    And in your testimony that counsel asked a couple of

18   random questions about, did you ever indicate that you had

19   the authority to use moneys from these LLCs to pay your own

20   debts?

21   A    No.

22   Q    In fact, didn't you indicate specifically that you were

23   not authorized to use the money to pay your own debts without

24   gaining authority?

25   A    Yes.

1    Q    And, in fact, in -- even in the cite to the transcript
2    that counsel mentioned, he said "a stroke of the pen and a
3    phone call," the phone call was to the person who you needed
4    to gain authority from which to make a move; isn't that
5    correct?
6    A    I'd have to go back and re-read it but I didn't have
7    authority on my own to move money.  That's correct.
8    Q    Okay.  So the bottom line is, like a banker who has the
9    key to the vault at a bank, he has the ability to move money,
10   that doesn't mean he has the authority to move money; is that
11   right?
12   A    I believe that's right.  Yes.
13   Q    Okay.  Like a banker who is a manager of Wells Fargo has
14   the key to the vault, he can't go in there, take half a
15   million and go pay his water bill with it, right?
16   A    I couldn't -- I couldn't -- I can't move money without
17   my permission.
18   Q    Okay.
19              MR. WANDNER:  One second.
20         (Brief pause.)
21              MR. WANDNER:  That's all I have.  Thank you, guys.
22              MR. TAHMASSEBI:  We're done.
23         (Proceedings concluded at 12:07 p.m.)
24
25

1                      C E R T I F I C A T E

2          I hereby certify that the foregoing is a complete, true

3      and accurate transcript of the proceedings had in the

4      above-entitled matter before the Honorable Sharon Johnson

5      Coleman at Chicago, Illinois, on August 31, 2022.

6

7      /s/*Laura LaCien*                    September 7, 2022
       Official Court Reporter                    DATE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# KONICEK & DILLON P.C.

### Trial Attorneys

Amir R. Tahmassebi - Partner • amir@konicekdillonlaw.com

February 2, 2023

*Via Email*
Mr. Jason Wandner
Jason M. Wandner, P.A.
100 N. Biscayne Blvd., Suite 1607
Miami, FL 33132

Re:     Zhu Zhai Holdings Limited, et al. v. Ivankovich
        Case No.: 20-cv-4985

Mr. Wander,

       Please provide all documentation evidencing any and all transfers that were made by your client to entities that he controlled or had an interest in from 2018 to present.  It is uncontroverted that your client's August 31, 2022, testimony establishes that he used his own personal funds to pay the "obligations" owed by entities he owned or had an interest in:

Q:     So you used personal funds to pay obligations of the companies?

A:     Yes.

Q:     Okay.  And that was through 2020 and 2021, correct?

A:     It started in 2019 as well.

Q:     Okay.  And then – and then what – who was the one that authorized payment of your personal funds to pay obligations of the companies, it had to be you, right?

A:     Yes.

Q:     And how did you transfer funds to these companies – well, which funds did you pay expenses for or obligations for, which corporations?

A:     All of them.
Q:     And how were those funds transferred?

A:     It would have been any way transferring funds.  It would have been just bank transfers, wire transfers, check, you know, any means people use to pay bills.

Examination of Anthony Ivankovich, p. 50:12 – 51:3.

       Debtor Ivankovich moved over $11 million of his own assets to pay "obligations" owed by entities he controlled or had an interest in:

**EXHIBIT
3**

Mr. Jason Wandner
February 2, 2023
Page 2

Q:    And then if you go down to Schedule B, it talks about "Marketable Securities, Stocks, Bonds, U.S. Government" and the total market value you have is $11 million, do you see that?

A:    Yes.

Q:    This is again on your personal financial statement?

A:    Yes.

Q:    And today, Mr. Ivankovich, do you still have that $11 million in marketable securities, stocks, bonds, and U.S. government?

A:    No.

Q:    Okay. And are you telling me that between again 2020 and today August 2022, all of that money was transferred out?

A:    It was used to pay bills.

Q:    Okay. And what bills was it used to pay?

A:    Payroll for the companies, mortgage payments, reserve payments, just the expenses of the companies when everything shut down during COVID.

*Id.* at 51:17 – 52:9.

Debtor Ivankovich has been involved in the relocation of funds as recently as April of last year:

Q:    Since April 6th of 2022, has any money been transferred out of the P2 Portfolio Managing Member LLC or Ivankovich Family LLC accounts?

A:    I'm sure there was.
…
Q:    Well, you were involved with them, right?

A:    Yeah.

Q:    And –

A:    I was involved in the organization.

Q:    And how much was transferred out?

A:    I don't know.

Mr. Jason Wandner
February 2, 2023
Page 3

…

Q:     Why was any money moved?

A:     Because these are companies that conduct business so to pay bills, to make investments.

*Id.* 71:25 – 72:13; 73:16-17.

       Given the aforementioned testimony, it is undisputed that your client has conducted countless transfers between his personal asserts and the entities he owns or has an interest in. Please provide all documentation evidencing said transfers within the next seven days. We would be happy to discuss further. This communication is made pursuant to Rule 37.

Sincerely,
KONICEK & DILLON, P.C.

Amir R. Tahmassebi
Enclosure

cc:    Michael W. Debre
       Cecilio Porras

Re: Ivankovich

Gary Goldstein <gary@gagpa.com>

Wed 3/1/2023 10:18 AM

To: Amir Tahmassebi <amir@konicekdillonlaw.com>

Cc: jason@wandnerlaw.com <jason@wandnerlaw.com>;Connor Whitting <connor@konicekdillonlaw.com>;Sheila Jacobsen <sheila@konicekdillonlaw.com>;Tihana Karlovic <tihana@konicekdillonlaw.com>;Michael Debre <MDebre@chuhak.com>;Cecilio I. Porras <cporras@chuhak.com>

Amir:

Do you have a confidentiality agreement that you prefer to use? I thought there was one entered already in the case approved by Judge Coleman.

You could check with Will Sears. If so we could just agree that the additional documents produced would be covered by that order.

That would include the LLCs whose records most likely will be included in the production.

We have been diligent in attempting to discover and review documents that we believe may be relevant to your informal document request.

We interpret the request to seek information on Steve Ivankovich's contributions to the various LLCs for the period 2018-2020, possibly 2017 if that year has relevant information on this issue.

Most likely we will create a cloud link.

We intend to start putting documents in and sharing them

By next Wednesday. We will not wait for execution of confidentiality order and will rely upon your discretion in granting access to said documents. They should not be included in any public filing absent a court order.

Any questions call Jason or me to work through issues in good faith.

I am copying Mike Debre and Cy with this email because the production will include LLC documents.

Gary

On Mar 1, 2023, at 10:54 AM, Amir Tahmassebi <amir@konicekdillonlaw.com> wrote:

Gary and Jason,

We received your answers to the interrogatories. However, we still have not received the documents requested in our Rule 37 letter. I spoke with Mr. Goldstein approximately two (2) weeks ago and was told they would be forthcoming. Please provide the documents within the next seven (7) days. I'm happy to discuss any issues relating to the production.

Regards,

Amir R. Tahmassebi
Konicek & Dillon, P.C.
70 W. Madison, Suite 2060
Chicago, IL 60602
(312) 328-9166 (Direct)

EXHIBIT
4

RE: Ivankovich

Gary Goldstein <gary@gagpa.com>

Wed 3/29/2023 10:17 AM

To: Connor Whitting <connor@konicekdillonlaw.com>

Connor:

I will respond to the production demand separately. I expect that you will have a formal response from Jason and myself by April 4, 2023. We are proceeding in good faith notwithstanding there being no request for production that complies with FRCP 34 directed to Steven Ivankovich. We have already created and given your firm access to a substantial amount of financial documents including LLC tax returns. If you believe it appropriate at this time to file a Rule 37 motion do so.

I have spoken with Mark Brown about "the telephone call". He received a call from an unknown number and indicated it was a woman's voice who of course he did not recognize and hung up what he believed was a spam call. I provided you with his personal cell number so obviously we in good faith were providing you with information to allow you to contact Mark. I suggest that you text mark identify yourself and provide him with a call back number, he can then return your call and arrange for service of a deposition notice.

Please coordinate the time place and means of deposition zoom preferably with Jason and Cy. I suggest zoom because Mark is not subject to attending a deposition in Chicago. To avoid that dispute try zoom or in person were convenient for the parties and Marks counsel.

Mark's number for you to text: 908-208-5421

Gary

---

**From:** Connor Whitting
**Sent:** Wednesday, March 22, 2023 6:08 PM
**To:** Gary Goldstein <gary@gagpa.com>; jason@wandnerlaw.com
**Cc:** Amir Tahmassebi <amir@konicekdillonlaw.com>; Sheila Jacobsen <sheila@konicekdillonlaw.com>
**Subject:** Re: Ivankovich

Counsel:

It has been almost seven weeks since we sent a Rule 37 letter seeking the production of any and all transfers that were made by Steven Ivankovich to entities that he controlled or had an interest in from 2018 to the present. To date, and despite Mr. Goldstein's prior assurances, we have yet to receive compliance. Many of the documents produced are non-responsive and do not evidence the transfers Ivankovich claims were made in his deposition. If we do not receive said production responses by next Tuesday, we will file a motion to compel. Of note, there have already been a number of Rule 37 conferences. I am available tomorrow or Friday for a Rule 37 conference.

Additionally, I called Mark Brown this morning and he proceeded to hang up on me after I told him who I was. We would ask that you please obtain the suite number to his address at 100 Park Avenue as it should not take you more than a brief phone call to obtain the specific address. He is, after all, the manager of all the relevant entities.

Thank you.

Best,

<div style="border:1px solid black; display:inline-block; padding:8px; text-align:center;">

**EXHIBIT**

**5**

</div>

Connor

Connor J. Whitting

Konicek & Dillon, P.C.

70 W. Madison, Suite 2060

Chicago, IL 60602

(630) 262-9655 (Direct)

(630) 262-9659 (Fax)

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   ZHU ZHAI HOLDINGS LIMITED    )
     and PETER PUI TAK LEE,       )
 4                                )
                  Plaintiffs,     )
 5                                )
           vs.                    )    No. 20-cv-4985
 6                                )
     STEVEN IVANKOVICH,           )
 7                                )
                  Defendant.      )
 8

 9            The deposition of JEANETTE IVANKOVICH,

10   taken pursuant to the Federal Rules of Civil

11   Procedure, before Nick D. Bowen, Certified

12   Shorthand Reporter No. 084-001661, at 70 West

13   Madison Street, Suite 2060, Chicago, Illinois, on

14   Thursday, March 23, 2023, commencing at 1:41 p.m.

15   pursuant to subpoena and notice.

16        APPEARANCES:

17             KONICEK & DILLON, PC, by
               MR. AMIR TAHMASSEBI
18             (70 West Madison Street, Suite 2060
                Chicago, Illinois  60602
19              630.262.9655
                amir@konicekdillonlaw.com)
20                appeared on behalf of the plaintiffs;

21

22                              ┌─────────────┐
                                │  EXHIBIT    │
23                              │             │
                                │     6       │
                                └─────────────┘
24
```

JEANETTE IVANKOVICH, 03/23/2023

Page 2

```
1    APPEARANCES:  (Cont'd)
2         CHUHAK & TECSON, PC, by
          MR. CECILIO PORRAS
3         (120 South Riverside Plaza, Suite 1700
          Chicago, Illinois  60606
4         312.855.4603
          cporras@chuhak.com)
5           appeared via Zoom on behalf of the
          defendant;
6
          SCHILLER DuCANTO & FLECK, by
7         MS. TANYA STANISH
          (321 North Clark Street, Suite 1200
8         Chicago, Illinois  60654
          312.235.6611
9         tstanish@sdflaw.com)
            appeared on behalf of the deponent;
10
          LAW OFFICE OF GARY S. GOLDSTEIN, by
11        MR. GARY S. GOLDSTEIN
          (11 High Street
12        Chester, New York 10918
          845.469.8630)
13          appeared via Zoom on behalf of Steven
          Ivankovich.
14
15                * * * * * * *
16
17
18
19
20
21
22
23
24
```

Page 3

```
1                I N D E X
2
   Witness:                           Page
3
       JEANETTE IVANKOVICH
4
          Examination by:
5
          Mr. Tahmassebi...............    4
6         Mr. Porras...................   53
7
8
9
10               E X H I B I T S
11   No.  Description          Marked/Referenced
12    1   Personal Financial Statement - Steven
             Ivankovich August 2020................  11
13    2   Pilgrim V Portfolio Organization
             Chart................................  19
14    3   Affidavit in Support of Emergency
             Petition for Temporary and Permanent
15           Maintenance, Child Support and for
             Other Relief.........................  23
16    4   Affidavit in Support of Emergency
             Petition for Exclusive Possession......  29
17    5   Asset Summary, Atlas P5 Portfolio......  35
      6   Answer to Amended Citation
18           Proceedings by Stifel Financial Corp....  41
19
             (Exhibits attached/scanned.)
20
21                   - - -
22
23
24
```

Page 4

```
1                  (Witness sworn.)
2               JEANETTE IVANKOVICH
3    called as a witness herein, having been first duly
4    sworn, was examined and testified as follows:
5                  EXAMINATION
6    BY MR. TAHMASSEBI:
7        Q.   Can you please state your name?
8        A.   Jeanette Ivankovich.
9        Q.   Okay.  You still go by Ms. Ivankovich;
10   is that okay?
11       A.   Yes.
12       Q.   Okay.  Have you given a deposition
13   before?
14       A.   Yes.
15       Q.   Okay.  And just give me the context if
16   you could of the deposition.
17       A.   I was deposed by Steven's divorce
18   counsel.
19       Q.   Okay.  And I'm assuming that related to
20   something with one of the service motions where the
21   jurisdiction will be or something to that effect.
22       A.   Yes.
23       MR. TAHMASSEBI:  Okay.  Counsel, you wanted
24   to make an announcement.
```

Page 5

```
1        MS. STANISH:  Yeah.
2        MR. TAHMASSEBI:  Do you want to do that now
3    so we don't forget?
4        MS. STANISH:  Sure.  Tanya Stanish, Schiller
5    DuCanto & Fleck on behalf of Jeanette Ivankovich.
6           I just wanted to let counsel know
7    that in the divorce matter, which is 2021 D 9220,
8    there is a protective order which is about to be
9    entered.  It was tendered to the court yesterday.
10   Hasn't been officially stamped yet.  But I did --
11   I am providing a copy to you, Counsel, of the
12   protective order that was sent to the judge.  It
13   protects documents and information relating to
14   Atlas, LLC.
15          So to the extent that you ask
16   Ms. Ivankovich any questions related specifically
17   to Atlas, LLC, we may need to pause to see -- and
18   for me to review and confer with my client to see
19   if she can answer the question or not.
20       MR. TAHMASSEBI:  Okay.  Understood.  And I
21   haven't had a chance to look at this, but I'll do
22   so.  And if we come to an issue, we'll take a
23   break.
24       MS. STANISH:  And I don't know.  Mr. Porras,
```

JEANETTE IVANKOVICH, 03/23/2023          Page 6..9

Page 6

1 do you want to put your appearance on the record?

2     MR. PORRAS: Yeah. Yeah, I do. Thanks,

3 Tanya. So Cy Porras, P-o-r-r-a-s, on behalf of the

4 intervenor LLCs.

5        And just for my knowledge, since I'm

6 on Zoom, is Jason Wandner there or Gary Goldstein?

7 I didn't hear any introduction of any sort at the

8 beginning.

9     MR. TAHMASSEBI: So Mr. Goldstein, who does

10 not have an appearance in this matter for one, but

11 has indicated he represents Mr. Ivankovich as you

12 know in various correspondence in the -- in our

13 cases, asked for the Zoom information, asked if he

14 could sit in. I said he's welcome to. Despite

15 that he doesn't have an appearance, we sent him the

16 information.

17        Mr. Wandner received notice of the

18 deposition just as you did, Counsel. I haven't

19 heard from them.

20        About ten minutes ago -- we were

21 supposed to start at 1:30. Everybody was here on

22 time, including yourself. I did them the courtesy

23 of a note saying we'd wait about 10 to 15 minutes

24 for them. We're since past that time. So I don't

Page 7

1 see any reason to wait any longer.

2     MR. PORRAS: I see. Amir, do you mind if I

3 just give them a call, specifically Jason, to see

4 if I can reach him, I mean one or two minutes, and

5 then obviously if he doesn't answer, doesn't give

6 me any indication as to what's going on, we can

7 proceed?

8     MR. TAHMASSEBI: Is that okay, Counsel?

9     MS. STANISH: That's fine.

10     THE WITNESS: I mean, I'm on a time limit. I

11 have kids, so ...

12     MR. TAHMASSEBI: Yeah, we'll give him a

13 minute or two if you want to try.

14     MS. STANISH: Yeah.

15     MR. TAHMASSEBI: But no longer.

16     MR. PORRAS: Okay. Appreciate it. Just give

17 me one minute.

18     MR. TAHMASSEBI: We'll go off the record.

19       (Brief pause.)

20     MR. TAHMASSEBI: Let's go back on the record

21 then.

22 BY MR. TAHMASSEBI:

23    **Q. Ms. Ivankovich, where do you currently**

24 **reside?**

Page 8

1    A. 920 West George, Chicago.

2    **Q. And how long have you been at that**

3 **address?**

4    A. Since September 1st, 2021.

5    **Q. And is that a rental, I think I saw on**

6 **some of the papers?**

7    A. Correct.

8    **Q. And does Mr. Ivankovich pay for those**

9 **rental expenses?**

10    A. Yes.

11    **Q. And approximately what's the rent a**

12 **month?**

13    A. The rent started out at 9,000 on

14 September 1st, 2021. Went to -- I negotiated it

15 down when Mr. Ivankovich stopped providing support

16 for me and the children in July 2021 to 8,000. And

17 then November 2021 I negotiated it down to --

18    MS. STANISH: I think you misspoke. July of

19 what year?

20    THE WITNESS: Oh, 2022. I'm sorry. I'm

21 sorry. 2022.

22        And then in November 2022, I

23 negotiated it down to 5,000 due to my financial

24 circumstances.

Page 9

1 BY MR. TAHMASSEBI:

2    **Q. Okay. And when approximately did**

3 **Mr. Ivankovich stop providing assistance to you and**

4 **the children? You have two children, right?**

5    A. I do have two children.

6    **Q. And I don't want to talk about the**

7 **children. But I just want to know if they're**

8 **still --**

9    A. Yeah, just for the family.

10       In October --

11    **Q. Approximately.**

12    A. October 2021, he stopped providing

13 assistance and made me contact his mother for

14 support.

15        In February 2022, he started

16 supporting us again.

17        And then in July 2022, he cut off

18 all support until December 2022 when the judge said

19 probably not a good idea.

20    **Q. Okay. And so prior to Mr. Ivankovich**

21 **cutting off the support, did he tell you at any**

22 **time in the year or two prior to that that his**

23 **businesses were failing, that his personal assets**

24 **had all been transferred away, and that he could no**

JEANETTE IVANKOVICH, 03/23/2023                                    Page 10..13

Page 10

1 longer provide you support from a financial basis
2 and that was the reason for stopping helping you
3 and the kids with your finances?  Do you understand
4 what I'm --
5      A.   I don't understand.  Could you please
6 clarify that?
7      Q.   Yeah.  So when the support was cut off,
8 was there a discussion between you and him where he
9 came to you and said, Look, since COVID has come
10 about, I have had to basically liquidate all of my
11 resources?  At one point, and I'll show you the
12 financial statement, he was worth approximately
13 55 million.  And since COVID now I am worth zero?
14      A.   He didn't say anything to me.  But our
15 lifestyle definitely did not reflect what you are
16 saying.
17           When I filed for divorce, we were on
18 a 150-foot yacht that requires a seven-person crew.
19 He had a fishing boat that he purchased for a
20 captain at 42 foot.  And he had a recreational boat
21 that we used that was 34 foot.
22           So I think Steve's always been fluid
23 with what he considers personal and business
24 expenses.  But our lifestyle did not reflect any

Page 11

1 downturn during COVID.
2      Q.   Okay.  Great.
3      A.   In fact, it was kind of an uptick.
4      Q.   And so that's exactly -- so Mr. -- just
5 so you know, Mr. Ivankovich testified that once
6 COVID hit, he had to transfer any personal assets,
7 any interest -- a lot of interest that he had in
8 his businesses to keep them afloat, and he went
9 from close to, and I'll show it to you, a net worth
10 of 56 million to a net worth of almost zero.
11           And all I'm getting at is based on
12 what you saw and the lifestyle you guys lived, that
13 testimony is not true?
14      A.   Correct.
15      Q.   And so I'll show you what I've marked
16 as Exhibit No. 1.
17      A.   Can I get my glasses?
18      Q.   Yeah, please do.
19           So Exhibit No. 1 is -- you'll see
20 the P is missing.  But, Jeanette, it's a personal
21 financial statement of Steven Ivankovich dated
22 August 2020.
23      A.   Okay.
24      Q.   And then does that -- do you recognize

Page 12

1 that signature?  Does that look like --
2      A.   That's Steven's, yes.
3      MR. TAHMASSEBI:  Okay.  And then if you go
4 to the third page of Exhibit 21 -- and this is a
5 document, just so you know, Counsel, that was
6 produced in the other litigation.  In our
7 litigation.  Excuse me.
8      MS. STANISH:  Okay.
9      MR. TAHMASSEBI:  And it is also subject to
10 a protective order.  So I would ask that it not be
11 disseminated at this point in time without leave of
12 court in the other action.
13      MS. STANISH:  Okay.
14      MR. TAHMASSEBI:  But we're here for our
15 action, so there's no preclusion about me asking
16 Ms. Ivankovich about it.
17      MS. STANISH:  Okay.
18 BY MR. TAHMASSEBI:
19      Q.   So if you look at -- in the third page
20 on the right column, and then you look down, it's a
21 little hard to read, but you see where it says Net
22 Worth (Total Assets minus Liabilities)?
23      A.   Net Worth (Total Assets, minus -- yes.
24      Q.   Okay.  And there it says -- and this is

Page 13

1 his personal financial statement -- that as of
2 September -- excuse me, August 26, 2020,
3 $55,367,404.  Do you see that?
4      A.   I do.
5      Q.   Okay.  And since -- and if I hear your
6 testimony correctly, since August 26 of 2020,
7 Mr. Ivankovich never came to you and said,
8 Jeanette, that 55 million, or whatever I've had in
9 the bank, it's gone, I can no longer support you
10 and the children?
11      A.   No.
12      Q.   Okay.  And, in fact, I think you said
13 your lifestyle exemplified almost -- not the
14 opposite, but that you had those kinds of funds?
15      A.   Yes.
16      Q.   Okay.  Would you have expected if --
17 and I don't want to get into the whole husband and
18 wife dynamic.  But I'm just thinking from my own
19 experience if there was a financial hardship of
20 that amount, 55 million, would you have expected
21 you to somehow know or have some idea that that was
22 the case?
23      A.   If the 55 million took a turn, I would
24 expect it to be reflected in our lifestyle.  I

JEANETTE IVANKOVICH, 03/23/2023                    Page 14..17

Page 14

1  don't know if Steven would come to me personally
2  and say that, but I would expect our lifestyle to
3  change, which it didn't.
4      Q.  Okay.  Let's look at Exhibit No. 2.
5          Make sure I'm done with 1.
6          Oh, let me -- these are tough to
7  read.  But can we go back to Exhibit 1 just for a
8  second?
9      A.  Is that page 3?
10     Q.  We're going to look at page 4.  I'm
11 really going to test everybody's eyes a little bit.
12         And there's a Schedule G about two-
13 thirds of the way down.
14     A.  Yes.
15     Q.  Okay.  And in the column, there's a --
16 it's Schedule G, just so the record's clear,
17 Unlisted Securities Owned.  And then the one I want
18 to talk about is Atlas P5 Portfolio.  It's the
19 third one down.  Do you see that?  I know it's
20 tough to see.
21     A.  I do.
22     Q.  Okay.  And then at the very right, it
23 says an amount of 29,140,000.  Do you see that?
24     A.  I do.

Page 15

1      Q.  Okay.  I think you said earlier -- do
2  you know what Atlas P5 Portfolio is?  Have you
3  heard of those -- that entity before or no?
4      A.  I know Atlas and Alliance have
5  covered --
6          (Brief interruption.)
7      MR. TAHMASSEBI:  Mr. Goldstein, if you're
8  going to appear, we'd ask that you turn on your
9  video.
10     MR. GOLDSTEIN:  Turn it on?
11     MR. TAHMASSEBI:  Yes.
12     MR. GOLDSTEIN:  No.
13     MR. TAHMASSEBI:  You're refusing to turn on
14 your video?
15     MR. GOLDSTEIN:  I don't see why you have to.
16 I can't see you.
17     MR. TAHMASSEBI:  Well, then you know what?
18 You don't have to see me.  The deponent is here.
19 I'm here live.
20         Did you ever file an appearance in
21 the matter?
22     MR. GOLDSTEIN:  Okay.  Wait a minute.  Who --
23 okay.  Just let's get -- let me -- I'm not -- I
24 just joined.  Who's talking?

Page 16

1      MR. TAHMASSEBI:  Sure.
2      MR. GOLDSTEIN:  Can you just identify
3  yourself?  Because I came in late.  And then I
4  can comment.
5      MR. TAHMASSEBI:  Yeah, you did come in late.
6  My name is Amir Tahmassebi.  I represent the
7  holdings entities.
8      MR. GOLDSTEIN:  Okay.
9      MR. TAHMASSEBI:  And I don't -- I did not see
10 your appearance on file, but I did tell you that
11 I'd, as a courtesy, allow you to appear.  But I'm
12 going to ask that if you're going to appear you
13 appear with your video.
14     MR. GOLDSTEIN:  Okay.  And you did tell me
15 that I could appear, did you not?
16     MR. TAHMASSEBI:  I said as a courtesy you
17 could appear.  But if you're going to appear,
18 you're going to have to follow the rules that we're
19 doing here in Illinois.  And if it's a dep via
20 Zoom, I'd want to see your video on.
21     MR. GOLDSTEIN:  Okay.  And -- yeah.  Let's
22 try this.  Well, you -- wait a minute.  Okay.  But
23 you can't see me, so let's get this going in the
24 right direction.  Here you go.  Can you see me?

Page 17

1      MR. TAHMASSEBI:  Yes.
2      MR. GOLDSTEIN:  You see me now?
3      MR. TAHMASSEBI:  Yep.
4      MR. GOLDSTEIN:  Okay.  Now you can go on with
5  your deposition.  Wait a minute.  I'll even make it
6  better for you because you don't want to see that
7  picture in the background.  I go through this all
8  the time.  Okay.  Go ahead, and I'll fix it up,
9  unless you want to wait until I get it absolutely
10 perfect for you.
11     MR. TAHMASSEBI:  No, I don't want to wait any
12 longer than I've already waited for you.
13     MR. GOLDSTEIN:  You didn't wait for me.
14     MR. TAHMASSEBI:  Okay.  The -- I'm going to
15 continue.
16     MS. STANISH:  I think Cy wanted to say
17 something.
18     MR. GOLDSTEIN:  Just so we're clear, you did
19 consent to me appearing, did you not?
20     MR. TAHMASSEBI:  I said yes.
21     MR. GOLDSTEIN:  Okay.  Good.  Let's go.
22 BY MR. TAHMASSEBI:
23     Q.  Ms. Ivankovich, we were talking about
24 the Atlas P5 Portfolio and the Alliance.  And I

JEANETTE IVANKOVICH, 03/23/2023                            Page 18..21

Page 18

1 think you were going to discuss what your knowledge
2 of those entities is or was.
3      A.   I know there's multiple Alliance Atlas
4 LLCs; whether it's portfolio, Birchwood, Multi-
5 family, Atlas Homes, Atlas -- the specifics, but
6 there's probably more than 15 or 20 --
7      Q.   Okay.
8      A.   -- that are associated with that, yes.
9      Q.   And is it your understanding that
10 Mr. Ivankovich individually has some interest in
11 those entities?
12     A.   Yes.
13     Q.   Okay.  And where does that understanding
14 come from?  Mr. Ivankovich himself?
15     A.   Yes, directly from Steven.
16     Q.   And what has Steven told you?  And I'm
17 not asking for -- you don't have to go into the
18 specifics, but just that he's an owner of these
19 entities, has control over them?
20     A.   Yes.  From my understanding, he has
21 control of the funds going in and out, and he's a
22 partner.
23     Q.   And just so -- we list some of them.
24 The Alliance entities, there's a couple.  The Atlas

Page 19

1 P5 Portfolio, that's one.  The Atlas P2 Portfolio.
2           What about the Ivankovich -- those
3 are some that you've been told he has an interest
4 in and controls the funds that are transferred in
5 and out?
6      A.   Yes.
7      Q.   And then as far as the couple others I
8 want to talk about -- you know what?  I'll show you
9 a document so it'll make it easier.  We'll mark
10 this actually as Exhibit 2.
11          I don't think I showed her the
12 affidavit.
13          Exhibit 3 is a document that
14 actually Mr. Ivankovich was shown at his deposition
15 and authenticated the structure.
16          But take a look at Exhibit Number --
17 Exhibit 2, just for the record, is a chart of a
18 number of different LLCS and kind of where they
19 stand as far as the subsidiaries and then the
20 ultimate ownership.  So I just want to talk a
21 little bit, Ms. Ivankovich, about some of these and
22 if you've been told at some point in time that, in
23 fact, Steven Ivankovich has an interest and/or
24 control over some of these LLCs.  And we can

Page 20

1 either --
2      MR. PORRAS:  Amir, real --
3 BY MR. TAHMASSEBI:
4      Q.   We can either -- we can either do it
5 you can go through it yourself, Ms. Ivankovich, and
6 tell me the ones that you recognize or a variation
7 thereof, or I can go through it one by one,
8 whichever you prefer.
9      MR. PORRAS:  Amir, real quickly.  Real
10 quickly.  This is Cy Porras again.  Do you mind if
11 she just shows the camera what the exhibit shows so
12 I know what we're looking at?
13     MR. TAHMASSEBI:  I don't mind, no.
14     MR. PORRAS:  Okay.  I appreciate that.  Okay.
15 All right.  And that's Exhibit 3, I think.  Did
16 you --
17     MR. TAHMASSEBI:  Exhibit 2.
18     MR. PORRAS:  Okay.  It's marked as Exhibit 3.
19     MS. STANISH:  That was one of my questions.
20          My second question is this a
21 protected document under your protective order?
22     MR. TAHMASSEBI:  This is not.
23     MS. STANISH:  Okay.
24

Page 21

1 BY MR. TAHMASSEBI:
2      Q.   So do you recognize -- let's just start
3 with the entity Overlook, Ms. Ivankovich.  Does
4 that name ring a bell to you?  You'll see Steven V.
5 Ivankovich listed as the managing member.
6      A.   Managing member.
7      Q.   Yeah.
8      A.   Some of these are not familiar with
9 me nor would they be because we wouldn't have
10 discussed them.  I do recall seeing in publications
11 that Steven was the facilitator of a sale for
12 Caribbean Isle for 49.5 million with a purchase
13 price four years previous of like 22 million and
14 that he was the CFO and the facilitator of that
15 sale.
16     Q.   You're talking about Pilgrim Caribbean
17 Isle, LLC?
18     A.   Yes.
19     Q.   Okay.  And then we talked about the
20 Alliance entities already, right?
21     A.   Yes.  And then the Alliance entities,
22 there's multiple that I've always assumed Steven
23 was part of based off conversations with him.
24     Q.   Okay.  And Mr. Ivankovich never told

JEANETTE IVANKOVICH, 03/23/2023                                    Page 22..25

Page 22

1 you since COVID hit in 2020 up until you guys had a
2 falling out that he had to transfer money out of
3 these entities or he had to transfer his personal
4 funds to the point where he could no longer afford
5 to live the lifestyle you guys were living, correct?
6     A.   He would not have shared that
7 information with me.  That wasn't how our marriage
8 operated.
9          But I will say that our lifestyle
10 did not reflect Steven transferring funds out.
11    Q.   Did Mr. Ivankovich ever tell you that
12 he was taking on a bunch of loans or personal
13 liability in order for you guys to maintain your
14 lifestyle?
15    A.   He told me that after I filed for
16 divorce.  But that was not part of our conversation
17 pre-divorce, no.
18    Q.   So it wasn't until you filed for
19 divorce that you heard from Mr. Ivankovich that he
20 was, quote, unquote, broke?
21    A.   That he was destitute, yes.
22    Q.   Okay.
23    A.   And looking for a job as a tennis
24 instructor or dive instructor.  Year and a half

Page 23

1 still job hunting.
2     Q.   He testified in our case that he was --
3 spent his days sitting on the beach, playing
4 tennis, and looking at girls.  Is that similar to
5 what you're referring to?
6     A.   No, no.  Because my experience with
7 Steven is actually he worked around the clock and
8 he traveled for work.  And he told me he was
9 working hard.  And COVID definitely kind of pulled
10 back on a lot of his, quote, unquote, business
11 travel.
12         But I was not told that he was
13 sitting on the beach looking at girls especially as
14 he was married.  I can't say what he's doing now.
15 But he's had a pretty active travel schedule for
16 somebody who doesn't have a job.  And he has
17 partners who accompany him on these trips, so ...
18 Living the life.
19    Q.   Exhibit No. 3.  And you touched on --
20 so Exhibit 3, for the record, is an affidavit filed
21 October 25th, 2021 in the divorce action here in
22 Cook County.  And just so I can confirm, there's --
23 on the last page, that's your it looks like kind of
24 stamped signature, right?

Page 24

1     A.   Yes.
2     Q.   Okay.  And this is an affidavit that
3 you would have reviewed for its accuracy before you
4 signed it?
5     A.   Yes.
6     Q.   Okay.  And this is what you touched on
7 already.  I want to look at paragraph 16 on what is
8 page 10 of the document, but that's because it's
9 part of the --
10    A.   Yes.
11    Q.   Okay.  So you say here, While I am
12 unclear of Steven's income from all sources, on or
13 about September 30th, 2021, Steven purchased a
14 five-bedroom, 150-foot yacht for $3.5 million.  Do
15 you see that?
16    A.   Yes.
17    Q.   And as far as you know, that did occur
18 by Mr. Ivankovich?
19    A.   Yes.
20    Q.   And you, in fact -- at that time were
21 you guys still together, or was that --
22    A.   Yes.
23    Q.   All right.  And I'm assuming you knew
24 he purchased it because he told you, I bought this

Page 25

1 yacht.
2     A.   Yes.  I was in the process of helping
3 him rehab it.
4     Q.   Okay.  And, in fact -- and then he also
5 told you, I'm assuming, around that same time that
6 it cost about 20,000 -- well, let me back up.  Did
7 he ever tell you that the yacht, the $3.5 million
8 yacht, he couldn't afford it?
9     A.   No.
10    Q.   Okay.  Do you know how or if he
11 financed the yacht at all?
12    A.   I don't know.  I wasn't privy to that.
13    Q.   Did he ever tell you at the time of
14 the purchase that it was someone else that
15 purchased it, not him?
16    A.   I mean, from my --
17    Q.   Just -- I'm sorry.  Did he ever tell
18 you?
19    A.   No.
20    Q.   Okay.  And then he also told you, it
21 sounds like, that it cost about 20,000 to dock it?
22    A.   Correct.
23    Q.   And did he ever tell you that someone
24 else -- did Mr. Ivankovich say someone else besides

Page 26

1 him was covering that $20,000 at the time or on or
2 around the time he purchased it?
3     A.   That was not the implication.  The
4 implication was it belonged to Steven.  He implied.
5     Q.   And then it says 150,000 a year for the
6 yacht's captain salary, which sounds about right.
7     A.   That's what we discussed, because he
8 wanted to replace the captain and how much it would
9 cost to replace the captain of the boat.
10    Q.   And so I'm assuming when this purchase
11 was made, it was -- it's a big deal for you guys,
12 right?  Number one, it's fun and interesting.
13    A.   Yes.
14    Q.   Number two, it's expensive.
15    A.   Yes.
16    Q.   And number three, it was going to be a
17 lot of work for sounds like you and Mr. Ivankovich.
18    A.   Yes.
19    Q.   Okay.  Was there anybody else -- when
20 you -- I think you said you were going to assist
21 with the rehab of it.
22    A.   Yes.
23    Q.   I'm assuming remodeling, design, things
24 like that.

Page 27

1     A.   Yes.
2     Q.   Was there anybody else that you worked
3 with in order to -- let me -- how can I put it?
4 Aside from you and Mr. Ivankovich, were there other
5 people that you were aware of that were directly
6 involved with the rehab or with the operation of
7 the yacht or with --
8     A.   Many.  When you talk about a 150-foot
9 boat, that's not something that can be carried out
10 by one or two people.
11    Q.   No.  But as far as who was in charge --
12    A.   Yes.
13    Q.   -- that would have been you guys, you
14 and Mr. Ivankovich?
15    A.   And Steve was employing other people to
16 help facilitate --
17    Q.   Got it.
18    A.   -- the rehab.
19    Q.   Okay.  Now I think we're on the same
20 page.  So in other words, obviously it takes a lot
21 of people to do what was being done.
22    A.   Correct.
23    Q.   So Steve would employ people to assist.
24 I'm assuming you would direct -- Steve and yourself

Page 28

1 employed people to assist you on what needed to be
2 helped with.
3     A.   I had people helping me, and Steven was
4 employing people.
5     Q.   I guess what I'm getting at is as far
6 as who the bosses were --
7     A.   Steven.
8     Q.   Okay.
9     A.   Steven was the boss for sure.
10    Q.   Okay.
11    A.   There's text messages from people he
12 employed referring to him as boss man with this
13 project.
14    Q.   Okay.  And as far as you -- good
15 enough.  I don't want to get into it.  I read
16 about -- how many times did you actually go down
17 and -- let me back up.
18         Approximately when did you go down
19 to first see the boat, the yacht, whatever we're
20 calling it?
21    A.   I think I spent two periods on the boat
22 before Steven had me falsely arrested.  And then I
23 filed for divorce.
24    Q.   And I don't want to go into that

Page 29

1 because I'm sure it's not fun to talk about.  But
2 the kids -- were the kids there on that trip?
3     A.   The kids were on that trip, yes.
4     Q.   And I'm assuming you were released and
5 there were no charges filed.
6     A.   I was released.  Steven pushed charges.
7 The charges were dismissed.  And then Steven tried
8 to get the charges reinstated.
9     Q.   Okay.
10    A.   Unsuccessfully.  But continued to
11 threaten me with getting them reinstated for the
12 next year.  I then continued to show the children
13 the video of my arrest.
14    Q.   The purchase, it says, was on or around
15 September 30th, 2021.  Is that just -- is that date
16 based on what Steven told you?
17    A.   Yeah.  Probably a little earlier than
18 that.  But that is when I started to become
19 involved.
20    Q.   Okay.  Did you ever see any paperwork
21 relative to that purchase?
22    A.   No.
23    Q.   Okay.  Exhibit No. 4.  This is Exhibit
24 No. 4.  This is another affidavit.  And just if you

JEANETTE IVANKOVICH, 03/23/2023                               Page 30..33

Page 30

1 can just confirm for me on the last page, 13, that
2 looks like the same signature stamp.
3      A.   Yes.
4      Q.   Okay.
5      MS. STANISH:  Can I have a copy?
6      MR. TAHMASSEBI:  Oh, I'm sorry.
7      THE WITNESS:  I think it's the same one.
8 BY MR. TAHMASSEBI:
9      Q.   Did I give you the same one?  I think
10 it's a little bit -- it's a little bit different.
11          A lot of it, Exhibit 4, overlaps,
12 but I want to focus on one part that doesn't.  And
13 that's at the very -- it's on the very last page
14 too.
15      A.   Page 13?
16      Q.   Yes.  Thank you.  Page 13.
17          So on paragraph 26 of page 13, the
18 affidavit says, Steven has sufficient housing
19 available to him in that his parents reside in a
20 luxury home in North Shore, Steven has friends that
21 live in the City of Chicago, and Steven has ample
22 moneys to pay for a hotel while not living on his
23 yacht in Florida, our rental apartment -- is that
24 Islamorada?

Page 31

1      A.   Islamorada, correct.
2      Q.   -- (continuing) or his parents' home in
3 Key Biscayne.  Or "Biscon."  I don't know how --
4      A.   Key Biscayne, yes.  Correct.
5      Q.   And so when you say -- in this
6 affidavit that's signed on October 25th, 2021, just
7 give me an idea when you say that Steven has ample
8 money to pay for a hotel kind of, you know, what's
9 that based on.
10      A.   Well, it could be based on in December
11 2022 we subpoenaed his passport, and Steven has
12 been in Dubai, Spain, France, the Cayman Islands,
13 the Dominican Republic, and other countries that I
14 can't name offhand --
15      Q.   Sure.
16      A.   -- where I'm sure he's paying for a
17 hotel living there.  So I think yes.  And Steven
18 has traveled extensively.  My impression was for
19 work.  That's what he always implied and told me.
20 But he has told the court that he hasn't had a job
21 for ten years, so ...
22      Q.   On that, I guess, as far as when you
23 were married, before the divorce was filed, did
24 the -- did you guys have a personal bank account?

Page 32

1      A.   No.
2      Q.   Okay.  Were all your accounts through --
3      A.   Business.
4      Q.   Businesses?
5      A.   Yes.
6      Q.   Okay.  And were you listed on those
7 accounts as a signator?  Or at least somebody that
8 could withdraw funds maybe would be a better way to
9 put it.
10      A.   No.
11      Q.   Okay.  So then when you needed -- for
12 example, let's just go back in, say, the year 2020,
13 if you needed to get out cash, a thousand dollars.
14      A.   Steven would transfer money to a TRG
15 account, and then I would have access to it.  TRG
16 International.  That was what my debit card was.
17 Or he would Venmo me money.
18      Q.   Did -- and at that time, let's just say
19 2020, 2021, before you and Mr. Ivankovich split up
20 or you filed for divorce, was there ever a time
21 where you said, Steven, I need five grand to go for
22 whatever, and he said, No, we can't afford that,
23 or, No, I'm not going to authorize that?
24      A.   I never really asked for five grand.

Page 33

1 I would always get it in like couple grand
2 increments.  But, no, I mean ...
3      Q.   Any time you needed money at least --
4      A.   Any time -- there were a couple points
5 where I -- he wasn't able to provide money for
6 whatever reason, and I would call his mother, and
7 she would provide; for like tuition or children's
8 expenses, if tuition was late.
9      Q.   I think you said earlier that as far as
10 you understood there was always somewhat of a blur
11 between Mr. Ivankovich's personal finances and what
12 he would take from the businesses.
13      A.   Correct.
14      Q.   Can you expand on that a little?
15      A.   Yeah.  As Steven presented, we had a
16 Chase credit card that has business expenses and
17 personal expenses on it.
18      Q.   Okay.  And so the Chase credit card,
19 was that through -- do you know which business that
20 was through?  Was that one of the Atlas entities?
21      A.   I think his father was the primary card
22 holder, Anthony Ivankovich.
23      Q.   When you say it had business, as far as
24 personal, in other words, you would be able to use

JEANETTE IVANKOVICH, 03/23/2023                                    Page 34..37

Page 34

1 the card?

2   A.   Yes.

3       Q.   And then also as far as you understood

4 it, it was used for business expenses?

5   A.   Yes.

6       Q.   And which businesses in your mind?

7 They kind of all --

8   A.   I mean, Atlas is an umbrella company

9 for multiple LLCs.  So Atlas Homes, Atlas -- I

10 don't know.  I didn't delve that far.

11      Q.   Atlas Homes, LLC, and then you knew --

12  A.   Management, you know.  I don't know

13 what else.

14      Q.   But as far as you understood that the --

15 a lot of Mr. Ivankovich's -- Steven Ivankovich's

16 business expenses were intermingled with some of

17 the personal expenses?

18  A.   Yes.

19      Q.   And I'm just going to -- try to let me

20 finish the question first so that Nick can take it

21 down.  You know where I'm going, and I know where

22 I'm going.  But I don't want him to -- and I think

23 just so that one's clear, the business expenses

24 that Mr. Ivankovich had for Atlas were intermingled

Page 35

1 a lot of the times with your personal expenses,

2 correct?

3   A.   Correct.

4       Q.   Okay.  An entity called A & O Family,

5 LLC, are you familiar with that entity?

6   A.   Yes.

7       Q.   All right.  Let me show you what I'm

8 going to mark as Exhibit 5.

9   A.   Is this finished?

10      Q.   Yes.

11           So Exhibit 5 is a document called

12 Asset Summary Atlas P5 Portfolio.  You said you

13 were familiar with the A & O Family, LLC?

14  A.   Yes.

15      Q.   Tell me what your understanding of what

16 that entity is.

17  A.   That it is the -- one of the multiple

18 family trusts that the Ivankovich family owns.

19      Q.   And do you understand that Mr. Ivankovich

20 is a beneficiary or has some type of interest?

21  A.   Yes.

22      Q.   And has he ever told you approximately

23 what that is?

24  A.   No.

Page 36

1       Q.   Okay.  If you take a look at page --

2 it's a double-sided one first.  But if you look at

3 page 12 of Exhibit No. 5.

4   MS. STANISH:  Is this a protected document?

5   MR. TAHMASSEBI:  It is not.

6   MS. STANISH:  Okay.

7 BY MR. TAHMASSEBI:

8       Q.   And I want to look specifically at the

9 third paragraph under the heading Comments about

10 two-thirds of the way down.

11  A.   Yes.

12      Q.   And just so you know, Ms. Ivankovich,

13 this is, you know, basically -- this was not

14 prepared by Mr. Ivankovich, but he testified he

15 provided information for Walker Dunlop to put this

16 together.

17  A.   Okay.

18      Q.   Third paragraph down under Comments,

19 Mr. Ivankovich reports his tangible net worth and

20 liquidity to be 42.7 million and 12.1 million

21 respectively as of January 2019.  And it goes on,

22 Of his 12.1 million in liquidity, 11 million is in

23 marketable securities and 1.1 million in cash.  Do

24 you see that?

Page 37

1   A.   Yes.

2       Q.   Is that consistent with what your

3 understanding of Mr. Ivankovich's worth was at

4 least on or around --

5   A.   I had no direct under- --

6   MS. STANISH:  Hold on.  Let him finish.

7   THE WITNESS:  Oh, I'm sorry.

8 BY MR. TAHMASSEBI:

9       Q.   -- (continuing) on or around April of

10 2019 at least based on how you guys lived your

11 life?

12  A.   Well, I had no information on the exact

13 amount.  I had information on our lifestyle.

14      Q.   And I think you said in some of the

15 papers that were filed in the divorce proceedings

16 that you guys were fortunate to live a very

17 extravagant lifestyle.

18  A.   Yes.

19      Q.   And then it goes on, The director of

20 investments at Stifel provided a letter stating

21 that the A & O Family, LLC, of which Steven

22 Ivankovich is 15.07 owner as well as one of the two

23 managing members, holds cash and marketable

24 securities in excess of 88 million (13.26 million

JEANETTE IVANKOVICH, 03/23/2023                    Page 38..41

Page 38

1 allocation) as of May 2019. Do you see that?
2     A.   Yes.
3     Q.   And I know you don't know the exact
4 percentage, but the statement here that he was an
5 owner and one of the managing members, that's
6 consistent with your understanding?
7     A.   Yes.
8     Q.   And you also -- maybe you -- I don't
9 want to put words in your mouth. But did you also
10 have an understanding that the A & O Family, LLC
11 had significant assets here it says?
12    A.   Yes.
13    Q.   And did Mr. -- and I would expect at
14 some point during the marriage Mr. Ivankovich told
15 you that he had access to funds that were held in
16 the A & O LLC and some of these other LLCs like the
17 Atlas LLCs.
18    A.   That would have never been a
19 discussion. It just would have been implied from
20 our lifestyle. We did not live a lifestyle of a
21 jobless man.
22    Q.   Okay. So in other words, you had no
23 personal bank accounts, you said, right?
24    A.   No.

Page 39

1     Q.   But somehow you were able to spend
2 money on a lot of different things?
3     A.   Yes.
4     Q.   How much was your house before it went
5 into that dilapidation because he didn't upkeep it
6 approximately?
7     A.   Well, it wasn't that it was
8 dilapidated. The house needed to be rehabbed.
9 That was always our intention, to rehab it. From
10 my understanding, it's -- it's a double lot back to
11 front in Old Town where there are no alleys. So
12 it's tandem. And Steven or an entity through
13 Steven has recently purchased the property next
14 door to, so now it's a three-lot property that his
15 intention, which has always been his intention --
16 he reached out to the owner multiple times before
17 the owner died and he purchased it -- to purchase
18 the property and let him live there for free. But
19 now it's a three-lot property that I think he plans
20 to connect.
21    Q.   Does he still have an ownership
22 interest in it, or do you know?
23    A.   I mean, he has an ownership interest in
24 it through whatever he's covering himself.

Page 40

1     MS. STANISH: Just so we're clear, which --
2 are you referring to their original house, or are
3 you --
4     THE WITNESS: 235 West Menomonee.
5 BY MR. TAHMASSEBI:
6     Q.   Yeah, I want to go back to the
7 original, so thank you for that clarification. I
8 understand the one -- yeah, I'm familiar with the
9 Old Town one.
10    A.   Yes.
11    Q.   He told me that that's in foreclosure,
12 but I don't know if that's true or not.
13    A.   I will just say it's been in foreclosure
14 for years, but the property taxes are always up to
15 date.
16    Q.   Okay. Your prior home then, do you
17 know who owned that? Was that you -- let's get the
18 address on the record.
19    A.   The rental?
20    Q.   No. The one before -- the home that
21 you lived in once you -- you know, the time around
22 when you were first married and thereafter.
23    A.   That was 235 West Menomonee.
24    Q.   Oh, that was. Okay.

Page 41

1     A.   Yes.
2     Q.   And that was a rental?
3     A.   No. We owned it.
4     Q.   Do you know -- when you say "we owned
5 it," was that you and him, or was that in some
6 entity?
7     A.   Steven had purchased it -- sorry.
8     Q.   That's okay.
9     A.   Steven had purchased it before we were
10 married, and my name was put on it in 2007 or 2008.
11    Q.   Let's take a look at Exhibit 6.
12         Exhibit 6 is also not a protected
13 document, Counsel.
14    A.   Are we finished with this one?
15    Q.   Yes. Thank you.
16         Exhibit 6 is a document called
17 Answer to Amended Citation by Stifel Financial
18 Corp. And I know, Ms. Ivankovich, it looks a
19 little bit -- very -- it's a court document. But
20 what I want to focus on is the page No. 3. And
21 what this is is a document that I requested
22 information as I would guess your counsel probably
23 did from Stifel.
24         And towards the bottom there on

Urlaub Bowen & Associates, Inc.   312-781-9586

JEANETTE IVANKOVICH, 03/23/2023                    Page 42..45

Page 42

1  No. 13 and 14 on page 3, there is a P2 Portfolio
2  Managing Member, LLC, and the account amount in
3  that is $10,991.73.  Do you see that?
4      A.   Yes.
5      Q.   And is that one of the entities we
6  talked about earlier that you had an understanding
7  Mr. Ivankovich either owned a part of or controlled
8  the finances?
9      A.   Well, the other document said Atlas P2
10 Portfolio.  It doesn't say Atlas P.  But my
11 impression was Steven had -- he had involvement in
12 everything Atlas.
13     Q.   Okay.  And then the Ivankovich Family
14 LLC --
15     A.   Yes.
16     Q.   -- you've heard of that before?
17     A.   Yes.
18     Q.   Okay.  And is it your understanding
19 Mr. Ivankovich had some interest -- Steven
20 Ivankovich just to be clear -- in that --
21     A.   Yes.
22     Q.   And that comes from a discussion you
23 had with him?
24     A.   Yes.

Page 43

1      Q.   All right.  And as far as you
2  understood -- you kind of said it was implied he
3  had access to these funds.  That was because of,
4  again, the fact that any time you needed money or
5  funds, it was there?
6      A.   Yes.
7      Q.   And as there were no personal bank
8  accounts, you would expect that these funds were
9  coming out of one of these entities that we've
10 mentioned if not numerous of them?
11     A.   They were coming from somewhere.
12     Q.   But as far as you understood, it was --
13     A.   Yes.
14     Q.   Let me just finish that question.
15          So as you understood, it would be
16 one of the LLCs we've discussed, the Atlas, the
17 Ivankovich, the A & O?
18     A.   A trust -- Steven has a trust as well.
19 So it would have been an LLC or a trust.
20     Q.   What's his trust -- name of his trust,
21 do you know?
22     A.   I don't know.
23     Q.   Are there any other entities that we
24 haven't talked about so far, Ms. Ivankovich, that

Page 44

1  your husband mentioned he had some ownership
2  interest in or control over?
3      A.   I did see approximately seven overseas
4  accounts that Steven had bank numbers to on his
5  desk.  They were under the heading Overseas
6  Accounts.  They had the bank account numbers.  But
7  at this point -- I took a picture of them because
8  we were not doing well, and he had already filed
9  for divorce a few times.  And I sent it somewhere.
10 I don't recall where I sent it just yet.
11          But there are overseas accounts that
12 he must have access to or otherwise he would not
13 have had those numbers.
14     Q.   How long ago was that, do you know?
15     A.   We were at 2142 North Cleveland.  So
16 approximately two years ago.  It would have been
17 right before I filed for divorce.
18     Q.   And I think you were getting to the
19 picture.  Have you been able to locate that or not?
20     A.   I sent it somewhere to protect it.  And
21 I'm still trying to recall.
22     Q.   Okay.  Based on your interactions with
23 Mr. Ivankovich, would you expect that he, in fact,
24 does have overseas accounts?

Page 45

1          Oh, I'll let you --
2      MS. STANISH:  Okay.
3  BY MR. TAHMASSEBI:
4      Q.   Would you expect that he does have
5  overseas accounts?
6      A.   Yes.  And accounts here.  I mean, I
7  know -- like I said, he purchased the property next
8  door to 235 West Menomonee to make a three-lot
9  through an LLC.
10          He toured and represented himself as
11 a purchaser and resident to a multimillion dollar
12 apartment in Trump Tower.
13          He told the kids he purchased -- a
14 year and a half ago that he purchased a farm in
15 Florida for them to live.
16          So he's been on a spending spree.
17 I don't know whose money he's using.
18     Q.   And this has been over the past --
19     A.   Year and a half.
20     Q.   Year and a half.  Okay.
21     A.   Yes.
22     Q.   Your husband has said and made
23 representations in the court, the federal courts
24 here and I think --

JEANETTE IVANKOVICH, 03/23/2023                    Page 46..49

Page 46

1    A.   Steven.

2    Q.   I'm sorry.

3    A.   Thank you.

4    Q.   Thank you.  I apologize.

5         Mr. Ivankovich has made

6  representations in the federal courts here in

7  Illinois and I believe also in the divorce courts

8  that he's, in fact, destitute and has no funds --

9    A.   Yes.

10   Q.   -- right?

11   A.   Yes.  Though it hasn't affected his

12 lifestyle.

13   Q.   Okay.  And so that goes to my next

14 question.  I'm kind of direct.  Do you believe that

15 that's true?

16   A.   No.

17   Q.   Okay.  And I think you've already

18 explained this, but just so we can kind of come

19 full circle.  Tell me, Jeanette, why you believe

20 he's making these -- why you believe the statements

21 he's making are false.

22   A.   He -- you have to understand he has

23 filed for divorce with me three separate times, and

24 each time told me he would leave me destitute, he

Page 47

1  would get me committed for mental incompetency, he

2  would take my children, he would leave me with

3  nothing, that everything that he owned was hidden

4  and I'd never have access to it.  So that's one

5  thing that would make me think that.

6         Two, his lifestyle hasn't changed.

7  He's deep sea fishing.  He's diving.  He's

8  traveling.  He has a girlfriend.  He's living his

9  best life and not supporting his kids.

10        And so I -- he's got to have access

11 to money somehow, right?  I mean, it's not cheap to

12 go to the Maldives, to go to the Cayman Islands,

13 the Isle of Wight, Spain, Dubai, buy an apartment

14 in Trump Tower with HOA fees close to $3,000 a

15 month.

16        He sent the kids home with -- he

17 takes them only -- he had -- he didn't see them for

18 a year, and then he started seeing them on holiday.

19 They'd come home with $1200 cash each in their

20 pocket, thousands of dollars worth of clothes, new

21 watches, iPhone 14s, brand new Macs, daily -- daily

22 private training sessions, thousand-dollar-a-day

23 Skip Barber driving school, private ski instruction,

24 you know, with a seven-bedroom ski-out home.  This

Page 48

1  is not a man that's living a destitute life.

2    Q.   Yeah.  Well, we agree on that.

3         His family I want to talk a little

4  bit about.

5    A.   Yes.

6    Q.   Okay.  He has a -- his parents are, I

7  think we talked about, down in Key Biscayne?

8    A.   They spent at least six months and one

9  day in Florida to validate them as Florida residents.

10 And then they have a waterfront home in Wilmette on

11 Michigan Avenue a couple -- beautiful.  It's

12 gorgeous.  It's a couple houses down from Gillson

13 Beach.

14   Q.   In Wilmette, Illinois?

15   A.   Yes.

16   Q.   Okay.  And so are they -- do you know

17 where they're -- you would expect they're in

18 Florida during the winter months here.  But, you

19 know, based on your experience, do you know when

20 they're usually there and when they're usually up --

21   A.   Now I pretty much cut off contact

22 except to ask his mom to make this nonsense stop.

23   Q.   Yeah.

24   A.   They would spend the winter months in

Page 49

1  Florida and then the summer months in Wilmette.

2    Q.   And then what's -- do you know the

3  address by chance of the house?

4    A.   Yes.  1150 North Michigan Avenue -- or

5  1150 Michigan Avenue, 60697 -- 60- -- I can't

6  remember.  It was their credit card.

7    Q.   It was a credit card address?

8    A.   It was a credit card address, but it's

9  changed now to Key Biscayne because Steven is now a

10 Florida resident, I guess.

11   Q.   And then how old are his parents, do

12 you have an idea?

13   A.   83.

14   Q.   Mr. Ivankovich testified -- Steven

15 Ivankovich testified that his father still had

16 significant roles in the businesses and was the one

17 still in charge.  And you may not have knowledge of

18 this.

19   A.   No.  I have enough knowledge to know

20 that the last times that I've seen Steven's father,

21 he's not doing well and he's not in charge.

22   Q.   So if Steven Ivankovich were to have

23 told me under oath when I asked him the question

24 about who controls the money, the transfers of a

Urlaub Bowen & Associates, Inc.   312-781-9586

JEANETTE IVANKOVICH, 03/23/2023                                    Page 50..53

Page 50

1  lot of these LLCs, and he would say, Oh, you'd have
2  to ask my elderly -- my father, and I said, Your
3  80-year-old father? and he said, Yes ...
4      A.   His father -- his father is sick, and
5  his father can't speak very well or so or make
6  decisions like that.  I would say the decision-
7  making is Steven and Steven's mother.
8      Q.   And how long -- and without getting too
9  much into his health, but based on your observations,
10 how long has that been the case?  Two or three
11 years?  Five years?
12     A.   Yeah, over two years.
13     Q.   Over two years.
14          And then his mother, is she a little
15 bit younger or around the same age?
16     A.   No.  She's the same sage.
17     Q.   And as far as you -- and the last time
18 when -- you still talk to her, I think you said,
19 to say help stop what's going on or help your
20 grandchildren or whatever.
21     A.   I stopped talking to them when I
22 realized the path of destruction the whole family
23 was on against me.  But I do reach out in times
24 of desperation to his mother because -- this is a

Page 51

1  pattern.  They did the same thing with Steven's
2  brother's divorce and the way they treated his wife
3  and his brother's children and ...
4      Q.   So -- and that goes into my next
5  question.  His brother -- he has the one brother
6  that's supposedly the -- whatever, the jazz or
7  something --
8      A.   He's a musician, and he's a doctor,
9  correct.  He's an orthopedic surgeon.
10     Q.   And you said he went through a divorce
11 where the Ivankovich family did a similar thing to
12 his ex-wife?
13     A.   Yes.
14     Q.   I would expect you haven't had any
15 communications with him in the last couple years,
16 or have you?
17     A.   I've had -- he's checked in on me
18 knowing what I've gone through.  But I haven't had
19 any conversation with him probably in over six
20 months, six, seven months.
21     Q.   Do you know where he lives?
22     A.   He lives in Gary, Indiana.
23     Q.   Any idea like --
24     A.   On the beach.  They purchased -- him

Page 52

1  and his wife, current wife, purchased a beachfront
2  home.
3      Q.   And they've had that for a couple years
4  now as far as you know?
5      A.   Yeah, couple years.  I don't know
6  exactly how long.
7      MR. TAHMASSEBI:  Okay.  Give me two-minute
8  break, and then I think I'm close to done.
9      THE WITNESS:  Okay.
10     MR. TAHMASSEBI:  Guys, we're going to take a
11 two-minute break.  All right?
12     MR. PORRAS:  Okay.
13          (Recess taken.)
14     MR. TAHMASSEBI:  We're back on the record.
15 BY MR. TAHMASSEBI:
16     Q.   You mentioned the purchase in the Trump
17 Tower.
18     A.   Yes.
19     Q.   And that -- I think you said it was --
20 at least Mr. Ivankovich facilitated it, signed for
21 whatever LLC as far as you understand?
22     A.   Yes.
23     MR. TAHMASSEBI:  Okay.  I don't have anything
24 further.

Page 53

1      MR. PORRAS:  Okay.  I do have a few follow-up
2  questions related to the remaining LLCs.
3      THE WITNESS:  Does he get to ask me questions?
4      MS. STANISH:  Yes.
5      THE WITNESS:  Okay.
6      MR. TAHMASSEBI:  Just a few.
7      MR. PORRAS:  And just for the record again,
8  Cy Porras for the intervenor LLCs.  I know the
9  court reporter had asked, I think that's just for
10 the sake of the record, which LLCs I represent.
11 There's about 17.  So I'll provide it afterwards.
12          EXAMINATION
13 BY MR. PORRAS:
14     Q.   But in any event, Ms. Ivankovich, I'm
15 going to ask you a few questions based off the
16 information you talked to Mr. Tahmassebi about.
17     A.   Ivankovich.
18     Q.   So just to be clear, Mr. Tahmassebi is
19 the attorney in front of you.  He asked you a few
20 questions.  Those are the questions and information
21 I want to ask you about.  Okay?
22     A.   Okay.
23     Q.   So you testified about Steven's
24 ownership, control of multiple Alliance LLCs.

JEANETTE IVANKOVICH, 03/23/2023                    Page 54..57

Page 54

1        Do you know the names of those LLCs?
2    A.   No.  I think I stated that earlier,
3  that there were multiple and just through inference
4  that Steven was part of all of them per Steven.
5    Q.   I see.  Okay.  So you don't know the
6  names of them, but it's your suspicion that he
7  controlled or was involved --
8        MR. TAHMASSEBI:  Hold on.  Let me just show
9  an objection because she did go through the names,
10 number one.  And she didn't say it was her
11 suspicion.  She said it was based on discussions
12 with Mr. Ivankovich.  So let's not be putting words
13 in her mouth to make it sound like she doesn't have
14 knowledge of something she already testified she
15 had personal knowledge of.
16       THE WITNESS:  We were married for 17 years,
17 Cy, and together for over 18.  So we had many
18 discussions over that.
19 BY MR. PORRAS:
20   Q.   And you just said that you inferred
21 that information; is that right?
22       MR. TAHMASSEBI:  Again, I think that was
23 based on you leading her, which you're allowed to
24 do.

Page 55

1        But you can answer however you want.
2        THE WITNESS:  Did we go through every single
3  LLC associated with Atlas?  No.  But we had
4  discussions on Atlas entities without naming them
5  specifically.
6  BY MR. PORRAS:
7    Q.   Okay.  And what were some of the names
8  if you remember today of the Atlas entities that
9  you recall?
10   A.   Atlas Alliance.  That's all that really
11 needed to be said.  And whatever follows was kind
12 of umbrellaed under Atlas and Alliance.
13   Q.   Okay.  So did you have any independent
14 knowledge other than your conversations with Steven
15 that led you to believe that Steven had control or
16 ownership of Atlas Alliance or any other LLCs?
17   A.   Unless Steven's a liar.
18   Q.   I'm sorry.  So --
19   A.   If Steven's a liar, then he doesn't.
20 But that's what he told me.  We've been together
21 for over 18 years, Cy.
22   Q.   Okay.
23   A.   We've had multiple conversations
24 regarding that, yes.

Page 56

1    Q.   All right.  I'm just going to ask the
2  question again to make sure you understand.  So
3  aside from those conversation, did you have any
4  independent knowledge as to whether Mr. Ivankovich,
5  Steven, had control or ownership of any Atlas
6  Alliance LLC or any other LLCs?
7    A.   Define "independent."
8    Q.   So I believe my question was outside
9  of those conversations, did you have any other
10 information that led you to believe that?
11   A.   Conversations with his parents.
12 Conversations with his family.  Conversations with
13 people who worked at Alliance Atlas, yes.
14   Q.   Okay.  And what were the names of those
15 people that you spoke with at --
16   A.   Olga, Antonia Ivankovich, Mark Brown,
17 Leslie Andren, Ravi Malli, David Latham, Jason
18 Wandner.  Who else?  I mean, you'd have to give me
19 a moment to go back.  Keep in mind, again, we've
20 been together for 18 years, so ...
21   Q.   Okay.  So based on that 18-year
22 relationship, can you name the Atlas Alliance LLCs
23 aside from just the name Atlas Alliance?
24   A.   No.  There would be no need for me to

Page 57

1  name them.  Atlas and Alliance are umbrella
2  companies for multiple LLCs.
3    Q.   Okay.  What are the names of those
4  multiple LLCs?
5    A.   There's no need for me to name them.
6  They're umbrellas.
7    Q.   So, ma'am, it's your deposition.  I'm
8  asking a question.  If you do know the answer, I
9  ask that you respond.  If you don't know, you can
10 tell me you don't know.  But to your knowledge,
11 what are the names of those Atlas LLCs?
12       MS. STANISH:  She's answered multiple times.
13       MR. TAHMASSEBI:  Yeah.  I don't think she
14 needs to answer it again.
15       MR. PORRAS:  I'm sorry.  What was the
16 objection?
17       MS. STANISH:  Asked and answered multiple
18 times.
19       MR. PORRAS:  What was her answer?
20       MS. STANISH:  Do you want the court reporter
21 to read it back all the times she answered?
22       MR. PORRAS:  We can -- Mr. Court Reporter,
23 would you mind reading back the last answer from
24 the witness.

JEANETTE IVANKOVICH, 03/23/2023                                    Page 58..61

Page 58

1          (The record was read as follows:
2          Q.  There's no need for me to
3          name them.  They're umbrellas.)
4      MR. PORRAS:  Okay.  So to me she's not
5  answered the question.  If she's refusing to answer
6  the question, then I could reserve the question for
7  the judge.  But to the extent that she's here today
8  and has knowledge, I think she should answer.
9      MR. TAHMASSEBI:  You're going to reserve a
10  silly question like that for the judge?
11      MR. PORRAS:  Is she refusing to answer?
12      MR. TAHMASSEBI:  I think she's answered to
13  the best of her knowledge.
14          Do you have anything to add?
15      MR. PORRAS:  No.  I think she's evading the
16  question.  So to the extent that she can answer --
17      THE WITNESS:  Are you kidding?  There's a lot
18  of evading going on.  But, no, not by me.
19  BY MR. PORRAS:
20      **Q.  By you, ma'am?**
21      A.  No, not by me.
22      **Q.  I understand.  So are you refusing to**
23  **answer the question?**
24      A.  No.  I think I answered it, Cy.

Page 59

1      MS. STANISH:  Answer it again, Jeanette, just
2  so Cy is clear as to what your answer is.  Why
3  don't you go ahead and answer it for him for the
4  fourth time.
5      THE WITNESS:  So any conversations that were
6  had, Atlas and Alliance would have been umbrella
7  companies for all the LLCs.
8  BY MR. PORRAS:
9      **Q.  Okay.  And what are the names of those**
10  **LLCs that are under the umbrella of Atlas Alliance?**
11      MS. STANISH:  If you can remember any names
12  as you sit here today, name them.  If you can't,
13  tell him you can't remember the names.
14      THE WITNESS:  Atlas Homes, Atlas Management,
15  Atlas, LLC, Atlas P2, P3, P4, Atlas Caribbean,
16  Atlas -- I mean, they're all, right?
17  BY MR. PORRAS:
18      **Q.  Sure.  And to your memory, was the name**
19  **Atlas in all the LLCs' names?**
20      A.  There would have been Alliance in some.
21  But, no, there are -- there's so many, Cy.
22      **Q.  Sure.  Okay.  I understand.  And today**
23  **is not meant to be a memory quiz.  It's not meant**
24  **to be --**

Page 60

1      A.  That's what you're turning it into.
2      **Q.  So it's not meant to be anything other**
3  **than what you remember today.  If you don't**
4  **remember, you can just let me know that.  That's**
5  **fine.**
6          So I think you also said that
7  **there's about 15 to 20 businesses that you believe**
8  **Steven Ivankovich controls.  Is that number**
9  **accurate to your memory?**
10      A.  I think you said there's 17.
11      **Q.  So --**
12      A.  I think that's what was said.  I think
13  there's multiple -- was it 10 to 20?  There's a
14  lot, yes.
15      **Q.  Okay.  So does 15 to 20 sound accurate?**
16      A.  I'm not going to go on record with
17  that.  That's guessing.
18      **Q.  Why not?**
19      A.  Because it's guessing.  And then
20  guessing turns back into "I don't know" and I'm
21  lying.  It turns into something leading.  So I'm
22  not going to guess, Cy.
23      **Q.  Okay.  And then for the names of LLCs,**
24  **were you also guessing there?**

Page 61

1      A.  Can I say asked and answered?
2      MS. STANISH:  No.  Just answer his question.
3      THE WITNESS:  Am I guessing?  No.  I'm not
4  guessing.  Those were ones that I knew for sure.
5  BY MR. PORRAS:
6      **Q.  Okay.  And did you ever see the**
7  **businesses' operating agreements?**
8      A.  No.
9      **Q.  Okay.  And, I'm sorry, did you know**
10  **what an operating agreement was?**
11      A.  I mean, for the most part, yes.
12      **Q.  Okay.  And did you see any bank**
13  **statements for any of these businesses?**
14      A.  No.  I would be relying on Steven's
15  word.
16      **Q.  Okay.  So your testimony as to any and**
17  **all of Steven's businesses, as you put it, is based**
18  **off your conversations with either him or his**
19  **family members or individuals that you believe**
20  **worked for those businesses; is that right?**
21      A.  I don't believe they worked for those
22  businesses.  They did work for those businesses
23  according to them and according to their website.
24  And that I trusted what came out of my husband's

JEANETTE IVANKOVICH, 03/23/2023                    Page 62..65

Page 62

1 mouth as the truth, yes.
2    Q.   Okay.  So just to be clear, yes, it's
3 based off conversations you had various individuals
4 including your ex-husband, Mr. Ivankovich?
5    A.   He's not ex yet.  We're working towards
6 that.
7    Q.   Okay.  But that's a yes to the
8 question, correct?
9    A.   Yes.
10    Q.   Okay.  And did you ever work for any of
11 those businesses?  And to put it a different way,
12 were you ever employed by any of the businesses
13 directly?
14    A.   No.  Despite my husband claiming that I
15 had sex with men for money and drugs, I have never
16 worked outside of the home during our marriage,
17 including at Atlas.
18    Q.   Okay.  I understand.  So you've not
19 been employed by any business including Atlas
20 obviously?
21      MR. TAHMASSEBI:  She just answered -- asked
22 and answered.
23      MS. STANISH:  Answer again so he's clear of
24 his answers.

Page 63

1      THE WITNESS:  I have never worked for Atlas
2 Homes, Management, LLC, P2, P3, P4, Atlas
3 Caribbean, Atlas Forest, Atlas Alliance.  No.
4 BY MR. PORRAS:
5    Q.   Okay.  During your marriage to
6 Mr. Ivankovich, were you ever employed by anyone
7 even if it wasn't related to Mr. Ivankovich's
8 business as you put it?
9      MR. TAHMASSEBI:  Asked and answered again.
10      MS. STANISH:  Answer it.
11 BY MR. PORRAS:
12    Q.   You can go ahead and answer.
13    A.   No.
14    Q.   Thank you.
15         Did you know the -- who the
16 members -- or do you know who the members of
17 the LLCs that you believe are controlled by
18 Mr. Ivankovich are?  Do you know who the members
19 of those LLCs are?
20      MR. TAHMASSEBI:  Aside from what's she's
21 already testified to, that Mr. Ivankovich -- Steven
22 Ivankovich was a member?
23      MR. PORRAS:  Yes.  Go ahead.
24      THE WITNESS:  I know Steven was a member.  I

Page 64

1 know his mother, his father.  I was told my
2 children are.  Steven told me he was trying to
3 remove his brother's children from the LLCs because
4 they don't deserve anything.  My assumption would
5 be Dan, his brother, would be part of the LLCs
6 based off of our conversations.  But that's it.
7 BY MR. PORRAS:
8    Q.   Okay.  And is it your understanding
9 that all the LLCs have all the same members?
10    A.   No, that would not be my understanding
11 at all.
12    Q.   And so do you have an understanding of
13 which LLCs have which members?
14    A.   No.
15    Q.   Okay.  And it's, I believe, your
16 testimony that Steven Ivankovich makes all the
17 decisions on behalf of these various LLCs that
18 we're referring to; is that right?
19    A.   I would say up until the last two or
20 three years before his father got sick to the point
21 where he couldn't -- couldn't participate in
22 decisions anymore that they were jointly based.  I
23 think Steven and his mother make those decisions
24 based off of conversations that I've had with both

Page 65

1 Steven and his mother for those.  But I would say
2 at this point the majority of the decisions are
3 made by Steven.
4    Q.   Okay.  So I understand, at some point
5 prior to Steven's father getting sick, the father
6 was involved in some of the decisions on behalf of
7 these LLCs; is that right?
8    A.   Yes.
9    Q.   Okay.  And in conjunction -- or rather,
10 is it your testimony that in conjunction with
11 Mr. Ivankovich's father that Steven and his mother
12 also were part of the decisionmaking process for
13 those LLCs at the same time the father was?
14    A.   No.  I don't think Steven's mother was
15 as heavily involved until Steven's father got sick.
16 That would be my -- that would be my impression as
17 a member of the immediate family.
18    Q.   Okay.  So that was based off, again,
19 your impressions from being around the family and
20 talking to Steven and other family members; is that
21 right?
22    A.   Correct.
23    Q.   Okay.  And then after Mr. Ivankovich's
24 father became ill, his mother, Steven's mother,

JEANETTE IVANKOVICH, 03/23/2023                    Page 66..69

Page 66

1  came on and also was making decisions about the
2  LLCs or aiding in making decisions; is that right?
3      A.   That would have been my impression
4  based off of conversations.
5      Q.   And I believe you testified that Steven
6  Ivankovich controlled the funds of the LLCs.  Do
7  you recall testifying to that?
8      A.   I recall saying that would be my
9  impression based off of conversations.
10     Q.   Okay.  So just so I understand that,
11 your understanding that Steven Ivankovich controls
12 the funds of the LLCs is based solely off your
13 conversations with Mr. Ivankovich, is that right,
14 with Steven Ivankovich?
15     A.   Me being under the impression that my
16 husband was not lying to me, yes, my impression was
17 that he did have control over decisionmaking of
18 those LLCs.
19     Q.   Okay.  But what about, say, specific
20 control of the LLCs' funds; so did he ever say to
21 you, I can go and take out money from this LLC bank
22 account?
23     MR. TAHMASSEBI:  Asked and answered again.
24 She's already testified to that.

Page 67

1          But you can answer again.
2      THE WITNESS:  No, that wouldn't be a
3  conversation that we had.  The conversation would
4  have been we needed money and then money appeared.
5  So whether it was magically through the sky or from
6  an LLC, it came from somewhere.
7  BY MR. PORRAS:
8      Q.   Okay.  But you don't know where that
9  money would have come from that Steven was using
10 for his own personal life; is that fair to say?
11     MR. TAHMASSEBI:  Again, she's already testified
12 from the LLCs.  You're trying to go back on her
13 prior testimony.  I think it's improper especially
14 in what would be an evidence deposition.  So I'm
15 going to object that you're misstating her --
16 you're trying to make her go back on what she's
17 already said.
18     MR. PORRAS:  I'm only reiterating what she
19 just said right now to make sure I understand and
20 to clarify any further points so --
21     MR. TAHMASSEBI:  Well, that's not what she
22 said.  But go ahead.
23 BY MR. PORRAS:
24     Q.   Ms. Ivankovich, did you answer the

Page 68

1  question?  I'm sorry.  Did you understand the
2  question?
3      A.   Can you ask it again?
4      MR. PORRAS:  Sure.  So -- and actually,
5  Mr. Court Reporter, do you mind reading back the
6  question.
7          (The record was read as follows:
8           Q.  But you don't know where
9           that money would have come from
9           that Steven was using for his
9           own personal life; is that fair
10          to say?)
11     THE WITNESS:  I guess that money would be
12 traceable if you follow through with the subpoena
13 on our credit cards and how everything was funded
14 through our lifestyle.  Then there would be no
15 questions.
16 BY MR. PORRAS:
17     Q.   Okay.  Sorry, ma'am.  So just so I
18 understand, to your knowledge, you don't have any
19 understanding of where those funds came from?
20     A.   To my knowledge, my husband had a job
21 for our entire marriage that he was able to pull
22 funds from.  Yes, that was my impression.  That was
23 the impression that Steven gave me.  That was the
24 impression that I had.  The LLCs are attached to

Page 69

1  the business, so I would assume as money came in,
2  like he said, that he would be able to pull from
3  it.
4          Do I have specifics for you?  No,
5  I do not.  But we could get specifics through
6  subpoenas and forensic accounting.  So if you're
7  that concerned, we could move forward with that.
8      Q.   Okay.  And when was, to your knowledge,
9  Steven Ivankovich last employed?
10     A.   To my knowledge, he's still employed.
11     Q.   Okay.  And who employs Steven
12 Ivankovich?
13     A.   To my knowledge, he's still working for
14 the family business.  And that's based off of what
15 he has said himself under deposition six months
16 ago, seven months ago.
17     Q.   And when you say "working for the
18 family business," does that family business have a
19 name?  Is there a specific entity?
20     A.   I think it has approximately 17 names
21 according to you.
22     Q.   Okay.  So when you refer to the family
23 business, are you referring to the LLCs that we've
24 been talking about?

JEANETTE IVANKOVICH, 03/23/2023                          Page 70..73

Page 70

1      A.   Yes.  And more.  And more.  Now,
2   there's been new outside of Atlas that has -- that
3   have been added.
4      Q.   Okay.  And, sorry, which ones are
5   those?
6      A.   Just get a forensic accountant to come
7   up with them.
8      Q.   Do you have an independent knowledge as
9   to what those --
10     A.   I have an independent knowledge that
11  there are boats and houses and apartments and
12  travel that has all been used and taken by
13  Mr. Ivankovich.  I know specifically he's used two
14  different LLCs to represent himself in the Trump
15  Tower.  I know he's used an LLC to represent
16  himself in the 235 West -- 233 West Menomonee.  I
17  know he has presented himself as the owner of the
18  Octopussy based on text messages that I have had
19  with vendors coming to me, employees coming to me.
20          So, yeah, there's more, Cy.  I think
21  a forensic accountant could clear all this up for
22  everyone.
23     Q.   Okay.  I'm sorry.  I don't know what
24  the Octopussy is.  What is the Octopussy?

Page 71

1      A.   Oh, he hasn't invited you on his boat
2   yet?  It is a 150-foot motor yacht undergoing an
3   extensive rehab.
4      Q.   Okay.  So that's the boat that you were
5   talking with Mr. Tahmassebi about earlier; is that
6   right?
7      A.   That would be the boat that Steven had
8   me falsely arrested on.  I'm sure you're aware of
9   that.
10     Q.   And you said that Steven owns it
11  through an LLC.  How do you know that?
12     MR. TAHMASSEBI:  Well, hold on.  I don't
13  think she said that.  So I think it misstates --
14  objection; misstates.
15     THE WITNESS:  I mean, Steven implied to me as
16  his wife through texts and through conversations
17  and through emails that that boat was going to be
18  used for personal and work events.  And so if he
19  didn't buy it himself, he bought it through an LLC,
20  which seems to be a pattern.
21  BY MR. PORRAS:
22     Q.   Do you know who owns that boat?
23     MR. TAHMASSEBI:  Objection.  She already
24  testified that she believes --

Page 72

1      THE WITNESS:  An LLC owns it.
2      MR. TAHMASSEBI:  -- either Steven
3   individually or an LLC.  She said that twice now.
4   BY MR. PORRAS:
5      Q.   Okay.  So do you know who owns that
6   boat?
7      A.   Steven or the LLC.
8      Q.   Okay.  When you say "the LLC," does
9   that LLC have a name?
10     A.   Why don't you ask Steven, Cy?
11     Q.   Do you know the name of the LLC that
12  you think may own that boat?
13     MS. STANISH:  Answer if you know or don't
14  know.
15     THE WITNESS:  There is like Contessa Marine
16  Research.  It's something like that.  I know that's
17  purchased.  I know the St. Anthony was used to --
18  an LLC to purchase.  I mean, Steven creates LLCs
19  like passing out candy on Halloween.  Everything's
20  an LLC, you know.  You know how rich people do
21  things.
22  BY MR. PORRAS:
23     Q.   I see.  And for the properties you
24  mentioned that Steven purchased, and I believe --

Page 73

1   correct me if I'm wrong, but I think you said he
2   purchased through an LLC; is that right?
3      A.   Yes.
4      Q.   Okay.  Do you know the names of those
5   LLCs?
6      A.   Delaware something.  I don't -- I don't
7   recall off -- if I saw it --
8      MS. STANISH:  If you want them, they are
9   admitted into evidence in the divorce proceedings.
10  We can get them for you.
11     THE WITNESS:  Yeah, they're admitted into
12  evidence in the divorce proceedings.
13  BY MR. PORRAS:
14     Q.   Okay.  And sitting here today, to your
15  recollection, Delaware something or another, I know
16  you don't recall the other ones, just sitting here
17  today; is that right?
18     A.   My answer is they're submitted into
19  evidence the divorce proceedings.  Please
20  feel free to reference.
21     Q.   Okay, ma'am.  So we're here for your
22  deposition today obviously in a different proceeding.
23     MS. STANISH:  If you remember their names as
24  you sit here today, say yes or no, I remember them

JEANETTE IVANKOVICH, 03/23/2023                    Page 74..77

Page 74

1  or don't remember them.
2      THE WITNESS: I don't remember them, no.
3      MR. TAHMASSEBI: Let's not waste time on
4  that.
5      MS. STANISH: We'll be happy to get you the
6  names. I'll send them to you.
7      MR. TAHMASSEBI: They said they're going to
8  give you the names. I mean, come on.
9      MS. STANISH: And they're incor- -- one of
10 them at least is incorporated in Delaware, which
11 is, I think, what she's remembering.
12     MR. TAHMASSEBI: If you're truly concerned
13 about the information, they said they'd provide it.
14 So you don't need to sit here and harass the
15 witness about, Well, you're here for your deposition.
16     MR. PORRAS: Amir, I don't think I'm
17 harassing her at all. I think I'm asking her
18 questions, and I think she's evading them. And I
19 think you're raising objections on her behalf --
20     THE WITNESS: Evading? No. I think I've
21 answered every question you've asked.
22     MR. PORRAS: I just want to put that on the
23 record, and I'm going to continue asking questions --
24     THE WITNESS: Several times.

Page 75

1      MR. PORRAS: -- Ms. Ivankovich.
2      THE WITNESS: I'm not evading anything, Cy.
3  I'm here. I showed up for my deposition. I'm
4  answering you honestly. That's more than your
5  representation can ...
6  BY MR. PORRAS:
7      Q.  Okay. So when you said that Steven
8  bought or purchased properties through LLCs, you
9  don't recall the names sitting here today; is that
10 right?
11     A.  Correct.
12     Q.  Okay. To your memory, did any of those
13 names include the name Atlas, for instance?
14     A.  No.
15     Q.  Okay. Were those LLCs related to what
16 you think as the family business, Atlas businesses?
17     MS. STANISH: Hold on. That's -- I'm going
18 to object to that. That's a compound question,
19 Atlas businesses versus family businesses. So can
20 you restate the question for her?
21 BY MR. PORRAS:
22     Q.  Yes. That's no problem.
23         So to your understanding, are the
24 LLCs that Steven used to purchase these properties

Page 76

1  that you mentioned the family businesses, the
2  family business LLCs?
3      A.  In my mind, they would be one and the
4  same. It all goes back to the same pond, right?
5  The money -- it's the same money source. So you
6  can call it whatever you want. But it goes back to
7  the same money source.
8      Q.  And what do you base that understanding
9  that it's the same money source on?
10     A.  Being married to Steven and being a
11 part of the immediate Ivankovich family for the
12 last 18 years.
13     Q.  Okay. And I think you had also
14 mentioned that there was a Chase credit card that
15 was used to pay your and Steven's personal
16 expenses; is that right?
17     A.  I think you're pretty familiar with it.
18 You have gone up in front of the judge trying to
19 stop the subpoena. So, yes, there is a Chase
20 credit card that I had a name -- that I had in my
21 name for the last 12-plus years, correct.
22     Q.  So that was a credit card under your
23 name, and it was your understanding that that
24 credit card was tied to an account owned by

Page 77

1  Steven's father; is that right?
2      A.  Correct.
3      Q.  Okay. So that wasn't an account owned
4  by the family business LLC; is that right?
5      A.  I think Steven used it for business
6  expenses as well as personal. They were
7  intermingled.
8      Q.  Okay. And what do you base your
9  understanding that they were used for intermingled
10 business and personal expenses?
11     A.  Based off of my knowledge Steven paying
12 business expenses and personal expenses with the
13 credit card.
14     Q.  Okay. And this is using his father's
15 credit card to pay those expenses, right?
16     A.  I mean, it was Steven's credit card.
17 Just because his father was the primary account
18 holder didn't mean it wasn't Steven's credit card.
19     Q.  I see.
20     A.  His father -- and his father never used
21 that card. His mother never used that card.
22     Q.  And what kind business expenses were
23 used -- were paid by that card?
24     A.  Utility bills for apartment complexes.

1 Payments for multifamily homes owned by Atlas.

2    **Q.   Okay.**

3    A.   Landscaping.  Utilities.

4    **Q.   And aside from the use of that credit**

5 **card that we're just talking about, do you have any**

6 **other basis to believe that Steven Ivankovich**

7 **intermingled his business expenses with his**

8 **personal expenses?**

9    A.   No.  I think that's enough.

10    **Q.   And during the use of that credit card,**

11 **was it your understanding that Steven's father was**

12 **ultimately the person paying for those charges?**

13    A.   No, not at all.

14    **Q.   Okay.**

15    A.   It was -- my impression from Steven was

16 he was going to pay the card, that the card was

17 paid -- being paid by him.  He's going to make a

18 payment in a couple --

19    **Q.   By "him," who do you mean by "him"?**

20    A.   Steven.

21    **Q.   Okay.  So Steven was going to be the**

22 **ultimate payer of those charges?**

23    A.   Yeah.  And there's text messages that

24 would support -- between Steven and I that would

1 support that.

2    **Q.   Okay.  So Mr. Tahmassebi, again, who's**

3 **the attorney that just asked you questions, he**

4 **asked you --**

5    A.   I'm sorry?

6    **Q.   I'm sorry.  I'm speaking very quickly,**

7 **I know.**

8    MS. STANISH:  First name is Amir.

9    THE WITNESS:  Oh, I'm sorry.

10    MS. STANISH:  Go ahead.

11 BY MR. PORRAS:

12    **Q.   Okay.  So the attorney that just asked**

13 **you questions, I believe asked you a few questions**

14 **about whether Steven Ivankovich transferred funds**

15 **to the family businesses.  Do you remember that**

16 **line of questioning?**

17    A.   No.

18    **Q.   Okay.  And I believe you testified that**

19 **you didn't know whether Steven Ivankovich did or**

20 **did not transfer his own personal funds to**

21 **businesses; is that right?**

22    A.   I don't -- I'm sorry.  I don't recall

23 that.  I recall Steven taking money from the

24 businesses for personal use.  I don't recall the

1 questioning being Steven taking his own money and

2 putting it into Atlas.

3    MS. STANISH:  He's referring to the beginning

4 of the deposition where counsel was asking you

5 about Steven saying he went from $56 million value

6 to zero because he had to give all his money, his

7 personal money to the defunct businesses, something

8 along those lines.

9    THE WITNESS:  No, I was never informed of

10 that.

11    MR. PORRAS:  Okay.

12    THE WITNESS:  And our lifestyle did not

13 reflect that transaction.

14 BY MR. PORRAS:

15    **Q.   That he was sending money to the**

16 **businesses -- or, rather, to the family businesses**

17 **we'll say.**

18    A.   No.  Well, while traveling on a

19 150-foot yacht and going deep sea fishing with

20 friends and -- no.  Doesn't sound like a man in

21 destitute.

22    **Q.   And you said that Steve Ivankovich**

23 **would send you money occasionally through Venmo.**

24 **Do you know where that money came from?**

1    MR. TAHMASSEBI:  I think she's asked and

2 answered.

3    THE WITNESS:  Steven?

4    MR. PORRAS:  Yes.

5    THE WITNESS:  Well, when the money would come

6 up on my Venmo, it would say Steven Ivankovich.  So

7 what we could do is we could subpoena Venmo to find

8 the source of that money or hire a forensic

9 accountant, and then there would be no questions as

10 to the source.

11    MS. STANISH:  After we get through a motion

12 to quash.  But go ahead.

13    THE WITNESS:  It's easy.  I'm not the one

14 making it difficult.

15 BY MR. PORRAS:

16    **Q.   Okay.  But you don't know where those**

17 **funds came from in short?**

18    A.   So when the money in my Venmo showed

19 up, it showed up as Steven Ivankovich.  So for me,

20 the source was Steven Ivankovich.  Where he

21 received that money from, it's a different question.

22    **Q.   Okay.  And then you don't know the**

23 **answer to that question?**

24    A.   No.  You could ask Steven, or we could

JEANETTE IVANKOVICH, 03/23/2023                                    Page 82..85

Page 82

1  get a forensic accountant, or we could subpoena.
2      **Q.   Okay.  But, again, you don't know the**
3  **answer to that question; you don't know where those**
4  **funds came from?**
5      A.   Steven.  They came from Steven.
6      **Q.   Okay.  And I believe you also mentioned**
7  **that he would send you money to a TRG account.  Did**
8  **I remember that correctly?**
9      A.   You did.
10     **Q.   Okay.  And is that a bank account, or**
11 **what kind of account is that?**
12     A.   Correct.  That was a business account
13 that was attached to a debit card that Steven
14 canceled two days after I filed for divorce.
15     **Q.   Okay.  And do you know what business**
16 **that was tied to, the TRG account?**
17     A.   I think TRG was the name of the
18 business.  Steven loved putting things in the name
19 of the business.  So once again, we could subpoena
20 that account and see the source of the funds.
21     **Q.   I see.  Okay.  So what bank was the TRG**
22 **account with?**
23     A.   It was Glenview State Bank.  It is
24 where his family banked.  And then it -- it turned

Page 83

1  over.  It was purchased by a larger bank.  And I
2  can't remember the name.  But it was -- it was
3  fairly recently.
4           And then after I filed for divorce,
5  Steven cut off my access to those accounts.
6      **Q.   Okay.  And I do apologize if --**
7      A.   No, you don't.  No, you don't.  But go
8  ahead.
9      **Q.   -- this question was asked specifically.**
10 **But did any -- to your knowledge, did any of the**
11 **family businesses, whether they're LLCs or trusts**
12 **or anything else from your understanding, directly**
13 **send you money?**
14     A.   No.  It would always be funneled
15 through Steven.
16     MR. PORRAS:  Okay.  That's I think all I
17 have, Ms. Ivankovich.  I appreciate your time.  I'm
18 not sure if Mr. Tahmassebi has any additional
19 follow-up or further questions.  But I'm wrapped up.
20     MS. STANISH:  Amir.
21     MR. TAHMASSEBI:  No.
22          The LLCs that we've mentioned, it's
23 your understanding, based on 18 years of marriage,
24 being around the family for --

Page 84

1      THE WITNESS:  It's 17 years of marriage, but
2  we've been together for 18.
3      MR. TAHMASSEBI:  Okay.  It's your
4  understanding, based on 17 years of marriage, that
5  Steven Ivankovich controlled the transfer of funds
6  from a number if not all those LLCs?
7      THE WITNESS:  Yes.
8      MR. TAHMASSEBI:  That's all I have.
9           All right.  I think -- what do you
10 want to do about signature, Counsel?
11     MS. STANISH:  Do you want the opportunity to
12 review the transcript before it's official?  You
13 can't make any substantive changes, but if the
14 court reporter has made any errors that are non-
15 substantive that you have the opportunity to
16 correct them.  Do you want that opportunity, or do
17 you want to waive that?
18     THE WITNESS:  I would like that opportunity,
19 please.
20     MS. STANISH:  Okay.  So reserve.
21     MR. TAHMASSEBI:  All right.  Great.  We will
22 attach the exhibits.  I'm going to order the
23 transcript, Nick.  Same order as usual.
24          Do you guys want a copy?

Page 85

1      MR. GOLDSTEIN:  We should get it.
2      MR. PORRAS:  Yes.
3      MR. GOLDSTEIN:  Cy, why don't you order a
4  copy.
5      MR. PORRAS:  Okay.  You got it.
6           (The deposition concluded at
7            3:23 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 86

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3    ZHU ZHAI HOLDINGS LIMITED   )
      and PETER PUI TAK LEE,      )
 4                                )
               Plaintiffs,        )
 5                                )
          vs.                     )    No. 20-cv-4985
 6                                )
      STEVEN IVANKOVICH,          )
 7                                )
               Defendant.         )
 8
 9         This is to certify that I have read my
      deposition taken on Thursday, March 23, 2023,
10    in the foregoing cause and that the foregoing
      transcript accurately states the questions asked
11    and the answers given by me, with the changes or
      corrections, if any, made on the Errata Sheet
12    attached hereto.
13
14
15    _____
               JEANETTE IVANKOVICH
16
17    No errata sheets submitted (Please initial)
      Number of errata sheets submitted _____ pages
18
      Subscribed and sworn to
19    before me this _____ day
      of _____ 2023.
20
21    _____
          Notary Public
22
23
24
```

Page 87

```
 1              REPORTER'S CERTIFICATE
 2       I, Nick D. Bowen, do hereby certify that
      JEANETTE IVANKOVICH was duly sworn by me to testify
 3    the whole truth, that the foregoing deposition was
      recorded stenographically by me and was reduced to
 4    computerized transcript under my direction, and
      that said deposition constitutes a true record of
 5    the testimony given by said witness.
 6       I further certify that the reading and
      signing of the deposition was not waived, and the
 7    deposition was submitted to Ms. Tanya Stanish,
      deponent's counsel, for signature.  Pursuant to
 8    Rule 30(e) of the Federal Rules of Civil Procedure,
      if deponent does not appear or read and sign the
 9    deposition within 30 days, the deposition may be
      used as fully as though signed, and this
10    certificate will then evidence such failure to
      appear as the reason for signature not being
11    obtained.
12       I further certify that I am not a relative
      or employee or attorney or counsel of any of the
13    parties, or a relative or employee of such attorney
      or counsel, or financially interested directly or
14    indirectly in this action.
15       IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Chicago,
16    Illinois, this 31st day of March 2023.
17
18
                 [signature] Nick D. Bowen
19    Illinois CSR No. 084-001661
20
21
22
23
24
```

Page 88

```
 1   Errata Sheet
 2
 3   NAME OF CASE: ZHU ZHAI HOLDINGS LIMITED and PETER PUI TAK LEE vs STEVEN IVANKOVICH
 4   DATE OF DEPOSITION: 03/23/2023
 5   NAME OF WITNESS: Jeanette Ivankovich
 6   Reason Codes:
 7       1. To clarify the record.
 8       2. To conform to the facts.
 9       3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25              _____
```

Index: $10,991.73–accuracy

JEANETTE IVANKOVICH, 03/23/2023

**Exhibits**

**1 Ivankovich 032323-1** 11:16,19 14:7

**2 Ivankovich 032323-2** 14:4 19:10,17 20:17

**3 Ivankovich 032323-3** 19:13 20:15,18 23:19,20

**4 Ivankovich 032323-4** 29:23,24 30:11

**5 Ivankovich 032323-5** 35:8,11 36:3

**6 Ivankovich 032323-6** 41:11, 12,16

**$**

**$10,991.73** 42:3

**$1200** 47:19

**$20,000** 26:1

**$3,000** 47:14

**$3.5** 24:14 25:7

**$55,367,404** 13:3

**$56** 80:5

**1**

**1** 11:16,19 14:5,7

**1.1** 36:23

**10** 6:23 24:8 60:13

**11** 36:22

**1150** 49:4,5

**12** 36:3

**12-plus** 76:21

**12.1** 36:20,22

**13** 30:1,15,16,17 42:1

**13.26** 37:24

**14** 42:1

**14s** 47:21

**15** 6:23 18:6 60:7,15

**15.07** 37:22

**150,000** 26:5

**150-foot** 10:18 24:14 27:8 71:2 80:19

**16** 24:7

**17** 53:11 54:16 60:10 69:20 84:1,4

**18** 54:17 55:21 56:20 76:12 83:23 84:2

**18-year** 56:21

**1:30** 6:21

**1st** 8:4,14

**2**

**2** 14:4 19:10,17 20:17

**20** 18:6 60:7,13,15

**20,000** 25:6,21

**2007** 41:10

**2008** 41:10

**2019** 36:21 37:10 38:1

**2020** 11:22 13:2,6 22:1 32:12,19

**2021** 5:7 8:4,14,16,17 9:12 23:21 24:13 29:15 31:6 32:19

**2022** 8:20,21,22 9:15,17,18 31:11

**21** 12:4

**2142** 44:15

**22** 21:13

**233** 70:16

**235** 40:4,23 45:8 70:16

**25th** 23:21 31:6

**26** 13:2,6 30:17

**29,140,000** 14:23

**3**

**3** 14:9 19:13 20:15,18 23:19,20 41:20 42:1

**30th** 24:13 29:15

**34** 10:21

**3:23** 85:7

**4**

**4** 14:10 29:23,24 30:11

**42** 10:20

**42.7** 36:20

**49.5** 21:12

**5**

**5** 35:8,11 36:3

**5,000** 8:23

**55** 10:13 13:8,20,23

**56** 11:10

**6**

**6** 41:11,12,16

**60-** 49:5

**60697** 49:5

**8**

**8,000** 8:16

**80-year-old** 50:3

**83** 49:13

**88** 37:24

**9**

**9,000** 8:13

**920** 8:1

**9220** 5:7

**A**

**absolutely** 17:9

**access** 32:15 38:15 43:3 44:12 47:4,10 83:5

**accompany** 23:17

**account** 31:24 32:15 42:2 44:6 66:22 76:24 77:3,17 82:7,10,11,12, 16,20,22

**accountant** 70:6,21 81:9 82:1

**accounting** 69:6

**accounts** 32:2,7 38:23 43:8 44:4, 6,11,24 45:5,6 83:5

**accuracy** 24:3

JEANETTE IVANKOVICH, 03/23/2023

**accurate** 60:9,15

**action** 12:12,15 23:21

**active** 23:15

**add** 58:14

**added** 70:3

**additional** 83:18

**address** 8:3 40:18 49:3,7,8

**admitted** 73:9,11

**affected** 46:11

**affidavit** 19:12 23:20 24:2 29:24
30:18 31:6

**afford** 22:4 25:8 32:22

**afloat** 11:8

**age** 50:15

**agree** 48:2

**agreement** 61:10

**agreements** 61:7

**ahead** 17:8 59:3 63:12,23 67:22
79:10 81:12 83:8

**aiding** 66:2

**alleys** 39:11

**Alliance** 15:4 17:24 18:3,24 21:20,
21 53:24 55:10,12,16 56:6,13,22,
23 57:1 59:6,10,20 63:3

**allocation** 38:1

**allowed** 54:23

**Amended** 41:17

**Amir** 7:2 16:6 20:2,9 74:16 79:8
83:20

**amount** 13:20 14:23 37:13 42:2

**ample** 30:21 31:7

**and/or** 19:23

**Andren** 56:17

**announcement** 4:24

**answering** 75:4

**answers** 62:24

**Anthony** 33:22 72:17

**Antonia** 56:16

**anymore** 64:22

**apartment** 30:23 45:12 47:13

77:24

**apartments** 70:11

**apologize** 46:4 83:6

**appearance** 6:1,10,15 15:20
16:10

**appeared** 67:4

**appearing** 17:19

**approximately** 8:11 9:2,11 10:12
28:18 35:22 39:6 44:3,16 69:20

**April** 37:9

**arrest** 29:13

**arrested** 28:22 71:8

**Asset** 35:12

**assets** 9:23 11:6 12:22,23 38:11

**assist** 26:20 27:23 28:1

**assistance** 9:3,13

**assume** 69:1

**assumed** 21:22

**assuming** 4:19 24:23 25:5 26:10,
23 27:24 29:4

**assumption** 64:4

**Atlas** 5:14,17 14:18 15:2,4 17:24
18:3,5,24 19:1 33:20 34:8,9,11,24
35:12 38:17 42:9,10,12 43:16 55:3,
4,8,10,12,16 56:5,13,22,23 57:1,11
59:6,10,14,15,16,19 62:17,19 63:1,
2,3 70:2 75:13,16,19 78:1 80:2

**attach** 84:22

**attached** 68:24 82:13

**attorney** 53:19 79:3,12

**August** 11:22 13:2,6

**authenticated** 19:15

**authorize** 32:23

**Avenue** 48:11 49:4,5

**aware** 27:5 71:8

―――――――――――――

**B**

―――――――――――――

**back** 7:20 14:7 23:10 25:6 28:17
32:12 39:10 40:6 52:14 56:19
57:21,23 60:20 67:12,16 68:5 76:4,
6

**background** 17:7

**bank** 13:9 31:24 38:23 43:7 44:4,6
61:12 66:21 82:10,21,23 83:1

**banked** 82:24

**Barber** 47:23

**base** 76:8 77:8

**based** 11:11 21:23 29:16 31:9,10
37:10 44:22 48:19 50:9 53:15
54:11,23 56:21 61:17 62:3 64:6,22,
24 65:18 66:4,9,12 69:14 70:18
77:11 83:23 84:4

**basically** 10:10 36:13

**basis** 10:1 78:6

**beach** 23:3,13 48:13 51:24

**beachfront** 52:1

**beautiful** 48:11

**beginning** 6:8 80:3

**behalf** 5:5 6:3 64:17 65:6 74:19

**believes** 71:24

**bell** 21:4

**belonged** 26:4

**beneficiary** 35:20

**big** 26:11

**bills** 77:24

**Birchwood** 18:4

**Biscayne** 31:3,4 48:7 49:9

**Biscon** 31:3

**bit** 14:11 19:21 30:10 41:19 48:4
50:15

**blur** 33:10

**boat** 10:19,20 26:9 27:9 28:19,21
71:1,4,7,17,22 72:6,12

**boats** 70:11

**boss** 28:9,12

**bosses** 28:6

**bottom** 41:24

**bought** 24:24 71:19 75:8

**brand** 47:21

**break** 5:23 52:8,11

**broke** 22:20

Index: brother–credit

JEANETTE IVANKOVICH, 03/23/2023

**brother** 51:5 64:5

**brother's** 51:2,3 64:3

**Brown** 56:16

**bunch** 22:12

**business** 10:23 23:10 32:3 33:16, 19,23 34:4,16,23 62:19 63:8 69:1, 14,18,23 75:16 76:2 77:4,5,10,12, 22 78:7 82:12,15,18,19

**businesses** 9:23 11:8 32:4 33:12 34:6 49:16 60:7 61:13,17,20,22 62:11,12 75:16,19 76:1 79:15,21, 24 80:7,16 83:11

**businesses'** 61:7

**buy** 47:13 71:19

---

**C**

**call** 7:3 33:6 76:6

**called** 4:3 35:4,11 41:16

**calling** 28:20

**camera** 20:11

**canceled** 82:14

**candy** 72:19

**captain** 10:20 26:6,8,9

**card** 32:16 33:16,18,21 34:1 49:6, 7,8 76:14,20,22,24 77:13,15,16,18, 21,23 78:5,10,16 82:13

**cards** 68:13

**Caribbean** 21:12,16 59:15 63:3

**carried** 27:9

**case** 13:22 23:2 50:10

**cases** 6:13

**cash** 32:13 36:23 37:23 47:19

**Cayman** 31:12 47:12

**CFO** 21:14

**chance** 5:21 49:3

**change** 14:3

**changed** 47:6 49:9

**charge** 27:11 49:17,21

**charges** 29:5,6,7,8 78:12,22

**chart** 19:17

**Chase** 33:16,18 76:14,19

**cheap** 47:11

**checked** 51:17

**Chicago** 8:1 30:21

**children** 8:16 9:4,5,7 13:10 29:12 47:2 51:3 64:2,3

**children's** 33:7

**circle** 46:19

**circumstances** 8:24

**Citation** 41:17

**City** 30:21

**claiming** 62:14

**clarification** 40:7

**clarify** 10:6 67:20

**clear** 14:16 17:18 34:23 40:1 42:20 53:18 59:2 62:2,23 70:21

**Cleveland** 44:15

**client** 5:18

**clock** 23:7

**close** 11:9 47:14 52:8

**clothes** 47:20

**column** 12:20 14:15

**comment** 16:4

**Comments** 36:9,18

**committed** 47:1

**communications** 51:15

**companies** 57:2 59:7

**company** 34:8

**complexes** 77:24

**compound** 75:18

**concerned** 69:7 74:12

**concluded** 85:6

**confer** 5:18

**confirm** 23:22 30:1

**conjunction** 65:9,10

**connect** 39:20

**consent** 17:19

**considers** 10:23

**consistent** 37:2 38:6

**contact** 9:13 48:21

**Contessa** 72:15

**context** 4:15

**continue** 17:15 74:23

**continued** 29:10,12

**continuing** 31:2 37:9

**control** 18:19,21 19:24 44:2 53:24 55:15 56:5 66:17,20

**controlled** 42:7 54:7 63:17 66:6 84:5

**controls** 19:4 49:24 60:8 66:11

**conversation** 22:16 51:19 56:3 67:3

**conversations** 21:23 55:14,23 56:9,11,12 59:5 61:18 62:3 64:6,24 66:4,9,13 71:16

**Cook** 23:22

**copy** 5:11 30:5 84:24 85:4

**Corp** 41:18

**correct** 8:7 11:14 22:5 25:22 27:22 31:1,4 33:13 35:2,3 51:9 62:8 65:22 73:1 75:11 76:21 77:2 82:12 84:16

**correctly** 13:6 82:8

**correspondence** 6:12

**cost** 25:6,21 26:9

**counsel** 4:18,23 5:6,11 6:18 7:8 12:5 41:13,22 80:4 84:10

**countries** 31:13

**County** 23:22

**couple** 18:24 19:7 33:1,4 48:11,12 51:15 52:3,5 78:18

**court** 5:9 12:12 31:20 41:19 45:23 53:9 57:20,22 68:5 84:14

**courtesy** 6:22 16:11,16

**courts** 45:23 46:6,7

**covered** 15:5

**covering** 26:1 39:24

**COVID** 10:9,13 11:1,6 22:1 23:9

**creates** 72:18

**credit** 33:16,18 49:6,7,8 68:13

JEANETTE IVANKOVICH, 03/23/2023

76:14,20,22,24 77:13,15,16,18
78:4,10

**crew** 10:18

**current** 52:1

**cut** 9:17 10:7 48:21 83:5

**cutting** 9:21

**Cy** 6:3 17:16 20:10 53:8 54:17
55:21 58:24 59:2,21 60:22 70:20
72:10 75:2 85:3

———————————

**D**

**daily** 47:21

**Dan** 64:5

**date** 29:15 40:15

**dated** 11:21

**David** 56:17

**day** 48:9

**days** 23:3 82:14

**deal** 26:11

**debit** 32:16 82:13

**December** 9:18 31:10

**decision-** 50:6

**decisionmaking** 65:12 66:17

**decisions** 50:6 64:17,22,23 65:2,6
66:1,2

**deep** 47:7 80:19

**Define** 56:7

**defunct** 80:7

**Delaware** 73:6,15 74:10

**delve** 34:10

**dep** 16:19

**deponent** 15:18

**deposed** 4:17

**deposition** 4:12,16 6:18 17:5
19:14 57:7 67:14 69:15 73:22
74:15 75:3 80:4 85:6

**deserve** 64:4

**design** 26:23

**desk** 44:5

**desperation** 50:24

**destitute** 22:21 46:8,24 48:1 80:21

**destruction** 50:22

**died** 39:17

**difficult** 81:14

**dilapidated** 39:8

**dilapidation** 39:5

**direct** 27:24 37:5 46:14

**direction** 16:24

**directly** 18:15 27:5 62:13 83:12

**director** 37:19

**discuss** 18:1

**discussed** 21:10 26:7 43:16

**discussion** 10:8 38:19 42:22

**discussions** 54:11,18 55:4

**dismissed** 29:7

**disseminated** 12:11

**dive** 22:24

**diving** 47:7

**divorce** 4:17 5:7 10:17 22:16,19
23:21 28:23 31:23 32:20 37:15
44:9,17 46:7,23 51:2,10 73:9,12,19
82:14 83:4

**dock** 25:21

**doctor** 51:8

**document** 12:5 19:9,13 20:21
24:8 35:11 36:4 41:13,16,19,21
42:9

**documents** 5:13

**dollar** 45:11

**dollars** 32:13 47:20

**Dominican** 31:13

**door** 39:14 45:8

**double** 39:10

**double-sided** 36:2

**downturn** 11:1

**driving** 47:23

**drugs** 62:15

**Dubai** 31:12 47:13

**Ducanto** 5:5

**due** 8:23

**duly** 4:3

**Dunlop** 36:15

**dynamic** 13:18

———————————

**E**

**earlier** 15:1 29:17 33:9 42:6 54:2
71:5

**easier** 19:9

**easy** 81:13

**effect** 4:21

**elderly** 50:2

**emails** 71:17

**employ** 27:23

**employed** 28:1,12 62:12,19 63:6
69:9,10

**employees** 70:19

**employing** 27:15 28:4

**employs** 69:11

**entered** 5:9

**entire** 68:21

**entities** 16:7 18:2,11,19,24 21:20,
21 22:3 33:20 42:5 43:9,23 55:4,8

**entity** 15:3 21:3 35:4,5,16 39:12
41:6 69:19

**errors** 84:14

**evading** 58:15,18 74:18,20 75:2

**event** 53:14

**events** 71:18

**everybody's** 14:11

**Everything's** 72:19

**evidence** 67:14 73:9,12,19

**ex-husband** 62:4

**ex-wife** 51:12

**exact** 37:12 38:3

**EXAMINATION** 4:5 53:12

**examined** 4:4

**excess** 37:24

**excuse** 12:7 13:2

**exemplified** 13:13

JEANETTE IVANKOVICH, 03/23/2023

**exhibit** 11:16,19 12:4 14:4,7
19:10,13,16,17 20:11,15,17,18
23:19,20 29:23 30:11 35:8,11 36:3
41:11,12,16

**exhibits** 84:22

**expand** 33:14

**expect** 13:24 14:2 38:13 43:8
44:23 45:4 48:17 51:14

**expected** 13:16,20

**expenses** 8:9 10:24 33:8,16,17
34:4,16,17,23 35:1 76:16 77:6,10,
12,15,22 78:7,8

**expensive** 26:14

**experience** 13:19 23:6 48:19

**explained** 46:18

**extensive** 71:3

**extensively** 31:18

**extent** 5:15 58:7,16

**extravagant** 37:17

**eyes** 14:11

---

**F**

**facilitate** 27:16

**facilitated** 52:20

**facilitator** 21:11,14

**fact** 11:3 13:12 19:23 24:20 25:4
43:4 44:23 46:8

**failing** 9:23

**fair** 67:10 68:9

**fairly** 83:3

**falling** 22:2

**false** 46:21

**falsely** 28:22 71:8

**familiar** 21:8 35:5,13 40:8 76:17

**family** 9:9 18:5 35:4,13,18 37:21
38:10 42:13 48:3 50:22 51:11
56:12 61:19 65:17,19,20 69:14,18,
22 75:16,19 76:1,2,11 77:4 79:15
80:16 82:24 83:11,24

**farm** 45:14

**father** 33:21 49:15,20 50:2,3,4,5
64:1,20 65:5,11,13,15,24 77:1,17,

**father's** 77:14

**February** 9:15

**federal** 45:23 46:6

**feel** 73:20

**fees** 47:14

**file** 15:20 16:10

**filed** 10:17 22:15,18 23:20 28:23
29:5 31:23 32:20 37:15 44:8,17
46:23 82:14 83:4

**financed** 25:11

**finances** 10:3 33:11 42:8

**financial** 8:23 10:1,12 11:21 13:1,
19 41:17

**find** 81:7

**fine** 7:9 60:5

**finish** 34:20 37:6 43:14

**finished** 35:9 41:14

**fishing** 10:19 47:7 80:19

**five-bedroom** 24:14

**fix** 17:8

**Fleck** 5:5

**Florida** 30:23 45:15 48:9,18 49:1,
10

**fluid** 10:22

**focus** 30:12 41:20

**follow** 16:18 68:12

**follow-up** 53:1 83:19

**foot** 10:20,21

**foreclosure** 40:11,13

**forensic** 69:6 70:6,21 81:8 82:1

**Forest** 63:3

**forget** 5:3

**fortunate** 37:16

**forward** 69:7

**fourth** 59:4

**France** 31:12

**free** 39:18 73:20

**friends** 30:20 80:20

20 78:11

**front** 39:11 53:19 76:18

**full** 46:19

**fun** 26:12 29:1

**funded** 68:13

**funds** 13:14 18:21 19:4 22:4,10
32:8 38:15 43:3,5,8 46:8 66:6,12,
20 68:19,22 79:14,20 81:17 82:4,
20 84:5

**funneled** 83:14

---

**G**

**Gary** 6:6 51:22

**gave** 68:23

**George** 8:1

**Gillson** 48:12

**girlfriend** 47:8

**girls** 23:4,13

**give** 4:15 7:3,5,12,16 30:9 31:7
52:7 56:18 74:8 80:6

**glasses** 11:17

**Glenview** 82:23

**Goldstein** 6:6,9 15:7,10,12,15,22
16:2,8,14,21 17:2,4,13,18,21 85:1,
3

**good** 9:19 17:21 28:14

**gorgeous** 48:12

**grand** 32:21,24 33:1

**grandchildren** 50:20

**Great** 11:2 84:21

**guess** 28:5 31:22 41:22 49:10
60:22 68:11

**guessing** 60:17,19,20,24 61:3,4

**guys** 11:12 22:1,5,13 24:21 26:11
27:13 31:24 37:10,16 52:10 84:24

---

**H**

**half** 22:24 45:14,19,20

**Halloween** 72:19

**happy** 74:5

**harass** 74:14

Index: harassing–kids

JEANETTE IVANKOVICH, 03/23/2023

**harassing** 74:17

**hard** 12:21 23:9

**hardship** 13:19

**heading** 36:9 44:5

**health** 50:9

**hear** 6:7 13:5

**heard** 6:19 15:3 22:19 42:16

**heavily** 65:15

**held** 38:15

**helped** 28:2

**helping** 10:2 25:2 28:3

**hidden** 47:3

**hire** 81:8

**hit** 11:6 22:1

**HOA** 47:14

**hold** 37:6 54:8 71:12 75:17

**holder** 33:22 77:18

**holdings** 16:7

**holds** 37:23

**holiday** 47:18

**home** 30:20 31:2 40:16,20 47:16, 19,24 48:10 52:2 62:16

**homes** 18:5 34:9,11 59:14 63:2 78:1

**honestly** 75:4

**hotel** 30:22 31:8,17

**house** 39:4,8 40:2 49:3

**houses** 48:12 70:11

**housing** 30:18

**hunting** 23:1

**husband** 13:17 44:1 45:22 62:14 66:16 68:20

**husband's** 61:24

**I**

**idea** 9:19 13:21 31:7 49:12 51:23

**identify** 16:2

**ill** 65:24

**Illinois** 16:19 46:7 48:14

**implication** 26:3,4

**implied** 26:4 31:19 38:19 43:2 71:15

**impression** 31:18 42:11 65:16 66:3,9,15,16 68:22,23,24 78:15

**impressions** 65:19

**improper** 67:13

**include** 75:13

**including** 6:22 62:4,17,19

**income** 24:12

**incompetency** 47:1

**incor-** 74:9

**incorporated** 74:10

**increments** 33:2

**independent** 55:13 56:4,7 70:8,10

**Indiana** 51:22

**indication** 7:6

**individually** 18:10 72:3

**individuals** 61:19 62:3

**inference** 54:3

**inferred** 54:20

**information** 5:13 6:13,16 22:7 36:15 37:12,13 41:22 53:16,20 54:21 56:10 74:13

**informed** 80:9

**instance** 75:13

**instruction** 47:23

**instructor** 22:24

**intention** 39:9,15

**interactions** 44:22

**interest** 11:7 18:10 19:3,23 35:20 39:22,23 42:19 44:2

**interesting** 26:12

**intermingled** 34:16,24 77:7,9 78:7

**International** 32:16

**interruption** 15:6

**intervenor** 6:4 53:8

**introduction** 6:7

**investments** 37:20

**invited** 71:1

**involved** 27:6 29:19 54:7 65:6,15

**involvement** 42:11

**iphone** 47:21

**Islamorada** 30:24 31:1

**Islands** 31:12 47:12

**Isle** 21:12,17 47:13

**issue** 5:22

**Ivankovich** 4:2,8,9 5:5,16 6:11 7:23 8:8,15 9:3,20 11:5,21 12:16 13:7 17:23 18:10,14 19:2,14,21,23 20:5 21:3,5,24 22:11,19 24:18 25:24 26:17 27:4,14 32:19 33:22 34:24 35:18,19 36:12,14,19 37:22 38:14 41:18 42:7,13,19,20 43:17, 24 44:23 46:5 49:14,15,22 51:11 52:20 53:14,17 54:12 56:4,16 60:8 62:4 63:6,18,21,22 64:16 66:6,11, 13,14 67:24 69:9,12 70:13 75:1 76:11 78:6 79:14,19 80:22 81:6,19, 20 83:17 84:5

**Ivankovich's** 33:11 34:15 37:3 63:7 65:11,23

**J**

**January** 36:21

**Jason** 6:6 7:3 56:17

**jazz** 51:6

**Jeanette** 4:2,8 5:5 11:20 13:8 46:19 59:1

**job** 22:23 23:1,16 31:20 68:20

**jobless** 38:21

**joined** 15:24

**jointly** 64:22

**judge** 5:12 9:18 58:7,10 76:18

**July** 8:16,18 9:17

**jurisdiction** 4:21

**K**

**Key** 31:3,4 48:7 49:9

**kidding** 58:17

**kids** 7:11 10:3 29:2,3 45:13 47:9, 16

Index: kind–month

JEANETTE IVANKOVICH, 03/23/2023

**kind** 11:3 19:18 23:9,23 31:8 34:7 43:2 46:14,18 55:11 77:22 82:11

**kinds** 13:14

**knew** 24:23 34:11 61:4

**knowing** 51:18

**knowledge** 6:5 18:1 49:17,19 54:14,15 55:14 56:4 57:10 58:8,13 68:18,20 69:8,10,13 70:8,10 77:11 83:10

---

**L**

---

**Landscaping** 78:3

**larger** 83:1

**late** 16:3,5 33:8

**Latham** 56:17

**leading** 54:23 60:21

**leave** 12:11 46:24 47:2

**led** 55:15 56:10

**Leslie** 56:17

**letter** 37:20

**Liabilities** 12:22

**liability** 22:13

**liar** 55:17,19

**life** 23:18 37:11 47:9 48:1 67:10 68:9

**lifestyle** 10:15,24 11:12 13:13,24 14:2 22:5,9,14 37:13,17 38:20 46:12 47:6 68:14 80:12

**limit** 7:10

**lines** 80:8

**liquidate** 10:10

**liquidity** 36:20,22

**list** 18:23

**listed** 21:5 32:6

**litigation** 12:6,7

**live** 15:19 22:5 30:21 37:16 38:20 39:18 45:15

**lived** 11:12 37:10 40:21

**lives** 51:21,22

**living** 22:5 23:18 30:22 31:17 47:8 48:1

**LLC** 5:14,17 21:17 34:11 35:5,13 37:21 38:10,16 42:2,14 43:19 45:9 52:21 55:3 56:6 59:15 63:2 66:21 67:6 70:15 71:11,19 72:1,3,7,8,9, 11,18,20 73:2 77:4

**LLCS** 6:4 18:4 19:18,24 34:9 38:16,17 43:16 50:1 53:2,8,10,24 54:1 55:16 56:6,22 57:2,4,11 59:7, 10 60:23 63:17,19 64:3,5,9,13,17 65:7,13 66:2,6,12,18 67:12 68:24 69:23 70:14 72:18 73:5 75:8,15,24 76:2 83:11,22 84:6

**LLCS'** 59:19 66:20

**loans** 22:12

**locate** 44:19

**long** 8:2 44:14 50:8,10 52:6

**longer** 7:1,15 10:1 13:9 17:12 22:4

**lot** 11:7 23:10 26:17 27:20 30:11 34:15 35:1 39:2,10 50:1 58:17 60:14

**loved** 82:18

**luxury** 30:20

**lying** 60:21 66:16

---

**M**

---

**Macs** 47:21

**made** 9:13 26:11 45:22 46:5 65:3 84:14

**magically** 67:5

**maintain** 22:13

**majority** 65:2

**make** 4:24 14:5 17:5 19:9 45:8 47:5 48:22 50:5 54:13 56:2 64:23 67:16,19 78:17 84:13

**makes** 64:16

**making** 46:20,21 50:7 66:1,2 81:14

**Maldives** 47:12

**Malli** 56:17

**man** 28:12 38:21 48:1 80:20

**Management** 34:12 59:14 63:2

**managing** 21:5,6 37:23 38:5 42:2

**Marine** 72:15

**mark** 19:9 35:8 56:16

**marked** 11:15 20:18

**marketable** 36:23 37:23

**marriage** 22:7 38:14 62:16 63:5 68:21 83:23 84:1,4

**married** 23:14 31:23 40:22 41:10 54:16 76:10

**matter** 5:7 6:10 15:21

**meant** 59:23 60:2

**member** 21:5,6 42:2 63:22,24 65:17

**members** 37:23 38:5 61:19 63:16, 18 64:9,13 65:20

**memory** 59:18,23 60:9 75:12

**men** 62:15

**Menomonee** 40:4,23 45:8 70:16

**mental** 47:1

**mentioned** 43:10 44:1 52:16 72:24 76:1,14 82:6 83:22

**messages** 28:11 70:18 78:23

**Michigan** 48:11 49:4,5

**million** 10:13 11:10 13:8,20,23 21:12,13 24:14 25:7 36:20,22,23 37:24 80:5

**mind** 7:2 20:10,13 34:6 56:19 57:23 68:5 76:3

**minus** 12:22,23

**minute** 7:13,17 15:22 16:22 17:5

**minutes** 6:20,23 7:4

**missing** 11:20

**misspoke** 8:18

**misstates** 71:13,14

**misstating** 67:15

**mom** 48:22

**moment** 56:19

**money** 22:2 31:8 32:14,17 33:3,5 39:2 43:4 45:17 47:11 49:24 62:15 66:21 67:4,9 68:8,11 69:1 76:5,7,9 79:23 80:1,6,7,15,23,24 81:5,8,18, 21 82:7 83:13

**moneys** 30:22

**month** 8:12 47:15

Index: months-playing

JEANETTE IVANKOVICH, 03/23/2023

**months** 48:8,18,24 49:1 51:20 69:15,16

**mother** 9:13 33:6 50:7,14,24 64:1, 23 65:1,11,14,24 77:21

**motion** 81:11

**motions** 4:20

**motor** 71:2

**mouth** 38:9 54:13 62:1

**move** 69:7

**Multi-** 18:4

**multifamily** 78:1

**multimillion** 45:11

**multiple** 18:3 21:22 34:9 35:17 39:16 53:24 54:3 55:23 57:2,4,12, 17 60:13

**musician** 51:8

---

**N**

---

**names** 54:1,6,9 55:7 56:14 57:3,11 59:9,11,13,19 60:23 69:20 73:4,23 74:6,8 75:9,13

**naming** 55:4

**needed** 28:1 32:11,13 33:3 39:8 43:4 55:11 67:4

**negotiated** 8:14,17,23

**net** 11:9,10 12:21,23 36:19

**Nick** 34:20 84:23

**non-** 84:14

**nonsense** 48:22

**North** 30:20 44:15 49:4

**note** 6:23

**notice** 6:17

**November** 8:17,22

**number** 19:16,18 26:12,14,16 54:10 60:8 84:6

**numbers** 44:4,6,13

**numerous** 43:10

---

**O**

---

**oath** 49:23

**object** 67:15 75:18

**objection** 54:9 57:16 71:14,23

**objections** 74:19

**observations** 50:9

**occasionally** 80:23

**occur** 24:17

**October** 9:10,12 23:21 31:6

**Octopussy** 70:18,24

**offhand** 31:14

**official** 84:12

**officially** 5:10

**Olga** 56:16

**one's** 34:23

**operated** 22:8

**operating** 61:7,10

**operation** 27:6

**opportunity** 84:11,15,16,18

**opposite** 13:14

**order** 5:8,12 12:10 20:21 22:13 27:3 84:22,23 85:3

**original** 40:2,7

**orthopedic** 51:9

**overlaps** 30:11

**Overlook** 21:3

**overseas** 44:3,5,11,24 45:5

**owned** 14:17 40:17 41:3,4 42:7 47:3 76:24 77:3 78:1

**owner** 18:18 37:22 38:5 39:16,17 70:17

**ownership** 19:20 39:21,23 44:1 53:24 55:16 56:5

**owns** 35:18 71:10,22 72:1,5

---

**P**

---

**P-O-R-R-A-S** 6:3

**p.m.** 85:7

**P2** 19:1 42:1,9 59:15 63:2

**P3** 59:15 63:2

**P4** 59:15 63:2

**P5** 14:18 15:2 17:24 19:1 35:12

**paid** 77:23 78:17

**papers** 8:6 37:15

**paperwork** 29:20

**paragraph** 24:7 30:17 36:9,18

**parents** 30:19 48:6 49:11 56:11

**parents'** 31:2

**part** 21:23 22:16 24:9 30:12 42:7 54:4 61:11 64:5 65:12 76:11

**participate** 64:21

**partner** 18:22

**partners** 23:17

**passing** 72:19

**passport** 31:11

**past** 6:24 45:18

**path** 50:22

**pattern** 51:1 71:20

**pause** 5:17 7:19

**pay** 8:8 30:22 31:8 76:15 77:15 78:16

**payer** 78:22

**paying** 31:16 77:11 78:12

**payment** 78:18

**Payments** 78:1

**people** 27:5,10,15,21,23 28:1,3,4, 11 56:13,15 72:20

**percentage** 38:4

**perfect** 17:10

**periods** 28:21

**person** 78:12

**personal** 9:23 10:23 11:6,20 13:1 22:3,12 31:24 33:11,17,24 34:17 35:1 38:23 43:7 54:15 67:10 68:9 71:18 76:15 77:6,10,12 78:8 79:20, 24 80:7

**personally** 14:1

**picture** 17:7 44:7,19

**Pilgrim** 21:16

**plans** 39:19

**playing** 23:3

```
                                                     Index: pocket-reporter
```

JEANETTE IVANKOVICH, 03/23/2023

**pocket** 47:20

**point** 10:11 12:11 19:22 22:4 38:14 44:7 64:20 65:2,4

**points** 33:4 67:20

**pond** 76:4

**Porras** 5:24 6:2,3 7:2,16 20:2,9,10, 14,18 52:12 53:1,7,8,13 54:19 55:6 57:15,19,22 58:4,11,15,19 59:8,17 61:5 63:4,11,23 64:7 67:7,18,23 68:4,16 71:21 72:4,22 73:15 74:16, 22 75:1,6,21 79:11 80:11,14 81:4, 15 83:16 85:2,5

**portfolio** 14:18 15:2 17:24 18:4 19:1 35:12 42:1,10

**pre-divorce** 22:17

**preclusion** 12:15

**prefer** 20:8

**prepared** 36:14

**presented** 33:15 70:17

**pretty** 23:15 48:21 76:17

**previous** 21:13

**price** 21:13

**primary** 33:21 77:17

**prior** 9:20,22 40:16 65:5 67:13

**private** 47:22,23

**privy** 25:12

**problem** 75:22

**proceed** 7:7

**proceeding** 73:22

**proceedings** 37:15 73:9,12,19

**process** 25:2 65:12

**produced** 12:6

**project** 28:13

**properties** 72:23 75:8,24

**property** 39:13,14,18,19 40:14 45:7

**protect** 44:20

**protected** 20:21 36:4 41:12

**protective** 5:8,12 12:10 20:21

**protects** 5:13

**provide** 10:1 33:5,7 53:11 74:13

**provided** 36:15 37:20

**providing** 5:11 8:15 9:3,12

**publications** 21:10

**pull** 68:21 69:2

**pulled** 23:9

**purchase** 21:12 25:14 26:10 29:14,21 39:17 52:16 72:18 75:24

**purchased** 10:19 24:13,24 25:15 26:2 39:13,17 41:7,9 45:7,13,14 51:24 52:1 72:17,24 73:2 75:8 83:1

**purchaser** 45:11

**pushed** 29:6

**put** 6:1 27:3 32:9 36:15 38:9 41:10 61:17 62:11 63:8 74:22

**putting** 54:12 80:2 82:18

---

## Q

**quash** 81:12

**question** 5:19 20:20 34:20 43:14 46:14 49:23 51:5 56:2,8 57:8 58:5, 6,10,16,23 61:2 62:8 68:1,2,6 74:21 75:18,20 81:21,23 82:3 83:9

**questioning** 79:16 80:1

**questions** 5:16 20:19 53:2,3,15,20 68:15 74:18,23 79:3,13 81:9 83:19

**quickly** 20:9,10 79:6

**quiz** 59:23

**quote** 22:20 23:10

---

## R

**raising** 74:19

**Ravi** 56:17

**reach** 7:4 50:23

**reached** 39:16

**read** 12:21 14:7 28:15 57:21 58:1 68:7

**reading** 57:23 68:5

**real** 20:2,9

**realized** 50:22

**reason** 7:1 10:2 33:6

**recall** 21:10 44:10,21 55:9 66:7,8

73:7,16 75:9 79:22,23,24

**received** 6:17 81:21

**recently** 39:13 83:3

**recess** 52:13

**recognize** 11:24 20:6 21:2

**recollection** 73:15

**record** 6:1 7:18,20 19:17 23:20 40:18 52:14 53:7,10 58:1 60:16 68:7 74:23

**record's** 14:16

**recreational** 10:20

**refer** 69:22

**reference** 73:20

**referring** 23:5 28:12 40:2 64:18 69:23 80:3

**reflect** 10:15,24 22:10 80:13

**reflected** 13:24

**refusing** 15:13 58:5,11,22

**rehab** 25:3 26:21 27:6,18 39:9 71:3

**rehabbed** 39:8

**reinstated** 29:8,11

**reiterating** 67:18

**related** 4:19 5:16 53:2 63:7 75:15

**relating** 5:13

**relationship** 56:22

**relative** 29:21

**released** 29:4,6

**relying** 61:14

**remaining** 53:2

**remember** 49:6 55:8 59:11,13 60:3,4 73:23,24 74:1,2 79:15 82:8 83:2

**remembering** 74:11

**remodeling** 26:23

**remove** 64:3

**rent** 8:11,13

**rental** 8:5,9 30:23 40:19 41:2

**replace** 26:8,9

**reporter** 53:9 57:20,22 68:5 84:14

Urlaub Bowen & Associates, Inc.   312-781-9586

Index: reports-Steven's

JEANETTE IVANKOVICH, 03/23/2023

**reports** 36:19

**represent** 16:6 53:10 70:14,15

**representation** 75:5

**representations** 45:23 46:6

**represented** 45:10

**represents** 6:11

**Republic** 31:13

**requested** 41:21

**requires** 10:18

**Research** 72:16

**reserve** 58:6,9 84:20

**reside** 7:24 30:19

**resident** 45:11 49:10

**residents** 48:9

**resources** 10:11

**respond** 57:9

**restate** 75:20

**review** 5:18 84:12

**reviewed** 24:3

**rich** 72:20

**ring** 21:4

**roles** 49:16

**rules** 16:18

---

**S**

---

**sage** 50:16

**sake** 53:10

**salary** 26:6

**sale** 21:11,15

**schedule** 14:12,16 23:15

**Schiller** 5:4

**school** 47:23

**sea** 47:7 80:19

**securities** 14:17 36:23 37:24

**send** 74:6 80:23 82:7 83:13

**sending** 80:15

**separate** 46:23

**September** 8:4,14 13:2 24:13

29:15

**service** 4:20

**sessions** 47:22

**seven-bedroom** 47:24

**seven-person** 10:18

**sex** 62:15

**shared** 22:6

**Shore** 30:20

**short** 81:17

**show** 10:11 11:9,15 19:8 29:12
35:7 54:8

**showed** 19:11 75:3 81:18,19

**shown** 19:14

**shows** 20:11

**sick** 50:4 64:20 65:5,15

**signator** 32:7

**signature** 12:1 23:24 30:2 84:10

**signed** 24:4 31:6 52:20

**significant** 38:11 49:16

**silly** 58:10

**similar** 23:4 51:11

**single** 55:2

**sit** 6:14 59:12 73:24 74:14

**sitting** 23:3,13 73:14,16 75:9

**ski** 47:23

**ski-out** 47:24

**Skip** 47:23

**sky** 67:5

**solely** 66:12

**sort** 6:7

**sound** 54:13 60:15 80:20

**sounds** 25:21 26:6,17

**source** 76:5,7,9 81:8,10,20 82:20

**sources** 24:12

**Spain** 31:12 47:13

**speak** 50:5

**speaking** 79:6

**specific** 66:19 69:19

**specifically** 5:16 7:3 36:8 55:5
70:13 83:9

**specifics** 18:5,18 69:4,5

**spend** 39:1 48:24

**spending** 45:16

**spent** 23:3 28:21 48:8

**split** 32:19

**spoke** 56:15

**spree** 45:16

**St** 72:17

**stamp** 30:2

**stamped** 5:10 23:24

**stand** 19:19

**Stanish** 5:1,4,24 7:9,14 8:18 12:8,
13,17 17:16 20:19,23 30:5 36:4,6
37:6 40:1 45:2 53:4 57:12,17,20
59:1,11 61:2 62:23 63:10 72:13
73:8,23 74:5,9 75:17 79:8,10 80:3
81:11 83:20 84:11,20

**start** 6:21 21:2

**started** 8:13 9:15 29:18 47:18

**state** 4:7 82:23

**stated** 54:2

**statement** 10:12 11:21 13:1 38:4

**statements** 46:20 61:13

**stating** 37:20

**Steve** 27:15,23,24 80:22

**Steve's** 10:22

**Steven** 11:21 14:1 18:15,16 19:23
21:4,11,22 22:10 23:7 24:13 26:4
28:3,7,9,22 29:6,7,16 30:18,20,21
31:7,11,17 32:14,21 33:15 34:15
37:21 39:12,13 41:7,9 42:11,19
43:18 44:4 46:1 49:9,14,22 50:7
54:4 55:14,15 56:5 60:8 63:21,24
64:2,16,23 65:1,3,11,20 66:5,11,14
67:9 68:9,23 69:9,11 71:7,10,15
72:2,7,10,18,24 75:7,24 76:10
77:5,11 78:6,15,20,21,24 79:14,19,
23 80:1,5 81:3,6,19,20,24 82:5,13,
18 83:5,15 84:5

**Steven's** 4:17 12:2 24:12 49:20
50:7 51:1 53:23 55:17,19 61:14,17
65:5,14,15,24 76:15 77:1,16,18
78:11

JEANETTE IVANKOVICH, 03/23/2023

**Stifel** 37:20 41:17,23

**stop** 9:3 48:22 50:19 76:19

**stopped** 8:15 9:12 50:21

**stopping** 10:2

**structure** 19:15

**subject** 12:9

**submitted** 73:18

**subpoena** 68:12 76:19 81:7 82:1, 19

**subpoenaed** 31:11

**subpoenas** 69:6

**subsidiaries** 19:19

**substantive** 84:13,15

**sufficient** 30:18

**Summary** 35:12

**summer** 49:1

**support** 8:15 9:14,18,21 10:1,7 13:9 78:24 79:1

**supporting** 9:16 47:9

**supposed** 6:21

**supposedly** 51:6

**surgeon** 51:9

**suspicion** 54:6,11

**sworn** 4:1,4

———————————

**T**

———————————

**Tahmassebi** 4:6,23 5:2,20 6:9 7:8,12,15,18,20,22 9:1 12:3,9,14, 18 15:7,11,13,17 16:1,5,6,9,16 17:1,3,11,14,20,22 20:3,13,17,22 21:1 30:6,8 36:5,7 37:8 40:5 45:3 52:7,10,14,15,23 53:6,16,18 54:8, 22 57:13 58:9,12 62:21 63:9,20 66:23 67:11,21 71:5,12,23 72:2 74:3,7,12 79:2 81:1 83:18,21 84:3, 8,21

**takes** 27:20 47:17

**taking** 22:12 79:23 80:1

**talk** 9:6 14:18 19:8,20 27:8 29:1 48:3 50:18

**talked** 21:19 42:6 43:24 48:7 53:16

**talking** 15:24 17:23 21:16 50:21

65:20 69:24 71:5 78:5

**tandem** 39:12

**tangible** 36:19

**Tanya** 5:4 6:3

**taxes** 40:14

**ten** 6:20 31:21

**tendered** 5:9

**tennis** 22:23 23:4

**test** 14:11

**testified** 4:4 11:5 23:2 36:14 49:14,15 53:23 54:14 63:21 66:5, 24 67:11 71:24 79:18

**testifying** 66:7

**testimony** 11:13 13:6 61:16 64:16 65:10 67:13

**text** 28:11 70:18 78:23

**texts** 71:16

**thereof** 20:7

**thing** 47:5 51:1,11

**things** 26:23 39:2 72:21 82:18

**thinking** 13:18

**thirds** 14:13

**thousand** 32:13

**thousand-dollar-a-day** 47:22

**thousands** 47:20

**threaten** 29:11

**three-lot** 39:14,19 45:8

**tied** 76:24 82:16

**time** 6:22,24 7:10 9:22 12:11 17:8 19:22 24:20 25:5,13 26:1,2 32:18, 20 33:3,4 40:21 43:4 46:24 50:17 59:4 65:13 74:3 83:17

**times** 28:16 35:1 39:16 44:9 46:23 49:20 50:23 57:12,18,21 74:24

**today** 55:8 58:7 59:12,22 60:3 73:14,17,22,24 75:9

**told** 18:16 19:3,22 21:24 22:15 23:8,12 24:24 25:5,20 29:16 31:19, 20 35:22 38:14 40:11 45:13 46:24 49:23 55:20 64:1,2

**total** 12:22,23

**touched** 23:19 24:6

**tough** 14:6,20

**toured** 45:10

**Tower** 45:12 47:14 52:17 70:15

**Town** 39:11 40:9

**traceable** 68:12

**training** 47:22

**transaction** 80:13

**transcript** 84:12,23

**transfer** 11:6 22:2,3 32:14 79:20 84:5

**transferred** 9:24 19:4 79:14

**transferring** 22:10

**transfers** 49:24

**travel** 23:11,15 70:12

**traveled** 23:8 31:18

**traveling** 47:8 80:18

**treated** 51:2

**TRG** 32:14,15 82:7,16,17,21

**trip** 29:2,3

**trips** 23:17

**true** 11:13 40:12 46:15

**Trump** 45:12 47:14 52:16 70:14

**trust** 43:18,19,20

**trusted** 61:24

**trusts** 35:18 83:11

**truth** 62:1

**tuition** 33:7,8

**turn** 13:23 15:8,10,13

**turned** 82:24

**turning** 60:1

**turns** 60:20,21

**two-** 14:12

**two-minute** 52:7,11

**two-thirds** 36:10

**type** 35:20

———————————

**U**

———————————

**ultimate** 19:20 78:22

JEANETTE IVANKOVICH, 03/23/2023

**ultimately** 78:12

**umbrella** 34:8 57:1 59:6,10

**umbrellaed** 55:12

**umbrellas** 57:6 58:3

**unclear** 24:12

**under-** 37:5

**undergoing** 71:2

**understand** 10:3,5 35:19 40:8
46:22 52:21 56:2 58:22 59:22
62:18 65:4 66:10 67:19 68:1,18

**understanding** 18:9,13,20 35:15
37:3 38:6,10 39:10 42:6,18 64:8,
10,12 66:11 68:19 75:23 76:8,23
77:9 78:11 83:12,23 84:4

**understood** 5:20 33:10 34:3,14
43:2,12,15

**Unlisted** 14:17

**unquote** 22:20 23:10

**Unsuccessfully** 29:10

**upkeep** 39:5

**uptick** 11:3

**usual** 84:23

**Utilities** 78:3

**Utility** 77:24

---
V
---

**validate** 48:9

**variation** 20:6

**vendors** 70:19

**Venmo** 32:17 80:23 81:6,7,18

**versus** 75:19

**video** 15:9,14 16:13,20 29:13

---
W
---

**wait** 6:23 7:1 15:22 16:22 17:5,9,
11,13

**waited** 17:12

**waive** 84:17

**Walker** 36:15

**Wandner** 6:6,17 56:18

**wanted** 4:23 5:6 17:16 26:8

**waste** 74:3

**watches** 47:21

**waterfront** 48:10

**website** 61:23

**West** 8:1 40:4,23 45:8 70:16

**whichever** 20:8

**wife** 13:18 51:2 52:1 71:16

**Wight** 47:13

**Wilmette** 48:10,14 49:1

**winter** 48:18,24

**withdraw** 32:8

**word** 61:15

**words** 27:20 33:24 38:9,22 54:12

**work** 23:8 26:17 31:19 61:22 62:10
71:18

**worked** 23:7 27:2 56:13 61:20,21
62:16 63:1

**working** 23:9 62:5 69:13,17

**worth** 10:12,13 11:9,10 12:22,23
36:19 37:3 47:20

**wrapped** 83:19

**wrong** 73:1

---
Y
---

**yacht** 10:18 24:14 25:1,7,8,11 27:7
28:19 30:23 71:2 80:19

**yacht's** 26:6

**year** 8:19 9:22 22:24 26:5 29:12
32:12 45:14,19,20 47:18

**years** 21:13 31:21 40:14 44:16
50:11,12,13 51:15 52:3,5 54:16
55:21 56:20 64:20 76:12,21 83:23
84:1,4

**yesterday** 5:9

**younger** 50:15

---
Z
---

**Zoom** 6:6,13 16:20

**Atlas v.**
**Macquarie et al (FINAL)** | **January 13, 2020**

Ivankovich - Plaintiff - Cross (Mr. Rossman) | Page 301

1 get on.

2      MR. ROSSMAN: I would object to that. There's

3 overlapping factual knowledge between these two witnesses

4 and I would not want to have this witness still open, have

5 Mr. Morris testify, and then have this witness be recalled.

6      THE COURT: I thought that might be your response

7 there. All right. Let's see how we do. Let's see if we

8 can try to get -- I'm sure Mr. Ivankovich would be

9 heartbroken to be done soon, but let's see if we can get it

10 done.

11      MR. ROSSMAN: To the limites of the Court Reporter

12 being mad with me, I will go as quickly as I can, your

13 Honor.

14 CROSS EXAMINATION CONTINUED

15 BY MR. ROSSMAN:

16    Q   Mr. Ivankovich, I want to understand something. The

17 Atlas entity, Atlas -- Atlas MF Mezzanine Borrower, LLC is the

18 plaintiff entity in this case, correct?

19    A   Correct.

20    Q   Okay. I want to make sure that we're on the same page

21 about what the actual financial condition of that entity is.

22      You were in the courtroom yesterday when Mr. Meister

23 represented that we don't have any money. He said that on Page

24 31 of the transcript referring to Atlas.

25    A   I don't recall that statement.

Ivankovich - Plaintiff - Cross (Mr. Rossman) | Page 302

1    Q   Do you recall your counsel said, prior hearing January

2 7th, 2020 hearing in this case, I'm referring to transcript Page

3 14, Atlas, the entity that is the party here, is obviously at

4 the moment bereft of assets because the assets that it had was

5 the equity collateral that was sold at the auction, is that a

6 true statement?

7    A   Yeah. I would categorize that as true.

8    Q   Would you like, sir, in your binder, there's a copy of

9 the Verified First Amended Complaint that was filed in this

10 action.

11    A   This is your binder.

12    Q   Yes. The cross-examination examination binder that I

13 gave you. It's toward the back of that binder. You see

14 something that's First Amended Complaint. It's a Verified

15 Complaint, which means you actually had to sign verification to

16 the truthfulness of it's contents, are you aware of that?

17    A   Correct.

18    Q   Okay. This is a complaint that was filed in this Court

19 on October 30th, 2017. Let me know when you're there.

20    A   Yep. I'm here.

21    Q   Okay. If you turn to paragraph 43 you'll see the

22 statement, Atlas still today is in a strong financial position

23 and is able to obtain financing to pay off the Mezzanine Loan?

24    A   Paragraph 43?

25    Q   43. It's in the back of that --

Ivankovich - Plaintiff - Cross (Mr. Rossman) | Page 303

1    A   My paragraph 43 says, however, despite the harm caused

2 by Macquarie's wrongful notice of a default on the Mezzanine

3 Loan, Atlas still today is in a strong financial position and is

4 able to obtain financing to pay off the Mezzanine Loan.

5    Q   So focusing on the second half of that sentence, where

6 it's true, the verified complaint says that Atlas still today is

7 in a strong financial position, correct?

8    A   Correct.

9    Q   Was that a true statement?

10    A   Yes.

11    Q   At the time you signed the verification?

12    A   Yes.

13    Q   Okay. Now, can you explain to me, sir, how it is that

14 on October 30th, 2017 and this is about five months after --

15 more than five months after the closing of my client's purchase

16 of the equity interest in the properties, how you could

17 represent to the Court that that entity was in a strong

18 financial condition?

19    A   I take that to mean that the overall Atlas entity,

20 which includes the Atlas principals. We could capitalize that

21 entity in five minutes.

22    Q   Now, if you turn to the first page of the Complaint,

23 the Verified Complaint.

24    A   Yes.

25    Q   Atlas is defined as the plaintiff, Atlas MF Mezzanine

Ivankovich - Plaintiff - Cross (Mr. Rossman) | Page 304

1 Borrower, LLC. Do you see that term Atlas?

2    A   I see that.

3    Q   So you're now telling me that that statement in the

4 Verified Complaint, in paragraph 43 that that particular entity

5 was in a strong financial condition, is that an untrue statement

6 or a true statement?

7    A   Absolutely. That's a true statement.

8    Q   How is it that your counsel could represent to this

9 Court yesterday that that entity has no assets?

10    A   The specific entity doesn't, but the chain of

11 ownership, as I said, has plenty of assets. We could populate

12 that entity with the signing of a pen and a phone call in a

13 matter of minutes.

14    Q   Is it your testimony, sir, in this Court under oath

15 that you have the authority to move money as you see fit to that

16 entity or away from that entity?

17    A   I don't have the authority, but I have the ability.

18    Q   Okay. Now, the -- I want to turn your attention to the

19 subject of obtaining a bank check for the auction that took

20 place on February 27th, 2017.

21      Do you recall testifying about that in response to

22 Mr. Gonzalez's questions?

23    A   Yes.

24    Q   You talked about not being able to get a check from JP

25 Morgan Chase that day, correct?

EXHIBIT 7

## Chicago Residential Lease

For Apartments, Condominiums, Single Family Homes, and Townhomes
© 2019 by Chicago Association of REALTORS® - All rights reserved
**This Contract is Intended to be a Binding Real Estate Contract**

V6.0 2019

| Date of Lease | Term of Lease | | Monthly Rent |
|---|---|---|---|
| | **Lease Beginning Date** | **Lease Ending Date & Time** | |
| 05 / 16 / **2019** | **July 1/2019** | **June 30/2021** | $8,650 YEAR 1, $8,905 YEAR 2 |

| Leased Address (Premises): | 2142 N Cleveland Ave, Chicago IL 60614 |
|---|---|

In consideration of the mutual covenants and agreements herein stated, Landlord(s) hereby leases to Tenant(s) and Tenant(s) hereby leases from Landlord(s) for use as a private dwelling only, the Premises, together with the fixtures and appliances listed below (if any) in the premises, for the above Term of Lease, subject to all the provisions of this Lease.

| [Yes] | [No] | The following are incorporated into the Lease when indicated | |
|---|---|---|---|
| | ✔ | A Security deposit is being held by Landlord (if any) | $ |
| **If YES, must complete →** | | Illinois Financial Institution (Name and Address) where Security Deposit shall be or is held (if any) | |
| ✔ | | **Non-Refundable** Move-In Fee (if any) | $ $1,000 |
| ✔ | | Pets Permitted (description of any pet permitted during lease): | PET FEES APPLY |
| ✔ | | Parking included in lease (space number(s) if any): | 2 CAR GARAGE |
| | ✔ | Additional Storage Location (if any): | |
| | ✔ | Furnished? If yes, attach Rider 23 - Furnished Lease Rider | |
| | | Rent shall include the following (check those that apply): | ☐ Water ☐ Electricity ☐ Gas ☐ Basic Cable ☐ Satellite ☐ Internet ☐ Lawn Care ☐ Snow Removal ☑ Other TAXES |
| | | Personal property owned and provided by Landlord (check those that apply): | ☑ Refrigerator ☑ Microwave ☑ Oven/Range ☑ Dishwasher ☑ Washer ☑ Dryer ☑ Other 2ND OVEN/RANGE, 2ND FRIDGE, 2ND W/D |
| | | Landlord's Property Insurer (Required for properties with 4 units or more) (Name, Address, and Phone of Homeowner Insurance Company): | |
| | | Tenant's Property Insurer, if required by Landlord: (Name, Address, and Phone of Renter Insurance Company): | |

### Identification of Tenant(s):

| Name(s) | ATLAS HOLDINGS INVESTMENT LLC |
|---|---|
| | |
| | |
| Telephone: | |
| Email: | steven.ivankovich@atlasresidentialuk.com |

### Landlord(s) or Authorized Management Agent:

| Name(s) | URBAN AGGREGATE LLC FOR |
|---|---|
| | LOT 2142 LLC |
| Address: | 1516 W CARROLL AVE |
| | CHICAGO IL 60607 |
| Telephone: | 312-841-6686 |
| Email: | TRACY@URBANAGGREGATE.COM |

### Name(s) of persons authorized to occupy premises:

Jeanette Ivankovich, Steven Ivankovich, Honoria Ivankovich and Isidore Ivankovich

### Person authorized to Act on Behalf Of Owner for the Purpose of Service of Process and Accepting Notices:

| Name: | TRACY BOYCHUK, REGISTERED AGENT |
|---|---|
| Address: | 1516 W CARROLL AVE, CHICAGO IL 60607 |
| Telephone: | 312-841-6686 |

### Additional Agreements and Covenants:

SEE ATTACHED POLICIES. RENT TOTAL $8,650 ($8,500 + $150 LANDSCAPING FEES) IN YEAR 1 AND $8,905 ($8,755 + $150 LANDSCAPING FEES) IN YEAR 2
TO BE PAID IN 4 INSTALLMENTS PER ANNUM ON THE FOLLOWING SCHEDULE:
DUE UPON SIGNING AND BEFORE JULY 1 = $18,450 TO LOT 2142 LLC AND $8,500 DUE TO @PROPERTIES
BY OCT 1, 2019 = $25,950
BY JAN 1, 2020 = $25,950
BY APRIL 1, 2020 = $25,950
BY JULY 1, 2020 = $26,715
BY OCT 1, 2020 = $26,715
BY JAN 1, 2021 = $26,715
BY APRIL 1, 2021 = $26,715

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed, on the day first above written.

| Tenant(s): SIGNATURE | Steven Ivankovich, Manager | Landlord(s): SIGNATURE | *TRACY BOYCHUK* |
|---|---|---|---|

**IMPORTANT:** This is a Chicago Association of REALTORS® form lease and is not specifically tailored to the legal requirements of your particular situation. The applicable laws and regulations for residential leases frequently change and differ between municipalities. It is important that you consult with an attorney prior to using this lease.

Page 1 / 19

## EXHIBIT
## 8

# RESIDENTIAL LEASE AGREEMENT

This agreement ("Lease"), dated Dec 18, 2021, is between Michael Sallander ("Landlord") and Atlas Apartment Acquisition, LLC ("Tenant").

**TERM OF LEASE AGREEMENT**
The Lease Agreement will begin on Dec 18, 2021 ("Lease Beginning Date") and will end on Mar 31, 2022 ("Lease End Date"), collectively referenced as the "Lease Term".

**RENTAL PROPERTY**
The Landlord agrees to rent to the Tenant the property described a fully furnished apartment located at 920 W George St, Chicago, IL, 60657, US Unit 3 which will be referred to in this Lease as the "Premises".

**RENT DUE**
  **A.** The amount of the rent is $9,000 to be paid Monthly ("Rent").
  **B.** The Rent is due in advance on or before the 1st day of each Month. The Rent Due Date is the date the Landlord must receive the Tenant's payment.

**SECURITY DEPOSIT**
The Landlord will transfer the Security Deposit of $4,500 from the Guarantor's previous lease of the Premises dated from September 1st, 2021 - December 17th, 2021.

**LANDLORD**
The Landlord(s) and/or agent(s) is/are:
**Name:** Michael Sallander (Owner)
**Email:** mikesallander@gmail.com
**Phone:** +1(312)569-0524
**Address:** 920 W George St, Chicago, IL, 60657, US, 3

**TENANT**
The Tenant(s) is/are:
**Name:** Atlas Apartment Acquisition, LLC
**Address:** 55 E Monroe St Ste 3610 Chicago, IL 60603-0000
**Email:** steven.ivankovich@atlasresidentialusa.com
**Phone: +**1(855)224-2220

**GUARANTOR**
The Guarantor(s) is/are:
**Name:** Steve Ivankovich
**Email:** sivankovic@me.com
**Phone:** +1(312)315-4826

**USE & OCCUPANCY OF PROPERTY**
The only person(s) who may occupy the Premises are: Steven Ivankovich, Jeanette Haskett, Honoria Ivankovich, Isidore Ivankovich.

# LEASE COVENANTS AND AGREEMENTS

**APPLICATION**
Tenant covenants that all representations made in the Application for this Lease are incorporated into this Lease and made a part of it. Tenant covenants that all information contained in the Application is true and that this information was given as an inducement for Landlord to enter into this Lease, and therefore constitutes a material covenant.

**UTILITIES & SERVICES**
Landlord will be responsible for the following utilities and services: Cable & Communication Services, Cable/Satellite, City Services, Electrical Services, Garbage Service, Gas Services, Internet, Landscaping, Laundry Services, Pest Control, Sewer, Water, Snow Removal. All utilities supplied by the Landlord are expected to be used in reasonable quantities, strictly for residential use.

**LATE FEE**
If the Rent or any other charges are not received by the Landlord on or before 5 days after the Rent Due Date, Tenant must pay a late fee of $50 in addition to the rent ("Late Fee").

**RETURNED BANK ITEMS**
If any check or other bank instrument tendered for payment of any tenant obligation hereunder is returned for insufficient funds, Tenant shall pay Landlord a $50.00 fee as additional rent. Landlord shall further have the right to demand that any such returned item be replaced by a charge to a credit card, cashier's check or money order. If Tenant tenders more than two checks or bank drafts during the term of this Lease which are returned for insufficient funds, Landlord shall have the right to demand that all future obligations hereunder be paid by credit card, cashier's check or money order.

**LOCKOUT FEE**
Should Tenants lock themselves out of the Premises, the Landlord or janitor may be called to gain entry when time permits. In this case a $50.00 fee ("Lockout Fee") will be charged at the time of service. Only occupants stated on this Lease will be provided access to the apartment.

**SECURITY DEPOSIT**
If Landlord has accepted the Security Deposit to insure Tenant's specific performance of each and every agreement, covenant, rule and obligation contained in this Lease, Landlord shall have the right, but not the obligation, to use the Security Deposit in whole or part, as a setoff against any default, either in payment of rent or other breach, which results in any loss to Landlord. If Tenant has complied with all obligations under this Lease, Landlord shall, within 45 days after Tenant vacates the Premises, refund the Security Deposit. The Security Deposit shall be held in a Federally Insured interest bearing account in a bank, savings and loan association, or other financial institution. Interest on the Security Deposit shall be paid at the rate set by the City Comptroller for security deposits held more than six months and may be paid to Tenant either directly or by credit in the form of a rent reduction. The Security Deposit shall not be allocated by Tenant toward payment of Rent.

**EXHIBIT**

**9**

**CONDITION OF PROPERTY**
   **A.** The Tenant acknowledges that the Tenant has inspected the Premises and at the commencement of this Lease, the interior and exterior of the Premises, as well as all equipment and any appliances are found to be in an acceptable condition and in good working order.
   **B.** The Tenant agrees that neither the Landlord nor his agent have made promises regarding the condition of the Premises.
   **C.** The Tenant agrees to return the Premises to Landlord at end of the Lease in the same condition it was the beginning of the Lease.

**TENANT INSPECTION PRIOR TO OCCUPANCY: BUILDING CODE VIOLATIONS**
Tenant has inspected the Premises and all common areas of the property to which Tenant has lawful access during the Lease Term, and is satisfied with their general condition and appearance. Tenant acknowledges that there have been no representations, promises or other undertakings by Landlord, or any agent of Landlord, made to induce Tenant to enter into this Lease, except those expressly made in writing, relative to the repairs, decorating, additions to, or removal of any portion of the Premises or of the property. Tenant further acknowledges that attached hereto are copies, if any, of notices received from the City of Chicago during the twelve months prior to the date hereof concerning code violations, and copies of notices from any utility provider regarding termination of utility services.

**TENANT RESPONSIBILITY REGARDING BED BUG INFESTATION**
Tenant shall be responsible for all requirements and obligations set forth in the Municipal Code of Chicago deemed
"Tenant Responsibility" and shall be liable for any and all damages which may occur as a result of Tenant's failure to strictly abide by any requirement as set forth in the Municipal Code of Chicago concerning any duty, condition, or responsibility required of Tenant with regard to reporting, treatment, or cooperation with Landlord in regards to Bed Bug infestation.

**TENANT MAINTENANCE OBLIGATIONS**
Tenant shall maintain the Premises in a clean, presentable and safe condition at all times and in accordance with all health, safety and building code regulations. At the termination of this Lease and upon surrender of the Premises, all fixtures, appliances and personal property of Landlord shall be in the same condition as they were on the Lease Beginning Date, normal wear and tear excepted. Landlord may at its sole option use all or part of the Security Deposit (if any) to repair and/or replace any damage to Landlord's property caused either directly by Tenant or by Tenant's negligence.

**POSSESSION**
Landlord shall deliver possession of the Premises to Tenant on the Lease Beginning Date. If Landlord is unable to deliver possession to Tenant on such date, this Lease shall remain in full force and effect except that the Rent shall be abated pro rata until possession is delivered, unless Tenant elects to maintain an action for possession of the Premises or, upon written notice to Landlord, elects to terminate this Lease.

**USE OF PREMISES**
The Premises shall be occupied exclusively for residential purposes by Tenant and the other persons specifically listed in the Application and any children which may be born to or in the legal custody of Tenant during the Lease term.
Unless agreed to in writing by Landlord, no person may occupy the Premises unless listed in the Application. Neither Tenant nor any person in legal occupancy of the Premises shall perform or permit any practice which could cause damage to the reputation of the building or Landlord, be injurious thereto, illegal, immoral, or increase the rate of insurance on the property. At no time during the Lease Term shall more persons reside in the Premises than would be permitted by the applicable building and/or zoning codes for the City of Chicago.

Shared Housing Units, AirBNB and/or rooms for rent ARE NOT ALLOWED under this Lease. At no time shall Tenant enter into short-term subleases, rooms for rent, or AirBNB agreements or leases. Such agreements will be considered a breach of Lease and cause for termination.

**SUBLEASE**
Tenant shall not sublease this Lease without the prior written consent of Landlord, which shall not be unreasonably withheld. Landlord may require Tenant to enter a formal written sublease agreement. Any sublease of this Lease shall not release Tenant from Tenant's obligation hereunder, until the full, specific performance and satisfaction of each and every agreement, covenant and obligation hereunder. Tenant shall be liable for any monetary and non-monetary breaches of this Lease caused by Tenant's subtenant.

**ASSIGNMENT**
Tenant shall not assign this Lease without the prior written consent of Landlord

**NO ALTERATIONS**
Tenant shall not make or cause to be made any alteration or addition to the Premises, without the prior written consent of Landlord, and shall under no circumstances install any additional lock or security device to the Premises or the property which could impair Landlord's access.

**RIGHT OF ACCESS BY LANDLORD**
Tenant shall permit reasonable access to Landlord, and any of Landlord's invitees, agents, or contractors, in accordance with local statues and ordinances, upon receiving 2 days' notice by mail, telephone, written notice or other means designed in good faith to provide notice. Landlord shall have immediate access to the Premises in case of emergency and where repairs or maintenance elsewhere in the building unexpectedly require such access. Landlord shall give Tenant notice of such entry within two days after such entry.

**RIGHT OF ACCESS TO SHOW PREMISES TO PROSPECTIVE TENANTS AND PURCHASERS**
Landlord shall have the right to show the Premises to all prospective Tenants and purchasers, and any of Landlord's other invitees, in accordance with local statutes and/or ordinances. Tenant shall permit reasonable access to Landlord upon receiving 2 days' notice by mail, telephone, written notice or other means designed in good faith to provide
notice. With such notice, Landlord shall also have the right to access the Premises to take photographs/video of the Premises for marketing purposes. Tenant shall be liable for any damages caused to Landlord for failure to cooperate under this provision. Tenant shall not interfere with Landlord's efforts to lease, market, or sell the Premises, and Tenant shall be liable for any damages caused by breach of this provision.

**VACATING THE PREMISES**
Tenant must leave the Premises clean and vacant by 12 PM noon CT on the Lease End Date ("Move Out Time").

**HOLDING OVER**
Tenant shall be liable for double the Rent in the event that Tenant retains possession of all or any part of the Premises after the Move Out Time on the Lease Ending Date. Landlord may at its sole option, upon written notice to Tenant, create a month to month tenancy between Landlord and Tenant under the same terms and conditions of this Lease. Additionally, if Tenant retains possession of all or any part of the Premises after the Lease End Date and pays less than double the Rent and Landlord accepts payment, this shall become a month to month tenancy, and not a year to year tenancy, between Landlord and Tenant under the same terms and conditions of this Lease.

**DAMAGES AND NEGLIGENCE**
Tenant shall be liable for any damage done to the premises as a result of Tenant's or Tenant's invitees, guests, or others authorized to reside in the Premises direct action, negligence or failure to inform Landlord of repairs necessary to prevent damage to the Premises.

**ABANDONMENT**
The Premises shall be deemed abandoned when the criteria set forth in the Chicago Residential Landlord/Tenant Ordinance have been met, and Landlord shall have the right to relet the Premises and dispose of Tenant's possessions in the manner prescribed by law.

**NOTICES**
Any legal notice or demand may be served by tendering it to any person thirteen years old or older residing on or in possession of the Premises; or by certified mail addressed to Tenant, return receipt requested; or by posting it upon the Premises door, if no authorized person under the Lease is in possession of the Premises. Further, except when a statue or ordinance requires notice to be sent by a particular means, Tenant agrees that all Tenant and building notices may be delivered by electronic communication (e-mail) to any e-mail address listed within this Lease Agreement. This is including but not limited to, late rent notices, notices of entry, fine notices, building maintenance updates, and lease renewal options. Tenant agrees to inform Landlord immediately in writing of any email address change.

**DAMAGE OR DESTRUCTION**
If the Premises or any part of the property is destroyed or damaged to an extent that makes the Premises uninhabitable, this Lease may be terminated in accordance with applicable statutes or ordinances. In such an event, Landlord does not undertake any covenant to repair or restore the Premises to a habitable condition.

**TENANT'S PERSONAL PROPERTY**
Except as provided by applicable law, Landlord shall not be responsible for the loss of any of Tenant's personal property in the Premises or on any part of the property. Tenant shall obtain insurance sufficient to cover all potential losses.

**LANDLORD'S TITLE**
Tenant shall commit no act which could in any way encumber Landlord's title to the property of which the Premises forms a part. In the event that Tenant does create or cause any encumbrance against the title, it shall be cured within five days after demand by Landlord. Any encumbrance created by Tenant shall constitute a material breach of this Lease. Tenant shall be liable to Landlord for all costs and damages incurred by Landlord, including all legal fees incurred as a result of any breach of this provision, to the extent permitted by statute or local ordinance.

**LEGAL EXPENSES**
Tenant shall be liable for all legal fees and costs incurred by Landlord as a result of Landlord's efforts to enforce any provision of this Lease, to the extent permitted by court rules, statute or local ordinance.

**LITIGATION ESCROW**
In the event that Tenant withholds rent in excess of that allowed by statutes or local ordinance, and Landlord institutes a lawsuit in Forcible Entry and Detainer to regain possession of the Premises, or in contract to enforce any provision of this Lease, Tenant shall place such excess rent with the Clerk of Circuit Court, pending disposition of the lawsuit.

**SURRENDER OF POSSESSION**
Tenant shall surrender possession of the Premises and return the keys to Landlord or Landlord's agent, immediately upon expiration of this Lease, or upon termination due to Tenant's breach. Surrender of possession shall also be deemed to have occurred if Tenant returns the keys to Landlord prior to the expiration of this Lease.

**SUBORDINATION OF LEASE/ESTOPPEL**
This Lease is subordinate to all mortgages upon the property of which the Premises forms a part, either in place at the time of Lease execution, or which may be placed upon the property at any time during the term of this Lease. Tenant shall execute any estoppel letter required by any mortgage lender or purchaser of the property, relative to the affirmation of Tenant's Lease status.

**EMINENT DOMAIN**
If all or part of the Premises or the property of which the Premises forms a part is condemned, expropriated or otherwise regulated by any governmental authority in a manner which would prevent lawful occupancy, this Lease shall be terminated and Tenant shall not be entitled to any compensation.

**HEIRS AND ASSIGNS**
All of the promises, covenants and agreements and conditions contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of Landlord and Tenant.

**ACCEPTANCE OF RENT AFTER TENANT BREACH**
Except where a breach is for non-payment of rent, Landlord may accept rent after a Tenant breach and the rent will be retained for use and occupancy of the Premises and shall not serve to extinguish Landlord's rights or remedies relative to any lawsuit that may be filed or in progress at the time of Tenant breach.

**TIME OF THE ESSENCE**
Time is of the essence for the payment of rent and the performance of each and every covenant, term, agreement and condition of this Lease, and Tenant shall be held in strict compliance with same.

**SEVERABILITY**
In the event that any provision, paragraph, rule or covenant contained in this Lease is deemed invalid or unenforceable, all remaining portions of this Lease shall survive and be construed in their entirety.

**LANDLORD'S REMEDIES**
All rights and remedies granted to Landlord hereunder shall be deemed distinct, separate and cumulative and the exercise of one or more thereof shall not waive, extinguish or preclude the exercise of any other right or remedy, unless same is specifically prohibited by court rules, statute or local ordinance. Tenant shall be required to comply strictly with all provisions, covenants and agreements hereunder, and no waiver shall be implied from Landlord's failure to exercise any of its rights or remedies.

**NO ADDITIONAL ENERGY DRAINING DEVICES**
Tenant is prohibited from installing any appliance or device to draw electricity, gas, or any other form of energy from any part of the property other than the Premises. Tenant shall further not install any devices which are not deemed ordinary household appliances or fixtures.

**STORAGE**
Tenant shall not be entitled to storage space outside the Premises, unless additional storage has been agreed upon in writing by Landlord.

**JOINT AND SEVERAL LIABILITY**
All persons executing this Lease shall be jointly and severally liable for the performance of each and every agreement, covenant and obligation hereunder.

**RE-KEYING OF LOCKS UPON PRIOR TENANT VACATING**
Tenant shall have the right to change or re-key the lock(s) to the Premises, and shall promptly provide notice thereof
to Landlord. Tenant shall immediately provide Landlord a copy of the key to the new lock. In the event that Tenant fails to give Landlord the new key upon Landlords request, such failure shall be deemed an act by Tenant of Material Non-Compliance under the terms of this Lease.

**CRIMINAL ACTIVITY BY TENANT**
If Tenant(s) or occupant(s), visitors, or guests on one or more occasions, uses or permits the use of the leased premises for the commission of a felony or Class A misdemeanor under the laws of Illinois, Landlord shall have the right to void the lease and recover the leased premises.

**ENDING OR RENEWING THE LEASE AGREEMENT**
At the end of the Lease term, if the Landlord or the Tenant does not give any written notice to the other party to end this Lease, it will automatically continue on a month to month basis. To terminate this Lease at the end of the Lease term or any renewal thereof, the Landlord or the Tenant must give to the other party at least 90 days prior written notice before the last day of the Lease term or any renewal thereof.

**GOVERNING LAW**
This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Illinois

**LEASE GUARANTEE**
Landlord under the Lease requires as a condition to its execution of the Lease that Guarantor guarantee the performance and obligations of Tenant under the Lease. Guarantor desires to have Landlord and Tenant enter into the Lease and therefore desires to guaranty Tenant's performance under the Lease as hereinafter provided.

Guarantor hereby covenants as follows:

1. **Guaranty:** Guarantor absolutely, unconditionally and irrevocably guarantees to Landlord the full, faithful and prompt performance of all obligations imposed on Tenant by the terms of the Lease, including, but not limited to: (a) the payment of any and all Rent payable by Tenant under the Lease, and (b) the performance and observance of all the covenants, terms, conditions and agreements of the Lease to be performed and observed by Tenant. Guarantor does hereby become surety to Landlord for and with respect to all of the aforesaid obligations of Tenant under the Lease.
2. **Covenants:** If Tenant defaults in the payment of any Rent payable by Tenant under the Lease or in the performance of any of the covenants, terms, conditions and agreements contained in the Lease, Guarantor will immediately: (a) pay such Rent to Landlord and any arrears thereof; (b) faithfully perform and fulfill all of such covenants, terms, conditions and agreements; and (c) pay the Landlord all damages, costs and expenses that may arise in consequence of any default by Tenant under Lease incurred by Landlord or caused by any such default and/or by the enforcement of this Guaranty). This Guaranty is a primary, absolute, continuing and unconditional guaranty of payment and of performance and not of mere collection. Guarantor's liability hereunder is direct and may be enforced without Landlord being required to resort to any other right, remedy or security. The validity of this Guaranty and the obligations of Guarantor hereunder shall not be terminated, affected or impaired by reason of the assertion or the failure to assert by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.
3. **Non-Release:** This Guaranty shall remain in full force and effect without regard to, and shall not be released, discharged or in any way impaired by: (a) any amendment or modification of, or supplement to, or extension or renewal (pursuant to an option granted, holding over, or otherwise) of the Lease (whether material or otherwise) or any assignment or transfer thereof, all of which Guarantor hereby consents to; (b) any exercise or non-exercise of any right, power, remedy or privilege under or in respect of the Lease or this Guaranty or any waiver, consent or approval by Landlord with respect to any of the covenants, terms, conditions or agreements contained in the Lease or any indulgences, forbearance or extensions of time for performance or observance allowed to Tenant from time to time and for any length of time; (c) the voluntary or involuntary liquidation or dissolution of Tenant, the sale of substantially all of the assets of Tenant, the marshaling of assets on liabilities, receiverships, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, reorganizations, arrangement, composition or readjustment of, or other similar proceeding affecting Tenant or any of Tenant's assets; (d) any limitation on the liability or obligation of Tenant under the Lease or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the National Bankruptcy Act or other statute or from the decision of any court; or (e) any extension, forbearance or leniency extended by Landlord to Tenant

# RULES AND REGULATIONS

1. Unless permitted within this Lease Agreement, no animals are permitted on the property and in the Premises without Landlord's prior written consent, which consent is deemed a license revocable with 10 days written notice by Landlord.
2. Entry ways, passages, public halls and common areas may not be obstructed in any way, and may not be used for storage, recreation, congregation or play, or in any manner that might endanger any occupant, invitee or licensee of the building.
3. Tenant shall not permit anything to be thrown out of the windows or from the balconies of the building.
4. No vehicle or bicycle is allowed in the Premises, building or any common area of the property, unless there is a specific area designated for same.
5. Incinerators and waste receptacles shall be used in accordance with posted signs, and all items placed therein shall be neatly packaged and deposited. No explosive device or any parcel or item shall be deposited therein which could cause danger.
6. No sign or advertisement shall be placed in, around or upon any area of the Premises or building without prior written consent of Landlord, which consent shall constitute a license revocable immediately upon written notice of Landlord.
7. No items of personal property shall be placed in, around or upon any common area of the building.
8. No noise or other sound is permitted which disturbs the other occupants from quiet enjoyment of their apartment or common areas of the property.
9. No cooking, baking or similar activity is permitted outside the kitchen area. However, any liability or loss arising from the use or operation of a grill shall be borne by Tenant.

10. No vertical or horizontal projection, machinery, device or receiver of any type, including satellite dishes, shall be attached in, around or upon any part of the Premises or the property without Landlord's written consent.
11. No unsightly or unsanitary practice which could undermine the sanitation, health or appearance of the building interior or exterior shall be permitted.
12. No activity carried on within the Premises or common areas of the property will be permitted which threatens the health, safety or property of any building occupant, or of Landlord.
13. Plumbing and electrical facilities in the Premises shall be maintained diligently and neatly at all times.
14. The use of water furniture is prohibited.
15. There is no smoking inside of the Premises. Cigarettes smoked outside must be disposed of properly and not discarded whatsoever on the Premises.
16. Tenant is responsible for the following maintenance items (but not limited to): changing batteries in smoke alarm, registering/connecting smoke alarm and maintaining connectivity, regularly changing furnace filters for units with forced air heat, using Tilex or similar product once a week on shower/bath to prevent mildew/mold, changing light bulbs, and changing water filers if applicable.
17. Tenant is responsible for purchasing a toilet plunger and resolving toilet clogs.
18. Tenant is required to purchase a renter's insurance policy.
19. Tenants are not permitted to keep charcoal grills on the Premises, any charcoal grills and accessories/supplies found on the Premises will be disposed of. Gas grills are allowed, canisters from gas grills are to be properly disposed of by Tenant. Tenant is not to accumulate gas canisters on premises. As per city code no grilling on porches/balconies/etc.
20. Parties or any other type of gatherings are strictly prohibited on any deck or balcony or roof of the building. No more than five persons are to occupy any deck or balcony at any given time.
21. Rent payments must be made online, with the online and maintenance portal. An activation email will be sent out to the Tenant email address(es) that was provided/recorded on this Lease. Tenant assumes responsibility with confirming and providing updated email address to Landlord.
22. These Rules and Regulations are not exhaustive and may be supplemented or modified from time to time upon written notice to Tenant.

# DISCLOSURES AND ACKNOWLEDGEMENTS

**NOTICE OF CONDITIONS AFFECTING HABITABILITY**
Tenant hereby acknowledge that Landlord has disclosed any code violations, code enforcements litigation and/or compliance board proceedings during the previous 12 months for the Premises and common areas and any notice of intent to terminate utility service, copies of which, if any, are attached to the lease.

**Tenant hereby acknowledges receipt of the following:**

1. City of Chicago Building Code Violations (if any)
2. Preventing Bedbug Infestations in Apartments Pamphlet
3. City of Chicago Residential Landlord and Tenant Ordinance Summary
4. Residential Landlord and Tenant Ordinance Rate of Interest on Security Deposits
5. Lead-Based Paint Hazard Disclosure (if any)
6. Protect Your Family From Lead in Your Home Pamphlet
7. Disclosure of Radon Hazards (if any)
8. Radon Testing Guidelines Pamphlet

By signing this Lease Agreement, the Tenant certifies that he/she has read, understood and agrees to comply with all of the terms, conditions, Rules and Regulations of this Lease.

| | | |
|---|---|---|
| Steve Ivankovich | *(signature)* | Date signed:<br>12/16/21 |
| | | |
| Landlord | *Michael Fallander* | Date signed:<br>Dec 15, 2021 |

# opencorporates

The Open Database Of The Corporate World

| Officer's name | | Search |

○ Companies　● Officers

- My Account
- Logout

## Found 115 officers

| Steven Ivankovich | | Go |

☐ exclude inactive Advanced Options

- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive 2519 HALSTED PROPERTIES, LLC (Illinois (US), 7 Sep 2018- ) 2519 N. HALSTED, CHICAGO, IL, 60614
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive HONORIA, LLC (Illinois (US), 7 Jul 2009- ) 135 REVERE DRIVE, NORTHBROOK, IL, 60062
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS LONGFELLOW ARMS, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS VISTAS OF PINNACLE PARK, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS MARIPOSA VILLAS, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN member, 🇺🇸 inactive 2519 HALSTED, LLC (Illinois (US), 23 Mar 2016- ) 2519 N HALSTED ST, CHICAGO, IL, 60614
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ALLIANCE HOLDINGS, L.L.C. (Illinois (US), 1 Mar 1996- ) 222 N LASALLE ST STE 800, CHICAGO, IL, 60601
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS APARTMENTS ACQUISITION LLC (Illinois (US), 19 Feb 2014- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS SAVOY OF GARLAND, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS BRIDGES ON KINSEY, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS RESIDENTIAL MANAGEMENT, LLC (Illinois (US), 17 Feb 2016- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- IVANKOVICH, STEVEN manager, 🇺🇸 TYLER ATLAS, LLC (Illinois (US), 12 Aug 2020- ) 791 CRANDON BLVD, KEY BISCAYNE, FL, 33149
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS PARAMOUNT TERRACE, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ZIP, L.L.C. (Illinois (US), 8 Nov 2000-31 Dec 2050) 221 N LASALLE ST STE 3700, CHICAGO, IL, 60601
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS APARTMENTS DEVELOPMENT, LLC (Illinois (US), 16 Jun 2017- ) 55 E. MONROE ST., STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive 610 DREXEL, LLC (Illinois (US), 15 Jul 2016- ) 55 E. MONROE ST., STE. 3610, CHICAGO, IL, 60603
- IVANKOVICH, STEVEN manager, 🇺🇸 GLENCOE FAMILY DWELLING LLC (Illinois (US), 16 Aug 2016- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603

EXHIBIT
10

- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS APARTMENT HOLDINGS LLC (Illinois (US), 25 Oct 2011- ) 791 CRANDON BLVD, MIAMI, FL, 33149
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive GRUPPO C'E, LLC (Illinois (US), 28 May 2009- ) 135 REVERE DR, NORTHBROOK, IL, 60062
- inactive IVANKOVICH, STEVEN member, 🇺🇸 inactive REVEREND DR. DAN, LLC (Illinois (US), 5 Apr 2016- ) 2519 N HALSTED ST, CHICAGO, IL, 60614
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS HUNTINGTON RIDGE, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS APARTMENT HOMES LLC (Illinois (US), 25 Oct 2011- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive CARIBBEAN WELLNESS INVESTMENTS LLC (Illinois (US), 14 Apr 2011- ) 135 REVERE DRIVE, NORTHBROOK, IL, 60062
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS DORADO RANCH, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS LEGENDS OF EL PASO, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS STONEBRIDGE AT CITY PARK, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- inactive IVANKOVICH, STEVEN manager, 🇺🇸 inactive ATLAS RIVER OAKS, LLC (Illinois (US), 14 May 2018- ) 55 E MONROE ST STE 3610, CHICAGO, IL, 60603
- Ivankovich, Steven assistant secretary, 🇺🇸 branch Alliance SH 2 GP, Inc. (North Carolina (US), 31 Aug 2000- ) 221 North Lasalle Street, Chicago, IL, 60661
- inactive STEVEN IVANKOVICH secretary, 🇺🇸 inactive branch ALLIANCE CP GP, INC. (Georgia (US), 15 May 2003- ) 221 N. LASALLE ST., SUITE 3700, CHICAGO, IL, 60601
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE GD OG GP, INC. (Florida (US), 10 Mar 2000- ) 221 N. LASALLE STREET, SUITE 3700, CHICAGO, IL 60601

- ← Previous
- 1
- 2
- 3
- 4
- Next →

Results per page 30 ⌄   Enterprise users only

## Filter by jurisdiction

- 1 California (US)
- 55 Florida (US)
- 1 Georgia (US)
- 29 Illinois (US)
- 1 Indiana (US)
- 1 North Carolina (US)
- 20 Texas (US)
- 7 United Kingdom

## Filter by position

- 4 agent
- 2 assistant sec.
- 1 assistant secretary
- 1 chairman

- 1 chief executive officer
- 14 director
- 2 executive vice president
- 1 llp designated member
- 26 manager
- 6 managing member
- 2 member
- 2 owner
- 7 president
- 11 secretary
- 13 vice president
- 22 *[blank]*

## Filter by nationality

- 7 AMERICAN
- 108 *[blank]*

## Filter by occupation

- 1 COMPANY DIRECTOR
- 3 REAL ESTATE CEO
- 2 REAL ESTATE PROFESSIONAL
- 109 *[blank]*

# About us

- About
- Blog
- Team
- Governance
- Jobs

# Using our data

- Our data
- Our purpose
- Legal/Licence
- User/Cookie privacy policy
- Public records privacy policy

# Help

- API Reference
- Glossary
- Status

# Contact

- Twitter

Case: 1:20-cv-04985 Document #: 263 Filed: 04/24/23 Page 170 of 182 PageID #:3355

- Medium
- Newsletter
- Problems with our data?
- Temporary redaction

# Impact

- Impact
- Grants

# opencorporates

The Open Database Of The Corporate World

| Officer's name | **Search** |

○ Companies   ● Officers

- [My Account](#)
- [Logout](#)

## Found 115 officers

| Steven Ivankovich | **Go** |

☐ exclude inactive Advanced Options

- inactive **STEVEN IVANKOVICH** 🇺🇸 inactive branch ALLIANCE GT 2 GP, INC. (Florida (US), 28 Aug 2000- ) 221 NORTH LASALLE STREET STE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** secretary, 🇺🇸 inactive branch ALLIANCE GD CC GP, INC. (Florida (US), 10 Mar 2000- ) 221 NORTH LASALLE STREET SUITE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** president, 🇺🇸 inactive branch ALLIANCE HC GP II, L.L.C. (Florida (US), 11 Jul 2005- ) 135 REVERE DRIVE, NORTHBROOK, IL 60062
- **STEVEN IVANKOVICH** chairman, 🇺🇸 branch ATLAS APARTMENT HOMES LLC (Florida (US), 17 Mar 2014- ) 791 Crandon Blvd, Key Biscayne, FL 60614
- inactive **STEVEN IVANKOVICH** assistant sec., 🇺🇸 inactive branch ALLIANCE GT 2 GP, INC. (Texas (US), 24 Aug 2000- 8 Jul 2005) 221 N LASALLE ST STE 3700, Chicago, IL, 60601, USA
- inactive **STEVEN IVANKOVICH** vice president, 🇺🇸 inactive branch ALLIANCE GT 2 GP, INC. (Florida (US), 28 Aug 2000- ) 221 NORTH LASALLE STREET STE 3700, CHICAGO, IL 60601
- **STEVEN IVANKOVICH** 🇺🇸 IMG MARINE, LLC (Florida (US), 21 Sep 2022- ) 382 NE 191 STREET, MIAMI, FL 33179
- inactive **STEVEN IVANKOVICH** president, 🇺🇸 inactive branch ALLIANCE GD OG GP, INC. (Florida (US), 10 Mar 2000- ) 221 N. LASALLE STREET, SUITE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** secretary, 🇺🇸 inactive branch ALLIANCE GT 2 GP, INC. (Florida (US), 28 Aug 2000- ) 221 NORTH LASALLE STREET STE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** inactive branch ALLIANCE SH PORTFOLIO I, INC. (Florida (US), 17 Apr 1998- ) 221 N. LASALLE ST., STE.3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** vice president, 🇺🇸 inactive branch ALLIANCE HC GP I, INC. (Florida (US), 31 Oct 2003- ) 221 NORTH LASALLE ST, STE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** secretary, 🇺🇸 inactive branch ALLIANCE GD OG GP, INC. (Florida (US), 10 Mar 2000- ) 221 N. LASALLE STREET, SUITE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** secretary, 🇺🇸 inactive branch ALLIANCE TD GP, INC. (Florida (US), 16 Jul 2002- ) 221 NORTH LASALLE STREET, SUITE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** secretary, 🇺🇸 inactive branch ALLIANCE DK GP, INC. (Florida (US), 7 Aug 2001- ) 221 NORTH LASALLE STE STE 3700, CHICAGO, IL 60601
- inactive **STEVEN IVANKOVICH** assistant sec., 🇺🇸 inactive branch ALLIANCE GD HD 2 GP, INC. (Texas (US), 9 Mar 2000- 8 Jul 2005) 221 N LA SALLE ST FL 37, Chicago, IL, 60601-1206, USA
- inactive **STEVEN IVANKOVICH** executive vice president, 🇺🇸 inactive branch ALLIANCE GD HD 2 GP, INC. (Texas (US), 9 Mar 2000- 8 Jul 2005) 221 N LA SALLE ST FL 37, Chicago, IL, 60601-1206, USA

- inactive STEVEN IVANKOVICH secretary, 🇺🇸 inactive branch ALLIANCE SH PORTFOLIO I, INC. (Florida (US), 17 Apr 1998- ) 221 N. LASALLE ST., STE.3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch PILGRIM FOREST PARK LLC (Florida (US), 14 May 2019- ) 55 E MONROE, STE 3610, CHICAGO, IL 60603
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch OVERLOOK MANAGING MEMBER, LLC (Florida (US), 8 Nov 2018- ) 55 E. MONROE, SUITE 3610, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH secretary, 🇺🇸 inactive branch ALLIANCE HC GP I, INC. (Florida (US), 31 Oct 2003- ) 221 NORTH LASALLE ST, STE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH president, 🇺🇸 inactive branch ALLIANCE TD GP, INC. (Florida (US), 16 Jul 2002- ) 221 NORTH LASALLE STREET, SUITE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH 🇺🇸 inactive ALLIANCE HTFL LLC (Florida (US), 1 Nov 2021- ) 1 EAST ERIE STREET SUITE 525 253, CHICAGO, IL 60611
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE DK GP, INC. (Florida (US), 7 Aug 2001- ) 221 NORTH LASALLE STE STE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE GD HD 1 GP, INC. (Florida (US), 10 Mar 2000- ) 221 NORTH LASALLE STREET SUITE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE TD GP, INC. (Florida (US), 16 Jul 2002- ) 221 NORTH LASALLE STREET, SUITE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH president, 🇺🇸 inactive branch ALLIANCE HC GP I, INC. (Florida (US), 31 Oct 2003- ) 221 NORTH LASALLE ST, STE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE GD CC GP, INC. (Florida (US), 10 Mar 2000- ) 221 NORTH LASALLE STREET SUITE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH agent, 🇺🇸 inactive ALLIANCE HTTX LLC (Florida (US), 1 Nov 2021- ) 791 CRAMDON BLVD., KEY BISCAYNE, FL 33149
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE GD HD 1 GP, INC. (Florida (US), 10 Mar 2000- ) 221 NORTH LASALLE STREET SUITE 3700, CHICAGO, IL 60601
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE GJ GP, INC. (Florida (US), 27 Feb 2001- ) 221 NORTH LASALLE STREET, STE 3700, CHICAGO, IL 60601

- ← Previous
- 2
- 3
- 4
- Next →

Results per page 30 ⌄   Enterprise users only

## Filter by jurisdiction

- 1 California (US)
- 55 Florida (US)
- 1 Georgia (US)
- 29 Illinois (US)
- 1 Indiana (US)
- 1 North Carolina (US)
- 20 Texas (US)
- 7 United Kingdom

## Filter by position

- 4 agent
- 2 assistant sec.
- 1 assistant secretary

- 1 [chairman](#)
- 1 [chief executive officer](#)
- 14 [director](#)
- 2 [executive vice president](#)
- 1 [llp designated member](#)
- 26 [manager](#)
- 6 [managing member](#)
- 2 [member](#)
- 2 [owner](#)
- 7 [president](#)
- 11 [secretary](#)
- 13 [vice president](#)
- 22 *[blank]*

## Filter by nationality

- 7 [AMERICAN](#)
- 108 *[blank]*

## Filter by occupation

- 1 [COMPANY DIRECTOR](#)
- 3 [REAL ESTATE CEO](#)
- 2 [REAL ESTATE PROFESSIONAL](#)
- 109 *[blank]*

# About us

- [About](#)
- [Blog](#)
- [Team](#)
- [Governance](#)
- [Jobs](#)

# Using our data

- [Our data](#)
- [Our purpose](#)
- [Legal/Licence](#)
- [User/Cookie privacy policy](#)
- [Public records privacy policy](#)

# Help

- [API Reference](#)
- [Glossary](#)
- [Status](#)

# Contact

Case: 1:20-cv-04985 Document #: 263 Filed: 04/24/23 Page 174 of 182 PageID #:3359

- [Twitter](Twitter)
- [Medium](Medium)
- [Newsletter](Newsletter)
- [Problems with our data?](Problems with our data?)
- [Temporary redaction](Temporary redaction)

# Impact

- [Impact](Impact)
- [Grants](Grants)

# opencorporates

The Open Database Of The Corporate World

| Officer's name | Search |

○ Companies  ● Officers

- Log in/Sign up

## Found 115 officers

| Steven Ivankovich | Go |

☐ exclude inactive Advanced Options

- inactive STEVEN IVANKOVICH president, 🇺🇸 inactive branch ALLIANCE GD CC GP, INC. (Florida (US), 10 Mar 2000- )
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE HC GP I, INC. (Florida (US), 31 Oct 2003- )
- inactive STEVEN IVANKOVICH 🇺🇸 inactive ALLIANCE HTTX LLC (Florida (US), 1 Nov 2021- )
- inactive STEVEN IVANKOVICH secretary, 🇺🇸 inactive branch ALLIANCE GD HD 1 GP, INC. (Florida (US), 10 Mar 2000- )
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch PILGRIM CARIBBEAN ISLE LLC (Florida (US), 8 Nov 2018- )
- STEVEN IVANKOVICH 🇺🇸 J & S FAMILY LLC (Florida (US), 2 Jun 2021- )
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE SH PORTFOLIO I, INC. (Florida (US), 17 Apr 1998- )
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE GD OG GP, INC. (Florida (US), 10 Mar 2000- )
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE HTTX GP, L.L.C. (Florida (US), 13 Jun 2019- )
- inactive STEVEN IVANKOVICH secretary, 🇺🇸 inactive branch ALLIANCE GT 5 GP, INC. (Florida (US), 28 Aug 2000- )
- STEVEN IVANKOVICH manager, 🇺🇸 A & O FAMILY LLC (Illinois (US), 3 Jun 2021- )
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE GJ GP, INC. (Florida (US), 27 Feb 2001- )
- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE OG PORTFOLIO I, INC. (Florida (US), 23 Oct 1996- )
- inactive STEVEN IVANKOVICH agent, 🇺🇸 inactive ALLIANCE HTFL LLC (Florida (US), 1 Nov 2021- )
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE GT 5 GP, INC. (Florida (US), 28 Aug 2000- )
- inactive STEVEN IVANKOVICH secretary, 🇺🇸 inactive branch ALLIANCE DK GP, INC. (Florida (US), 7 Aug 2001- )
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE OG PORTFOLIO I, INC. (Florida (US), 23 Oct 1996- )
- inactive STEVEN IVANKOVICH president, 🇺🇸 inactive branch ALLIANCE GJ GP, INC. (Florida (US), 27 Feb 2001- )
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE GD CC GP, INC. (Florida (US), 10 Mar 2000- )

- inactive STEVEN IVANKOVICH 🇺🇸 inactive branch ALLIANCE GT 5 GP, INC. (Florida (US), 28 Aug 2000- )
- STEVEN IVANKOVICH 🇺🇸 branch ATLAS APARTMENT HOMES LLC (Florida (US), 17 Mar 2014- )
- STEVEN IVANKOVICH 🇺🇸 TATTERED FLAG INTREPID LLC (Florida (US), 26 Jan 2021- )
- inactive STEVEN IVANKOVICH president, 🇺🇸 inactive branch ALLIANCE DK GP, INC. (Florida (US), 7 Aug 2001- )
- inactive STEVEN IVANKOVICH executive vice president, 🇺🇸 inactive branch ALLIANCE GT 2 GP, INC. (Texas (US), 24 Aug 2000- 8 Jul 2005)
- STEVEN IVANKOVICH agent, 🇺🇸 A & O FAMILY LLC (Illinois (US), 3 Jun 2021- )
- inactive STEVEN IVANKOVICH secretary, 🇺🇸 inactive branch ALLIANCE GJ GP, INC. (Florida (US), 27 Feb 2001- )
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE HD PORTFOLIO I, INC. (Florida (US), 21 Jul 1997- )
- inactive STEVEN IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE TD GP, INC. (Florida (US), 16 Jul 2002- )
- inactive STEVEN V IVANKOVICH vice president, 🇺🇸 inactive branch ALLIANCE FHW GP, INC. (Indiana (US), 13 Aug 2003-17 Mar 2009)
- inactive STEVEN V. IVANKOVICH chief executive officer, 🇺🇸 inactive branch HAZARDOUS SPORTS, INC. (California (US), 24 Feb 2003- 2 May 2011)

- ← Previous
- 3
- 4
- Next →

Results per page 30 ⌄ Enterprise users only

## Filter by jurisdiction

- 1 California (US)
- 55 Florida (US)
- 1 Georgia (US)
- 29 Illinois (US)
- 1 Indiana (US)
- 1 North Carolina (US)
- 20 Texas (US)
- 7 United Kingdom

## Filter by position

- 4 agent
- 2 assistant sec.
- 1 assistant secretary
- 1 chairman
- 1 chief executive officer
- 14 director
- 2 executive vice president
- 1 llp designated member
- 26 manager
- 6 managing member
- 2 member
- 2 owner
- 7 president

4/24/23, 11:58 AM
Case: 1:20-cv-04985 Document #: 263 Filed: 04/24/23 Page 177 of 182 PageID #:3362
Company officers and companies matching 'Steven Ivankovich' - OpenCorporates

- 11 [secretary](#)
- 13 [vice president](#)
- 22 *[blank]*

## Filter by nationality

- 7 [AMERICAN](#)
- 108 *[blank]*

## Filter by occupation

- 1 [COMPANY DIRECTOR](#)
- 3 [REAL ESTATE CEO](#)
- 2 [REAL ESTATE PROFESSIONAL](#)
- 109 *[blank]*

# About us

- [About](#)
- [Blog](#)
- [Team](#)
- [Governance](#)
- [Jobs](#)

# Using our data

- [Our data](#)
- [Our purpose](#)
- [Legal/Licence](#)
- [User/Cookie privacy policy](#)
- [Public records privacy policy](#)

# Help

- [API Reference](#)
- [Glossary](#)
- [Status](#)

# Contact

- [Twitter](#)
- [Medium](#)
- [Newsletter](#)
- [Problems with our data?](#)
- [Temporary redaction](#)

# Impact

- [Impact](#)
- [Grants](#)

4/24/23, 11:58 AM
Case: 1:20-cv-04985 Document #: 263 Filed: 04/24/23 Page 178 of 182 PageID #:3363
Company officers and charities that match Steven Ivankovich - OpenCorporates

# opencorporates

The Open Database Of The Corporate World

| Officer's name | Search |

○ Companies   ● Officers

- My Account
- Logout

## Found 115 officers

| Steven Ivankovich | Go |

☐ exclude inactive  Advanced Options

- **STEVEN VALENTINO IVANKOVICH** director, 🇬🇧 ATLAS RESIDENTIAL SOLUTIONS MANAGEMENT UK LIMITED (United Kingdom, 3 Mar 2016- ) BROAD HOUSE THE BROADWAY, OLD HATFIELD, HERTS, AL9 5BG, ENGLAND
- inactive **STEVEN VALENTINO IVANKOVICH** llp designated member, 🇬🇧 inactive ATLAS RESIDENTIAL MANAGEMENT LLP (United Kingdom, 14 Mar 2013-14 Jun 2016) 111 BUCKINGHAM PALACE ROAD, LONDON, SW1W 0SR, UNITED KINGDOM
- inactive **STEVEN VALENTINO IVANKOVICH** director, 🇬🇧 inactive GRUPPO CE UK LIMITED (United Kingdom, 12 May 2015-18 Jan 2022) BROAD HOUSE THE BROADWAY, OLD HATFIELD, HERTS, AL9 5BG, UNITED KINGDOM
- inactive **STEVEN VALENTINO IVANKOVICH** director, 🇬🇧 ATLAS RESIDENTIAL MANAGEMENT LIMITED (United Kingdom, 11 Oct 2019- ) BROAD HOUSE THE BROADWAY, OLD HATFIELD, HERTFORDSHIRE, AL9 5BG, UNITED KINGDOM
- inactive **STEVEN VALENTINO IVANKOVICH** director, 🇬🇧 inactive ATLAS GP MEZZ UK LIMITED (United Kingdom, 3 Apr 2013- 4 Mar 2014) 27 OLD GLOUCESTER STREET, LONDON, WC1N 3AX, UNITED KINGDOM
- inactive **STEVEN VALENTINO IVANKOVICH** director, 🇬🇧 inactive GP SENIOR HOLDCO UK LIMITED (United Kingdom, 3 Apr 2013- 4 Mar 2014) 27 OLD GLOUCESTER STREET, LONDON, WC1N 3AX, UNITED KINGDOM
- inactive **STEVEN VALENTINO IVANKOVICH** director, 🇬🇧 inactive GP MEZZ HOLDCO UK LIMITED (United Kingdom, 3 Apr 2013- 4 Mar 2014) 27 OLD GLOUCESTER STREET, LONDON, WC1N 3AX, UNITED KINGDOM
- inactive Steven Ivankovich director, 🇺🇸 inactive branch Atlas Apartment Homes LLC (Texas (US), 1 May 2018-25 Jan 2019) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive Steven Ivankovich managing member, 🇺🇸 inactive branch PILGRIM Warwick Owner LLC (Texas (US), 6 Jun 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive Steven Ivankovich managing member, 🇺🇸 inactive branch PILGRIM Coulter LLC (Texas (US), 9 May 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive Steven Ivankovich managing member, 🇺🇸 inactive branch PILGRIM Warwick LLC (Texas (US), 9 May 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive Steven Ivankovich managing member, 🇺🇸 inactive branch PILGRIM Windtree Owner LLC (Texas (US), 6 Jun 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive Steven Ivankovich managing member, 🇺🇸 inactive branch PILGRIM Coulter Owner LLC (Texas (US), 6 Jun 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA

- [Steven Ivankovich](#) agent, 🇺🇸 branch [ATLAS APARTMENT HOMES LLC](#) (Florida (US), 17 Mar 2014- ) 791 Crandon, Key Biscayne, FL 33149
- inactive [Steven Ivankovich](#) director, 🇺🇸 inactive branch [PILGRIM Coulter LLC](#) (Texas (US), 9 May 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) owner, 🇺🇸 inactive branch [Atlas Apartment Homes LLC](#) (Texas (US), 1 May 2018-25 Jan 2019) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) director, 🇺🇸 inactive branch [Atlas Apartment Homes LLC](#) (Texas (US), 1 May 2018-25 Jan 2019) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) director, 🇺🇸 inactive branch [PILGRIM Windtree LLC](#) (Texas (US), 9 May 2019-20 Aug 2021) 1 E Erie St, Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) director, 🇺🇸 inactive branch [PILGRIM Coulter Owner LLC](#) (Texas (US), 6 Jun 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) owner, 🇺🇸 inactive branch [Atlas Apartment Homes LLC](#) (Texas (US), 1 May 2018-25 Jan 2019) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) director, 🇺🇸 inactive branch [PILGRIM Warwick Owner LLC](#) (Texas (US), 6 Jun 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) managing member, 🇺🇸 inactive branch [PILGRIM Windtree LLC](#) (Texas (US), 9 May 2019-20 Aug 2021) 1 E Erie St, Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) director, 🇺🇸 inactive branch [PILGRIM Warwick LLC](#) (Texas (US), 9 May 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven Ivankovich](#) director, 🇺🇸 inactive branch [PILGRIM Windtree Owner LLC](#) (Texas (US), 6 Jun 2019-20 Aug 2021) 1 East Erie Street Ste 525 253, Chicago, IL, 60611, USA
- inactive [Steven V Ivankovich](#) 🇺🇸 inactive branch [ALLIANCE HTFL GP, L.L.C.](#) (Florida (US), 18 Jun 2007- ) 55 E Monroe, Chicago, IL 60603

---

- [← Previous](#)
- [4](#)
- [Next →](#)

Results per page  30 ⌄  [Enterprise users only](#)

## Filter by jurisdiction

- 1 [California (US)](#)
- 55 [Florida (US)](#)
- 1 [Georgia (US)](#)
- 29 [Illinois (US)](#)
- 1 [Indiana (US)](#)
- 1 [North Carolina (US)](#)
- 20 [Texas (US)](#)
- 7 [United Kingdom](#)

## Filter by position

- 4 [agent](#)
- 2 [assistant sec.](#)
- 1 [assistant secretary](#)
- 1 [chairman](#)
- 1 [chief executive officer](#)
- 14 [director](#)
- 2 [executive vice president](#)
- 1 [llp designated member](#)
- 26 [manager](#)
- 6 [managing member](#)

- 2 [member](#)
- 2 [owner](#)
- 7 [president](#)
- 11 [secretary](#)
- 13 [vice president](#)
- 22 *[blank]*

## Filter by nationality

- 7 [AMERICAN](#)
- 108 *[blank]*

## Filter by occupation

- 1 [COMPANY DIRECTOR](#)
- 3 [REAL ESTATE CEO](#)
- 2 [REAL ESTATE PROFESSIONAL](#)
- 109 *[blank]*

# About us

- [About](#)
- [Blog](#)
- [Team](#)
- [Governance](#)
- [Jobs](#)

# Using our data

- [Our data](#)
- [Our purpose](#)
- [Legal/Licence](#)
- [User/Cookie privacy policy](#)
- [Public records privacy policy](#)

# Help

- [API Reference](#)
- [Glossary](#)
- [Status](#)

# Contact

- [Twitter](#)
- [Medium](#)
- [Newsletter](#)
- [Problems with our data?](#)
- [Temporary redaction](#)

# Impact

- [Impact](#)
- [Grants](#)